**GIBSON, DUNN & CRUTCHER LLP**
Matthew J. Williams
Mitchell A. Karlan
Alan Moskowitz
Dylan S. Cassidy
200 Park Avenue
New York, NY 10166
(212) 351-4000 (Tel)
(212) 351-4035 (Fax)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PT DELTA MERLIN DUNIA TEXTILE, *et al.*,[1] | Case No. 19-_____ |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

**VERIFIED PETITION UNDER CHAPTER 15 FOR**
**RECOGNITION OF A FOREIGN MAIN PROCEEDING**

Geoffrey David Simms in his capacity as the duly authorized foreign representative (the

"***Foreign Representative***") of PT Delta Merlin Dunia Textile ("***DMDT***") and its affiliated debtors

in a foreign proceeding (collectively with DMDT, the "***Foreign Debtors***") in connection with their

foreign proceedings (collectively, the "***PKPU Proceedings***") pending in the Semarang

Commercial Court (the "***Indonesian Court***"), pursuant to Indonesian Insolvency Law (as defined

---

[1] The Foreign Debtors in these chapter 15 cases are the following entities: (i) PT Delta Merlin Dunia Textile, whose address is Jl Solo - Sragen Km 14, Desa Pulosari, Kec Kebakkramat, Karanganyar, Central Java, (ii) PT Delta Dunia Tekstil, whose address is Jl Raya Solo - Sragen KM 10.8, Desa Kaling, Kec Tasikmadu, Karanganyar, Central Java, (iii) PT Dunia Setia Sandang Asli Tekstil, whose address is Jl Raya Palur Km 7.1, Desa Dagen, Kec Jaten, Karanganyar, Central Java, (iv) PT Delta Merlin Sandang Tekstil, whose address is Jl Raya Timur Km 10, Kel Bumiaji, Kec Gondang, Sragen, Central Java, (v) PT Delta Dunia Sandang Tekstil, whose address is Jl Raya Semarang - Demak Km 14, Desa Tambakroto, Kec Sayung, Demak, Central Java, (vi) PT Perusahaan Dagang dan Perindustrian Damai, whose address is Jl Simongan No 100, Kel Ngemplak Simongan, Kec Semarang Barat, Semarang, Central Java, and (vii) Mr. Sumitro, whose address is Tegalharjo, RT.004/RW.004, Kelurahan Tegalharjo, Kecamatan Jebres, Kota Surakarta, Jawa Tengah, Indonesia.

below), by and through his undersigned counsel, respectfully submits this verified petition (together with the *Chapter 15 Petition for Recognition of a Foreign Proceeding (Official Form 401)* filed immediately prior hereto for each Foreign Debtor, the "**Petitions**") in support of entry of an order pursuant to section 1517(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") (a) finding that (i) the Foreign Debtors are each eligible to be a "debtor" under chapter 15 of the Bankruptcy Code, (ii) each PKPU Proceeding is the "foreign main proceeding" for each Foreign Debtor within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Petition for each Foreign Debtor was properly filed and meets the requirements of section 1515 of the Bankruptcy Code, and (b) granting recognition of each PKPU Proceeding as a foreign main proceeding under sections 1517, 1520 and 1521 of the Bankruptcy Code.

In support of the Petition, the Foreign Representative submits the (a) *Declaration of Foreign Representative in Support of Verified Chapter 15 Petition and Motion for Provisional Relief* (the "**Simms Declaration**") and (b) *Declaration of Gregorius Petrus Aji Wijaya in Support of the Verified Chapter 15 Petition and Motion for Provisional Relief* (the "**Wijaya Declaration**"), each of which has been filed contemporaneously herewith and is incorporated herein by reference as if fully set forth herein.  In further support of the Petitions, the Foreign Representative respectfully states as follows:

## JURISDICTION AND VENUE

1.      The cases have been properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code by the filing of the Petitions seeking recognition of the PKPU Proceedings as foreign main proceedings under section 1515 of the Bankruptcy Code.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, section 1501 of the Bankruptcy Code, and the *Amended Standing Order of Reference to Bankruptcy Judges of the District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

3.      The Foreign Debtors have paid a retainer to Gibson, Dunn & Crutcher LLP ("***Gibson Dunn***") in which each has a *pro rata* ownership interest.  Simms Declaration ¶ 42.  The retainer is held in a Citibank bank account located in this District.  *Id.*  Additionally, Foreign Debtor DMDT is party to an *indenture* governed by New York law, as described below.  *Id.* ¶¶ 42, 44.  Accordingly, venue is proper in this District pursuant to 28 U.S.C. § 1410(1).  In addition, this district will likely be convenient to any other creditors who might seek to challenge the Foreign Representative's request for recognition of the PKPU Proceedings as foreign main proceedings in these chapter 15 cases because of New York's centrality in international finance and commerce. Moreover, venue in this district is consistent with the interests of justice and the convenience of the parties pursuant to 28 U.S.C. § 1410(3).

4.      The statutory bases for relief are sections 1504, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code.

**BACKGROUND**

I.    **Overview of the Foreign Debtors**

    A.    **Overview of the Foreign Debtors' Businesses**

    5.    The Foreign Debtors consist of (a) six private companies: (i) DMDT, (ii) PT Delta Dunia Tekstil ("***DDT***"), (iii) PT Dunia Setia Sandang Asli Tekstil ("***DSSAT***"), (iv) PT Delta Merlin Sandang Tekstil  ("***DMST***"), (v) PT Delta Dunia Sandang Tekstil ("***DDST***"), and (vi) PT Perusahaan Dagang dan Perindustrian Damai ("***Damaitex***," and collectively with DMDT, DDT, DSSAT, DMST, and DDST, the "***Duniatex Group***"), each incorporated under the laws of Indonesia with their registered offices located in Indonesia and (b) an individual, Mr. Sumitro, who is the beneficial owner and controlling shareholder of the Foreign Debtors and who resides in Indonesia.  *Id.* ¶ 5.  The board of directors and board of commissioners of each member of the Duniatex Group are comprised of Indonesian residents.  *Id.* ¶ 6.

    6.    The registered address of the headquarters of the Duniatex Group is Jalan Raya Palur km 7.1 Karanganyar, City of Solo in the Indonesian Province of Central Java in Indonesia.  The Duniatex Group is a vertically integrated group of textile manufacturing companies.  DDT, DMST and DDST are in the business of yarn manufacturing (collectively the "***Spinning Companies***").  DMDT is in the business of greige manufacturing along with DSSAT (the "***Weaving Companies***").  DSSAT is also part of the textile dyeing and finishing business with Damaitex (collectively the "***Dyeing and Finishing Companies***").  The group structure is set forth in the diagram below.  *Id.* ¶ 7.



7.      The Spinning Companies produce both carded and combined yarn from fibre such as "middling" grade raw cotton, viscose rayon fibre, and polyester staple fibre.  The Weaving Companies produce cotton, rayon, polyester and denim greiges from yarn produced by the Spinning Companies.  The Dyeing and Finishing Companies, in turn, produce finished fabrics predominately for Indonesia domiciled customers from greiges manufactured by the Weaving Companies.  *Id.* ¶ 8.

8.      The Duniatex Group has 25 production facilities in the cities of Ungaran, Karanganyar, Sukaharjo, Pekalongan, Demak, Sragen, Semarang and Boyolali, all of which are located in the province of Central Java, Indonesia.  The Duniatex Group does not have operations or material assets outside of Indonesia.  *Id.* ¶ 9.

9.      The domestic Indonesian market is by far the largest market for the Duniatex Group.  Domestic sales represent 76.1% of the total sales by value for the Duniatex Group.  Set out in the table below is a summary break down of the domestic and international sales of the Duniatex Group for the quarter ended June 30, 2019.  *Id.* ¶ 10.

| Group | % Value of Domestic Sales /International Sales |
|---|---|
| Spinning Companies | 63.0%/37.0 |
| Weaving Companies | 97.3%/2.7% |
| Dyeing and Finishing Companies | 96.9%/3.1% |
| Total Sales on Group Basis | 76.1%/23.9% |

10.     Accordingly, a significant majority of each member of the Duniatex Group's assets,

business operations, trade creditors and customers are located in Indonesia.

**B.      Overview of the Duniatex Group's Capital Structure**

11.     The Duniatex Group has a complex capital structure that interconnects the various

parties in and outside of the Duniatex Group, characterized by the following:

a)      There are five main classes of capital facilities: bilateral and syndicated term loans, bilateral and syndicated working capital loans, letter of credit facilities ("**L/C Facilities**"), unsecured notes and foreign exchange hedging facilities ("**FX Hedging Facilities**").  Indonesian Rupiah and US Dollar are the denominated currencies.

b)      The majority of the loan facilities are secured by assets of the underlying borrowers.  In some cases, loans are also secured by assets owned by non-borrowing parties of the Duniatex Group or entities outside of the Duniatex Group. For example, a review of valuer reports of land and buildings pledged to lenders of the Duniatex Group shows that approximately 52.6%, by value, is owned not by the borrower but by either other entities within the Duniatex Group or by Mr. Sumitro and his immediate family.  In addition, Mr. Sumitro has provided personal guarantees to most of the bank lenders of the Duniatex Group.

c)      All loan facilities are governed by Indonesian law (the "**Onshore Loans**") with the exception of: (i) a single bilateral facility under Singapore law; (ii) the syndicated loan facilities which are under English law ((i) and (ii) being the "**Offshore Loans**"); and (iii) the unsecured notes which are governed by New York law. All onshore security documentation is governed by Indonesian law.

d)      There are a total of 48 bank lenders to the Duniatex Group.  Of these, 22 have provided loan facilities to two or more entities within the Duniatex Group representing 81.6% of the total outstanding lent by banks to the group as of 31 August 2019.  Most capital facilities contain cross-default provisions not only within facilities under the same legal entity but also against facilities across legal entities within the Duniatex Group.  As such, should various facilities be in default and accelerated, this will cause a cross default under other loan facilities and the

6

> unsecured notes once the relevant acceleration provisions for each instrument are invoked. Additionally, Mr. Sumitro has provided personal guarantees with respect to the Offshore Loans and various Onshore Loans. Accordingly, an accelerated default under the unsecured notes will cross default various loan facilities due to the personal guarantees of Mr. Sumitro to the relevant loan facilities.

*Id.* ¶ 11.

12.    The table below details the capital structure of the Duniatex Group categorized based on the main classes as mentioned above as of August 31, 2019. *Id.* ¶ 12.

| In Millions | Lent by Indonesia Domiciled Lenders | | | Lent by Foreign Domiciled Lenders | Total Loan |
|---|---|---|---|---|---|
| | IDR | US$ | Total US$ Eqv[2] | US$ | US$ Eqv |
| Term Loans | | | | | |
|   Bilateral | 3,074,303 | 10 | 226 | - | 226 |
|   Syndicated | - | 89 | 89 | 187 | 276 |
| Working Capital Loans | | | | | |
|   Bilateral | 5,908,816 | - | 415 | 12 | 427 |
|   Syndicated | - | 47 | 47 | 63 | 110 |
| L/C Facilities | - | 144 | 144 | - | 144 |
| Unsecured Notes | - | - | - | 300 | 300 |
| FX Hedging Facilities | 396,742 | - | 28 | - | 28 |
| | | | | | |
| **Total** | **9,379,861** | **290** | **949** | **562** | **1,511** |

13.    As of August 31, 2019, the aggregate sum lent by the Indonesia-domiciled lenders (the "***Indonesia Domiciled Lenders***") of the Duniatex Group amounted to US$948,295,496 (which includes an aggregate sum of US$123,803,772 lent by Indonesia Domiciled Lenders through syndicated loan facilities originated by foreign-domiciled lenders ("***Foreign Domiciled Lenders***")) lent through the following facilities:

---

[2] "US$ Eqv" uses IDR and US$ foreign exchange of IDR14,237 as of August 31, 2019.

(a)     US$290,260,959 to DMST from nine Indonesia Domiciled Lenders through six bilateral working capital facilities, one syndicated term loan, five bilateral term loan facilities, four L/C Facilities, and three FX Hedging Facilities.

(b)     US$273,739,506 to DDT from nine Indonesia Domiciled Lenders through 10 bilateral working capital facilities, three letter of credit facilities, two bilateral term loans and one FX Hedging Facility, as well as one syndicated working capital facility and one syndicated term loan facility arranged by Foreign Domiciled Lenders totaling US$23,661,111.

(c)     US$178,915,729 to DDST from 12 Indonesia Domiciled Lenders through three bilateral working capital facilities, five L/C facilities, two bilateral term loan facilities, and four FX hedging facilities, as well as one syndicated working capital facility and one syndicated term loan facility arranged by Foreign Domiciled Lenders totaling US$87,302,544.

(d)     US$61,010,556 to DMDT from seven Indonesia Domiciled Lenders through three bilateral working capital facilities, and four bilateral term loan facilities, as well as one syndicated term loan arranged by Foreign Domiciled Lender totaling US$12,840,116.

(e)     US$137,472,755 to DSSAT from 10 Indonesia Domiciled Lenders through 12 bilateral working capital facilities and 10 bilateral term loans facilities.

(f)     US$6,895,990 to Damaitex from one Indonesia Domiciled Lender through two bilateral working capital facilities.

*Id.* ¶ 13.

14.     The loans from Foreign Domiciled Lenders of the Duniatex Group as of August 31, 2019 amounted to US$562,296,538 (which excludes US$123,803,772 that the Indonesia Domiciled Lenders lent to the Duniatex Group via syndicated arranged by the Foreign Domiciled Lenders). The capital facilities were:

a)     US$300,000,000 in notes 8.625% senior notes due 2024 issued by DMDT (the "***Notes***") governed by a New York law indenture, dated March 12, 2019 (the "***Indenture***") and listed on the Singapore Exchange Securities Trading Limited. The outstanding principal as of August 31, 2019 remained at US$300,000,000.

b)     US$13,000,000 under a bilateral term loan dated August 27, 2019 from BNP Paribas to DMDT governed by Singapore law with Singapore law governed and Indonesian law governed personal guarantees from Mr. Sumitro. The outstanding principal as at September 13, 2019 was US$12,265,310.

8

c) US$160,000,000 (with an option to increase up to US$250,000,000) under a facilities agreement dated June 21, 2018 from a syndicate of banks to DMDT ("***DMDT Syndicate***") governed by English law with a personal guarantee from Mr. Sumitro (the "***2018 Loan***"). The outstanding principal as of August 31, 2019 was US$66,034,884. This current outstanding principal excludes a sum of US$12,840,116 owing to an Indonesia Domiciled Lender as described above.

d) US$260,000,000 under a facilities agreement dated September 29, 2016 from a syndicate of banks to DDST ("***DDST Syndicate***") governed by English law with a personal guarantee from Mr. Sumitro The outstanding principal as of August 31, 2019 was US$75,297,456. This current outstanding principal excludes US$87,302,544 owing to the Indonesian Domiciled Lenders as described previously.

e) US$135,000,000 facilities agreement dated November 15, 2017 from a syndicate of banks to DDT ("***DDT Syndicate***") governed by English law with a personal guarantee from Mr. Sumitro. The current outstanding principal as of August 31, 2019 was US$108,698,889 which excluded US$23,661,111 lent by the Indonesia Domiciled Lenders to DDT as described at paragraph 17(b) above.

*Id.* ¶ 14.

15.     As noted above, Mr. Sumitro has provided personal guarantees with respect to various Duniatex Group debt facilities. *Id.* ¶ 15.

16.     Additionally, Mr. Sumitro has three property loans and a term loan from three Indonesian banks. The aggregate outstanding balance as at August 31, 2019 was US$6,554,841. The three property loans were used to finance the purchase of three separate residential properties. The term loan was used to meet Mr. Sumitro's personal tax obligations in Indonesia and is secured over a portfolio of land owned by Mr. Sumitro. *Id.* ¶ 16.

## II.     Overview of the Foreign Debtors' Financial Position

### A.     The Foreign Debtors' Financial Position

17.     Based on the Duniatex Group's financial information as of June 30, 2019 and short term cash flow projections, projected cash collection in the next 90 and 180 days from June 30, 2019 (i.e. September 30, 2019 and December 31, 2019 respectively) is expected to be sufficient to cover the Duniatex Group's ongoing operating costs. However, there will be insufficient funds

thereafter to service the Duniatex Group's expected debt repayment obligations and expected loan maturities during the same period.[3]  *Id.* ¶ 17.

18.     The following tables sets out the current expected cash shortfall for the Duniatex Group.  *Id.* ¶ 18.

| US$'000[4] | DDT | | DDST | |
|---|---|---|---|---|
| | Q3 2019 | Q4 2019 | Q3 2019 | Q4 2019 |
| Cash balance as of beginning of the period | 763 | (60,057) | 2,136 | (111,062) |
| Expected collection from customers | 43,218 | 43,818 | 42,415 | 42,866 |
| Expected payment to suppliers and operating expenses | (40,400) | (41,405) | (39,646) | (40,062) |
| **Projected cash flow from operating activities** | **2,818** | **2,413** | **2,769** | **2,804** |
| Expected repayment / maturity of financial indebtedness | | | | |
|    Principal | 58,462 | 23,527 | 112,448 | 44,082 |
|    Interest | 5,176 | 6,040 | 3,519 | 2,229 |
| **Expected cash shortfall** | **(60,057)** | **(87,211)** | **(111,062)** | **(154,569)** |

| US$'000[5] | DMST | | DMDT | |
|---|---|---|---|---|
| | Q3 2019 | Q4 2019 | Q3 2019 | Q4 2019 |
| Cash balance as of beginning of the period | 9,173 | (58,013) | 1,791 | (21,189) |
| Expected collection from customers | 49,372 | 53,797 | 70,896 | 72,351 |
| Expected payment to suppliers and operating expenses | (48,563) | (51,369) | (68,118) | (70,466) |
| **Projected cash flow from operating activities** | **809** | **2,428** | **2,778** | **1,885** |
| Expected repayment / maturity of financial indebtedness | | | | |
|    Principal | 66,024 | 107,999 | 23,538 | 11,384 |
|    Interest | 1,971 | 2,134 | 2,220 | 2,310 |
| **Expected cash shortfall** | **(58,013)** | **(165,718)** | **(21,189)** | **(32,998)** |

---

[3]  The current cash flow projections are based on draft unaudited financial information of the Duniatex Group, management expectations and discussions with its advisors.  Management and its advisors revise and update the cash flow projections as and when up to date and accurate information becomes available.  During the PKPU Proceedings, management and its advisors will conduct due diligence in order to formulate a detailed cash flow projection for the Duniatex Group.

[4]  Based on average foreign exchange rate of IDR14,141 as of June 30, 2019.

[5]  Based on average foreign exchange rate of IDR14,141 as of June 30, 2019.

| US$'000[6] | DSSAT | | Damaitex | |
|---|---|---|---|---|
| | **Q3 2019** | **Q4 2019** | **Q3 2019** | **Q4 2019** |
| Cash balance as of beginning of the period | 463 | (23,351) | 45 | (146) |
| Expected collection from customers | 70,896 | 72,351 | | |
| Expected payment to suppliers and operating expenses | (68,118) | (70,466) | | |
| **Projected cash flow from operating activities** | **2,778** | **1,885** | **80** | **80** |
| Expected repayment / maturity of financial indebtedness | | | | |
| Principal | 22,428 | 22,613 | - | 6,943 |
| Interest | 4,164 | 2,883 | 271 | 178 |
| **Expected cash shortfall** | **(23,351)** | **(46,962)** | **(146)** | **(7,187)** |

19.    Total expected aggregate cash shortfall is estimated to be US$273,818,798 by the end of September 2019 and US$494,645,895 by December 31, 2019. *Id.* ¶ 19.

20.    Between June and October 2018, the Duniatex Group entered into various foreign exchange hedging contracts to hedge against the Duniatex Group's Indonesian Rupiah and US Dollar foreign exchange rate risk.  Between October 2018 and June 2019, the Indonesian Rupiah depreciated approximately 7.3% against the US Dollar, causing the Duniatex Group to record losses of US$17,504,385 for the period ended 31 December 2018 on foreign exchange contracts with aggregate value of US$804,100,000.  Further, actual and unrealized foreign exchanges losses for 2019 is estimated to be US$66,663,036 against foreign exchange contracts with aggregate value of US$960,500,000.  These losses have severely affected the cash reserve of the Duniatex Group. *Id.* ¶ 20.

21.    The material depreciation of Indonesian Rupiah against the US Dollar increased the production cost of the Duniatex Group as the cost to import raw materials significantly increased particularly the cost to import raw cotton from the United States.  In addition, in August 2018, the

---

[6]  Based on average foreign exchange rate of IDR14,141 as of June 30, 2019.

United States tariffs on imports from China increased from 10% to 25%, including tariffs on textile products.   Around the same time, Indonesia's import of Chinese textile products significantly increased as Chinese textile producers sought to find markets for their products other than the United States.   The combination of these two factors, and the associated lag effect adversely affected Duniatex Group's production and sales volumes in 2019.  *Id.* ¶ 21.

### B.    The Foreign Debtors' Restructuring Efforts Prior to the PKPU Proceedings

22.    Given the Duniatex Group's deteriorating financial position, the management of the Duniatex Group engaged AJCapital Advisory on or around July 15, 2019 to assess the Duniatex Group's financial position and the potential reorganization of its business.   In addition, the Duniatex Group had commenced discussions with various onshore lenders in an effort to achieve a consensual restructuring of the Duniatex Group (the "***Consensual Restructuring***").  *Id.* ¶ 22.

23.    Between July and September 2019, as part of its Consensual Restructuring Process, the Duniatex Group took the following actions:

a) DDT negotiated with three Indonesia Domiciled Lenders to extend the maturity of several working capital facilities and term loans with an aggregate principal amount of US$111,168,083 between one to three years.

b) DMST negotiated with two Indonesia Domiciled Lenders to extend the maturity of several working capital loan facilities with an aggregate principal amount of US$51,928,075 for between four to six years.

c) DDST negotiated with one Indonesia Domiciled Lender to extend the maturity of several working capital and term loan facilities with aggregate principal of US$6,216,197 for one and four years respectively.

d) DMDT negotiated with one Indonesia Domiciled Lender to extend the maturity of several working capital loans with an aggregate principal amount of US$19,667,065 by one year.

e) DSSAT negotiated with five Indonesia Domiciled Lenders to extend the maturity of several working capital loan and term loan facilities with an aggregate principal amount of US$40,528,201 for between one to six years.

*Id.* ¶ 23.

24.     In further efforts to achieve the Consensual Restructuring for the Duniatex Group, DMDT negotiated with BNP Paribas to convert losses on a foreign exchange hedging account into a working capital facility.   Accordingly, DMDT entered into a bilateral loan agreement for US$13,000,000 with BNP Paribas on August 27, 2019 (the "***BNP Loan***"). To secure the BNP Loan, Mr. Sumitro also entered into two personal guarantees (under both Indonesian law and Singapore law) on the same date (the "***Sumitro Guarantees***").  The BNP Loan and the Sumitro Guarantees were entered into 15 days prior to the involuntary PKPU proceeding which was commenced against the Duniatex Group on September 11, 2019, as outlined below.  *Id.* ¶ 24.

### C.     Interest Payment on the Notes.

25.     As a result of the declining cash position, on or around September 11, 2019—the same day an involuntary PKPU proceeding was commenced against the Duniatex Group, as described below—the board of directors and the board of commissioners of DMDT (the Issuer of the Notes pursuant to the Indenture) concluded that DMDT did not have sufficient funds to (i) meet its scheduled coupon payments due on September 12, 2019 totaling US$12,937,500 and (ii) refill the Notes' "Interest Reserve Account" with an amount equal to one semi-annual payment of interest under the terms of the Notes.  Accordingly, on September 12, 2019, DMDT announced on the Singapore Stock Exchange that the current financial and operational position of the company would not make it commercially feasible to make any interest payments on the Notes.  *Id.* ¶ 25.

26.     On September 16, 2019, the Indenture Trustee for the Notes (the "***Indenture Trustee***") issued a notice asserting that the failure to make interest payments that were due and payable on September 12, 2019, would give rise to a default under the Indenture, if such failure continued uncured for a period of 30 consecutive days.  *Id.* ¶ 26.

II.     **The PKPU Proceedings**

A.      **PKPU Proceedings Generally**

27.     PKPU is an abbreviation for Penundaan Kewajiban Pembayaran Utang, an Indonesian phrase meaning "suspension of payments."  A PKPU proceeding is not an involuntary suspension of payments, but instead involves a court-enforced suspension of payments of creditor liabilities.  Wijaya Declaration ¶ 5.

28.     PKPU proceedings are governed by Law No. 37 of 2004 on Bankruptcy and Suspension of Debt Payment Obligations (the "*Indonesian Insolvency Law*").  An unofficial English translation of the Indonesian Insolvency Law is attached as **Exhibit A** to the Wijaya Declaration.  *Id.* ¶ 6.

29.     The Indonesian Insolvency Law contains several sections, one of which covers the declaration of a debtor's bankruptcy and the liquidation of a debtor's assets for the benefit of creditors (the "*Indonesian Bankruptcy Law*").  *Id.* ¶ 8.  Another section of the Indonesian Insolvency Law governs PKPU proceedings (the "*PKPU Law*").  *Id.*

30.     Indonesian PKPU proceedings are intended to permit a debtor to achieve an amicable settlement with its creditors and thereby avoid a declaration of bankruptcy by, and liquidation of, the debtor.  It is a process whereby the debtor proposes to its creditors a composition plan to restructure its debts and reorganize its business operations (a "*Composition Plan*").  *Id.* ¶ 9.

31.     Matters under the Indonesian Insolvency Law, including PKPU proceedings, are adjudicated in the Indonesian Court by a panel of three judges.  Judges of the Indonesian Court have specialized knowledge and experience in insolvency and other business law matters.  Only the ratification of a Composition Plan may be appealed to the Indonesian Supreme Court pursuant

14

to Article 295 of the PKPU Law, while the PKPU Order (as defined below) of the Indonesian Court cannot be appealed to the Indonesian Supreme Court pursuant to Article 235 paragraph 1 of the PKPU Law.  *Id.* ¶ 10.

32.    The PKPU process commences with the filing of a PKPU application.  PKPU Law does not differentiate between a PKPU proceeding for an individual or a company and a PKPU proceeding can be commenced for either an individual or company.  Pursuant to Article 222 of the PKPU Law, a PKPU proceeding can be voluntary (i.e., commenced either by the debtor itself), provided that it has more than one creditor and has failed to pay at least one debt which is due and payable, or involuntary (i.e., commenced by a creditor), if the creditor determines that the debtor will be unable to pay a debt that is due and payable.  *Id.* ¶ 11.

33.    If the application is submitted by a debtor, pursuant to Article 225(2) of the PKPU Law, the Indonesian Court must issue its order approving or denying the application within three days of the application.  If the application is submitted by a creditor, Article 225(3) of the PKPU Law provides that within 20 days of that filing, the Indonesian Court must issue its order approving or denying the application.  Pursuant to Article 224(4), an initial case hearing (the "***Initial PKPU Hearing***") must be scheduled within 45 days of the order commencing the PKPU proceeding.  As described in paragraph 40 below, at the Initial PKPU Hearing creditors vote whether to continue or dismiss the PKPU proceeding unless a Composition Plan has been proposed beforehand. The continuation of the PKPU proceeding must then be approved by the Indonesian Court.  *Id.* ¶ 12.

34.    If a PKPU application (either voluntary or involuntary) is granted, the PKPU proceeding is commenced and a supervisory judge is appointed to oversee the proceeding.  *Id.* ¶ 13.  Pursuant to Article 225, (2) and (3) of the PKPU Law, the Indonesian Court also appoints one or more independent administrators who, in accordance with Article 240, paragraph 1 of the PKPU

Law, together with the debtor, manages the PKPU proceeding which includes exercising control over the debtor's assets during the PKPU proceeding. *Id.*

35.    Article 246 of the PKPU Law (a) implements a stay of all collection efforts against the debtor during the PKPU proceeding and (b) stays secured creditors' rights to enforce their security interest during the PKPU proceeding. Article 242 of the PKPU Law provides that: (a) all enforcement processes against the debtor to pursue debt settlement that were initiated before the PKPU proceedings be suspended; and (b) upon the request of the administrators or the supervisory judge, all attachments over the debtor and its assets are required to be lifted immediately after a permanent suspension of payments declaration is issued by the court. *Id.* ¶ 14.

36.    Article 245 of the PKPU Law provides that, except for secured and other privileged claims, the debtor is generally prohibited from paying any of its debts during the PKPU proceeding, unless the payment is made to all of its creditors proportionally and without exception. *Id.* ¶ 15.

37.    Additionally, Article 240 of the PKPU Law provides that, during the PKPU proceeding, the debtor is barred from disposing assets or borrowing money without the approval of the independent administrators appointed by the Indonesian Court. Loans can only be approved by administrators if they are for purposes of increasing the value of the debtor's assets. If the borrowing requires the posting of collateral, the loan must be approved by the supervising judge. *Id.* ¶ 16.

38.    Pursuant to Article 255 of the PKPU Law, a PKPU proceeding may be terminated by the Indonesian Court at the request of one or more creditors or the supervising judge if, *inter alia*, the debtor acts in bad faith in managing its assets during the PKPU proceeding or the debtor attempts to prejudice its creditors. *Id.* ¶ 17.

16

39.     Pursuant to Article 224 of the PKPU Law, the debtor is required to file with the Indonesian Court a list of the types and amounts of receivables and debts.  *Id.* ¶ 18.

40.     The PKPU Law includes an equitable process for the submission and review of creditor claims.  Under the PKPU Law, all claims must be verified and written proofs must be submitted to the administrators.  Pursuant to Article 271 of the PKPU Law, the administrators are required to verify the claims against the debtor's records.  The administrators review the genuineness of the debts and, as provided under Article 272 of the PKPU Law, decide whether to either acknowledge or reject the submitted claims.  Under Article 280 of the PKPU Law, the supervisory judge also assesses the claims and may determine whether the creditors whose claims are rejected by the administrators can participate in voting on the proposed plan.  *Id.* ¶ 19.

### B.     PKPU Composition Plan

41.     As noted above, the goal of a PKPU proceeding is to present a Composition Plan to restructure the debtor's debts and reorganize its business operations.  *Id.* ¶ 20.

42.     Once a Composition Plan is proposed by a PKPU debtor, all parties in interest (the debtor, the creditors, and the administrators) enter into negotiations regarding the debtor's proposed Composition Plan and, pursuant to Article 268 of the PKPU Law, a meeting is scheduled (the "***Initial Composition Plan Meeting***").  A Composition Plan requires the approval of a majority in number and at least two-thirds in value of each class of debt of the debtor who attend and vote at the Initial Composition Plan Meeting.  If the debtor's Composition Plan is not accepted by the requisite majority of creditors, then a receiver is appointed and the debtor is liquidated under the Indonesian Insolvency Law.  *Id.* ¶ 21.

43.     If the Composition Plan is not submitted before the Initial PKPU Hearing, the requisite majority of creditors must vote on whether to allow for the extension of the PKPU

17

proceeding (an extension may not last beyond 270 days beyond the date of the declaration of the temporary suspension of payments). If an extension of time is granted, further creditors' meetings may be held for the debtor to present its Composition Plan to its creditors. Upon the debtor showing reasonable endeavors to progress the PKPU process, it is common for an extension to be granted should it be required. At one of these meetings, the creditors will either vote to accept or reject the Composition Plan or may once again extend the PKPU proceeding to allow the debtor to put forward a restructuring proposal (provided that the aggregate of all extensions given do not exceed 270 days). *Id.* ¶ 22.

44.     If the Composition Plan is approved by creditors, it must then be approved by the Indonesian Court. Under Article 284 of the PKPU Law, the administrators and the creditors have an opportunity to object to the approval of the Composition Plan. Pursuant to Article 285 of the PKPU Law, the Indonesian Court can reject a Composition Plan accepted by the requisite majority of creditors if, *inter alia* (a) the value of the debtor's assets is far greater than the amount agreed upon in the Composition Plan; (b) there are significant issues regarding implementation of the Composition Plan; (c) the plan is not proposed in good faith; or (d) the fees and costs of the administrators have not been paid. If the Composition Plan is rejected by the Indonesian Court, then a receiver is appointed and the debtor is declared bankrupt and liquidated under the Indonesian Insolvency Law. *Id.* ¶ 23.

45.     Under Article 286 of the PKPU Law, if the proposed Composition Plan is approved by creditors and is thereafter approved by the Indonesian Court, the Composition Plan will bind all creditors, except secured creditors that vote against the Composition Plan. *Id.* ¶ 24.

46.     The ratification of a Composition Plan by the Indonesian Court may be appealed to the Indonesian Supreme Court pursuant to Article 295 of the PKPU Law.  Such an appeal must be submitted within 30 days.  *Id.* ¶ 25.

47.     In accordance with Article 291 of the PKPU Law, the debtor's failure to comply with the terms of an approved Composition Plan may result in an attempt by the debtor's creditors to nullify the plan and a declaration by the Indonesian Court of the debtor as bankrupt, which results in the appointment of a receiver and the liquidation of the debtor under the Indonesian Insolvency Law.  *Id.* ¶ 26.

### C.     The Foreign Debtors' PKPU Proceeding

#### 1.     The Duniatex Group's PKPU Proceeding

48.     On September 11, 2019, PT Shine Golden Bridge ("***PT SGB***"), a creditor of the Foreign Debtors, filed an involuntary application (the "***Duniatex Group PKPU Application***") to commence a PKPU proceeding against the members of the Duniatex Group in the Indonesian Court (the "***Duniatex Group PKPU***").  Simms Declaration ¶ 27.  The Duniatex Group PKPU is registered under no. 22/Pdt.Sus-PKPU/2019/PN Niaga smg.  Wijaya Declaration ¶ 30.

49.     DMDT owes approximately US$125,000 to PT SGB pursuant to a supply contract entered in 2018 (the "***SGB Debt***").  The other members of the Duniatex Group and Mr. Sumitro each guaranteed the SGB Debt.  Simms Declaration ¶ 28.

#### 2.     Mr. Sumitro's PKPU Proceeding

50.     As a result of the Duniatex Group PKPU Application, and the personal guarantees provided by Mr. Sumitro, on September 25, 2019, Mr. Sumitro, the beneficial owner and controlling shareholder of the Duniatex Group, filed a voluntary application (the "***Sumitro PKPU Application***") to commence an individual PKPU proceeding in the Indonesian Court (the "***Sumitro***

*PKPU*").  *Id.* ¶ 28.   The Sumitro PKPU is a stand-alone PKPU case, registered under No.25/Pdt.Sus-PKPU/2019/PN Niaga Smg.  Wijaya Declaration ¶ 30.

### 3.   **The PKPU Orders**

51.    On September 30, 2019, the Indonesian Court issued (i) an order granting the Duniatex Group PKPU Application (the "***Duniatex Group PKPU Order***") and (ii) an order granting the Sumitro PKPU Application (the "***Sumitro PKPU Order***," and together with the Duniatex Group PKPU Order, the "***PKPU Orders***").  Certified copies of the English translation of the PKPU Orders are attached to the Petitions, respectively.  The PKPU Orders provide a 45-day moratorium on payments (which can be extended by creditor vote and court approval at the Initial PKPU Hearing), during which the Foreign Debtors are required to prepare a Composition Plan and seek agreement with its creditors.  The Duniatex Group continues to operate in the ordinary course of business under the protection of that moratorium.  *Id.* ¶ 33.

52.    In the Duniatex Group PKPU, Mr. Pudjo Hunggul HW, S.H, M.H was appointed as the supervising judge and Mr. Hamonangan Syahdan Hutabarat, S.H, Mr. Alfin Sulaiman, S.H., M.H, Mr. Januardo Sulung P. Sihombing, S.H., M.H., M.A., BKP. and Mrs. Nila Asriyanti, S.H., were selected and appointed as the independent administrators.  *Id.* ¶ 34.

53.    In the Sumitro PKPU, Mr. Edy Suwanto, S.H,M.H was appointed as the supervising judge and Mr. Verry Sitorus, S.H, and Mr. Uli Ingot Hamonangan Simanungkalit, S.H., were selected and appointed as the independent administrators.  *Id.* ¶ 35.

54.    On or about October 4, 2019, the administrators provided notice of the proceeding to known creditors by registered mail and published notice in Harian Bisnis Indonesia, Harian Tribun Jateng and the State Gazette of the Republic of Indonesia.  *Id.* ¶ 36.

55.     The Duniatex Group PKPU and Sumitro PKPU are separate PKPU proceedings, but, in light of the connections between Mr. Sumitro and the Duniatex Group, for efficiency the two PKPU Proceedings are intended to effectively be jointly administered in Indonesia and the Foreign Debtors expect to propose a Composition Plan covering both PKPU Proceedings. Under PKPU Law, a single PKPU Composition Plan can encompass more than one PKPU proceeding. *Id.* ¶ 37.

56.     In the PKPU Proceedings, the Foreign Debtors intend to present a Composition Plan that would allow the Duniatex Group to avoid liquidation, ensure the continued employment of the employees, and maximize value for all stakeholders in an equitable manner. Simms Declaration ¶ 35.

**D.     The Chapter 15 Cases**

57.     On the date hereof (the "***Petition Date***"), the Foreign Representative filed an Official Form 410 (Chapter 15 Petition for Recognition of a Foreign Proceeding) on behalf of each of the Foreign Debtors commencing these chapter 15 cases (the "***Chapter 15 Cases***"). *Id.* ¶ 40.

## RELIEF REQUESTED

58.     The Foreign Representative respectfully requests the entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to section 1517(a) of the Bankruptcy Code (a) finding that (i) the Foreign Debtors are each eligible to be a "debtor" under chapter 15 of the Bankruptcy Code, (ii) each of the PKPU Proceedings is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code and (iv) the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code, and (b) granting recognition of each of the PKPU Proceeding as a foreign main proceeding under

section 1517 of the Bankruptcy Code and the relief granted under sections 1520 and 1521 of the Bankruptcy Code.

I.    **The Foreign Debtors Are Each Eligible to be a "Debtor" Under Chapter 15 of the Bankruptcy Code**

59.    Each Foreign Debtor qualifies as a "debtor" as that term is defined in section 1502(a)(1) of the Bankruptcy Code because it is an "entity," which includes persons and corporations.  *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes "individuals" and "corporations").  As noted above, (a) each member of the Duniatex Group is a private company incorporated under the laws of Indonesia and (b) Mr. Sumitro is an individual.  Simms Declaration ¶¶ 5, 42.

60.    The Foreign Debtors each have property in the United States for purposes of being eligible under section 109(a) of the Bankruptcy Code, which requires that a debtor must either reside or have a domicile, a place of business, or property in the United States.  11 U.S.C. § 109(a); *see Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors).  Courts in this District have required that the debtor have only nominal property in the United States to be eligible to file a chapter 15 case.  *See, e.g., In re Globo Comunicacoes e Participacoes S.A.*, 317 B.R. 235, 249 (S.D.N.Y. 2004) ("For a foreign corporation to qualify as a debtor under Section 109, courts have required only nominal amounts of property to be located in the United States, and have noted that there is 'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings."); *In re Paper I Partners, L.P.*, 283 B.R. 661, 674 (Bankr. S.D.N.Y. 2002) ("There is no statutory requirement as to the property's minimum value.").

61.    Here, as noted above, each Foreign Debtor meets the flexible threshold for having property in the United States as required under section 109(a) of the Bankruptcy Code because it

has an interest in the retainer paid to Gibson Dunn, which is being held a bank account located in New York. *See In re Octaviar Admin. Pty Ltd.,* 511 B.R. 361, 372-74 (Bankr. S.D.N.Y. 2014) (noting the "line of authority that supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States," and holding that cash in a client trust account maintained by U.S. counsel to the foreign representative satisfied section 109(a)); *In re Suntech*, 520 B.R. at 413-16 (holding that a New York bank account over which chapter 15 debtor possessed power to direct disbursement of funds was property sufficient to establish eligibility for chapter 15 case in New York).

62.    In addition, DMDT, as issuer of the Notes, is party to the Indenture which is governed by New York Law and in the Indenture, DMDT consented to jurisdiction in New York in connection with any suit, action or proceeding arising out of or relating to the Notes.  Simms Declaration ¶¶ 14, 42.  The New York choice of law and forum selection clauses in the Indenture fulfill the section 109(a) "property in the United States" requirement. *See In re U.S. Steel Canada Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017) ("debt subject to a New York governing law clause and a New York forum selection clause constitutes property in the United States"); *In re Berau Capital Resources Pte Ltd* (*In re Berau*), 540 B.R. 80, 82-84 (Bankr. S.D.N.Y. 2015) (holding that dollar denominated debt documents governed by New York law and containing New York forum selection clauses satisfied the eligibility requirements under section 109(a)).

63.    Accordingly, each Foreign Debtor is eligible to be a chapter 15 debtor.

**III.    The PKPU Proceedings are each Foreign Main Proceedings**

64.    The Foreign Debtors' PKPU Proceedings are entitled to recognition as foreign main proceedings under chapter 15 of the Bankruptcy Code.  Section 1517(a) of the Bankruptcy Code

provides that, subject to section 1506 of the Bankruptcy Code, a court "shall" enter an order

granting recognition of a foreign proceeding if:

> (i)    such foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code;

> (ii)   the foreign representative applying for recognition is a person or body; and

> (iii)  the petition meets the requirements of section 1515 of the Bankruptcy Code.

11 U.S.C. § 1517(a); *see* H.R. Rep. 109-31, pt. 1 (2005) ("The decision to grant recognition is not

dependent upon any findings about the nature of the foreign proceedings . . . [t]he requirements of

this section . . . are all that must be fulfilled to attain recognition."). Section 1517(b) of the

Bankruptcy Code provides that a foreign proceeding "shall be recognized . . . (1) as a foreign main

proceeding if it is pending in the country where the debtor has the center of its main interests." 11

U.S.C. § 1517(b)(1). Here, all of the requirements for recognition of each PKPU Proceeding as a

foreign main proceeding are satisfied.

### A.    The PKPU Proceedings Constitute "Foreign Proceedings"

65.    The PKPU Proceedings are "foreign proceedings" under chapter 15 of the

Bankruptcy Code. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23). Based on this definition, courts have held that a "foreign proceeding" is one:

> a    in which acts and formalities are set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;

> > (1)    that has either a judicial or an administrative character;

24

(2)      that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

(3)      that is located in a foreign country;

(4)      that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

(5)      in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

(6)      that is for the purpose of reorganization or liquidation.

*See Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Oversight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525 (Bankr. S.D.N.Y. 2008) (discussing factors).

66.     The PKPU Proceedings were commenced pursuant to the Indonesian Insolvency Law. As noted above, the Indonesian Insolvency Law contains two sections, one of which covers the declaration of the debtor's bankruptcy and the liquidation of the debtor's assets for the benefit of creditors. The other section of the Indonesian Insolvency Law, PKPU Law, governs PKPU proceedings.

67.     Indonesian PKPU proceedings are intended to achieve an amicable settlement with the debtor's creditors and avoid a declaration of the debtor's bankruptcy and liquidation of the debtor. It is a process under which the debtor proposes a composition plan to its creditors to restructure its debts and reorganize its business operations. Wijaya Declaration ¶ 9. Matters under the Indonesian Insolvency Law, including PKPU proceedings, are administered in the Indonesian Court. Cases in the Indonesian Court are adjudicated by a panel of three judges. *Id.* ¶ 10. In PKPU proceedings, a supervisory judge is appointed to oversee the proceeding. *Id.* ¶ 13.

Restructuring plans pursuant to the PKPU Law, like Chapter 11 proceedings under the Bankruptcy Code, provide mechanisms for the orderly reorganization of the debtor. *Id.* ¶¶ 9, 20.

68.    Accordingly, the PKPU Proceedings are clearly a judicial proceeding under Indonesian law relating to insolvency or adjustment of debt in which the assets and affairs of Duniatex Group are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation. As such, this Chapter 15 case concerns a "foreign proceeding" within the meaning of Section 101(23) of the Bankruptcy Code.

69.    Courts in this district and elsewhere have recognized PKPU proceedings as foreign proceedings. *See PT Bumi Resources Tbk*, Case No. 17-10115 (MKV) (Bankr. S.D.N.Y. March 17, 2017); *In re PT Berlian Laju Tanker Tbk*, Case No. 13-10901 (SMB) (Bankr. S.D.N.Y. January 8, 2015); *In re PT Arpeni Pratama Ocean Line Tbk*, Case No. 11-15691 (ALG) (Bankr. S.D.N.Y. Jan. 12, 2012).

70.    Accordingly, the Foreign Representative respectfully requests that the Court finds that each PKPU Proceeding constitutes a "foreign proceeding."

**B.    The PKPU Proceedings are "Foreign Main Proceedings"**

**1.    The Duniatex Group PKPU Proceeding**

71.    The Duniatex Group PKPU qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests"). The relevant time period to determine the location of a debtor's "center of

main interests" ("*COMI*") is the date on which the chapter 15 petition is filed.  *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013).

72.    While the Bankruptcy Code does not expressly define COMI, it provides that, in the absence of evidence to the contrary, a foreign debtor's registered office is presumed to be its COMI.  *See* 11 U.S.C. § 1516(c); *see also In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012); *In re Tri-Continental Exch. Ltd.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) ("In effect, the registered office . . . is evidence that is probative of, and that may in the absence of other evidence be accepted as proxy for, 'center of main interest.'").

73.    As set forth above and in the Simms Declaration, the Republic of Indonesia is the center of the Duniatex Group's main interests.  Each member of the Duniatex Group is incorporated under Indonesian law and has its registered office in Indonesia.  Simms Declaration ¶ 41.  Consequently, each member of the Duniatex Group is entitled to the statutory presumption that its COMI is located in Indonesia.  As described above, the Duniatex Group's headquarters is located in Indonesia, and each member of the board of directors and board of commissioners of each member of the Duniatex Group resides in Indonesia.  All of the manufacturing activities conducted by the Duniatex Group occur in Indonesia and a substantial majority of the creditors of each member of the Duniatex Group are located in Indonesia.  All material assets and operations of each member of the Duniatex Group are located and occur in Indonesia.

74.    Accordingly, as the Duniatex Group PKPU is pending in the COMI of each member of the Duniatex Group, the Duniatex Group PKPU should be recognized as a foreign main proceeding.

2.  **Mr. Sumitro's PKPU Proceeding**

75.    The Sumitro PKPU qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests."  *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests").  In the case of an individual debtor, the debtor's habitual residence is presumed to be the center of the debtor's main interests.  11 U.S.C. § 1516(c).

76.    The Bankruptcy Code does not define "habitual residence" or provide a conclusive test for determining a debtor's COMI.  In determining the location of an individual debtor's COMI, courts have considered the following list of non-exhaustive factors (a) the length of time spent in the location; (b) the occupational or familial ties to the area; and (c) the location of the individual's regular activities, jobs, assets, investments, clubs, unions, and institutions of which he is a member. *See In re Ran*, 607 F.3d 1017, 1023 (5th Cir. 2010); *In re Loy*, 380 B.R. 154, 162 (Bankr. E.D. Va. 2007); *In re Kemsley*, 489 B.R. 346, 360 (Bankr. S.D.N.Y. 2013).

77.    Here, Mr. Sumitro is a citizen of the Republic of Indonesia, his domicile is in Indonesia, and he has lived in Indonesia his entire life.  He is the ultimate beneficial owner and the controlling shareholder of each member of the Duniatex Group, which are all incorporated in Indonesia.  Simms Declaration ¶ 44.

78.    Accordingly, as the Sumitro PKPU is pending in his COMI, the Sumitro PKPU Proceeding should be recognized as a foreign main proceeding.

IV.     **The Foreign Representative Satisfies the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code**

79.     For recognition under chapter 15, a foreign proceeding must also have a foreign representative. *See* 11 U.S.C. § 1517(a)(2). The Foreign Representative submits that each Chapter 15 Case was commenced by a duly appointed and authorized "foreign representative" of each Foreign Debtor within the meaning of section 101(24) of the Bankruptcy Code. Section 101(24) of the Bankruptcy Code provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

80.     The respective board of commissioners and board of directors of each of the members of the Duniatex Group appointed Mr. Geoffrey David Simms, the chief executive officer and partner of AJCapital Advisory (the firm that was appointed by the Duniatex Group to assess its financial position and the reorganization of its business), as the Foreign Representative for each of the members of the Duniatex Group in connection with their Chapter 15 Cases and directed Mr. Simms to commence a Chapter 15 case for each member of the Duniatex Group upon entry of the Duniatex Group PKPU Order. Simms Declaration ¶ 36. Copies of the resolutions of the board of commissioners and board of directors are attached to the Petitions.

81.     Additionally, pursuant to a power of attorney, each member of the Duniatex Group, among other things, formally appointed Mr. Simms as the Foreign Representative in their Chapter 15 Cases. *Id.* ¶ 37. Additionally, pursuant to a power of attorney, Mr. Sumitro, amongst other things, formally appointed Mr. Simms as the Foreign Representative in connection with his Chapter 15 Case. *Id.* ¶ 38.

82.    The authority given to Mr. Simms by each member of the Duniatex Group and Mr. Sumitro to act as their Foreign Representative in these Chapter 15 Cases has been acknowledged and approved by the administrators of the Duniatex Group PKPU and the Sumitro PKPU.  Wijaya Declaration ¶ 39.  A copy of the applicable power of attorney and approval by the administrators is attached to each Foreign Debtor's Petition.

83.    Accordingly, the Foreign Representative respectfully submits that Mr. Simms is a duly appointed foreign representative for all of the Foreign Debtors.

**V.    The Petition Was Properly Filed and Satisfied the Requirements of Section 1515 of the Bankruptcy Code**

84.    The Foreign Representative duly and properly commenced each Chapter 15 Case in accordance with sections 1504 and 1509 of the Bankruptcy Code, which require the filing of a petition for recognition under section 1515 of the Bankruptcy Code. *See* 11 U.S.C. §§ 1504, 1509(a).  In accordance with section 1515(b)(1) and (d) of the Bankruptcy Code, attached to the Petitions is a certified copy of the English translation of the applicable PKPU Orders.   In accordance with section 1515(c) of the Bankruptcy Code, the Foreign Representative also submitted a declaration attached to the Petition for each Foreign Debtor containing a statement identifying the proceeding commenced by the Foreign Debtors in Singapore, pursuant to section 354B of the Companies Act (Chapter 50 of Singapore) (the "***Singapore Companies Act***") read with Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency as contained in the Tenth Schedule of the Singapore Companies Act, as the only known "foreign proceeding" with respect to the Foreign Debtors other than the PKPU Proceedings.  Accordingly, the requirements of section 1515 of the Bankruptcy Code have been satisfied.  Additionally, attached to the Petitions is (a) a corporate ownership statement containing the information described in Bankruptcy Rule

7007.1, and (b) a list of foreign persons or bodies authorized to administer foreign proceedings of

the Foreign Debtors pursuant to Bankruptcy Rule 1007(a)(4).

## VI.    The Foreign Representative Should be Entrusted With the Administration of the Foreign Debtors' Assets in the United States on a Final Basis

85.    Pursuant to section 1521(a)(5), this Court should entrust the administration or

realization of all of the Foreign Debtors' assets within the territorial jurisdiction of the United

States on a final basis.

86.    Upon recognition of the PKPU Proceedings, the Court may entrust assets to the

foreign representative or another person. *See* 11 U.S.C. § 1521(a)(5).  Further, upon recognition,

unless the Court orders otherwise, the Foreign Representative is automatically empowered to

operate the Foreign Debtors' "business and exercise the rights and powers of a trustee under and

to the extent provided by sections 363 and 552."  11 U.S.C. § 1520(a)(3).  This relief is critical to

ensure the fair, efficient and centralized administration of the Foreign Debtors' estates.  Therefore,

the Foreign Representative respectfully requests that he be (a) entrusted with the administration of

all of the Foreign Debtors' assets located in the United States and (b) established as the exclusive

authority to administer the Foreign Debtors' assets and affairs in the United States on a final basis.

## NOTICE

87.    Notice of this Petition has been provided to: (a) the Office of the United States

Trustee, (b) the Foreign Debtors, (c) the parties authorized to administer the PKPU Proceedings as

set forth in the Petitions, (d) all parties to any litigation in which any of the Foreign Debtors is a

party and that is pending in the United States as of the commencement of these Chapter 15 Cases,

and (e) all known parties against whom provisional relief is sought as set forth in the statements

of Foreign Representative required by Federal Rule of Bankruptcy Procedure 1007(a)(4)(B),

31

attached to the Petitions.  The Foreign Representative submits that no other or further notice of this Petition is necessary or required.

## **NO PRIOR REQUEST**

88.    No prior request for the relief sought in this Petition has been made to this or any other court.

WHEREFORE, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A** granting the relief requested herein and such other and further relief as is just and proper.

Dated: New York, New York
October 8, 2019

Respectfully submitted,

**GIBSON, DUNN & CRUTCHER LLP**

/s/ *Matthew J. Williams*
Matthew J. Williams
Mitchell A. Karlan
Alan Moskowitz
Dylan S. Cassidy
200 Park Avenue
New York, NY 10166
(212) 351-4000 (Tel)
(212) 351-4035 (Fax)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PT DELTA MERLIN DUNIA TEXTILE, *et al.*,[1] | Case No. 19-_____ |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

## STATEMENT OF VERIFICATION

Pursuant to 28 U.S.C. § 1746, Geoffrey David Simms hereby declares as follows under penalty of perjury under the laws of the United States of America as follows:

1. I am the duly authorized foreign representative of each of the Foreign Debtors and I am duly authorized to file this Petition and to commence and act in these Chapter 15 Cases.

2. I have read the foregoing Petition and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

Executed on October, 8 2019,
in Jakarta, Indonesia.

Geoffrey David Simms
Foreign Representative

---

[1] The Foreign Debtors in these chapter 15 cases are the following entities: (i) PT Delta Merlin Dunia Textile, whose address is Jl Solo - Sragen Km 14, Desa Pulosari, Kec Kebakkramat, Karanganyar, Central Java, (ii) PT Delta Dunia Tekstil, whose address is Jl Raya Solo - Sragen KM 10.8, Desa Kaling, Kec Tasikmadu, Karanganyar, Central Java, (iii) PT Dunia Setia Sandang Asli Tekstil, whose address is Jl Raya Palur Km 7.1, Desa Dagen, Kec Jaten, Karanganyar, Central Java, (iv) PT Delta Merlin Sandang Tekstil, whose address is Jl Raya Timur Km 10, Kel Bumiaji, Kec Gondang, Sragen, Central Java, (v) PT Delta Dunia Sandang Tekstil, whose address is Jl Raya Semarang - Demak Km 14, Desa Tambakroto, Kec Sayung, Demak, Central Java, (vi) PT Perusahaan Dagang dan Perindustrian Damai, whose address is Jl Simongan No 100, Kel Ngemplak Simongan, Kec Semarang Barat, Semarang, Central Java, and (vii) Mr. Sumitro, whose address is Tegalharjo, RT.004/RW.004, Kelurahan Tegalharjo, Kecamatan Jebres, Kota Surakarta, Jawa Tengah, Indonesia.

## Exhibit A

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| PT DELTA MERLIN DUNIA TEXTILE, *et al.*,[1] | Case No. 19-_____ |
| Debtors in a Foreign Proceeding. | (Joint Administration Requested) |

## ORDER RECOGNIZING FOREIGN PROCEEDING

Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding* (the "**Verified Petition**" and, together with the Chapter 15 Petition for Recognition of a Foreign Proceeding (Official Form 401) filed immediately prior hereto for each Foreign Debtor, the "**Petitions**")[2] of Geoffrey David Simms, in his capacity as the duly authorized foreign representative (the "**Foreign Representative**") of each of the Foreign Debtors, in support of entry of an order pursuant to sections 1517(a) and 1521(a)(6) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**") (a) finding that (i) each Foreign Debtor is eligible to be a "debtor" under chapter 15 of the Bankruptcy Code, (ii) the PKPU Proceedings are "foreign main proceedings" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" of each Foreign Debtor

---

[1]  The Foreign Debtors in these chapter 15 cases are the following entities: (i) PT Delta Merlin Dunia Textile, whose address is Jl Solo - Sragen Km 14, Desa Pulosari, Kec Kebakkramat, Karanganyar, Central Java, (ii) PT Delta Dunia Tekstil, whose address is Jl Raya Solo - Sragen KM 10.8, Desa Kaling, Kec Tasikmadu, Karanganyar, Central Java, (iii) PT Dunia Setia Sandang Asli Tekstil, whose address is Jl Raya Palur Km 7.1, Desa Dagen, Kec Jaten, Karanganyar, Central Java, (iv) PT Delta Merlin Sandang Tekstil, whose address is Jl Raya Timur Km 10, Kel Bumiaji, Kec Gondang, Sragen, Central Java, (v) PT Delta Dunia Sandang Tekstil, whose address is Jl Raya Semarang - Demak Km 14, Desa Tambakroto, Kec Sayung, Demak, Central Java, (vi) PT Perusahaan Dagang dan Perindustrian Damai, whose address is Jl Simongan No 100, Kel Ngemplak Simongan, Kec Semarang Barat, Semarang, Central Java, and (vii) Mr. Sumitro, whose address is Tegalharjo, RT.004/RW.004, Kelurahan Tegalharjo, Kecamatan Jebres, Kota Surakarta, Jawa Tengah, Indonesia.

[2]  Capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to such terms in the Verified Petition.

1

under section 101(24) of the Bankruptcy Code, and (iv) each Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code, (b) granting recognition of the PKPU Proceedings as foreign main proceedings under section 1517 of the Bankruptcy Code and granted the relief under section 1520 of the Bankruptcy Code; and upon the hearing (the "*Hearing*") on the Petition and this Court's review and consideration of the Petition, the Simms Declaration and the Wijaya Declaration; and appropriate and timely notice of the filing of the Petition and the Hearing having been given; and no other or further notice being necessary or required; and the Court having determined that the legal and factual bases set forth in the Petition and all other pleadings and proceedings in this case establish just cause to grant the relief ordered herein, and after due deliberation therefore,

### IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.       This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, section 1501 of the Bankruptcy Code, and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated as of January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.).

B.       The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

C.       Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

---

[3]  The findings and conclusions set forth herein and on the record of the Hearing to consider the Petition constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*").  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

2

D.      Good, sufficient, appropriate, and timely notice of the filing of the Petitions and the

Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and

2002(q) and the *Order Scheduling a Hearing on Chapter 15 Petition for Recognition and*

*Specifying the Form and Manner of Service of Notice* [Dkt. No. ____] to: (a) the United States

Trustee for the Southern District of New York, (b) the Foreign Debtors, (c) the parties authorized

to administer the PKPU Proceedings as set forth in the Petition, (d) all parties to any litigation in

which any of the Foreign Debtors is a party and that is pending in the United States as of the

commencement of these Chapter 15 Cases, (e) all known parties against whom provisional relief

is sought as set forth in the statements of Foreign Representative required by Federal Rule of

Bankruptcy Procedure 1007(a)(4)(B), attached to the Petitions, and (f) all parties that have filed a

notice of appearance in these Chapter 15 Cases.  In light of the nature of the relief requested and

prior orders of this Court, no other or further notice is required.

E.      No objections or responses were filed that have not been overruled, withdrawn, or

otherwise resolved.

F.      Each Foreign Debtor is "eligible" to be a debtor in the Chapter 15 Case pursuant to

sections 109 and 1501 of the Bankruptcy Code.

G.      The PKPU Proceedings are "foreign proceedings" as such term is defined in section

101(23) of the Bankruptcy Code.

H.      The PKPU Proceedings are pending in the Republic Indonesia, which is where each

Foreign Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the

Bankruptcy Code. As such, the PKPU Proceedings are "foreign main proceedings" pursuant to

section 1502(4) of the Bankruptcy Code and are entitled to recognition as foreign main

proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code.

3

I.      The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed and designated as the "foreign representative" of each Foreign Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

J.      These Chapter 15 Cases were properly commenced pursuant to sections 1504 and 1509, and the Petition satisfies the requirements of section 1515 of the Bankruptcy Code and Rule 2002(q) of the Federal Rules of Bankruptcy Procedure.

K.      The relief sought by the Petition will not cause undue hardship or inconvenience to any party in interest and, to the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Debtors, their estates and all of their creditors.

L.      The relief granted hereby is necessary to effectuate the purposes and objections of Chapter 15 and to protect the Foreign Debtors and the interests of their creditors and other parties in interest.

M.      Appropriate notice of the filing of, and the Hearing on, the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

N.      The relief granted herein is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to section 1507, 1517, 1520, and 1521 of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.      The Petitions and the relief requested in this Order are granted as set forth herein, and any objections or responses thereto that have not been withdrawn or resolved are overruled with prejudice.

2.      The PKPU Proceedings are recognized as "foreign main proceedings" pursuant to sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.      All relief and protections afforded foreign main proceedings under section 1520 of the Bankruptcy Code are hereby granted to the PKPU Proceedings, each Foreign Debtor and each Foreign Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to each Foreign Debtor and its property within the territorial jurisdiction of the United States.

4.      All entities (as that term is defined in section 101(15) of the Bankruptcy Code), other than the Foreign Representative and his authorized representatives and agents, are hereby enjoined from:

  a.      execution against any Foreign Debtors' assets;

  b.      the commencement or continuation, including the issuance or employment of process, of a judicial, quasi-judicial, administrative, regulatory, arbitral, bankruptcy, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements or otherwise against any Foreign Debtor, which in either case in any way relates to, or would interfere with, the administration of any Foreign Debtors' estate in the PKPU Proceeding;

  c.      the enforcement of a judgment against any Foreign Debtor or against property of any Foreign Debtor;

d.      any act to obtain possession of property of any Foreign Debtor's estate or of property from any Foreign Debtor's estate or to exercise control over property of any Foreign Debtor's estate;

e.      any act to create, perfect, or enforce any lien against property of any Foreign Debtor's estate;

f.      any act to collect, assess, or recover a claim against any Foreign Debtor; and

g.      transferring, relinquishing or disposing of any property of any Foreign Debtor to any entity other than the Foreign Representative and his authorized representatives and agents;

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

5.      Pursuant to section 1521(a)(6) of the Bankruptcy Code, all prior relief granted to the Foreign Debtors by this Court pursuant to section 1519(a) of the Bankruptcy Code shall be extended and any order granting provisional relief shall remain in full force and effect, notwithstanding anything to the contrary contained therein.

6.      The Foreign Representative is recognized as the "foreign representative" of each Foreign Debtor as defined in section 101(24) of the Bankruptcy Code in respect of the PKPU Proceedings.

7.      The Foreign Representative is entrusted with the administration and realization of all of the Foreign Debtors' assets located in the United States and is established as the exclusive authority to administer the Foreign Debtors' assets and affairs in the United States.

8.      The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

9.      No action taken by the Foreign Representative in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the PKPU Proceedings, the

6

documents contemplated thereunder, this Order, the Chapter 15 Cases, any further order for additional relief in the Chapter 15 Cases, or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded the Foreign Representative in its capacity as such under sections 306 or 1510 of the Bankruptcy Code.

10.      The Foreign Representative, the Foreign Debtors, and each of their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

11.      Notwithstanding Bankruptcy Rule 7062, made applicable to these Chapter 15 Cases by Bankruptcy Rule 1018, this Order shall be immediately effective and enforceable upon its entry.

12.      This Court shall retain jurisdiction with respect to:  (i) the enforcement, amendment or modification of this Order; (ii) any requests for additional relief or any adversary proceeding brought in and through these Chapter 15 Cases; and (iii) any request by an entity for relief from the provisions of this Order, for cause shown as to any of the foregoing and provided that the same is properly commenced and within the jurisdiction of this Court.


Dated: New York, New York
_____, 2019


_____
UNITED STATES BANKRUPTCY JUDGE