**GIBSON, DUNN & CRUTCHER LLP**
Matthew J. Williams
Mitchell A. Karlan
Alan Moskowitz
Dylan S. Cassidy
200 Park Avenue
New York, NY 10166
(212) 351-4000 (Tel)
(212) 351-4035 (Fax)

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re:* | Chapter 15 |
| PT DELTA MERLIN DUNIA TEXTILE, *et al.*,[1] | Case No. 19-13214 (shl) |
| Debtors in a Foreign Proceeding. | (Jointly Administered) |

**MOTION OF THE FOREIGN REPRESENTATIVE FOR AN ORDER RECOGNIZING AND ENFORCING THE ORDER OF THE INDONESIAN COURT APPROVING THE COMPOSITION PLANS AND GRANTING RELATED RELIEF**

Geoffrey David Simms, in his capacity as the duly authorized foreign representative (the

"***Foreign Representative***") of PT Delta Merlin Dunia Textile ("***DMDT***") and its affiliated debtors

in a foreign proceeding (collectively with DMDT, the "***Foreign Debtors***") in connection with their

foreign proceedings referred to as case 22/Pdt.Sus-PKPU/2019/PN.Smg ("***PKPU Case 22***") and

case 25/Pdt Sus-PKPU/2019/PN.Smg ("***PKPU Case 25***", together with PKPU Case 22, the "***PKPU***

***Proceedings***") pending in the Semarang Commercial Court (the "***Indonesian Court***"), pursuant to

Law No. 37 of 2004 on Bankruptcy and Suspension of Debt Payment Obligations (the "***Indonesian***

---

[1]   The Foreign Debtors in these chapter 15 cases are the following entities: (i) PT Delta Merlin Dunia Textile, whose address is Jl Solo - Sragen Km 14, Desa Pulosari, Kec Kebakkramat, Karanganyar, Central Java, (ii) PT Delta Dunia Tekstil, whose address is Jl Raya Solo - Sragen KM 10.8, Desa Kaling, Kec Tasikmadu, Karanganyar, Central Java, (iii) PT Dunia Setia Sandang Asli Tekstil, whose address is Jl Raya Palur Km 7.1, Desa Dagen, Kec Jaten, Karanganyar, Central Java, (iv) PT Delta Merlin Sandang Tekstil, whose address is Jl Raya Timur Km 10, Kel Bumiaji, Kec Gondang, Sragen, Central Java, (v) PT Delta Dunia Sandang Tekstil, whose address is Jl Raya Semarang - Demak Km 14, Desa Tambakroto, Kec Sayung, Demak, Central Java, (vi) PT Perusahaan Dagang dan Perindustrian Damai, whose address is Jl Simongan No 100, Kel Ngemplak Simongan, Kec Semarang Barat, Semarang, Central Java, and (vii) Mr. Sumitro, whose address is Tegalharjo, RT.004/RW.004, Kelurahan Tegalharjo, Kecamatan Jebres, Kota Surakarta, Jawa Tengah, Indonesia.

*Insolvency Law*"), by and through his undersigned counsel, respectfully submits this motion (the

"**Motion**") for entry of an order (the "***Proposed Order***"), substantially in the form attached hereto

as **Exhibit A**, under sections 105(a), 1145, 1507, 1521 and 1525 of title 11 of the United States

Code (the "***Bankruptcy Code***"):

  a.  giving full force and effect in the United States to the orders of the Indonesian Court, dated June 26, 2020 (the "***Plan Approval Orders***") approving the composition plans prepared in the course of the PKPU Proceedings (including all exhibits, supplements, appendices and schedules thereto, the composition plan for PKPU Case 22, referred to herein as the "***Case 22 Composition Plan***", the composition for PKPU Case 25, referred to herein as "***Case 25 Composition Plan***" and together, the "***Composition Plans***");[2]

  b.  permanently enjoining all parties affected or bound by the Composition Plans from commencing or taking any action inconsistent with the Composition Plans or the Plan Approval Orders within the territorial jurisdiction of the United States with respect to claims or interests treated under the Composition Plans (the "***Injunction***");

  c.  declaring that the issuance of the DMDT Securities (as defined below) under the Case 22 Composition Plan is exempt from registration under section 1145 of the Bankruptcy Code;

  d.  waiving the 14-day stay of effectiveness of the order; and

  e.  granting such other and further relief as the Court deems just and proper.

In support of this Motion, the Foreign Representative submits the *Declaration of Foreign Representative in Support of the Motion for an Order Recognizing and Enforcing the Order of the Indonesian Court Approving the Composition Plans and Granting Related Relief* (the "**Supplemental Simms Declaration**") and the *Declaration of Aji Wijaya in Support of the Motion for an Order Recognizing and Enforcing the Order of the Indonesian Court Approving the*

---

[2]  Certified English translations of the Plan Approval Order approving the Case 22 Composition Plan and the Plan Approval Order approving the Case 25 Composition Plan (each including the key provisions of the Composition Plans) are attached hereto as **Exhibit B** and **Exhibit C**, respectively.  Unofficial English translations of the Case 22 Composition Plan and the Case 25 Composition Plan are attached hereto as **Exhibit D** and **Exhibit E**, respectively.

*Composition Plans and Granting Related Relief* (the "***Supplemental Wijaya Declaration***") filed contemporaneously herewith and respectfully states as follows:

## PRELIMINARY STATEMENT

1.    This Motion requests enforcement of the Composition Plans in the United States, which are the product of more than nine months of planning, preparation and arduous negotiations between the Foreign Debtors and their stakeholders on the terms of a comprehensive financial restructuring (the "***Financial Restructuring***").  The six Foreign Debtors that are part of PKPU Case 22: (i) DMDT, (ii) PT Delta Dunia Tekstil ("***DDT***"), (iii) PT Dunia Setia Sandang Asli Tekstil ("***DSSAT***"), (iv) PT Delta Merlin Sandang Tekstil ("***DMST***"), (v) PT Delta Dunia Sandang Tekstil ("***DDST***"), and (vi) PT Perusahaan Dagang dan Perindustrian Damai ("***Damiatex***" and, (i)-(vi) collectively, the "***Duniatex Group***") as well as Mr. Sumitro, the beneficial owner and controlling shareholder of the Duniatex Group that is the sole Foreign Debtor in PKPU Case 25, reached an agreement with their key stakeholders on the terms of the Financial Restructuring that will significantly deleverage the Duniatex Group's balance sheet, preserve jobs, maximize value and strategically position the Duniatex Group for continued success in the textile manufacturing industry.

2.    This complex cross-border Financial Restructuring is being implemented using three separate insolvency regimes in Indonesia, the United States and Singapore.   In Indonesia, the Composition Plans received overwhelming support from the Foreign Debtors' creditors.  In the United States, the Foreign Representative requested recognition of the PKPU Proceedings as a foreign main proceeding under section 1520 of Bankruptcy Code, and on February 4, 2020, this Court granted that relief.  *See Order Recognizing Foreign Proceeding* [Dkt. No. 30] (the "***Recognition Order***").  In Singapore, the Foreign Debtors requested recognition of the PKPU Proceedings as a foreign main proceeding under section 354B of the Companies Act (Cap. 50) of Singapore and Article 15 of the UNCITRAL Model law on Cross-Border Insolvency from the High Court of Singapore (the "***Singapore Court***"), and on March 9, 2020, the Singapore Court granted that relief.  *See* Supplemental Simms Declaration ¶ 5.

3.      The Foreign Representative submits that recognition and enforcement is warranted under sections 105, 1507 and 1521 of the Bankruptcy Code and principles of international comity. Accordingly, the Foreign Representative respectfully requests that this Court grant the relief requested herein to ensure that the Plan Approval Orders and the Composition Plans are applied consistently in Indonesia, Singapore and the United States.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated as of January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District pursuant to 28 U.S.C. § 1410. The statutory predicates for the relief requested in this Motion are sections 105(a), 1145, 1507, 1521 and 1525 of the Bankruptcy Code.

## THE FINANCIAL RESTRUCTURING[3]

5.      Since obtaining the Recognition Order, the Duniatex Group, Mr. Sumitro and their advisors held extensive in-person meetings and calls with its various stakeholders regarding the terms of a potential financial restructuring.  Those negotiations involved representatives and advisors from each of the Duniatex Group's key constituencies, including:  (i) an ad hoc group of lenders consisting of approximately 24.42% of the total secured debt of the Duniatex Group (the "***Lender Working Group***"); (ii) an ad hoc group of holders (the "***Noteholders***") of the $300,000,000 in notes 8.625% senior notes due 2024 issued by DMDT (the "***Notes***") governed by

---

[3]   Set forth herein is an overview of the Financial Restructuring contemplated in the PKPU Proceedings, the Singapore Cases and the Chapter 15 Cases. For a full description of the Foreign Debtors and the Duniatex Group, their businesses, financial position, capital structure, pre-petition restructuring efforts and events giving rise to the PKPU Proceedings, the Foreign Representative respectfully refers the Court to the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding* [Dkt. No. 2] (the "***Verified Petition***"), the *Declaration of Foreign Representative in Support of Verified Chapter 15 Petition and Motion for Provisional Relief* [Dkt. No. 3], *Declaration of Gregorius Petrus Aji Wijaya in Support of the Verified Chapter 15 Petition and Motion for Provisional Relief* [Docket No. 4], the *Supplement to the Declaration of Foreign Representative in Support of Verified Chapter 15 Petition and Motion for Provisional Relief* [Docket No. 14], the Supplemental Simms Declaration and the Supplemental Wijaya Declaration, each incorporated herein by reference.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Verified Petition.

a New York law indenture, dated March 12, 2019 (the "*Indenture*") consisting of Noteholders holding approximately 23% of the Notes (the "*Ad Hoc Noteholder Group*"); and (iii) certain other key stakeholders.  *See* Supplemental Simms Declaration ¶ 6.

6.      The final Composition Plans are the product of months of intense negotiations with creditors with multiple iterations being circulated after obtaining feedback from various stakeholders through town hall meetings, calls and other channels.  The first drafts of the Case 22 Composition Plan and Case 25 Composition Plan were circulated to the various creditor constituencies in November 2019 and December 2019, respectively, and after extensive negotiations the Composition Plans were finalized in June 2020.  *See Id.* ¶ 7.

7.      The voting on the Composition Plans took place on Tuesday, June 23, 2020 and the results of the voting were available on the same.[4]  *See Id.* ¶ 9.  There were two voting classes for each of PKPU Case 22 and PKPU Case 25, a secured voting class and an unsecured voting class. The voting for the Case 22 Composition Plan was done on a consolidated basis for each class (for example, all the secured creditors for each of the six entities that make up the Duniatex Group six members voted as the secured class for PKPU Case 22).  Despite this, there was no consolidation of the assets and liabilities of any Foreign Debtor and the Case 22 Composition Plan provides that the assets of DMDT, the issuer under the Indenture, will be used only to satisfy the creditors of DMDT.  *See* Supplemental Wijaya Declaration ¶ 11.

8.      In Indonesia, the Composition Plans received overwhelming support from the Foreign Debtors' creditors. The Case 22 Composition Plan was approved by 96.45% in value and 94.8% in number by the secured creditors that voted on the Case 22 Composition Plan. The unsecured creditors approved the Case 22 Composition Plan by 99.96% in value and 94.12% in number that voted on the Case 22 Composition Plan.  The Noteholders were classified as secured creditors.  Noteholders holding approximately 58.7% of the Notes submitted votes and the voting Noteholders overwhelmingly supported the Case 22 Composition Plan, with approximately

---

[4]  The final Composition Plans were circulated to the creditors of the Duniatex Group on June 21, 2020, together with an invitation to attend a meeting to vote on the Composition Plans via zoom on June 23, 2020.  *See Id.* ¶ 8.

99.15% voting in favor thereof. The Case 25 Composition Plan was (a) approved by all of the secured creditors that voted on the Case 25 Composition Plan and (b) approved by 96.2% in value and 97.7% in number of the unsecured creditors that voted on the Case 25 Composition Plan. With this support, the Indonesian Court approved the Composition Plans in the Plan Approval Orders. *See* Supplemental Wijaya Declaration ¶ 10; Supplemental Simms Declaration ¶ 10.

9.       The implementation of the Composition Plans will ensure that the reorganized Duniatex Group will deleverage the balance sheet and put it in a better financial position. Additionally, the Composition Plans will preserve the personal guarantees provided by Mr. Sumitro for the benefit of the creditors of the Duniatex Group and provide a full recovery to Mr. Sumitro's secured creditors in PKPU Case 25. *See* Supplemental Simms Declaration ¶ 12.

10.       The Composition Plans are based on financial projections that consider, among other things: improved governance and transparency, necessary working capital to support the needs of the business, the commitments of Mr. Sumitro via his personal guarantees, the debt capacity of each operating company within the Duniatex Group, the impact of the Covid-19 pandemic, maintaining appropriate staffing levels; and ensuring alignment of stakeholder objectives. *See Id.* ¶ 13.

***PKPU Case 22***

11.       The Case 22 Composition Plan restructures the debt of the Duniatex Group to allow it to survive as a going concern. The Case 22 Composition Plan also provides that Mr. Sumitro will retain his ownership of the Duniatex Group, will contribute assets valued at approximately $139 million, including certain real property owned by Mr. Sumitro, and is required to pledge certain other of his personal assets valued at approximately $36 million, including certain real property owned by Mr. Sumitro, to secure certain working capital loans to the Duniatex Group in a total amount of approximately $100 million. In addition, the personal guarantees Mr. Sumitro had previously provided with respect to the various Duniatex Group debt facilities will continue to secure the debts under the Case 22 Composition Plan for the respective Duniatex Group debt facilities. *See Id.* ¶ 14.

12.     Pursuant to the Case 22 Composition Plan, and of particular significance to the Chapter 15 Cases given that the Notes are governed by New York law and the interest reserve account is in the United States (the "***Interest Reserve Account***"),[5] all Notes will be exchanged into: (i) US$ 150 million 8-year Notes A secured by a second-lien pledge on certain DMDT assets ("***Notes A***"); and (ii) US$ 150 million unsecured, 12-year zero-coupon Notes B ("***Notes B***", and together with Notes A, the "***DMDT Securities***").   The key terms as set out in the Case 22 Composition Plan are that all Noteholders will receive the following treatment:

    a.     Notes A would be secured by a second-lien security over various land, buildings and machinery of certain factories of DMDT.

    b.     Notes A are to pay a 1.5% coupon annually for the first year and 2.5% thereafter for the remaining tenor. There will be no coupon payment for Note B.

    c.     DMDT will refinance Notes A at the end of the seventh year on a best-efforts basis, subject to market conditions at the time. Otherwise, Notes A are to be redeemed at the end of the eighth year with a single balloon payment.

    d.     There will be a 10% redemption premium for Notes B at maturity. Notes B are to be redeemed using excess cash (as defined in the cash-waterfall mechanism) via a reverse Dutch auction mechanism.

    e.     The outstanding coupon as of September 30, 2019 under the Notes is US$14,231,250. The amount of US$12,937,500 currently in the Interest Reserve Account will be paid to the Noteholders and the remaining interest coupon of US$1,293,750 is waived**.** The payment of the US$12,937,500 currently in the Interest Reserve Account in accordance with the Case 22 Composition Plan (the "***Interest Payment***") is to occur upon entry of the Proposed Order approving this Motion.

    f.     DMDT agrees not to incur any additional financial debt secured against the assets pledged to the DMDT Securities, unless it is subordinated to the DMDT Securities.

    g.     There will also be a cash sweep mechanism utilizing excess cash, including from DMDT, which will be used for accelerated repayment of the DMDT Securities.

---

[5]   The Foreign Debtors do not have any US creditors other than the Noteholders and the Indenture is the only financing agreement governed by US law.

*See Id.* ¶ 15.

13.    The remaining creditors of the Duniatex Group (i.e. the creditors other than the Noteholders), holding claims of approximately $1.2 billion in the aggregate, will receive the following treatment under the Case 22 Composition Plan:

    (a)    Creditors who are solely secured by non-operating assets, consisting of approximately $135 million of secured claims, will receive proceeds through the orderly sale of non-operating assets and/or a transfer of ownership title of that non-operating asset for the purpose of partial or complete debt settlement.

    (b)    Creditors secured by operating assets, consisting of approximately $1.1 billion of secured claims, will receive proceeds from the operating cash flows of the respective Foreign Debtor in the manner as set out in the cash waterfall mechanism contained in the Composition Plan.

*See Id.* ¶ 16.

**PKPU Case 25[6]**

14.    Mr. Sumitro, is the beneficial owner and controlling shareholder of the Duniatex Group and resides in Indonesia. Mr. Sumitro provided personal guarantees with respect to various Duniatex Group debt facilities. *See* Supplemental Simms Declaration ¶ 17

15.    Under the Case 25 Composition Plan, Mr. Sumitro's guarantees of the obligations of the Duniatex Group will be preserved for the benefit of the Duniatex Group creditors. The secured creditors of Mr. Sumitro will be paid in full. *See Id.* ¶ 18.

**Approval of Composition Plans**

16.    On June 26, 2020, the Indonesian Court held a court hearing (the "***Plan Approval Hearing***") at which the Foreign Debtors requested that the Indonesian Court approve the Composition Plans. At the Plan Approval Hearing, the Indonesian Court examined whether the Composition Plans sufficiently protected the interests of all affected creditors in accordance with Indonesian law. In particular, the Indonesian Court ensured that the treatment of the various

---

[6] Even though there is a Composition Plan for each of the PKPU Case 22 and PKPU Case 25, the Composition Plans are inter-connected with each other because of the connections between Mr. Sumitro and the Duniatex Group. *See* Supplemental Wijaya Declaration ¶ 22.

groups of creditors was justified and not manifestly disproportionate. Consistent with Indonesian law procedures governing a Plan Approval Hearing, the Indonesian Court heard the oral arguments of the Foreign Debtors, the Administrators, and the creditors, at the Plan Approval Hearing. The Indonesian Court also considered the written legal arguments and supporting evidence provided by all the parties and filed with the Indonesian Court. *See* Supplemental Wijaya Declaration ¶ 12.

17.    At the Plan Approval Hearing the Indonesian Court entered the Plan Approval Orders which approved the Composition Plans. *See Id.* ¶ 13.

18.    Upon the granting of the Plan Approval Orders, Article 286 of the PKPU Law prevents creditors whose claims are governed by the Composition Plans (once approved and effective) from commencing any legal proceeding against the Foreign Debtors if the Foreign Debtors have not breached the Composition Plans. *See Id.* ¶ 14.

19.    As such, on the basis that there is no breach of the Composition Plans by the Foreign Debtors, the Composition Plans and Article 286 of the PKPU Law provides a contractual moratorium to the Foreign Debtors replacing the suspension of obligation for payment of debts during the PKPU process. *See Id.* ¶ 15.

20.    Furthermore, as of the date hereof, (i) no objection has been made to the Indonesian Semarang Commercial Court in relation to the ratification of the Composition Plans; and (ii) no application has been filed for the annulment or cancellation (cassation) of the Plan Approval Orders under Article 285 paragraph (4) of the PKPU Law within the 8-day deadline for such applications, and the Plan Approval Orders have therefore become final and binding. *See Id*. ¶ 16.

21.    Now, the Foreign Representative on behalf of the Foreign Debtors returns to this Court seeking, *inter alia*, to have this Court recognize and enforce the Plan Approval Orders entered by the Indonesian Court so the Foreign Debtors may proceed promptly with the implementation of the Financial Restructuring contemplated by the approved Composition Plans.

## **RELIEF REQUESTED**

22.    The Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, (i) giving full force and effect in the United States to the

Plan Approval Orders, (ii) permanently enjoining all parties affected or bound by the Composition

Plans from commencing or taking any action inconsistent with the Composition Plans or the Plan

Approval Orders within the territorial jurisdiction of the United States with respect to claims or

interests treated under the Composition Plans, (iii) declaring that the DMDT Securities to be issued

by DMDT under the Composition Plans are exempt from registration in accordance with section

1145 of the Bankruptcy Code, (iv) waiving the 14-day stay of effectiveness of the order and (v)

granting related relief.

## BASIS FOR RELIEF REQUESTED

23.     The relief requested in this Motion is authorized pursuant to sections 105(a), 1145,

1507, 1521 and 1525 of the Bankruptcy Code and is consistent with well-established principles of

international comity.  Upon recognition of a foreign proceeding, section 1521(a) authorizes the

Court to grant "any appropriate relief" at the request of the foreign representative "where necessary

to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of

the creditors[,]" including any relief that may be available to a trustee or debtor-in-possession,

subject to certain exceptions that do not apply here.  11 U.S.C. § 1521(a); *In re Daebo Int'l

Shipping Co., Ltd.*, 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015); *Hosking v. TPG Capital Mgmt.

(In re Hellas Telecomms. (Lux.) II SCA)*, 535 B.R. 543, 586 (Bankr. S.D.N.Y. 2015) ("a foreign

representative may obtain relief available to a trustee under the Bankruptcy Code . . . ."); *see also

In re ABC Learning Centres Ltd.*, 728 F.3d 301, 306 (3d Cir. 2013) ("Foreign Representatives can

access U.S. courts to request enforcement of orders of the foreign proceeding and to stay actions

against foreign debtors' property in the United States.").

24.     The Court may also grant relief pursuant to section 1507, which authorizes the

Court to provide "additional assistance" to a foreign representative under the Bankruptcy Code or

other U.S. law at any time after recognition. *See* 11 U.S.C. § 1507(a).[7] Moreover, section 105(a)

---

[7]  The relief requested herein is also consistent with section 1525(a) of the Bankruptcy Code, which provides that
"[c]onsistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or
a foreign representative, either directly or through the trustee." 11 U.S.C. § 1525(a); *see In re Inversora Eléctrica
de Buenos Aires S.A.*, 560 B.R. 650, 656 (Bankr. S.D.N.Y. 2016) (finding that enforcement of an Argentine
homologation order was consistent with section 1525 of the Bankruptcy Code).

of the Bankruptcy Code authorizes the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

25.    In addition, Chapter 15 of the Bankruptcy Code empowers "courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity." *In re Rede Energia S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333-34 (S.D.N.Y. 2008)); *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("chapter 15 maintains—and in some respects enhances—the 'maximum flexibility' . . . that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations.") (internal citations omitted).  Courts are "guided by the principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 696 (Bankr. S.D.N.Y.2010) (*citing In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009)); *see also CT Inv. Mgmt v. Cozumel Caribe (In re Cozumel Caribe S.A. de C.V.)*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012) (noting that comity is a "central tenet" in chapter 15 proceedings); 11 U.S.C. § 1501 (stating that the purpose of chapter 15 is to provide mechanisms for cooperation and comity between courts dealing with cross-border insolvency cases).  As this Court has explained:

> While recognition of the foreign proceeding turns on the objective criteria under § 1517, relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity.  Once a case is recognized as a foreign main proceeding, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity.

*In re Sino-Forest Corp.*, 501 B.R. 655, 664 (Bankr. S.D.N.Y. 2013) (internal citations and quotations omitted).  Here, the Court should exercise its discretion pursuant to sections 105(a), 1145, 1507, 1521 and 1525 of the Bankruptcy Code, consistent with the principles of comity, to recognize and enforce the Plan Approval Orders, grant the Injunction, and apply the section 1145 exemption to the issuance of the DMDT Securities.

## II.    The Plan Approval Orders Should Be Recognized And Enforced

### 1.    Recognition and Enforcement of the Plan Approval Orders is Warranted Under Section 1521 of the Bankruptcy Code

26.    Recognition and enforcement of the Plan Approval Orders is "appropriate relief" under section 1521(a) of the Bankruptcy Code because recognition and enforcement by this Court of the Plan Approval Orders is a critical component in a series of steps required to effectuate the Financial Restructuring.  Recognition and enforcement of the Plan Approval Orders is necessary to ensure that the Financial Restructuring contemplated by the Composition Plans can be implemented without disruption or adverse actions being brought against the Foreign Debtors or their assets in the United States. Indeed, without assistance from this Court, the Plan Approval Orders approving the Composition Plans, which has the overwhelming support of the Duniatex Group's creditors, could be fundamentally undermined to the detriment of all parties in interest. Notably, the interests of creditors and other parties in interest are aligned with the Foreign Representative's interests in obtaining recognition and enforcement of the Plan Approval Orders to ensure that the Composition Plans is implemented appropriately across jurisdictions, including in the United States.  *See* Supplemental Simms Declaration ¶ 19.  The Foreign Representative, therefore, respectfully requests that the Court recognize and enforce the Plan Approval Orders to ensure that the Composition Plans is successfully implemented within the territorial jurisdiction of the United States.

27.    Courts in this District routinely grant recognition and enforcement of foreign court orders approving a foreign debtor's restructuring plan.  *See, e.g.*, *See In re CGG S.A.*, 579 B.R. 716 (Bankr. S.D.N.Y. 2017) (approving enforcement of reorganization plan from French insolvency proceeding); *In re PT Bumi Resources TBK*, Case No. 17-10115 (MKV) (Bankr. S.D.N.Y. Mar. 17, 2017) [Docket No. 17] (granting recognition of Indonesian PKPU Proceeding and enforcement of Composition Plan); *The Argo Fund Ltd. V. Bd. of Dirs. of Telecom Arg., S.A., as Foreign Rep. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.)*, 528 F.3d 162, 174-75 (2d Cir. 2008) (concluding that the bankruptcy court did not abuse its discretion in granting

full force and effect to an Argentine plan and approval order in the United States); *In re Rede Energia*, 515 B.R. at 93 (enforcing a Brazilian reorganization plan and enjoining acts in contravention thereof); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing an order of the South African Court sanctioning a scheme of arrangement); *In re Ocean Rig UDW Inc.*, Case No. 17-10736 (MG) [Dkt. No. ●] (Bankr. S.D.N.Y. Sept. 20, 2017) (recognizing and enforcing Cayman schemes and orders of Cayman court sanctioning same); *In re Boart Longyear Ltd.*, Case No. 17-11156 (MEW) [Dkt. No. ●] (Bankr. S.D.N.Y. Aug. 30, 2017) (recognizing and enforcing order of the Supreme Court of New South Wales sanctioning Australian schemes of arrangement); *In re Mood Media Corp.*, Case No. 17-11413 (MEW) [Dkt. No. ●] (Bankr. S.D.N.Y. June 28, 2017) (recognizing and enforcing a Canadian plan of arrangement and a Canadian court order approving same); *In re Pac. Expl. & Prod. Corp.*, Case No. 16-11189 (JLG) [Dkt. No. ●] (Bankr. S.D.N.Y. Oct. 3, 2016) (same); *In re Kaisa Grp. Holdings Ltd.*, Case No. 16-11303 (SHL) [Dkt. No. ●] (Bankr. S.D.N.Y. July 14, 2016) (recognizing and enforcing a Hong Kong scheme and a Hong Kong scheme sanction order).

28.    Accordingly, the Court should recognize and enforce the Plan Approval Orders under section 1521(a) of the Bankruptcy Code.

### 2.    Recognition and Enforcement of the Plan Approval Orders is Also Authorized Under Section 1507 of the Bankruptcy Code

29.    Recognition and enforcement of the Plan Approval Orders is also authorized as "additional assistance" under section 1507 of the Bankruptcy Code. Under section 1507(b) of the Bankruptcy Code, in considering a request for additional assistance consistent with principles of comity, the Court also considers whether the requested relief will ensure:

> (a)    just treatment of all holders of claims against or interests in the debtor's property;
>
> (b)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (c)    prevention of preferential or fraudulent dispositions of property of the debtor;

(d)      distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(e)      if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

3.      **Enforcement of the Plan Approval Orders Will Facilitate Just Treatment of Creditors**

30.      "The just treatment factor is satisfied upon a showing that the applicable law provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors." *Telecom Arg.*, 528 F.3d at 170 (*quoting* 2 COLLIER ON BANKRUPTCY ¶ 304.08 (15th ed. 2007) ("Usually, an ancillary petition furthers the goals of just treatment of all creditors by preventing piecemeal dismemberment and by centralizing administration of the debtor's affairs and assets."). A foreign proceeding fails to satisfy this factor when creditors are not given access to information or a meaningful opportunity to be heard or if a foreign proceeding would not recognize certain creditors as claimholders. *See Telecom Arg.*, 528 F.3d at 170.

31.      Here, recognition and enforcement of the Plan Approval Orders and the Composition Plans ensures just treatment of all holders of claims against and interests in the Foreign Debtors. Creditors were given adequate notice of the Composition Plans, and many stakeholders, including the Lender Working Group, the Ad Hoc Noteholder Group and several significant shareholders, actively participated in the extensive negotiations that resulted in the Financial Restructuring embodied in the Composition Plans. The Foreign Debtors provided extensive information to their stakeholders, including all information required to be disclosed under Indonesian law. These creditors had an opportunity to participate in and vote on the Composition Plans at the June 23, 2020 meeting to vote on the Composition Plans. *See* Supplemental Simms Declaration ¶ 20. Accordingly, enforcement of the Plan Approval Orders will facilitate just treatment of creditors.

4.      **The Plan Approval Orders Protects U.S. Creditors**

32.      The second factor of section 1507(b) requires that U.S. creditors be protected against "prejudice and inconvenience in the processing of claims" in the foreign proceeding.  *In re Rede Energia S.A.*, 515 B.R. at 96.

33.      Under the Plan Approval Orders and the Composition Plans, U.S.-based creditors are not required to undertake any procedure (including for filing claims) different than similarly situated non-U.S. creditors. The Composition Plans do not provide for different treatment of the claims against or interests in the Foreign Debtors held by non-U.S. creditors and U.S.-based creditors.  *See* Supplemental Wijaya Declaration ¶ 17.  Accordingly, U.S.-based creditors are in no way unfairly prejudiced by the Composition Plans or the Plan Approval Orders.

5.      **The Plan Approval Orders Prevents Preferential or Fraudulent Dispositions of Property of the Foreign Debtors**

34.      The Plan Approval Orders and the Composition Plans provide for equitable and ratable distributions to holders of similarly situated creditors and do not provide preferential treatment to any creditors.  The Plan Approval Orders and the Composition Plans comply fully with Indonesian insolvency law and are not being used as a means of accomplishing any fraudulent or preferential transfers.

6.      **The Plan Approval Orders are Consistent with U.S. Law**

35.      The Plan Approval Orders and the Composition Plans largely comport with United States bankruptcy law.  The Second Circuit and other appellate courts have repeatedly recognized that "the priority rules of a foreign jurisdiction need not be identical to those of the United States." *Telecom Arg.*, 528 F.3d at 170 n.9 (*citing Schimmelpenninck v. Byrne* (*In re Schimmelpenninck*), 183 F.3d 347, 364 (5th Cir. 1999)); *In re Rede Energia S.A.*, 515 B.R. at 97; *In re Manning*, 236 B.R. 14, 25 (9th Cir. B.A.P. 1999)) (citation omitted).

36.      Here, the Composition Plans separately classified and provided distributions to creditors based on the status of their claims in accordance with Indonesian law.  Importantly, the Foreign Debtors' creditors, including the Noteholders, have voted overwhelmingly to accept the

treatment afforded to them under the Composition Plans, in each case in accordance with applicable Indonesian law.   *See* Supplemental Wijaya Declaration ¶ 18.   Accordingly, the Composition Plans are consistent with U.S. law.

### 7.      Section 1507(b)(5) is Satisfied

37.      The requirement that the requested relief include the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns is inapplicable to the PKPU 22 Composition Plan because none of the members of the Duniatex Group is an individual. The PKPU 25 Composition Plan provides Mr. Sumitro with the ability to successfully emerge from the PKPU Proceeding free of all claims and obligations subject to his obligations under the Composition Plans, including his guarantee obligations relating to the Duniatex Group, thereby reasonably assuring Mr. Sumitro will be provided with a fresh start satisfying section 1507(b)(5) of the Bankruptcy Code.

### III.     The Plan Approval Orders are Entitled to Recognition and Enforcement as a Matter of Comity

38.      In determining whether to recognize and enforce a foreign judgment, courts also consider general comity principles. *See In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 698 (*citing Hilton v. Guyot*, 159 U.S. 113, 166 (1895); *Pariente v. Scott Meredith Literary Agency, Inc.*, 771 F. Supp. 609, 615 (S.D.N.Y. 1991)). In *Hilton v. Guyot*, the Supreme Court held that if the foreign court provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting," the foreign judgment should be enforced and not "tried afresh." *Hilton*, 159 U.S. at 202-03.

39.      "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate

domestic public policy." *In re Atlas Shipping A/S*, 404 B.R. 726, 733 (Bankr. S.D.N.Y. 2009) (citations omitted); *see also JP Morgan Chase Bank v. Altos Hornos de Mexico S.A.*, 412 F.3d 418, 424 (2d Cir. 2005) ("[D]eference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States."); *Universal Cas. & Sur. Co. v. Gee (In re Gee)*, 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985) (noting that if the bankruptcy court is satisfied with the procedural fairness of the foreign proceeding, it "should not sit as an appellate court over the foreign proceedings.").

40.    Extending comity to orders confirming foreign plans of reorganization is particularly significant given the importance of "assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail." *Atlas Shipping*, 404 B.R. at 737 (internal citation omitted); *see also Cunard S.S. Co. Ltd. v. Salen Reefer Servs. AB*, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").

41.    "[P]rinciples of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of [provisions in foreign court orders], even if those provisions could not be entered in a plenary chapter 11 case." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 696. The "relief granted in [a] foreign proceeding and the relief available in a U.S. proceeding need not be identical[,]" and U.S. bankruptcy courts are "not required to make an independent determination about the propriety of individual acts of a foreign court." *Id.* at 697 (*citing In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 391 (Bankr. S.D.N.Y. 2004)); *In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.*, 238 B.R. 25, 56–61 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (extending comity to order confirming foreign plan and stating "[a]s long as the manner in which the scheme acquired statutory effect comports with our notions of procedural fairness, comity should be extended to it.") (citations omitted). Rather, the key determination required to be made by the U.S. bankruptcy court is

whether the procedures in the foreign jurisdiction "meet our fundamental standards of fairness." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 697.

42.     Here, all affected creditors had a full and fair opportunity to vote on the Composition Plans, in each case after ample notice and adequate disclosure of the terms of the Financial Restructuring.   The parties also had an opportunity to file objections and litigate their objections before the Indonesian Court at the Plan Approval Hearing.   The PKPU Proceedings were administered under the Indonesian Insolvency Laws by the Indonesia Court.   To the extent any party disagrees with the Indonesian Court's decision in the Plan Approval Orders, that party has the right to file and pursue a recourse against the Plan Approval Orders before the Indonesian Court, provided such party satisfies the statutory conditions to initiate such recourse.   All parties have had an opportunity to assert claims in the PKPU Proceedings under a sophisticated insolvency regime before an impartial court, in accordance with fundamental standards of due process. Accordingly, the Court should recognize and enforce the Plan Approval Orders, consistent with the principles of comity.   *See In re Sino-Forest Corp.*, 501 B.R.   at 664 (noting that post-recognition relief "is largely discretionary and turns on subjective factors that embody principles of comity").

1.      **The PKPU Proceedings Were Administered in a Manner Consistent with U.S. Public Policy**

43.     Although section 1506 places a limitation on relief available under chapter 15 if such relief is manifestly contrary to U.S. public policy, this exception is narrowly construed. *See In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 697 (*citing In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333 (S.D.N.Y. 2006)); *see also In re Poymanov*, 571 B.R. 24, 38 (Bankr. S.D.N.Y. 2017) (noting that the public policy exception "is to be applied sparingly"); *In re OAS S.A.*, 533 B.R. 83, 103 (Bankr. S.D.N.Y. 2015) (recognizing that the public policy exception "requires a narrow reading") (internal citation and quotations omitted). "[T]he word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the

United States." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. at 697 (internal citation omitted).

44.    Nothing in the Composition Plans or the Plan Approval Orders is manifestly contrary to U.S. public policy.  The Composition Plans provides for a comprehensive resolution of the Foreign Debtors' financial liabilities under Indonesian law that is substantially similar to the result that would be achieved under the Bankruptcy Code.  The Indonesian Court's exercise of jurisdiction over, and supervision of, the Foreign Debtors was proper under the Indonesian Insolvency Law, which provides for a fundamentally fair process that "accords with the source of civilized jurisprudence." *In re Rede Energia*, 515 B.R. at 98.  Accordingly, the public policy exception does not apply.

**IV.    Granting A Permanent Injunction Is Necessary To Enforce The Plan Approval Orders**

45.    To the extent not otherwise stayed under sections 1520 and 362 of the Bankruptcy Code or the Recognition Order, the Foreign Representative also seeks the Injunction to prevent any parties from attempting to continue or commence actions or assert claims in the United States against the Foreign Debtors or their property inconsistent with the Composition Plans or the Plan Approval Orders.  The Injunction requested herein is necessary to ensure that the Composition Plans can be implemented successfully and will ensure that all parties cannot take actions adverse to the Foreign Debtors or their property located in the territorial jurisdiction of the United States in an effort to gain an unfair advantage over other parties in interest subject to the Composition Plans.

46.    This Court has the authority to grant the Injunction in these Chapter 15 Cases.  *See*, *e.g.*, *In re CGG S.A.*, 579 B.R. 716 (Bankr. S.D.N.Y. 2017); *In re PT Bumi Resources TBK*, Case No. 17-10115 (MKV) (Bankr. S.D.N.Y. Mar. 17, 2017) [Docket No. 17]; *Metcalfe & Mansfield*, 421 B.R. at 700 (granting permanent injunctive relief in chapter 15 case in respect of Canadian plan); *In re Ocean Rig UDW Inc.*, Case No. 17-10736 (MG) [Dkt. No. 153] (permanently enjoining any action inconsistent with Cayman schemes or orders of Cayman court sanctioning same); *In re*

*Boart Longyear Ltd.*, Case No. 17-11156 (MEW) [Dkt. No. 45] (permanently enjoining any claims or other relief with respect to any claim restructured pursuant to Australian schemes of arrangement, except as such schemes permit); *In re Groupo Isolux Corsán, S.A.*, Case No. 16-12202 (SHL) [Dkt. No. 50] (Bankr. S.D.N.Y. Nov. 17, 2016) (granting injunctive relief to the foreign representative with respect to holders of affected debt claims under a Spanish homologation and Dutch composition orders).[8]

47.    The standards, procedures and limitations applicable to an injunction apply to relief sought under section 1521(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1521(e).  Generally, to obtain a permanent injunction, a movant must demonstrate the likelihood of irreparable harm.  *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995). Irreparable harm in the chapter 15 context may exist if there is a risk of disruption to the orderly and fair distribution of assets through dissenting creditor actions to the detriment of other creditors. *See, e.g.*, *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714-15 (2d Cir. 1987); *Garcia Avila*, 296 B.R. at 114 ("irreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum") (quoting Collier On Bankruptcy ¶ 304.05 (15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors."); *In re Petition of Brierley*, 145 B.R. 151, 168 (Bankr. S.D.N.Y. 1992) ("Harm to the estate exists from the failure to grant injunctive relief in the form of disruption of an orderly determination of claims and the fair distribution in a single case.") (internal citation and quotations omitted).

48.    Irreparable harm exists here because dissenting creditors may seek judgments in the United States against the Foreign Debtors and their property located in the U.S. in an effort to

---

[8]    *See also In re Pac. Expl. & Prod. Corp.*, No. 16-11189 (JLG) [Dkt. No. 31]; *In re Winsway Enters. Holdings Ltd.*, No. 16-10833 (MG) [Dkt. No. 22] (Bankr. S.D.N.Y. June 16, 2016); *In re Zlomrex Int'l Financing S.A.*, No. 13-14138 (SHL) [Dkt. No. 17] (Bankr. S.D.N.Y. Jan. 31, 2014); *In re BTA Bank JSC*, No. 12-13081 (JMP) [Dkt. No. 20] (Bankr. S.D.N.Y. Jan. 3, 2013); *In re Highlands Ins. Co. (U.K.) Ltd.*, No. 07-13970 (MG) [Dkt. No. 40] (Bankr. S.D.N.Y. Aug. 18, 2009); *In re Castle Holdco 4, Ltd.*, No. 09-11761 (REG) [Dkt. No. 25] (Bankr. S.D.N.Y. May 7, 2009); *In re Gordian RunOff (UK) Ltd.*, No. 06-11563 (RDD) [Dkt. No. 14] (Bankr. S.D.N.Y. Aug. 29, 2006)

obtain more than their *pro rata* treatment to which they are entitled under the Composition Plans. For example, if the Noteholders could effectively circumvent the terms of the Composition Plans by commencing actions in the United States, DMDT would be left to defend against these lawsuits, however meritless, which would be a significant waste of time and resources. The Injunction will help to ensure the fair and efficient implementation of the Composition Plans and to bind all of the Foreign Debtors' creditors to the terms of the Composition Plans, as approved by the Plan Approval Orders.

49.     Absent permanent injunctive relief, the Foreign Debtors' efforts to consummate this consensual cross-border Financial Restructuring could be thwarted by the actions of dissenting creditors, a result that is inconsistent with the purposes of chapter 15. The interests of affected parties under the Composition Plans are sufficiently protected under section 1522(a) of the Bankruptcy Code by the treatment afforded to them in the PKPU Proceedings because all similarly situated parties will be treated equally and fairly. The Injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors and is consistent with principles of comity. Accordingly, the Injunction should be granted.

## V.     The Court Should Apply Section 1145 To The DMDT Securities To Be Issued By DMDT Under The Case 22 Composition Plan

50.     The Foreign Representative requests that this Court declare that the DMDT Securities to be issued under the Case 22 Composition Plan are exempt from registration under Section 5 of the Securities Act of 1933, as amended (the "***Securities Act***") pursuant to section 1145 of the Bankruptcy Code. Exemption from registration under the Securities Act—like the Injunction— is consistent with relief customarily granted by U.S. courts in connection with proceedings under chapter 11.

51.     It is appropriate and necessary to approve that relief in these Chapter 15 Cases to ensure that creditors receiving distributions under the Composition Plans are treated fairly. The exemption is appropriate here because it is necessary to effectuate the purpose of chapter 15 and

protect the interests of the Foreign Debtors' creditors and shareholders consistent with the underlying policy considerations of section 1145. Therefore, the relief requested should be granted.

1. **Overview of Section 1145 Relief**

52.    In connection with an offer, sale or resale of securities in a chapter 11 case, the seller ordinarily must comply with the applicable requirements not only of the Bankruptcy Code, but also of federal and state securities laws.  Section 1145(a)(1) of the Bankruptcy Code provides a limited exemption from registration under federal and state securities law for an offer or sale of securities that are:

(a)    offered or sold "under a plan";

(b)    "of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan"; and

(c)    "in exchange for a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor or such affiliate."

*See* 11 U.S.C. § 1145(a)(1).  Resales of securities that fall within the exemption under subsection 1145(a)(1) are also exempt from registration, provided that they are accompanied by a written disclosure statement that is approved, after notice and a hearing, by a court as containing "adequate information." 11 U.S.C. §§ 1125, 1145(a)(4).  Section 1145(c) causes an offer or sale of securities of the kind and in the manner specified under section 1145(a)(1) to be deemed to be a public offering. *See* 11 U.S.C. § 1145(c).

53.    Section 1145 "shield[s] from liability under the federal securities laws those individuals participating in the reorganization of an entity in bankruptcy" for the purpose of "encourag[ing] satisfaction of debts or other existing interests in the debtor." *S.E.C. v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 425 (S.D.N.Y. 2007).  It was enacted in recognition of the perceived unfairness of compelling participants in the chapter 11 process, many of whom may be involuntary participants, to comply with securities law requirements.  *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess., at 236-38 (1977) ("Present law presents a creditor with great uncertainty if he wants to sell securities received in a bankruptcy reorganization.  This uncertainty acts as a

retarding force on the flexibility of the reorganization process. Creditors normally have little choice in deciding whether to "purchase" securities of the debtor."); *In re Frontier Airlines, Inc.*, 93 B.R. 1014, 1021 (Bankr. D. Colo. 1988) ("The obvious purpose of section 1145 is to encourage reorganization and to relieve bankrupt entities of the strict requirements of securities laws so long as adequate disclosure is made.") (internal citations and quotations omitted); *In re Amarex, Inc.*, 53 B.R. 12, 14 (Bankr. W.D. Okla. 1985) (same).

2.   **Section 1145 Relief Is Available to Chapter 15 Debtors Under Bankruptcy Code Sections 1521(a)(7) and 1507**

54.   Section 1145 relief may be granted by this Court as "additional relief" under section 1521(a) of the Bankruptcy Code because it is relief that is available to a chapter 11 debtor in possession.[9] Alternatively, the relief requested is authorized pursuant to section 1507 of the Bankruptcy Code as "additional assistance."

55.   Applying the exemption in chapter 15 cases is consistent with the express purpose of chapter 15, which affords bankruptcy courts broad discretionary powers to provide "greater legal certainty for trade and investment," "fair and efficient administration of cross-border insolvencies," "protection and maximization of the value of the debtor's assets," and "facilitation of the rescue of financially troubled businesses." *See* 11 U.S.C. § 1501; *Cf. In re Fin. News Network, Inc.*, 980 F.2d 165, 169 (2d Cir. 1992) (noting the "broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it"). The legislative history of chapter 15 supports a determination that section 1145 relief is available to chapter 15 debtors. *See Atlas Shipping A/S*, 404 B.R. at 739 ("Congress explained . . . that the bankruptcy court was being given broad latitude [under chapter 15] to mold relief to meet specific

---

[9]   The relief available under section 1521(a) includes "any additional relief that may be available to a trustee," with certain exceptions not relevant here. 11 U.S.C. § 1521(a)(7). "Trustee" means, among other things, "a debtor in possession under any chapter of this title." 11 U.S.C. § 1502(6); *see also In re Pro-Fit Int'l Ltd.*, 391 B.R. 850, 865 (Bankr. C.D. Cal. 2008) ("It is highly unlikely that a court can simply ignore all the rest of the bankruptcy code and the other provisions relating to bankruptcy cases in the United States, just because they are not specifically mentioned in chapter 15. . . The better reading is that many other provisions of the bankruptcy code can be applicable in a chapter 15 case. . . ."). The Bankruptcy Code expressly provides that a debtor in possession in a chapter 11 case is entitled to benefit from the provisions of section 1145 of the Bankruptcy Code. *See* 11 U.S.C. § 101(13); 901(a); 1107; 1145(a)(1).

circumstances[,]" and therefore a bankruptcy court's discretion to grant relief under Section 1521(a) is "exceedingly broad").

56.     Courts in this district and others have granted requests to apply section 1145 in a chapter 15 case.  *See In re Oi S.A.*, 587 B.R. 253, n.3 (Bankr. S.D.N.Y. 2018); *In re PT Bumi Resources TBK*, Case No. 17-10115 (MKV) (Bankr. S.D.N.Y. Mar. 17, 2017) [Docket No. 17] (granting recognition of Indonesian PKPU Proceeding and enforcement of Composition Plan); *In re CGG S.A.*, 579 B.R. 716, 721 (Bankr. S.D.N.Y. 2017); *In re Abengoa, S.A.*, Case No. 16-10754 (KJC) (Bankr. D. Del. Dec. 8, 2016) (ruling that the securities issued by the foreign debtor were exempt from registration under section 1145 of the Bankruptcy Code "[b]y virtue of 11 U.S.C. § 1521 and in the alternative 11 U.S.C. § 1507"); *In re Quebecor World Inc.*, Case No. 08-13814 (JMP) [Dkt. No. 12] (Bankr. S.D.N.Y. July 1, 2009) (giving full force and effect to the Canadian Sanction Order approving debtors' reliance on the section 1145 exemption to issue securities without registration with the SEC); *Cf. In re Landsbanki Islands HF.*, Case No. 08-14921 (RDD) [Dkt. No. 57] (Bankr. S.D.N.Y. Feb. 16, 2016) (finding that securities issued by foreign debtor were exempt from the registration requirements of the Securities Act under section 3(a)(10)). Accordingly, the Foreign Debtors are eligible for section 1145 relief, and the Court should apply it to the DMDT Securities in this case.

### 3.    The Exchange of the DMDT Securities Is Exempt from Registration Under Bankruptcy Code Section 1145

57.     Section 1145 relief is warranted here because the issuance of the DMDT Securities pursuant to the Case 22 Composition Plan satisfies each requirement of section 1145.

58.     *First*, the requirement that the DMDT Securities be issued "under a plan" is met by analogy.  The Case 22 Composition Plan is the functional equivalent of a chapter 11 plan, as it provides for distributions to holders of claims and interests, including the issuance of the DMDT Securities to the Noteholders.  Accordingly, the DMDT Securities are being offered under the functional equivalent of a plan, thereby satisfying section 1145(a)(1) of the Bankruptcy Code.

59.    *Second*, the requirement that the securities offered or sold be "of the debtor" is clearly met.  The DMDT Securities are being issued by DMDT, a Foreign Debtor, which is a "debtor" under section 1502 of the Bankruptcy Code.

60.    *Third*, the requirement that the DMDT Securities be offered "in exchange for a claim against [or] an interest in...the debtor" is also satisfied because the Case 22 Composition Plan provides that the Noteholders will receive the DMDT Securities in exchange for and in satisfaction of their claims against and interests in DMDT.

61.    *Fourth*, the Case 22 Composition Plan contained a description of the DMDT Securities to be issued thereunder, the recapitalization of DMDT a description of the claims against and interests in DMDT, as well as the proposed treatment of such claims.  *See* Supplemental Wijaya Declaration ¶ 21.  In addition, the Plan Approval Order approving the Case 22 Composition Plan constitutes the Indonesian Court's approval of the substantive fairness of the Case 22 Composition Plan in accordance with Indonesian law.  *See* Supplemental Wijaya Declaration ¶ 21. Thus, disclosure concerning the DMDT Securities justifies the application of the exemption from the Securities Act, and requiring further disclosure would impose an unnecessary burden on DMDT's time and resources.

62.    Moreover, applying the section 1145 exemption in the Chapter 15 Cases is consistent with the policy considerations underlying section 1145 in the chapter 11 context.  It will allow DMDT to distribute the DMDT Securities in a manner that will facilitate an orderly and value-maximization of those assets.  That value is enhanced by the fact that the DMDT Securities will be freely transferrable on the basis that the issuance of the DMDT Securities is deemed to be a public offering under section 1145(c) of the Bankruptcy Code.  The flexibility afforded by section 1145 is critical to ensuring that the recipients of the DMDT Securities can realize the value provided under the Case 22 Composition Plan.

63.    Accordingly, the Foreign Representative submits that the DMDT Securities to be issued pursuant to the Case 22 Composition Plan satisfy each of the requirements under section 1145 of the Bankruptcy Code, and that application of the section 1145 exemption is both necessary

and appropriate.  And because application of section 1145 in this case will assist DMDT in its issuance of the DMDT Securities, it serves to "protect the assets of the debtor" as well as "the interests of the creditors." Accordingly, application of section 1145 is warranted.

## VI.    WAIVER OF STAY

64.    The Foreign Representative respectfully requests that, to the extent applicable, the Court cause the Proposed Order to become effective immediately upon entry notwithstanding the 14-day stay of effectiveness of the order imposed by operation of the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), including Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014.  Such a waiver is appropriate in these circumstances to allow the Foreign Debtors to proceed immediately with the implementation of the restructuring steps to ensure that the Foreign Debtors can emerge from their multi-jurisdictional insolvency proceedings as expeditiously as possible.

65.    The waiver will help the Foreign Debtors avoid any delay in beginning the restructuring implementation steps which could jeopardize the Duniatex Group's ability to consummate the Financial Restructuring .  In light of the overwhelming consensus on the Financial Restructuring and the need to begin implementing this massive restructuring in multiple jurisdictions, granting a waiver of the 14-day stay of effectiveness period is appropriate so that the Composition Plans can be consummated as soon as possible.

66.    Courts in this district routinely provide full or partial waivers of the 14-day stay of effectiveness period in chapter 15 cases.  *In re CGG S.A.*, 579 B.R. 716 (Bankr. S.D.N.Y. 2017); *In re PT Bumi Resources TBK*, Case No. 17-10115 (MKV) (Bankr. S.D.N.Y. Mar. 17, 2017) [Docket No. 17]; *In re Boart Longyear Ltd.*, Case No.  17-11156 (MEW) [Dkt. No. 45]; *In re Pac. Expl. & Prod. Corp.*, Case No. 16-11189 (JLG) [Dkt. No. 31]; *In re Landsbanki Islands HF.*, Case No. 08-14921 (RDD) [Dkt. No. 65]; *In re Metcalfe & Mansfield Alternative Investments*, Case No. 09-16709 (MG) [Dkt. No. 28]; *In re Quebecor World Inc.*, Chapter 15, Case No. 08-13814 (JMP) [Dkt. No. 12].

**NOTICE**

67.    Notice of this Motion has been provided to:  (a) the United States Trustee for the Southern District of New York, (b) the Foreign Debtors, (c) the parties authorized to administer the PKPU Proceedings as set forth in the Petition, (d) the Bank of New York Mellon, as Indenture Trustee for the Notes (the "***Indenture Trustee***"), (e) counsel to the Ad Hoc Noteholder Group, (f) the Securities and Exchange Commission, and (g) all parties that have filed a notice of appearance in these Chapter 15 Cases.  The Foreign Representative submits that no other or further notice of this Motion is necessary or required.

**CONCLUSION**

68.    For the reasons set forth herein, the Foreign Representative respectfully requests that the Court enter an order:  (a) recognizing and enforcing the Plan Approval Orders; (b) granting the Injunction; (c) declaring that the DMDT Securities are exempt from registration under section 1145 of the Bankruptcy Code; (d) waiving the 14-day stay of effectiveness of the order and (e) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      August 18, 2020

    Respectfully submitted,

    **GIBSON, DUNN & CRUTCHER LLP**

    /s/ *Matthew J. Williams*
    Matthew J. Williams
    Mitchell A. Karlan
    Alan Moskowitz
    Dylan S. Cassidy
    200 Park Avenue
    New York, NY 10166
    (212) 351-4000 (Tel)
    (212) 351-4035 (Fax)

    *Counsel to the Foreign Representative*

## **Exhibit A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| *In re:* | Chapter 15 |
| PT DELTA MERLIN DUNIA TEXTILE, *et al.*,[1] | Case No. 19-13214 (SHL) |
| Debtors in a Foreign Proceeding. | (Jointly Administered) |

**ORDER RECOGNIZING AND ENFORCING THE ORDER OF THE INDONESIAN**
**COURT APPROVING THE COMPOSITION PLANS**
**AND GRANTING RELATED RELIEF**

Upon consideration of the *Motion of the Foreign Representative for an Order Recognizing and Enforcing the Order of the Indonesian Court Approving the Composition Plans and Granting Related Relief* (the "***Motion***")[2] of Geoffrey David Simms, as the duly authorized foreign representative ("***Foreign Representative***") of PT Delta Merlin Dunia Textile ("***DMDT***") and its affiliated debtors in a foreign proceeding (collectively with DMDT, the "***Foreign Debtors***") in connection with their foreign proceedings (collectively, the "***PKPU Proceedings***") pending in the Semarang Commercial Court (the "***Indonesian Court***"), pursuant to Law No. 37 of 2004 on Bankruptcy and Suspension of Debt Payment Obligations (the "Indonesian Insolvency Law"), for entry of an order pursuant to sections 105(a), 1145, 1507, 1521 and 1525 of title 11 of the United States Code (the "***Bankruptcy Code***"):

       a.     giving full force and effect in the United States to the order of the Indonesian Court (the "***Plan Approval Order***") approving the plans prepared in the course of the PKPU Proceedings (the composition plan for PKPU Case 22 referred to herein as the "***Case 22 Composition Plan***", the composition for PKPU Case 25 referred to herein as the "***Case 25***

---

[1] The Foreign Debtors in these chapter 15 cases are the following entities: (i) PT Delta Merlin Dunia Textile, whose address is Jl Solo - Sragen Km 14, Desa Pulosari, Kec Kebakkramat, Karanganyar, Central Java, (ii) PT Delta Dunia Tekstil, whose address is Jl Raya Solo - Sragen KM 10.8, Desa Kaling, Kec Tasikmadu, Karanganyar, Central Java, (iii) PT Dunia Setia Sandang Asli Tekstil, whose address is Jl Raya Palur Km 7.1, Desa Dagen, Kec Jaten, Karanganyar, Central Java, (iv) PT Delta Merlin Sandang Tekstil, whose address is Jl Raya Timur Km 10, Kel Bumiaji, Kec Gondang, Sragen, Central Java, (v) PT Delta Dunia Sandang Tekstil, whose address is Jl Raya Semarang - Demak Km 14, Desa Tambakroto, Kec Sayung, Demak, Central Java, (vi) PT Perusahaan Dagang dan Perindustrian Damai, whose address is Jl Simongan No 100, Kel Ngemplak Simongan, Kec Semarang Barat, Semarang, Central Java, and (vii) Mr. Sumitro, whose address is Tegalharjo, RT.004/RW.004, Kelurahan Tegalharjo, Kecamatan Jebres, Kota Surakarta, Jawa Tengah, Indonesia.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

*Composition Plan*" and together, including all exhibits, supplements, appendices and schedules thereto, the "***Composition Plans***");

b.   permanently enjoining all parties affected or bound by the Composition Plan from commencing or taking any action inconsistent with the Composition Plan or the Plan Approval Order within the territorial jurisdiction of the United States with respect to the claims or interests treated under the Composition Plan (the "***Injunction***");

c.   declaring that the issuance of the DMDT Securities under the Case 22 Composition Plan is exempt from registration under section 1145 of the Bankruptcy Code;

d.   waiving the 14-day stay of effectiveness of the order; and

e.   granting related relief.

and upon consideration of (a) the *Declaration of Foreign Representative in Support of the Motion for an Order Recognizing and Enforcing the Order of the Indonesian Court Approving the Composition Plans and Granting Related Relief* and (b) the *Declaration of Aji Wijaya in Support of the Motion for an Order Recognizing and Enforcing the Order of the Indonesian Court Approving the Composition Plans and Granting Related Relief*; and due and sufficient notice of the Motion, the Plan Approval Order and the Composition Plans having been provided; and the Court having held a hearing on September 11, 2020 (the "***Hearing***") to consider the relief requested in the Motion; and no objections to the Motion having been filed that have not been withdrawn, resolved or overruled; and the Court having found and determined that the relief sought in the Motion is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Foreign Debtors; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

**THE COURT FINDS AND CONCLUDES AS FOLLOWS**:[3]

A.   This Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference to*

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

*Bankruptcy Judges of the District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.).   Consideration of the Motion and the relief requested therein is a core proceeding under 28 U.S.C. § 157(b)(2)(P).   Venue is proper in this District under 28 U.S.C. § 1410(1) and (3).

B.       Pursuant to an order of this Court, dated February 4, 2020, the Foreign Representative was duly recognized as the "foreign representative" of the Foreign Debtors within the meaning of section 101(24) of the Bankruptcy Code, and the PKPU Proceeding was recognized as a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code [Dkt. No. 30] (the "***Recognition Order***").

C.       Notice of the Motion and the Hearing thereon was sufficient under the circumstances and no other or further notice is necessary or required.

D.       The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1145, 1507, 1521 and 1525 of the Bankruptcy Code and will not cause hardship to any party in interest.   To the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Foreign Debtors, its creditors and other parties in interest.

E.       The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code and to protect the Foreign Debtors and the interests of its creditors and all parties in interest.

F.       Absent the relief granted herein, the PKPU Proceeding and each of the Foreign Debtor's efforts to consummate the Financial Restructuring may be thwarted by the actions of certain creditors, which would be at odds with the purpose of chapter 15 of the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.   Such results could threaten, frustrate, delay, and ultimately jeopardize the implementation of the Financial Restructuring. Absent the Injunction, each of the Foreign Debtor and its assets may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in

3

connection with claims under the PKPU Proceeding against each of the Foreign Debtors and their assets, thereby interfering with and causing irreparable harm to each Foreign Debtor, its creditors and other parties in interest.

G.   The Injunction contained herein (i) is within the Court's jurisdiction to grant, (ii) is essential to the success and objectives of the PKPU Proceeding and the Composition Plans and (iii) confers material benefits on, and is in the best interests of, the Foreign Debtors, its creditors and all other parties in interest.

H.   The issuance of the DMDT Securities is an essential element of the Composition Plan and is in the best interests of each of the Foreign Debtors, its creditors and all other parties in interest.  The DMDT Securities will be issued pursuant to the Composition Plan in exchange for, and in full and final settlement of, claims against or interests in the Foreign Debtors and the terms and conditions of the DMDT Securities are fair and reasonable and were fully disclosed to parties in interest.  Therefore, the issuance of the DMDT Securities satisfies the requirements for exemption pursuant to section 1145 of the Bankruptcy Code.

I.   The Foreign Representative and each of the Foreign Debtors, as applicable, are entitled to the additional assistance and discretionary relief requested in the Motion under sections 1507 and 1521 of the Bankruptcy Code, including application of the exemption provided for under section 1145 of the Bankruptcy Code.

J.   The relief granted herein will, in accordance with section 1507(b) of the Bankruptcy Code, reasonably assure:  (i) the just treatment of all holders of claims against or interests in each Foreign Debtor's property; (ii) the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the PKPU Proceeding; (iii) the prevention of preferential or fraudulent dispositions of property of the Foreign Debtors; and (iv) the distribution of proceeds of each Foreign Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

K.      All creditors and other parties in interest, including the Foreign Debtors, are sufficiently protected in the grant of the relief ordered hereby in compliance with 11 U.S.C. § 1522(a).

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1.      The Motion is GRANTED as set forth herein.

2.      All objections, responses or oppositions to the relief requested in the Motion that have not been withdrawn, waived, settled, or resolved are hereby overruled on the merits.

3.      The Plan Approval Orders and the Composition Plans are hereby recognized, granted comity and given full force and effect in the United States and are binding and enforceable, in accordance with their terms, pursuant to sections 105(a), 1145, 1507, 1521 and 1525 of the Bankruptcy Code, on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose claims or interests are affected by the Composition Plans and each of their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, other than each of the Foreign Debtors and its expressly authorized representatives and agents, the "***Affected Entities***"), whether or not the Affected Entity consented to be bound by or participated in the Composition Plan; *provided*, *however*, that the foregoing shall not (i) apply to any obligations issued or required to be paid pursuant to the Composition Plan or the Plan Approval Order or (ii) enjoin any party from bringing an action to enforce the terms of the Composition Plans or any document, instrument or agreement executed to implement the Composition Plans.

4.      All Affected Entities are hereby permanently enjoined from, with respect to and only to the extent of, any debt, claim or interest affected by the Plan Approval Order and the Composition Plans, except as expressly permitted by the Composition Plans:

    a.   Execution against any of the Foreign Debtors' assets;

b.  The commencement or continuation, including the issuance or employment of process, of a judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including without limitation any and all unpaid judgments, settlements, or otherwise against any Foreign Debtor, or the seeking of any related discovery, which in each case is in any way inconsistent, or would interfere, with the administration of any Foreign Debtor's estate in the PKPU Proceeding or the implementation or consummation of the Plan Approval Orders or the Composition Plans;

c.  Taking or continuing any act to create, perfect or enforce a lien or other security interest, setoff or other claim against any Foreign Debtor or any of its property or proceeds thereof, which in each case is in any way inconsistent, or would interfere, with the administration of any Foreign Debtor's estate in the PKPU Proceeding or the implementation or consummation of the Plan Approval Orders or the Composition Plans;

d.  Transferring, relinquishing or disposing of any property of any of the Foreign Debtors to any entity other than the Foreign Representative and his authorized representatives and agents or taking or continuing any act to obtain possession of, commingle, or exercise control over, such property, in each case to the extent inconsistent with the Composition Plans, the Plan Approval Orders or Indonesian law;

e.  Commencing or continuing in any manner, directly or indirectly, an individual action or proceeding against any Foreign Debtor or concerning any Foreign Debtor's assets, rights, obligations, or liabilities to the extent they have not been stayed pursuant to sections 1520(a) and 362 of the Bankruptcy Code or the Recognition Order; and

f.  Declaring or considering the filing of the PKPU Proceeding, these Chapter 15 Cases, the Composition Plans or the Plan Approval Orders a default or event of default under any agreement, contract or arrangement;

*provided*, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States; *provided*, *further*, that nothing herein shall prevent any entity from (i) seeking enforcement of any rights or obligations under the Composition Plans or any document, instrument or agreement executed to implement the Composition Plans, or (ii) taking any actions or entering into transactions permitted by the Composition Plans.

5.  Pursuant to sections 1521 and 1507 of the Bankruptcy Code, section 1145 of the Bankruptcy Code applies in these Chapter 15 Cases, and DMDT's issuance of the DMDT Securities under, and in accordance with, the Case 22 Composition Plan shall be exempt from registration under the Securities Act of 1933, as amended, and applicable state securities laws.

The DMDT Securities shall be freely tradeable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (b) compliance with rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (c) the restrictions, if any, on the transferability of such securities and instruments set forth in the organizational documents of the Foreign Debtor; and (d) applicable regulatory approval, if any.

6.      The Indenture Trustee is authorized and directed to use the funds in the Interest Reserve Account to make the Interest Payment.

7.      The Foreign Representative and each of the Foreign Debtors are authorized and empowered to, and may in their discretion and without further delay, execute and deliver documents to effectuate the Composition Plans and take any action and perform any act necessary to implement and effectuate the terms of this Order, the Plan Approval Order and the Composition Plans, including, without limitation, seeking any relief from this Court that may be necessary or appropriate to ensure consummation of the Composition Plans.  The Foreign Debtors and the Foreign Representative are authorized and empowered to exercise all consent and approval rights provided for in the Composition Plans in the manner set forth in the Composition Plans.

8.      No action taken by the Foreign Representative, the Foreign Debtors or their respective agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the PKPU Proceeding, these Chapter 15 Cases or any further proceeding commenced in these Chapter 15 Cases shall be deemed to constitute a waiver of the immunity afforded such persons under 11 U.S.C. §§ 306 or 1510.

9.      No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

10.     Except to the extent modified herein, the relief granted in the Recognition Order shall continue in full force and effect.

11.     Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

12.     The Motion satisfies the requirements of Bankruptcy Rule 5009(c), and the Foreign Representative's obligation to submit a final report in connection with the closure of these Chapter 15 Cases has been fulfilled.

13.     Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry; (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

14.     This Court shall retain jurisdiction with respect to all matters relating to the implementation, enforcement, amendment or modification of this Order.

Dated: _____, 2020
New York, New York

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY
JUDGE

## **Exhibit B**

Plan Approval Order Approving Case 22 Composition Plan

# DECISION

## Number 22/Pdt.Sus-PiPUI20191PN.Smg

## FOR JUSTICE BASED ON ALMIGHTY GOD

The Commercial Court at Semarang District Court which investigates and hears the case of the petition of Suspension of Payment (PKPU) as the court of first instance has issued the decision submitted by:

**PT. SHINE GOLDEN BRIDGE,** *(formerly)* having its domicile in Gresik, its address at Jl. Pertaminan No. 78, Desa Sumberame, Kec. Wringinanom, Kab. Gresik, ***currently*** having its domicile in Mojokerto, its address at Dusun Bangsari RT.001 RW.003 Kembangsari Ngoro, Kab. Mojokerto, Jawa Timur, Indonesia, in this matter represented by YONG INDRO SETYO, having his address at Prambanan lidah kulon BD-17, RT 001, RW 008, Surabaya, Director of PT. SHINE GOLDEN BRIDGE, acting for and on behalf of the Director of the Company as and in his position;

in this matter granted his power to:

1. **HARIYANTO, S.H., M.Hum, 2. PURWANTO, S.H., 3. ENDANG ERNIAWATI, S.H.** are advocates of **"HARIYANTO & PARTNERS" Office of Advocates, Legal Consultants, Receivers & Administrators** having its address at Jl. Tidar 28.II, Tel. (031) 5323374. Fax (031) 5328372 Surabaya, pursuant to a Special Power of Attorney dated 20 August 2019 registered at the Registrar's Office of Semarang District Court on 11 September 2019, acting for and on behalf of and for the legal interests of **PT. SHINE GOLDEN BRIDGE;**

1

Herinafter referred to as "**Petitioner in PKPU**".

The Petitioner in PKPU submits the Petition for Suspension of Payment ("**PKPU Petition**")

**Against:**

1. **PT DELTA MERLIN DUNIA TEXTILE,** a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen KM. 14, Pulosari Village, Kebakkramat Sub-district, Karanganyar Regency, Central Java, Indonesia (hereinafter referred to as "**Respondent in PKPU I**");

2. **PT DELTA DUNIA TEKSTIL,** a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen KM. 10.8, Kaling Village, Tasikmadu Sub-district, Karanganyar Regency, Central Java, Indonesia (hereinafter referred to as "**Respondent in PKPU II**");

3. **PT DELTA MERLIN SANDANG TEKSTIL,** a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Raya Timur KM. 10, Bumiaji Village, Gondang Sub-district, Sragen Regency, Central Java, Indonesia (hereinafter referred to as "**Respondent in PKPU III**");

4. **PT DELTA DUNIA SANDANG TEKSTIL,** a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Semarang – Demak KM. 14, Tambakroto Village, Sayung Sub-district, Demak Regency, Central Java, Indonesia (hereinafter referred to as "**Respondent in PKPU IV**");



5.  **PT DUNIA SETIA SANDANG ASLI TEKSTIL,** a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Raya Palur KM. 7.1, Dagen Village, Jaten Sub-district, Karanganyar Regency, Central Java, Indonesia (hereinafter referred to as "**Respondent in PKPU V**"); and

6.  **PT PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI,** a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Simongan No. 100, Ngemplak Village, Semarang Barat Sub-district, Semarang City, Central Java, Indonesia (hereinafter referred to as "**Respondent in PKPU VI**");

In this matter they elect the legal domicile at their representatives **GP Aji Wijaya, S.H., Hardiansyah, S.H., MH., and Pradana Snehabandhana P., S.H., LLM** all are advocates and legal consultants at the Aji Wijaya & Co., Law Office, having its address at Gedung Cyber 2, 31st Floor, Jalan HR Rasuna Said, Blok X-5 No. 13, South Jakarta 12950, based on a Special Power of Attorney dated 16 September 2019, registered in the legal register at the registrar's office of Semarang District Court, dated 20 September 2019;

Hereinafter collectively referred to as "Respondents in PKPU".

The Commercial Court;

Having read the case files:

Having heard the parties to the dispute;

Having heard and examined the reports from the Supervisory Judge and the Administrator Team

### ON THE MERITS OF THE CASE

Considering, that the Petitioner in PKPU in its letter of petition dated 10 September 2019 which was received and registered at the Registrar's Office at Semarang District Court on 11

3

September 2019 under Case Register Number: 12/Pdt.Sus-PKPU/2019/PN.Smg., and on the

petition for Suspension of Payment (hereinafter abbreviated as "**PKPU**"), the Panel of Judges

issued the decision on 30 September 2019, with the rulings as follows:

## HAS ADJUDICATED AND DECIDED

1. To grant the Petition for Suspension of Debt Payment (PKPU) submitted by the Petitioner in PKPU in its entirety;

2. To notify that the Respondents in PKPU, namely:

    2.1    PT DELTA MERLIN DUNIA TEXTILE, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen KM. 14, Pulosari Village, Kebakkramat Sub-district, Karanganyar Regency, Central Java, Indonesia;

    2.2    PT DELTA DUNIA TEKSTIL, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen KM. 10.8, Kaling Village, Tasikmadu Sub-district, Karanganyar Regency, Central Java, Indonesia;

    2.3    PT DELTA MERLIN SANDANG TEKSTIL, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Raya Timur KM. 10, Bumiaji Village, Gondang Sub-district, Sragen Regency, Central Java, Indonesia;

    2.4    PT DELTA DUNIA SANDANG TEKSTIL, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Semarang – Demak KM. 14, RT. 05/RW.02, Tambakroto Village, Sayung Sub-district, Demak Regency, Central Java, Indonesia;

    2.5    PT DUNIA SETIA SANDANG ASLI TEKSTIL, a limited liability company, duly established under the laws of the Republic of Indonesia, having its

4



registered office at Jl. Raya Palur KM. 7.1, Dagen Village, Jaten Sub-district, Karanganyar Regency, Central Java, Indonesia; and

2.6    PT PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Simongan No. 100, Ngemplak Village, Semarang Barat Sub-district, Semarang City, Central Java, Indonesia;

are granted Temporary Suspension of Payment (Temporary PKPU) with all of the legal consequences for a maximum duration of 45 (forty-five) days since the date the case decision on the PKPU Petition was read out;

3.   To appoint Pudjo Hunggul NW, S.H., M,H., Commercial Judge at Semarang District Court to supervise the PKPU proceedings of the Respondents in PKPU:

4.   To appoint:

4.1    HAMONANGAN SYAHDAN HUTABARAT, S.H. having his office at SHAL Legal Counsellors, currently having its address at Sovereign Plaza, 20th Floor Unit C, Jl. TB. Simatupang, Kavling 36, South Jakarta, 12430, Receiver and Administrator registered with the Ministry of Law and Human Rights of the Republic of Indonesia Number: AHU-203.AH.04.03-2017 dated 6 November 2017;

4.2    ALFIN SULAIMAN, S.H., M.H., having his office at Sulaiman & Herling Attorneys at Law, having its address at Menara Bank Danamon, 12th Floor, Zona F suite 1201, Jl. Prof. Dr. Satrio Kav. EIV No.6, Mega Kuningan, South Jakarta, Receiver and Administrator registered with the Ministry of Law and Human Rights of the Republic of Indonesia Number: AHU.AH,04.03-86 dated 4 April 2016;

4.3 JANUARDO SULUNG P. SIHOMBING, M.H., M.A., BKP., having his office at Simanungkalit Sihombing & Rekan, having its address at Gedung Manggala Wanabhakti, Blok IV, 3rd Floor, Suite 332, Wing B, JI. Jend. Gatot Subroto No.6, Senayan, Central Jakarta 10270, Receiver and Administrator registered with the Ministry of Law and Human Rights of the Republic of Indonesia Number: AHU-AH.04.03-224 dated 18 November 2016; and

4.4 NILA ASRIYANTI, S.H., having her office at SYAHRIAL RIDHO & PARTNERS, having its address at Ruko Plaza Ciputat Mas Blok B/AA, Jalan Ir. H. Juanda No, 5A, South Jakarta – 15412, Receiver and Administrator registered with the Ministry of Law and Human Rights of the Republic of Indonesia Number: AHU.AH.04.03-48 dated 22 March 2017;

As the Administrator Team in the PKPU proceedings of the Respondents in PKPU and/or as the Receiver in the event that the Respondents in PKPU are declared bankrupt;

5. To determine the hearing of the Panel of Judges on Thursday, 14 October 2019, at the Commercial Court of Semarang District Court, at Jalan Siliwangi (Krapyak) No. 512 Semarang 50148 Central Java;

6. To order the Administrator Team to summon the Petitioner in PKPU and its Creditors known by registered mail so that thay come to the hearing as specified above;

7. To determine the administration fees and service fees for the Administrators, which will be determined later after the end of duration of PKPU in accordance with prevailing provisions of law;

8. To defer the court costs until the permanent PKPU proceedings continue.



6

Considering, that further the Supervisory Judge issued Decision Number: 22/Pdt.Sus-PKPU/2019/PN Niaga Smg on Tuesday, 1 October 2019, which reads as follows:

1. The first creditors' meeting will be held on **Wednesday, 9 October 2019, at 10.00 WIB**, at the Commercial Court Building at Semarang District Court, Jalan Siliwangi Number 512 Semarang,

2. The Deadline for Submission of Creditors' Invoices and Tax Invoices is **Wednesday, 16 October 2019, from 10.00 to 17.00 WIB** at the offices of the Administrator Team:

   - SHAL Legal Counsellors, having its address at Sovereign Plaza, 20th Floor Unit C, Jl. TB. Simatupang, Kavling 36, South Jakarta, 12430 Indonesia, Tel. (021) 22767891;

   - Arkananta Vennootchap, having its address at RDTX Tower, 12th Floor Zone F Suite 1201, Jl. Prof, Dr. Satrio Kav. EIV No.6, Mega Kuningan, South Jakarta 12940, Indonesia, TeI. (021) 57906210;

   - Simanungkalit Sihombing dan Rekan Counsellors at law, having its address at Gedung Manggala Wanabhakti, Blok IV, 3rd Floor, Suite 332, Wing B, Jl. Jerid. Gatot Subroto No. 6, Senayan, Central Jakarta 10270, Tel. 57903080;

   - Email: timpengurus.dtx@gmail.com

3. **The meeting for Verification of Debts** will be held on **Thursday, 31 October 2019, at 10.00 WIB onwards**, at the Commercial Court at Semarang District Court at Jl. Siliwangi Nomor 512 Semarang;

4. **The meeting for the discussion on the Composition Plan & Voting to Approve or Reject the Composition Plan** will be held on **Friday, 8 November 19, at 10.00**



**WIB onwards,** at the Commercial Court at Semarang District Court at Jl. Siliwangi Nomor 512 Semarang;

5.    **The hearing/deliberation of Panel of Judges Hakim** will be held on **Thursday, 14 November 2019, at 10.00 WIB onwards,** at the Commercial Court at Semarang District Court at Jl. Siliwangi Nomor 512 Semarang:

6.    To determine 2 (two) daily newspapers:

5.1 Tribun Jateng

5.2 Bisnis Indonesia

And Official State Gazette of the Republic of Indonesia;

For the Administrator Team to announce the Decision of PKPUS Number 22/Pdt.Sus-PKPU/2019/PN Niaga Smg:

7.    To order the Registrar's Office of Commercial Court at Semarang District Court to inform this decision to the Administrators;

Considering that pursuant to Decision Number: 22/Pdt.Sus-PKPU12019/PN Smg dated 14 November 2019 (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) were given Permanent PKPU for 90 (ninety) days since the said Decision was read out;

Considering that pursuant to Decision Number: 22/Pdt.Sus-PKPU/2019/PN Smg dated 12 February 2020 (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG

8

DAN PERINDUSTRIAN DAMAI (IN PKPU) were given Permanent PKPU for 76 (seventy six) days since the said Decision was read out;

Considering that pursuant to Decision Number: 22/Pdt.Sus-PKPU/2019/PN Smg, dated 27 April 2020 (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) have been given Permanent PKPU for 23 (twenty three) days since the said Decision was read out;

Considering that pursuant to Decision Number: 22/Pdt.Sus-PKPU/2019/PN Smg, dated 20 May 2020 (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) were given Permanent PKPU for 37 (thirty seven) days since the said Decision was read out;

Considering, that the Supervisory Judge submitted a Report to the Panel of Judges in a letter dated 25 June 2020 with the Subject: Report and Recommendation for Approval of the Composition Plan in Case Number 22/Pdt.Sus-PKPU/2019/PN Smg;

Considering, that the Supervisory Judge's Report principally reports that a settlement has been achieved among (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) and the Creditors;

Considering, that based on the report of the Supervisory Judge on the settlement in the process of (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) and the Creditors which has been achieved by way of voting on the Composition Plan proposed by (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) is in compliance with provisions of Article 281 of Law Number 37 of 2004 on Bankruptcy and Suspension of Payment;

Considering, that based on the above reasons, **I as the Supervisory Judge hereby proposes to the Panel of Judges hearing Case Number: 22/Pdt.Sus-PKPU/2019/PN Smg to approve the making of the Composition Plan into the Composition Agreement dated 23 June 2020 at the Hearing of the Panel of Judges on Friday, 26 June 2020 in order to fulfill the provisions stipulated in Article 285 Paragraph (1) of Law Number 37 of 2004 on Bankruptcy and Suspension of Payment.**

Considering, that at the meeting on Friday, 26 June 2020, the Creditors and the Debtors confirmed the Report of the Supervisory Judge and the statement of the Administrator Team and pray the Panel of Judges approve the compositon plan that has been approved by the Debtors and their Creditors in accordance with Article 281 paragraph (1) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment;

10

Considering, that in order to summarize the description of this decision, it shall further refer to the matters contained in the minutes of hearing and the Supervisory Judge's Report,

Considering, that since there are no other matters that need to be conveyed by the parties, the Court will subsequently issue its decision;

### ON LEGAL CONSIDERATIONS:

Considering, that the purpose and objective of the approval of the settlement as mentioned above;

Considering, that the Composition Plan was achieved by means of voting as referred to in Article 281 paragraph (1) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment;

Considering, that at the time of voting on 23 June 2020, Creditors who were present and cast their votes were as follows:

1.    **Table of Voting of Secured Creditors**

| VOTING | NUMBER OF CREDITORS | % | CLAIMS | VOTES | % |
|---|---|---|---|---|---|
| **APPROVED** | 55 | 95% | Rp. 19,155,261,702,558.80 | 1,915,526 | 96.45% |
| **REJECTED** | 3 | 5% | Rp. 704,834,981,782.45 | 70,483 | 3.55% |
| **TOTAL** | 58 | 100% | Rp. 19,860,096,684,341.20 | 1,986,010 | 100% |

Based on the table above, 55 (fifty five) Secured Creditors representing 95% (ninety five percent) of the Secured Creditors present at the online voting meeting with a total of voting rights of 1,915,526 (one million nine hundred fifteen thousand five hundred twenty six) representing 96.45% (ninety six point forty five percent) of recognized claims of Secured Creditors present at the online voting meeting who **approved** the Composition Plan.

11

Then, 3 (three) Secured Creditors representing 5% (five percent) of the Secured Creditors present at the online voting meeting with a total of 70,483 voting rights (seventy thousand thousand four hundred eighty three) representing 3.55% (three point fifty five percent) of recognized claims of Secured Creditors present at the online voting meeting who **rejected** the Composition Plan.

2.    **Table of Voting of Unsecured Creditors**

| VOTING | NUMBER OF CREDITORS | % | CLAIMS | VOTES | % |
|--------|---------------------|-----|-------------------------|--------|--------|
| APPROVED | 16 | 94% | Rp. 247,473,238,377.54 | 24,747 | 99.96% |
| REJECTED | 1 | 6% | Rp. 88,524,023.00 | 9 | 0.04% |
| TOTAL | 17 | 100% | Rp. 247,561,762,400.54 | 24,756 | 100% |

Based on the table above, 16 (sixteen) Unsecured Creditors representing 94% (ninety four percent) of the Unsecured Creditors present at the online voting meeting with a total of voting rights of 24,747 (twenty four thousand seven hundred forty seven) representing 99.96% (ninety nine point ninety six percent) of recognized claims of Unsecured Creditors present at the online voting meeting who **approved** the Composition Plan.

Then, 1 (one) Unsecured Creditor representing 6% (six percent) of the Unsecured Creditors present at the online voting meeting with a total of 9 (nine) voting rights representing 0.04% (zero point zero four percent) of recognized claims of Unsecured Creditors present at the online voting meeting who **rejected** the Composition Plan.

Considering, that based on article 281 paragraph (1) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment, the Panel of Judges is of the opinion that the quorum for voting for the approval of the composition plan has been fulfilled and is binding on the parties and legally valid;

Considering, that following the hearing and examination of the Report of the Supervisory Judge, the Administrator Team, Debtors and Creditors, there are no reasons to refuse to approve the composition plan as required in Article 285 paragraph (2) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment:

Considering, that for the Composition Plan agreed upon between the Debtors and Creditors for payment of the amount of receivables of each creditor the following terms and conditions are agreed:

On this day, Tuesday, 23 June 2020, at the Commercial Court of Semarang District Court, a Composition Plan was made and executed by and between the Debtors (as described below) and the Creditors (as described below) as evidence and a approval between Debtors and Creditors to the Composition Plan ("**Composition Plan**"):

1. **PT Delta Merlin Dunia Textile**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen Km. 14, Pulosari Village, Kebakkramat Sub-district, Karanganyar Regency, Central Java, Indonesia (hereinafter, "**DMDT**"), in this matter represented by Tan Sauw Hwa, in his capacity as President Director, therefore lawfully acting for and on behalf of DMDT.

2. **PT Delta Dunia Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen Km. 10.8, Kaling Village, Tasikmadu Sub-district, Karanganyar Regency, Central Java, Indonesia (hereinafter, "**DDT**"), in this matter represented by Tan Sauw Hwa, in his capacity as Director, therefore lawfully acting for and on behalf of DDT.

3. **PT Delta Merlin Sandang Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Raya Timur Km. 10, Bumiaji Village, Gondang Sub-district, Sragen Regency, Central Java, Indonesia



(hereinafter, "**DMST**"), in this matter represented by Tan Sauw Hwa, in his capacity as President Director, therefore lawfully acting for and on behalf of DMST.

4. **PT Delta Dunia Sandang Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Semarang – Demak Km. 14, Tambakroto Village, Sayung Sub-district, Demak Regency, Central Java, Indonesia (hereinafter, "**DDST**"), in this matter represented by Yohanes Hendrawan in his capacity as President Director, therefore lawfully acting for and on behalf of DDST.

5. **PT Dunia Setia Sandang Asli Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Raya Palur Km. 7.1, Dagen Village, Jaten Sub-district, Karanganyar Regency, Central Java, Indonesia (hereinafter, "**DSSA**"), in this matter represented by Yohanes Hendrawan in his capacity as President Director, therefore lawfully acting for and on behalf of DSSA.

6. **PT Perusahaan Dagang Dan Perindustrian Damai**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Simongan No. 100, Ngemplak village, Semarang Barat sub-district, Semarang City, Central Java, Indonesia (hereinafter, "**Damaitex**"), in this regards represented by Megawati in her capacity as President Director therefore lawfully acting for and on behalf of Damaitex.

Hereinafter, DMDT, DDT, DMST, DDST, DSSA, and Damaitex, are jointly referred to as the "**Debtors**" or "**Group**", and each a "**Debtor**")

and

7. The Creditors, as set forth in Appendix 3 (Verified Creditors), are creditors registered in the final debt list dated 25 November 2019 as verified by the Administrator Team as detailed on Appendix 3 (Verified Creditors) ("**Final Debt List**").

They are individually referred to as "**Creditor**" and collectively "**Creditors**"

14

The Debtors and the Creditors are collectively referred to as the **"Parties"**.

The Debtors and the Creditors first explain the following:

A. That on 10 September 2019, an application of PKPU petition (**"PKPU Petition"**) was submitted by one of the creditors of the Debtors against the Debtors with case register number No. 22/Pdt.Sus-PKPU/2019/PN SMG.

B. That the Panel of Judges at the Commercial Court at Semarang District Court have granted and declared the Debtors being in Temporary PKPU, as determined in Court Decision No. 22/Pdt.Sus-PKPU/2019/PN SMG (**"PKPU Decision"**) which was read out on the Court Hearing on 30 September 2019 (**"PKPU Decision Date"**).

C. That the Panel of Judges in case 22/Pdt.Sus-PKPU/2019/PN SMG read out the decision on the case by the virtue of which: (i) granted the PKPU Petition; (ii) granted the Companies of temporary PKPU for duration of 45 (forty five) Days since the date the decision was read (**"Temporary PKPU"**); (iii) stated the appointment of Hamonangan Syahdan Hutabarat, S.H., Alfin Sulaiman, S.H., M.H., Januardo Sulung P. Sihombing, S.H., M.H., M.A., BKP., and Nila Asriyanti, S.H. as the Administrator Team of the Companies (under PKPU); and (iv) appointed Mr. Pudjo Hunggul HW, S.H., M.H. as the Supervisory Judge.

D. That in accordance with the decision No. 22/Pdt.Sus-PKPU/2019/PN SMG dated 8 April 2020, the Commercial Court Panel Judge appointed Mr. Andreas Purwantyo Setiyadi, S.H., M.H., as Supervisory Judge in Case No.22/Pdt.Sus-PKPU/2019/PN SMG, replacing Mr. Pudjo Hunggul HW, S.H., M.H. who is being reassigned as High Court Judge at Kupang High Court.

E. That the Debtors have followed the Temporary PKPU and its extensions granted through permanent PKPU proceedings with the schedules and agenda as determined by the Administrator Team and the Supervisory Judge.

F. That the content of the Composition Plan has been presented in creditors meetings via court or out-of-court proceedings in Commercial Court at Semarang District Court as attended by the Creditors with the Supervisory Judge on the matter of the Composition Plan as proposed by the Debtors.

G. That in the creditors meeting convened today, Tuesday, 23 June 2020 the Supervisory Judge, Administrator Team, the Creditors, and the Debtors attended the creditors meeting held in Commercial Court at Semarang District Court either via physical meeting or electronic communication facilities as arranged by Administrator Team for the discussion on the Composition Plan and on voting to approve or reject the Composition Plan.

H. With regards to the above, the Debtors and the Creditors who approved the Composition Plan, intend to make and sign this Composition Plan as evidence that a settlement has been reached between the Debtors and the Creditors.

Further, based on the matters above, in the Composition Plan, the Debtors and the Creditors each declares that it agrees to the following terms and conditions as set forth in the Composition Plan:

**Definitions**

Each definition below, unless expressly stated otherwise within the context of each sentence under this Composition Plan and separately defined in this Composition Plan has the following definition:

**"DMDT 2 Assets"** are assets with reference of DMDT 2 as detailed in 9.1 Appendix 1 (Operating Assets).

**"DMDT 3 Assets"** are assets with reference of DMDT 3 as detailed in 9.1 Appendix 1 (Operating Assets).

**"DMDT 4 Assets"** are assets with reference of DMDT 4 as detailed in 9.1 Appendix 1 (Operating Assets).

16

"**DMDT 5 Assets**" are assets with reference of DMDT 5 as detailed in 9.1 Appendix 1 (Operating Assets).

"**DMDT 6 Assets**" are assets with reference of DMDT 6 as detailed in 9.1 Appendix 1 (Operating Assets).

"**DMDT 7 Assets**" are assets with reference of DMDT 7 as detailed in 9.1 Appendix 1 (Operating Assets).

"**Non-Operating Assets**" are assets securing the Existing Facilities other than Operating Assets.

"**Operating Assets**" are assets defined in 9.1 Appendix 1 (Operating Assets).

"**Sponsor's Duniatex Assets**" refers to assets defined in provisions on Working Capital as detailed in point (5).

"**Sponsor's Personal Assets**" refers to assets defined in provisions on Working Capital as detailed in point (4).

"**AYDA**" or *Agunan Yang Diambil Alih* means a transfer of ownership title from a debtor to a creditor for the purpose of partial or complete debt settlement.

"**CAMA**" means a cash account management agreement entered into or to be entered into by (among others) the relevant Debtors and the relevant Account Banks in accordance with this Composition Plan.

"**Security Documents**" mean deeds and/or certificates of *Hak Tanggungan*, fiducia security rights and/or pledges and any other relevant documents including pursuant to the Existing Facilities and including but not limited to the security sharing agreements and any ancillary documents in the relevant deeds and/or certificates which are required for perfection, implementation and enforcement of any Security Documents.

"**Supervisory Judge**" is a judge as mentioned under Bankruptcy Law, who is appointed and assigned by the Panel of Judges.

17

"**Day**" or "**Days**" or "**Calendar Day**" or "**Calendar Days**" means each day or days in 1 (one) year without exception including Saturdays, Sundays, and national holidays as determined by the Government and Business Day.

"**Business Day**" means a day (other than a Saturday, Sunday, or national holidays) on which banks are open for general banking business (including dealings in foreign currencies) in New York City, London, Jakarta, Hong Kong, and Singapore.

"**Participating Secured Creditors**" are the secured creditors of the Existing Facilities that granted approval to this Composition Plan and their successors from time to time in the event of assignment or novation as set out under this Composition Plan.

"**Trade Creditors**" are Creditor who owns receivables'dues from any of the DMDT, DDT, DMST, DDST, DSSA and Damaitex generated by production or operational activities which have been verified by the Administrator Team.

"**Participating Creditors**" are the creditors of the Existing Facilities that granted approval to this Composition Plan.

"**Panel of Judges**" is a Panel of Judges who adjudicate and hear this PKPU Petition.

"**Key Hires**" means the chief financial officer ("**CFO**"), the operational director, and sales and marketing director.

"**Outstanding Interest/Margin/Profit Sharing and Penalty**" or "**Outstanding Interest/Margin and Penalty**" means the outstanding interests, margin, profit sharing, and/or penalties outstanding as of PKPU Decision Date as detailed in Appendix 5 (Settlement Details).

"**Commercial Court**" is the Commercial Court of the Semarang District Court which is located at Jl. Siliwangi No.512, Kembangarum, Semarang Barat Subdistrict, Semarang City, Central Jawa 50146.

"**Administrator (Team)**" means the administrator as referred to in the Bankruptcy Law as appointed and authorized by the Panel of Judges

18

**"Debt Settlement by Sales of Non-Operating Asset and/or AYDA"** means the process of sales of Non-Operating Assets and/or AYDA for debt settlement as set out in provisions on Debt Settlement by Sales of Non-Operating Assets in this Composition Plan.

**"Participating Secured Creditors Approval (Debtor)"** means approval from more than half of the Participating Secured Creditors of a relevant Debtor by number and two-thirds of the Participating Secured Creditors of a relevant Debtor by total value of outstanding principal debts of the relevant Debtor during the time such approval is being sought.

**"Participating Secured Creditors Approval (Debtors)"** means approval from more than half of all Participating Secured Creditors by number and two-thirds of all the Participating Secured Creditors by total value of outstanding principal debts of all the Debtors during the time such approval is being sought.

**"PKF"** means Paul Hadiwinata, Hidayat, Arsono, Retno, Palilingan & Rekan public accountant office by virtue of decision of Minister of Finance of the Republic of Indonesia no. 855/KM.1/2017 with its address at UOB Plaza 30th and 42nd floors, Jl. M.H. Thamrin Lot 8-10, Central Jakarta 10230 which is a member of PKF International Limited.

**"Point to Point"** means the determination of an Interest Payment Date, a Margin/Profit Sharing Payment Date, and a Principal Payment Date:

1) the first of which falls on the date one calendar month (for Monthly Interest Payment Date, Monthly Margin/Profit Sharing Payment Date, and Monthly Principal Payment Date) or three calendar months (for Quarterly Interest Payment Date, Quarterly Margin/Profit Sharing Payment Date and Quarterly Principal Payment Date) after the Homologation Date; and

2) subsequent such dates fall exactly on one calendar month (for Monthly Interest Payment Date, Monthly Margin/Profit Sharing Payment Date and Monthly Principal Payment Date) or three calendar months (for Quarterly Interest Payment Date, Quarterly Margin/Profit Sharing Payment Date, and Quarterly Principal Payment Date) after the prior relevant Monthly

Interest Payment Date, Monthly Margin/Profit Sharing Payment Date, and Monthly Principal

Payment Date or Quarterly Interest Payment Date, Quarterly Margin/Profit Sharing Payment

Date, and Quarterly Principal Payment Date.

"**Homologated Composition Plan**" means the Composition Plan which has been homologated

or ratified by the Panel Judge on the Homologation Date.

"**Composition Plan**" is this Composition Plan that was approved through voting at the meeting

of the creditors in accordance to Article 281 paragraph (1) of the Bankruptcy Law on Tuesday,

23 June 2020.

"**Reverse Dutch Auction**" means a bidding process where the buyer (in this case the Debtors or

other party(ies) as appointed by the Debtors) bids on the settlement price of certain debt against

cash from available funds beginning from the lowest settlement price. If there is no settlement

from the price, the buyer increases its bid until settlement closes.

"**Sponsor**" means Sumitro, Indonesian citizen, born in Surakarta on 25 December 1969 holder of

Resident's Identity Card (KTP) no. 3372042512690002, with his registered address in

Tegalharjo, Kecamatan Jebres, Kota Surakarta, Central Java, Indonesia as the Debtor in Case No

25.Pdt.Sus-PKPU/2019/PN SMG.

"**Year**" means calendar year.

"**Effective Date**" means Homologation Date.

"**Homologation Date**" is the date of homologation or ratification by the Panel Judge on the Case

No. 22/Pdt.Sus-PKPU/2019/PN SMG at Semarang Commercial Court in regard to the

Composition Plan, regardless of any cassation or any other legal actions taken against the

homologation of this Composition Plan by the Panel of Judges of Case No. 22/Pdt.Sus-

PKPU/2019/PN SMG.

"**Maturity Date**" is the date falling on the last Calendar Day (determined by Point to Point

calculation) of the relevant Tenor (as set out in the debt restructuring terms in Appendix 5

20

(Settlement Details)) provided however, that, if any Maturity Date would otherwise fall on a date which is not a Business Day, the Maturity Date will be deemed to be the previous Business Day, (and for illustration, if the Homologation Date falls on 26 June 2020, then the Maturity Date for the settlement with 10 year Tenor is 25 June 2030).

"**Sustainable Debt**" means such debt as set out in Appendix 5 (Settlement Details).

"**Bankruptcy Law**" means Law No. 37 of 2004 on Bankruptcy and Suspension of Payment.

1.   **SUMMARY**

1.1   This Composition Plan has been prepared to help achieve a consensual restructuring with all Creditors of the Debtors. This Composition Plan was composed and prepared by the Debtors to be voted on by the Creditors at the creditors' meeting held in the Commercial Court based on the provisions of Article 281 paragraph (1) of Law No. 37 of 2004 concerning Bankruptcy and Suspension of Payment.

In making their decisions, the Creditors must rely on their own judgment and analysis of this Composition Plan, the terms and conditions, and all information contained in this Composition Plan, including all the benefits and risks contained therein.

1.2   This Composition Plan is made with appendices as may be referred to in certain sections of this Composition Plan. The appendices are inseparable parts of this Composition Plan.

2.   **GENERAL PROVISIONS OF THE COMPOSITION PLAN**

2.1   The provisions in this Composition Plan are based on a financial projection that considers (i) improved governance and transparency, necessary working capital to support the needs of the business, and sustainable debt loads; (ii) the commitments of the Sponsor via his personal guarantees, the debt capacity of each operating company within the Group, the operating versus non-operating assets and creditors' security rights against them, and the impact of the Covid-19 pandemic; (iii) maintaining staffing levels to provide employment; and (iv) ensuring alignment of stakeholders' objectives

21

2.2    Subject to the terms of the Composition Plan, the settlement plan for each of the Creditors under this Composition Plan is prepared with the following general provisions subject to and in observance with this Composition Plan and Appendix 5 (Settlement Details):

    I.    Creditors solely secured by Non-Operating Assets shall be settled through Debt Settlement by Sales of Non-Operating Assets and/or AYDA.

    II.    Creditors secured by Operating Assets shall be settled through the operating cash flows as set out in the Cash Waterfall Mechanism.

    III.    Excess Cash, on a bi-annual basis, will be used to accelerate repayment of the facilities of each Debtor.

    IV.    Cash interest (or profit sharing/margin for sharia financing) on sustainable debt portion will then increase to 5% for IDR denominated loans and 2.5% for USD denominated loans.

2.3    **Transfer of Rights**. Each Creditor may at any time assign any of its rights and obligations over their claims under the Homologated Composition Plan, to another party, which assignment or transfer will come into force without any requirement to obtain the consent of the Debtors or the courts of Indonesia and will be effective as of the date specified in the relevant assignment or transfer document, subject to the following provisions:

    I.    Any third party who is a transferee or assignee of such novation or transfer of claim rights and obligations from the Creditor under the Homologated Composition Plan will be bound by and subject to all provisions of the Homologated Composition Plan.

    II.    Any Creditor who assigns or transfers its rights and obligations to any third party shall give a notice in writing to the Debtors regarding such transfer or assignment

of claims, using the notice details set out in clauses 8.2 and 8.3 in this Composition Plan, in accordance with applicable laws and regulations in Indonesia. The Debtors shall execute and do all such acts and things as the Creditors may request for perfecting and completing any assignment or transfer.

III.    Pending receipt of the notification of transfer or assignment and such transfer or assignment being fully complete, the Debtors must continue to make payment to the relevant original Creditor as if no transfer or assignment had occurred.

2.4    The following provisions of the Composition Plan apply to these following Creditors:

A.    Verified Creditors

These are the Debtors' Creditors whose claims against the Debtors have been verified by the Administrator Team and listed in the Final Debt List dated 25 November 2019 as prepared by the Administrator Team.

B.    Creditors for Debts Outside Verification

These are (1) creditors who have claims against Debtors but did not participate in or register their claims in the PKPU Case No. 22/Pdt.Sus-PKPU/2019/PN SMG; or (2) creditors that are not identified or have not been recognized by the Debtors prior to the Composition Plan being homologated by the Panel of Judges. For the creditors or group of creditors as referred to in this paragraph B, the following conditions apply:

1)    These claim or claims can only be accepted and acknowledged later by the respective Debtor(s) if they conform with Indonesian standardized accounting principles and applicable laws and regulations; and

2)    The claim or claims if received and acknowledged later by the relevant Debtor will only be paid and discharged after the Debtor

23

concerned has unconditionally and irrevocably paid and discharged all of his obligations to the Creditors party to this Composition Plan and the Debtors and Creditors party to this Composition Plan must comply with the contents of this Composition Plan.

2.5    After the Composition Plan has been homologated by the Panel of Judges of the Semarang Commercial Court in Case No. 22/Pdt.Sus-PKPU/2019/PN SMG, the Composition Plan that has been ratified is binding all Creditors, except the secured creditors who do not approve the Composition Plan (the **"Dissenting Secured Creditors"**) as referred to in Article 281 paragraph (2) of the Bankruptcy Law.



3.   **SPECIFIC PROVISIONS OF THE COMPOSITION PLAN**

| | |
|---|---|
| **Existing Facilities** | The following is a list of agreements (as well as the amounts of the facilities under those agreements) that underlie the obligations of the Debtors to the relevant Creditors. The amounts of claims based on the results of verification are detailed in Appendix 3 (Verified Creditors).<br><br>**Bilateral Facilities**<br><br>PT Bank BNI Syariah ("**BNI Syariah**")<br><br>1) Facility of BNI Syariah to DMDT consists of Rp300,000,000,000 non-revolving loan granted pursuant to a financing agreement made between PT Delta Merlin Dunia Textile ("**DMDT**") and PT Bank BNI Syariah under Deed of Funding Limit Agreement (*Akta Akad Plafond Pembiayaan*) No.165, dated 27 December 2018 drawn down through:<br><br>   a) Musyarakah Mutanaqisah Financing No.369/MMQ800/884/XII/2018 dated. 27 December 2018 first drawdown of Rp186,900,000,000.<br><br>   b) Musyarakah Mutanaqisah Financing No.025/MMQ800/884/I/2019 dated 16 January 2019 second drawdown of Rp113,100,000,000.<br><br>PT Bank BNP Paribas ("**BNPP Indonesia**")<br><br>2) Facility of BNPP Indonesia to DDST consists of transaction(s) pursuant to a Foreign Exchange Facility Letter No. LC/DR-158/LA/2016 made between PT Delta Dunia Sandang Textile |

("**DDST**") and PT Bank BNP Paribas Indonesia.

PT Bank BRI Syariah ("**BRI Syariah**")

3) Facilities of BRI Syariah to DMDT consist of

a) Rp130,000,000,000 line facility granted pursuant to a financing agreement made between DMDT and PT Bank BRI Syariah under Deed No. 11 dated 17 January 2018 in conjuction with Financing Principle Approval (*Surat Persetujuan Prinsip Pembiayaan/* SP3), Addendum Number: 12/AO-SOLO/I/2018 dated 17 January 2018 in conjuction with Financing Principle Approval (SP3) No.127/AO-SOLO/VII/2019 dated 30 July 2019 in conjuction with Financing Principle Approval (SP3) for Drawdown I No.128/AO-SOLO/VII/2019 dated 31 July 2019 in conjuction with Financing Principle Approval (SP3) *Penarikan II* No.129/AO-SOLO/VII/2019 dated 31 July 2019.

b) Rp150.000.000.000 line facility granted pursuant to a financing agreement made between DMDT and PT Bank BRI Syariah under deed No. 77 dated 13 November 2009 in conjuction with Deed of Addendum to Line Facility Granting Agreement (*Musyarak*ah) No.12 dated 17 January 2018 in conjuction with Financing Principle Approval (SP3) Addendum Number: 12/AO-SOLO/I/2017 dated 17 January 2018 in conjuction with Financing Principle Approval (SP3)



No.125/AO-SOLO/VII/2019 dated 30 July 2019 in conjuction Letter of BRI Syariah No. 126/AO-SOLO/VII/2019 dated 30 July 2019.

4) Facilities of BRI Syariah to DMST consist of

   a) Rp100,000,000,000 musyarakah financing granted pursuant to a financing agreement made between DMST and PT Bank BRI Syariah under deed No. 130 dated 29 September 2017 made before Rahayu Utami Sari, SH, MKn in Karanganyar in conjunction with letter of BRI Syariah No. 132/AO-SOLO/VII/2019 dated 30 July 2019 and the Addendum to *Musyarakah* Financing Agreement No. 114 dated 31 July 2019.

   b) Rp80,000,000,000 musyarakah financing granted pursuant to a financing agreement made between DMST and BRI Syariah No. 15 dated 12 February 2016 in conjuction with Letter of BRI Syariah No 131/AO-SOLO/VII/2019 dated 30 July 2019.

5) Facility of BRI Syariah to DSSA consists of Rp38,500,000,000 line facility granted pursuant to a financing agreement made between DSSA and PT Bank BRI Syariah under Deed No 69 dated 9 December 2011 which last amended by addendum No. 115 dated 31 July 2019.

PT Bank Central Asia Tbk ("**BCA**")

6) Facility of BCA to DMDT consists of a letter of credit granted



pursuant to a letter of credit application submitted by DMDT to PT Bank Central Asia Tbk dated 15 July 2019.

7) Facility of BCA to DSSA consists of a usance letter of credit granted pursuant to a credit agreement No. 668/7850/KRD/SLV/19 made between DSSA and PT Bank Central Asia Tbk dated 11 July 2019.

PT Bank CIMB Niaga Tbk ("**CIMB Niaga**")

8) Facility of CIMB Niaga to DSSA consists of a checking account and a special transaction financing agreement made between DSSA and PT Bank CIMB Niaga Tbk granted pursuant to the 13th Amendment and Restatement of Credit Agreement No. 106/PK/CSC.JTG-SLB/VI/2007 dated 13 June 2007, duly executed on 27 December 2019.

9) Facility of CIMB Niaga to DMST consists of a trade financing facility granted pursuant to a credit agreement made between DMST and PT Bank CIMB Niaga Tbk under the 18th Amendment and Restatement No. 6, dated 06 May 2008 duly executed on 27 December 2019.

PT Bank Danamon Indonesia Tbk ("**Danamon**")

10) Facility of Danamon to DMST consists of a foreign exchange and derivative transaction facility granted pursuant to the Foreign Exchange and Derivative Transaction Main Agreement and its related Appendices made between DMST and Danamon dated 11 August 2015.

11) Facility of Danamon to DSSA consists of an Omnibus Trade loan Sight Letter of Credit (L/C) for Import/*Surat Kredit Berdokumen Dalam Negeri* (SKBDN), Usance Letter of Credit (L/C) for Import/*Surat Kredit Berdokumen Dalam Negeri* (SKBDN), Trust Receipt (TR), Open Account Financing (OAF) Seller, Bank Guarantee, Overdraft (Checking Account Credit), and Term Loan facility granted pursuant to the agreement between DSSA and Danamon under Deed no 138 dated 28 October 2010 as well as its amendments and extensions last executed under the Extension Agreement to Credit Agreement No. 199/PPWK/EB/0619 dated 3 June 2019.

PT Bank Harda Internasional Tbk ("**Harda**")

12) Facility of Harda to DSSA consists of Rp75,000,000,000 working capital with an installment facility granted pursuant to the agreement made between DSSA and PT Bank Harda Internasional Tbk under a credit approval letter No: 018/OL-Krd/BHI-SOLO/XI-2017 in conjuction with the Deed of Credit Agreement No. 57 dated 14 November 2017 made before Sunarto, SH.,Notary in Surakarta city.

PT Bank HSBC Indonesia ("**HSBC Indonesia**")

13) Facility of HSBC Indonesia to DDST consists of US$23,000,000 facility granted pursuant to the agreement made between DDST and PT Bank HSBC Indonesia under Facility Agreement No. JAK/000241/U/170713 dated 14 August 2017.

PT Bank Mandiri (Persero) Tbk (**"Mandiri"**)

14) Facilities of Mandiri to DDT consist of

    a) Rp250,000,000,000 fixed working capital facility granted pursuant to the agreement made between DDT and PT Bank Mandiri (Persero) Tbk in the deed of fixed working capital facility No.37 dated 10 May 2012 last amended by its addendum dated 8 May 2018 in conjuction with its addendum dated 9 May 2019.

    b) Rp250.000.000.000 revolving working capital facility granted pursuant to the agreement made between DDT and PT Bank Mandiri (Persero) Tbk under the deed of revolving working capital facility No.36 dated 10 May 2012 in conjuction with the 7th addendum dated 8 May 2018 in conjuction with the 8th addendum dated 9 May 2019.

    c) US$20,000,000 non-cash loan facility granted pursuant to the agreement made between DDT and PT Bank Mandiri (Persero) Tbk in the deed of non-cash loan facility No.38 dated 10 May 2012 in conjuction with the 8th addendum dated 8 May 2018 in conjuction with the 9th addendum dated 9 May 2019.

15) Facilities of Mandiri to Damaitex consist of

    a) Rp10,000,000,000 working capital facility granted pursuant to the agreement made between Damaitex and PT Bank Mandiri (Persero) Tbk in Deed No. 92 dated 11 September



2002 with regards to working capital agreement no 136/010/PK-KMK/CO/2002 last amended by 21st amendment dated 30 August 2019 .

b) Rp90,000,000,000 working capital facility granted pursuant to the agreement made between Damaitex and PT Bank Mandiri (Persero) Tbk under agreement No. RCO/SMG/172/PK-MK/2010 dated 22 July 2010 last amended by 11th amendment dated 30 August 2019.

16) Facilities of Mandiri to DMST consist of

a) Rp350,000,000,000 investment loan facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under the deed of agreement No 53 dated 23 December 2013 made before Pujiastuti Pangestu SH, Notary in Karanganyar and its subsequent amendments.

b) Rp500,000,000,000 working capital facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under the deed of agreement No. 13 dated 17 November 2014 made before Pujiastuti Pangestu SH, Notary in Karanganyar and its subsequent amendments.

c) Rp1,170,000,000,000 investment loan facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under the deed of agreement



No. 55 dated 16 September 2015 made before Pujiastuti Pangestu SH, Notary in Karanganyar and its subsequent amendments.

d) US$20,000,000 non-cash loan facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under the deed of agreement No 23 dated 6 May 2015 made before Pujiastuti Pangestu SH, Notary in Karanganyar and its subsequent amendments.

PT Bank Maspion Indonesia Tbk (“**Maspion**”)

17) Facility of Maspion to DSSA consists of Rp50,000,000,000 fixed instalment loan granted pursuant to the agreement made between DSSA and PT Bank Maspion Indonesia Tbk in the deed of credit facility No. 03 dated 9 November 2018.

PT Bank Maybank Indonesia Tbk (“**Maybank Indonesia**”)

18) Facility of Maybank Indonesia to DDST consists of trade financing facility granted pursuant to the agreement made between DDST and PT Bank Maybank Indonesia Tbk in the deed of credit agreement No. 99 dated 27 November 2012 made before Notary Ina Megahwati, SH., in Surakarta in conjuction with its amendment dated 12 December 2017 in conjuction with the credit restatement letter No.S.2018.220/DIR Global Banking – LC & MNC dated 22 November 2018.

PT Bank Muamalat Indonesia Tbk (“**Muamalat**”)

19) Facility of Muamalat to DMDT consists of Rp125,000,000,000

checking account financing facility granted pursuant to the agreement made between DMDT and PT Bank Muamalat Indonesia Tbk in the deed of musyarakah financing No.61 dated 19 December 2014 in conjuction with Al Murabahah Line Facility in the deed of addendum No.62 dated 19 December 2014 in conjuction with Line Facility Al Murabahah Revolving addendum deed No.53 dated 17 March 2016 in conjuction with Line Facility Al Murabahah Revolving addendum deed No.103 dated 29 March 2017 in conjuction with the letter of facility extension offer No. 09/BMI-CBWEST/OL/IV/2019 dated 29 April 2019.

PT Bank Multiarta Sentosa ("**Multiarta Sentosa**")

20) Facilities of Multiarta Sentosa to DSSA consist of

a) Credit Facility provided in pursuant to the agreement made between DSSA and Multiarta Sentosa based on Credit Agreement No.4 dated 9 July 2018 made before Notary Soes Asmara Argawati, SH as amended by the Amendment to Credit Agreement (Restructuring) No. 004/PDA1/SLO/072019 dated 25 July 2019.

b) Credit Facility provided pursuant to the agreement made between DSSA and Multiarta Sentosa based on Credit Agreement No.15 dated 28 November 2018 made before Notary Asih Sari Dewanti, SH as amended by the Amendment Agreement (Restructuring)

33

No.005/PDA2&3/SLO/072019 dated 25 July 2019.

PT Bank Nationalnobu Tbk ("**Nobu**")

21) Facilities of Nobu to DDST consist of Rp20,000,000,000 checking account facility and Rp71,000,000,000 fixed loan instalment facility granted pursuant to the agreement made between DDST and PT Bank Nationalnobu Tbk in the deed of credit agreement No. 22 dated 22 April 2019 made before Agustine Esther, SH., Notary in Surakarta.

PT Bank Negara Indonesia (Persero) Tbk ("**BNI**")

22) Facility of BNI to DDST consists of Rp167,500,000,000 working capital financing facility granted pursuant to the agreement made between DDST and PT Bank Negara Indonesia (Persero) Tbk in the credit agreement No 2014.033 dated 15 October 2014 last amended by the 7th amendment dated 27 September 2019.

PT Bank Permata Tbk ("**Permata**")

23) Facilities of Permata to DMST consist of

a) US$10.000.000 revolving omnibus loan facility granted pursuant to the agreement made between DMST and PT Bank Permata Tbk under the deed of credit agreement No. 34 dated 31 October 2014 made before Notary Elly Halida, SH, MKn in Jakarta as last amended by the deed of amendment No. 10 dated 28 January 2019 made before Notary Erfan Yuniarto SH, MKn, in Jakarta.



b) US$20,000,000 revolving loan facility granted pursuant to the agreement made between DMST and PT Bank Permata Tbk under credit agreement No. 124 dated 27 December 2011 made before Ina Megahwati, SH, MKn., Notary in Surakarta and its subsequent amendments.

PT Bank QNB Indonesia Tbk ("**QNB Indonesia**")

24) Facility of QNB Indonesia to DDST consists of US$10,000,000 loan facility granted pursuant to the agreement made between DDST and PT Bank QNB Indonesia Tbk under the deed of credit agreement No.16 dated 16 January 2015 and its subsequent amendments.

PT Bank Rakyat Indonesia (Persero) Tbk ("**BRI**")

25) Facilities of BRI to DDT consist of

a) US$70,000,000 foreign exchange line facility granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under credit agreement deed No. 109 dated 20 June 2016 and its subsequent amendments.

b) Rp23,796,000,000 investment credit facility in the form of pseudo checking account referred to as Tranche B Investment Credit granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero)Tbk under the deed of credit agreement No. 107 dated 20 June 2016.

c) Rp727,520,000,000 working capital facility granted



pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under the deed of credit agreement No. 104 dated 20 June 2016 and its subsequent amendments.

d) US$30,000,000 working capital import facility and US$30.000.000 import guarantee deferment facility granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under the deed of credit agreement No 105 dated 20 June 2015 and its subsequent amendments.

e) Rp40.000.000.000 trade line credit facility granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under the deed of credit agreement No. 108 dated 20 June 2016 and its subsequent amendments.

26) Facility of BRI to DSSA consist of

a) Rp700,000,000,000 investment loan facility granted pursuant to the agreement made between DSSA and PT Bank Rakyat Indonesia (Persero) Tbk under the deed of credit agreement No. 08 dated 21 January 2019 made before Notary Fessy Farizqoh Alwi, SH., M.Kn. in South Jakarta.

PT Bank Shinhan Indonesia ("**Shinhan Indonesia**")

27) Facilities of Shinhan Indonesia to DSSA consist of:

a) Rp10,000,000,000 corporate loan (working capital) facility granted pursuant to the agreement made between DSSA and



PT Bank Shinhan Indonesia under the deed of credit agreement No. 45 dated 16 December 2016 and its subsequent amendments.

28) Rp50,000,000,000 corporate loan 1 (working capital) and Rp100,000,000,000 corporate loan 2 (working capital) facilities granted pursuant to the agreement made between DSSA and PT Bank Shinhan Indonesia under the deed of credit agreement No. 34 dated 16 April 2018 and its subsequent amendments.

   a) Rp50,000,000,000 corporate loan (working capital) facility granted pursuant to the agreement made between DSSA and PT Bank Shinhan Indonesia under the deed of credit agreement No. 117 dated 22 March 2019 and its subsequent amendments.

29) Facilities of Shinhan Indonesia to DDT consist of

   a) Rp20,000,000,000 corporate loan (working capital) facility granted pursuant to the agreement made between DDT and PT Bank Shinhan Indonesia under the deed of credit agreement No. 120 dated 27 April 2016 and its subsequent amendments.

   b) Rp100,000,000,000 checking account loan facility granted pursuant to the agreement made between DDT and PT Bank Shinhan Indonesia under the deed of facility agreement No. 51 dated 18 April 2017 and its subsequent amendments.

   c) Rp200,000,000,000 corporate loan facility (working capital)

granted pursuant to the agreement made between DDT and PT Bank Shinhan Indonesia under the deed of facility agreement No. 48 dated 28 September 2017 and its subsequent amendments.

PT Bank Syariah Mandiri ("**Mandiri Syariah**")

30) Facilities of Mandiri Syariah to DDST consist of Rp250,000,000,000 *wakalah bin ujroh* LC/SKBDN facility and Rp250,000,000,000 revolving *murabahah* facility granted pursuant to the agreement made between DDST and PT Bank Syariah Mandiri under the deed of *Akad* Line Facility – Wa'Ad (*al murabahah, al musyarakah, al-kafalah* and *wakalah*) Switchable No.38 dated 29 September 2014 made before Mrs. Agustina Junaedi, SH., Notary in Jakarta.

31) Facilities of Mandiri Syariah to DSSA consist of

a) Line Facility Commitment granted pursuant to the agreement made between DSSA and PT Bank Syariah Mandiri under deed No. 22 dated 21 November 2012 made before Efran Yuniarto, SH., MKn, Notary in Jakarta and its subsequent amendments.

b) Line Facility Commitment granted pursuant to the agreement made between DSSA and PT Bank Syariah Mandiri under deed No. 08 dated 17 May 2013 made before Efran Yuniarto, SH., MKn, Notary in Jakarta and its subsequent amendments.

c) Line Facility Commitment granted pursuant to the agreement made between DSSA and PT Bank Syariah Mandiri under deed No. 06 dated 28 June 2018 made before Hendra Wismal, SH., MKn, Notary in Jakarta and its subsequent amendments.

Lembaga Pembiayaan Ekspor Indonesia ("**LPEI**")

32) Facilities of LPEI to DMST consist of (a)Rp530,000,000,000 export financing facility, and (b) Rp800,000,000,000 and US$15,000,000 export financing facilities granted pursuant to the agreement made between DMST and Lembaga Pembiayaan Ekspor Indonesia under the deeds of facility agreement No. 39 dated 28 March 2018 and No. 44 dated 26 May 2010, respectively and their subsequent amendments.

33) Facilities of BNI to DDT consist of (a) Rp699,200,000,000 export financing facility and (b) US$28,333,328 export financing facility granted pursuant to the agreement made between DDT and Lembaga Pembiayaan Ekspor Indonesia under the deeds of facility agreement No. 15 dated 23 March 2017 and No. 16 dated 23 March 2017, respectively, and their subsequent amendments.

Standard Chartered Bank, Jakarta Branch ("**SCB Indonesia**")

34) Facilities of SCB Indonesia to DMST consist of:

a) US Dollar denominated trade facility granted pursuant to the agreement made between DMST and Standard Chartered

Bank, Jakarta Branch under the facility letter dated 18 May 2007 No. JKT/ATG/2102 and its subsequent amendments.

   b) transaction(s) based on the Terms and Conditions for Foreign Exchange Services Letter dated 18 May 2017 with Standard Chartered Bank, Jakarta Branch.

35) Facility of SCB Indonesia to DDT consists of US Dollar denominated trade facility granted pursuant to the agreement made between DDT and Standard Chartered Bank, Jakarta Branch under the facility letter No. JKT/EDF/5076 dated 18 May 2018 later amended and restated by the facility letter No. JKT/EDF/5331 dated 12 April 2019.

PT Bank Mega Tbk ("**Mega**")

36) Facility of Mega to DDT consist of Rp50,000,000,000 fixed loan and Rp170,000,000,000 fixed loan facilities granted pursuant to the agreement made between DDT and PT Bank Mega Tbk under the credit restructuring approval letter No. 070/CMBS/SPPK/19 dated 31 July 2019 in conjuction with the deed of credit agreement No. 22 dated 17 November 2014 and the foreign exchange transaction facility agreement No. SPJ 026.MKTS-MKT/16 and their subsequent amendments.

PT Bank Mega Syariah ("**Mega Syariah**")

37) Facility of Mega Syariah to DSSA consist of Rp25,000,000,000 restructured checking account, Rp25,000,000,000 restructured line facility, Rp26,139,323,032 restructured investment



financing, and Rp48,144,904,954 restructured line facilities granted under the facility approval letter from PT Bank Mega Syariah to DSSA No SPRP.180/CBC.Solo/VII/19 dated 19 July 2019 and No.074/CBC.Solo/III/19 dated 28 March 2019.

**Syndicated Creditors**

1) Facility of Syndicated Creditors to DMDT consist of the US$160,000,000 senior secured facility granted pursuant to the facility agreement dated 21 June 2018 and made between DMDT as borrower, Sumitro as the personal guarantor, BNP Paribas, ING Bank N.V., Singapore Branch, Maybank Kim Eng Securities Pte. Ltd. and Standard Chartered Bank as the arrangers, Standard Chartered Bank (Hong Kong) Limited as the agent, PT Bank Central Asia as the security agent, and the original lenders, including claims of BNP Paribas acting through its Singapore Branch and Standard Chartered Bank (Hong Kong) Limited as the agent of this facility.

2) US$135,000,000 syndicated facility granted pursuant to the facilities agreement dated 15 November 2017 made between DDT as the borrower, BNP Paribas, Maybank Kim Eng Securities Pte. Ltd., Qatar National Bank (Q.P.S.C.), Singapore Branch and Standard Chartered Bank as the arrangers, Standard Chartered Bank (Hong Kong) Limited as the agent, PT Bank QNB Indonesia Tbk as the security agent and common security agent, and the original lenders subsequently amended as of 31

January 2018, including the claims of BNP Paribas acting through its Singapore Branch and Standard Chartered Bank (Hong Kong) Limited as the agent of this facility.

3) Facility of Syndicated Creditors to DDST consists of US$260,000,000 syndicated facility granted pursuant to the facilities agreement dated 29 September 2016 made between DDST as the borrower, BNP Paribas, PT HSBC Securities Indonesia and The Hongkong Shanghai Banking Corporation Limited as the mandated lead arrangers, PT Bank Negara Indonesia (Persero) Tbk as the agent and security agent, and the original lenders

(hereinafter the Syndicated Creditors under the facility agreements listed in paragraphs 1 to 3 above referred to as "**LWG Syndicated Creditors**")

4) Facility of Syndicated Creditors to DMST consists of US$50,000,000 syndicated term facility granted pursuant to the agreement made between DMST, PT Bank Permata Tbk, and PT Bank ICBC Indonesia under the facility agreement dated 31 October 2014.

**Senior Noteholders**

1) Facility of Senior Noteholders to DMDT consists of US$300,000,000 8.625% senior note due 2024 issued by DMDT.

(together the "**Existing Facilities**" and each an "**Existing**



| | |
|---|---|
| | Facility"). |
| **Security Rights** | 1) DMDT 2 Assets and DMDT 3 Assets which on the PKPU Decision Date are encumbered as asset security to Mandiri will be encumbered to be the first rank security securing Mandiri claims against DDT, DMST, and Damaitex under Mandiri's Existing Facilities with such Debtors with security amount in compliance with Mandiri's regulations. For the avoidance of doubt, such encumbrance of DMDT 2 Assets and DMDT 3 Assets are subject to the terms and conditions set out in this Composition Plan regarding their use for working capital funding as set out in point (5) of the provisions on Working Capital.<br><br>2) DMDT 4 Assets which, on the PKPU Decision date are pledged to LPEI, will be encumbered to be the first rank security securing LPEI claims against DDT and DMST under LPEI's which are part of the Existing Facilities with such Debtors.<br><br>3) DMDT 4 Assets, DMDT 5 Assets, and DMDT 6 Assets will be encumbered to become the second rank security for Notes A (as stipulated in the Settlement for Senior Notes in Appendix 5 (Settlement Details). Specifically for DMDT 5 Assets and DMDT 6 Assets, the creation of the second rank security for Notes A is subject to the holders of Notes A providing all documents required by LWG Syndicated Creditors to ensure the enforcement of the release of security over DMDT 5 Assets and |



DMDT 6 Assets following the effective date of the CSPA in accordance with the Composition Plan and its ancillary documents including the CSPA

For the avoidance of doubt:

a) DMDT 4 Assets are charged as the first rank security to LPEI.

b) DMDT 5 Assets and DMDT 6 Assets are and remain secured, as the first ranking security, in favor of the Syndicated Creditors of DMDT under the US$160,000,000 senior secured facility granted pursuant to the facility agreement dated 21 June 2018.

4) Unless otherwise stipulated in this Composition Plan, the existing security interests under various existing Security Documents and security sharing agreements created under and securing the Existing Facilities shall remain in place to secure the obligations of the relevant Debtors relating to the relevant Creditors of the Existing Facilities under the Existing Facilities and this Composition Plan.

5) The Debtors are required to pay all taxes and insure (or maintain insurance cover for) collateralised assets which are based on Security Documents of the Existing Facilities and/or this Composition Plan.

6) Each Participating Creditor at its discretion may request (and the relevant Debtor must comply with) any amendment to the

relevant Security Documents to the extent such request is made to ensure such Creditor's security rights under the relevant Existing Facilities and Security Documents are maintained in accordance with and with due observance of the terms of this Composition Plan.

7) Nothing in this Composition Plan waives the obligations of the Debtors under the Existing Facilities and Security Documents to which they are party and the Debtors have the obligation to continue discharging any obligations they have under the Existing Facilities and Security Documents except to the extent they are amended or expressly superseded by this Composition Plan, with due observance of the terms of this Composition Plan. For the avoidance of doubt and without limiting the scope of the Debtors' obligations under the Existing Facilities and Security Documents, the Debtors are obligated to provide the necessary information to the relevant Creditors and to update the list of security objects under the Existing Facilities and Security Documents (as applicable).

8) To the extent necessary, the relevant Creditors of the Existing Facilities will provide (or will procure to provide) all approvals and actions (including to effect of the release of security, placement of security, and/or the granting of security rights subordinated to such relevant creditor) required to ensure the validity of the Creditor's rights under this Composition Plan.

9) The process of preparing and perfecting any new Security Documents required under the terms of this Composition Plan:

 a) starts on the Effective Date and must be completed within 3 (three) months from the Effective Date or within any other period as required by the notaries/PPAT approved by the relevant Creditors or on such other date as agreed by the Debtors and the relevant Creditors who are granted the relevant security rights referred to in these Security Rights provisions;

 b) is to be done by assigning notaries/PPAT approved by the relevant Creditors who are granted the relevant security rights based on these Security Rights provisions; and

 c) the Debtors must ensure that all documents and letters required for the preparation and/or perfection of Security Documents must be available no later than 14 (fourteen) Calendar Days from the date requested by the relevant Participating Secured Creditors and/or by the notaries/ PPAT.

10) With due consideration to article 281 paragraph 2 of the Bankruptcy Law, Dissenting Secured Creditors shall be entitled to compensation payments calculated as follows (the "**Compensation Payments**"):

 a) each Dissenting Secured Creditor may appoint a licensed independent valuer (*Kantor Jasa Penilai Publik "KJPP"*) to

| | |
|---|---|
| | determine the liquidation value of the assets secured under existing Security Documents which secure the relevant Existing Facilities owed to the relevant Dissenting Secured Creditor (the "**Existing Secured Assets**"); and <br><br> b) each relevant Dissenting Secured Creditor shall be entitled to enforce such existing Security Documents based on the terms under the relevant Security Documents. Alternatively, the relevant Debtors, at their own election, may offer the relevant Dissenting Secured Creditors a one-time payment of compensation in the amount equal to the lower of the amount of the outstanding debt owed to them that is secured by Existing Secured Assets and the value of their Existing Secured Assets. The terms of the payment are to be agreed between the relevant Dissenting Secured Creditors and the relevant Debtors. |
| **Interest    Payment Provisions** | Payment of interest for the amount of Interest Payable is to be paid in cash on the Interest Payment Date to each relevant Creditor, further details of which are provided in Appendix 5 (Settlement Details) and/or other parts of this Composition Plan. To accommodate the uncertainty caused by the COVID-19 outbreak, in the event that any of the Debtors fails to meet any of the monthly interest payments in the first year, the Debtor may elect to defer up to 3 (three) monthly interest payments but not consecutively and 1 (one) quarterly interest payment in the first year after the |

Homologation Date. The deferred interest shall be paid through Excess Cash under the Cash Waterfall Mechanism, but in any case and if there is no available Excess Cash, all unpaid and deferred interest shall be fully paid by the end of the third year after the Homologation Date and the relevant Debtor is still required to make payment from other sources of funds. For the avoidance of doubt, no deferral of monthly and quarterly interest payments is allowed after the end of the first year after the Homologation Date.

(for illustration, if the Homologation Date falls on 26 June 2020, a Debtor may defer the payment of monthly interest for August, October, and December 2020 until 24 June 2023. However as 24 June 2023 is a Saturday and 25 June 2023 is a Sunday, then the payment of the deferred interest shall be made by 23 June 2023. Regardless of whether there is any Excess Cash or any other reason, such deferred interest must be paid no later than by 23 June 2023.)

With due consideration to the Interest Payment Provisions, the following provisions govern interest payments:

1) The monthly interest payment dates are determined on a Point to Point basis until and including the Maturity Date of the relevant debt or such date when all the relevant debt is unconditionally and irrevocably repaid in full (“**Monthly Interest Payment Date**”). However, if a Monthly Interest Payment Date falls on a day other than a Business Day, then the Monthly Interest Payment Date is advanced to the preceding Business Day.

| | |
|---|---|
| | 2) The quarterly interest payment dates are determined on a Point to Point basis until and including the Maturity Date of the relevant debt or such date when the relevant debt is unconditionally and irrevocably repaid in full (“**Quarterly Interest Payment Date**”). However, if a Quarterly Interest Payment Date falls on a day other than a Business Day, then the Quarterly Interest Payment Date is advanced to the preceding Business Day. |
| | (Any Monthly Interest Payment Dates and Quarterly Interest Payment Dates are called the “**Interest Payment Dates**”) |
| | 3) **Interest Period** is a period that starts on (and includes) the Effective Date (if it is the first Interest Period) or, if applicable, an Interest Payment Date and ends on (and does not include) the next Interest Payment Date or the relevant Maturity Date or such date where all the relevant debt is unconditionally and irrevocably repaid in full (if it is the last Interest Period). |
| | 4) Interest that must be paid on an Interest Payment Date (“**Interest Payable**”) is calculated by applying the interest rate applicable to the said interest period on the relevant principal outstanding as detailed in Appendix 5 (Settlement Details), multiplied by the number of days on the Interest Period divided by 360. |
| **Margin/Profit Sharing Payment** | Payment of margin or profit sharing in the amount of Margin/Profit Sharing Payable is to be paid in cash on the Margin/Profit Sharing |



| | |
|---|---|
| **Provisions** (Applicable for sharia financing) | Payment Date to each relevant Creditor, further details of which are provided in Appendix 5 (Settlement Details) and/or other parts of this Composition Plan. To accommodate the uncertainty caused by the COVID-19 outbreak, in the event that any of the Debtors fails to meet any of the monthly margin/profit sharing payments in the first year, the Debtor may elect to defer up to 3 (three) monthly margin/profit sharing payments but not consecutively and 1 (one) quarterly margin/profit sharing payment in the first year after the Homologation Date. The deferred margin/profit sharing shall be paid through Excess Cash under the Cash Waterfall Mechanism, but in any case and if there is no available Excess Cash, all unpaid and deferred margin/profit sharing shall be fully paid by the end of the third year after the Homologation Date and the relevant Debtor is still required to make payment from other sources of funds. For the avoidance of doubt, no deferral of monthly and quarterly margin/profit sharing payments is allowed after the end of the first year after the Homologation Date. (for illustration, if the Homologation Date falls on 26 June 2020, a Debtor may defer the payment of monthly margin/profit sharing for August, October, and December 2020 until 24 June 2023. However as 24 June 2023 is a Saturday and 25 June 2023 is a Sunday, then the payment of the deferred margin/profit sharing shall be made by 23 June 2023. Regardless of whether there is any Excess Cash or any other reason, such deferred margin/profit sharing must be paid |



no later than by 23 June 2023.)

With due consideration to this Margin/Profit Sharing Payment Provisions, the following provisions govern margin/profit sharing payments:

1) The monthly margin/profit sharing payment dates are determined on a Point to Point basis until and including the Maturity Date of the relevant debt or such date when all the relevant debt is unconditionally and irrevocably repaid in full (**"Monthly Margin/Profit Sharing Payment Date"**). However, if a Monthly Margin/Profit Sharing Payment Date falls on a day other than a Business Day, then the Monthly Margin/Profit Sharing Payment Date is advanced to the preceding Business Day.

2) The quarterly margin/profit sharing payment dates are determined on a Point to Point basis until and including the Maturity Date of the relevant debt or such date where the relevant debt is unconditionally and irrevocably repaid in full (**"Quarterly Margin/profit Sharing Payment Date"**). However, if a Quarterly Margin/Profit Sharing Payment Date falls on a day other than a Business Day, then the Quarterly Margin/Profit Sharing Payment Date is advanced to the preceding Business Day.

(Hereinafter Monthly Margin/Profit Sharing Payment Dates and Quarterly Margin/Profit Sharing Payment Dates referred to as

| | |
|---|---|
| | "**Margin/profit Sharing Payment Dates**") |
| | 3) **Margin/Profit Sharing Period** is a period that starts on (and includes) the Effective Date (if it is the first Margin/Profit Sharing Period) or, if applicable, an Margin/Profit Sharing Payment Date and ends on (and does not include) the next Margin/Profit Sharing Payment Date or relevant Maturity Date or such date when all the relevant debt is unconditionally and irrevocably repaid in full (if it is the last Margin/Profit Sharing Period). |
| | 4) Margin/profit sharing that must be paid on a Margin/Profit Sharing Payment Date ("**Margin/Profit Sharing Payable**") is calculated by applying the margin/profit sharing rate applicable to the said margin/profit sharing period for the relevant principal outstanding as detailed Appendix 5 (Settlement Details), multiplied by the number of days on the Margin/Profit Sharing Period divided by 360. |
| **Provisions on Principal Repayments** | Principal repayments for the Principal Payable are to be paid in cash on the Principal Payment Date to the relevant Creditors as set out in detail in Appendix 5 (Settlement Details) and/or other parts of this Composition Plan. In connection with the uncertainty caused by the COVID-19 outbreak, in the event that any of the Debtors fail to meet the principal payment obligations in the first year, that Debtor may elect to defer up to 3 (three) monthly principal payments but not consecutively and one quarterly principal payment in the first |

year after the Homologation Date. The deferred principal is to be paid through Excess Cash as stipulated in the Cash Waterfall Mechanism, but in any case and if there is no available Excess Cash, the deferred principal shall be unconditionally and irrevocably fully paid by the end of the third year falling after the Homologation Date and the relevant Debtor shall be required to make payments from other sources of funds. For the avoidance of doubt, no deferral of monthly and quarterly principal payments is allowed after the end of the first year falling after the Homologation Date.

(for illustration, if the Homologation Date falls on 26 June 2020, a Debtor may defer the payment of monthly principal for August, October, and December 2020 until 24 June 2023. However as 24 June 2023 is a Saturday and 25 June 2023 is a Sunday, then the payment of the deferred principal shall be made by 23 June 2023.)

With due consideration to this Principal Repayment provisions, the following provisions govern interest [sic] payments:

1) Monthly principal payment dates are determined on a Point to Point basis up to and including the Maturity Date of the relevant debt or the date on which the relevant debt is unconditionally and irrevocably repaid in full ("**Monthly Principal Payment Date**"). If there is a Monthly Principal Payment Date that falls on a day other than a Business Day, then the Principal Payment Date is advanced to the preceding Business Day.



| | |
|---|---|
| | 2) Quarterly principal payment dates are determined on a Point to Point basis up to and including the Maturity Date of the relevant debt or the date on which the relevant debt is unconditionally and irrevocably repaid in full ("**Quarterly Principal Payment Date**"). If there is a Quarterly Principal Payment Date which falls on a day other than a Business Day, then the Quarterly Principal Payment Date is advanced to the preceding Business Day.<br><br>(Hereinafter Monthly Principal Payment Date and Quarterly Principal Payment Date referred to as the "**Principal Payment Dates**").<br><br>3) **Principal Period** is a period that starts on (and includes) the Effective Date (if it is the first Principal Period) or, if applicable, a Principal Payment Date and ends on (and excludes) the next Principal Payment Date or Maturity Date (if it is the last Principal Period).<br><br>4) Principal that must be paid on the Principal Payment Date ("**Principal Payable**") is calculated using the Principal Repayment amount of the relevant debt and the relevant year as detailed in Appendix 5 (Settlement Details), multiplied by the number of calendar months in the Principal Period and divided by 12 as set forth in the Cash Waterfall Mechanism. |
| **Debt Settlement Via Non-Operating** | 1) Settlement through Debt Settlement Via Non-Operating Asset applies to debts secured against Non-Operating Assets. |

| | |
|---|---|
| **Assets** | 2) Debt Settlement Via Non-Operating Asset are made, based on the relevant Creditor's discretion through: <br><br> a) sales of non-operating assets ("**Sales of Non-Operating Assets**"); or <br><br> b) transfer of Non-Operating Assets through AYDA. <br><br> 3) Relevant Creditors can proceed with Debt Settlement Via Non-Operating Assets from the Effective Date. <br><br> 4) Each relevant Creditor will be given the authority to manage the sales process and sales decisions for its respective security including: <br><br> a) selection and appointment of a public appraisal service office ("**KJPP**"), and a notary/land deed official (PPAT); <br><br> b) determination of composition of Non-Operating Assets that will be subjected to the Sales of Non-Operating Assets and Non-Operating Assets that will be subjected to AYDA; <br><br> c) timing of Sales of Non-Operating Assets and AYDA including changing the decision to conduct Sales of Non-Operating Assets (in the event that the sales is difficult to do) into AYDA; <br><br> d) selection and appointment of sales agents; <br><br> e) determination of sales prices and fees of third parties' assisting the sales process; and <br><br> f) sales and transfer of ownership (this will be supported by a power of attorney to sell). |

5) Transaction costs for Debt Settlement Via Non-Operating Asset (if any), given the cash and working capital constraints of the Group, will be deducted from the proceeds of sales, including:

   a)  seller property tax (2.5%) on land and buildings;

   b)  independent appraisal fee / KJPP;

   c)  sales agent fees;

   d)  notary/land deed official (PPAT) fees; and

   e)  other reasonable costs related to the sales of Non-Operating Assets and AYDA.

6) The Debtors undertake that at any time they will fulfill all the requirements needed for the implementation of the sales of Non-Operating Assets and/or AYDA including but not limited to (a) providing a power of attorney to sell and other supporting documents, (b) providing access to documents and locations for KJPP to conduct an assessment, and (c) requesting documents and/or approvals from the relevant agencies as may be needed, provided that:

   a)  The relevant Debtor is required to fulfill all of these requirements within 30 (thirty) Calendar Days from the moment the request letter from the relevant Creditor is received.

   b)  In the event that the fulfillment depends on the receipt of documents and/or approvals from the relevant agencies, the fulfillment of the required requirements shall be within 30



(thirty) Calendar Days from the date the documents and/or approvals from the relevant agencies are received.

c) If the required documents submitted by the relevant Debtor in relation to Debt Settlement Via Non-Operating Asset are rejected by the land office or the competent authority, the relevant Debtor is required to provide other required documents as requested by the relevant Creditor, including by way of execution of other documents required for Debt Settlement Via Non-Operating Asset purposes and/or AYDA.

7) At the first request of the relevant Participating Creditor, the relevant Debtor undertakes (and as may be required, guarantees that the parties holding the title to the Non-Operational Assets are willing) to at any time vacate the Non-Operational Assets subjected to the sales of the Non-Operational Assets or AYDA, and the relevant Debtor shall bear all costs associated with the vacating.

8) No Debtor shall rent out or extend the term of any rent of Non-Operational Assets without the prior written approval from the relevant Participating Creditor(s).

9) The Debtors guarantee that the party holding title rights to the Non-Operating Assets is willing to fulfill the requirements at any (reasonable) time for the Sales of Non-Operational Assets and/or AYDA including but not limited to being present at the



| | |
|---|---|
| | office of a notary/land deed official (PPAT).<br><br>10) Provisions on debt settlement through Debt Settlement Via Non-Operating Assets of each Creditors must be read together with Appendix 5 (Settlement Details) relating to each of the Creditors. |
| **Novation Provisions** | The settlement of Existing Facilities by way of transfer of debt settlement obligation ("**Novation**") as detailed in Appendix 5 (Settlement Details) shall be subject to and carried out in accordance with the following provisions:<br><br>1) The effectiveness of the Novation agreement, release of security and encumbrance of security after the signing of the Novation (either for asset security or guarantee) must be completed within a period of 6 (six) months from the Effective Date, or within such other period as agreed by the Debtors and the relevant Participating Creditors.<br><br>2) Each Debtor undertakes, guarantees, and ensures the furnishing of irrevocable powers of attorney to re-register the security to be encumbered after the Novation, being either security granted by the Debtor or from the guarantor or other third party on the execution date of the Novation.<br><br>3) Each Debtor undertakes, guarantees, and ensures: (a) the signing of the Novation Deed and its effective execution are in accordance with the Articles of Association of the Debtor, and (b) the availability of the required documents. |

| | |
|---|---|
| | 4) Prior to the effectiveness of the Novation, the relevant Debtor must continue to carry out its obligations to the relevant Creditor in accordance with the payment schedule stipulated in the Composition Plan. |
| | 5) Failure to complete the obligations stated in paragraphs 1, 2, 3 and 4 above shall constitute an event of default and shall be treated in accordance with the provisions on Default in the Composition Plan. |
| | 6) If the effectiveness of the Novation is prevented for any reason, including due to objection from any third parties, the relevant Debtor must continue to carry out its obligations to the relevant Creditor in accordance with the payment schedule stipulated in the Composition Plan. |
| | 7) The Participating Creditor relevant to the Novation acting on the request of the relevant Debtor to the Novation may but is not obligated to amend and/or waive the terms set out under this Novation Provision . |
| | 8) Any costs incurred in the preparation and the perfection of the documentation to render this novation effective are borne by the relevant Debtor. |
| **Turn Around Consultant** | The Group shall engage a global consulting firm to be tasked substantially with the review of and/or preparation of turn around and operational plans, including the planning for capital expenditure and estimated working capital needs for the Group ("**Turn Around** |

| | |
|---|---|
| | **Consultant"**).<br><br>The Turn Around Consultant with the appropriate experience shall be selected from the list below (the "**Agreed List**") and shall be appointed within 90 (ninety) Days of the Effective Date.<br><br>The Agreed List of global consultants is as follows:<br><br>1)  Partners in Performance;<br><br>2)  Strategy&;<br><br>3)  McKinsey & Company; and<br><br>4)  AT Kearney<br><br>The selection of any Turn Around Consultant outside of the Agreed List requires the approval of the Independent Director.<br><br>The operational and turn around review is to form the basis of a business plan to be developed by the Board of Directors, including the Independent Director. |
| **Working Capital** | 1)  The CFO shall provide an annual budget for the Group to the Independent Director no later than the date falling 15 (fifteen) Calendar Days prior to the end of each financial year (each, an "**Annual Budget**"). Each Annual Budget shall be approved by the CFO and Independent Director.  Each Annual Budget shall include a calculation for working capital requirements of each company in the Group based on the following metrics (unless amended as agreed by the CFO and Independent Director):<br><br>a)  cash; plus<br><br>b)  inventory at a minimum of 45 days of sales; plus |

c) accounts receivable at a minimum of 30 days of sales; less

d) accounts payable at a maximum of 60 days of sales; plus

e) Any Approved Capital Expenditure or Operating Expenditure approved by the Independent Director, with consideration of the detailed business review and turnaround plan.

("**Working Capital Requirement**").

2) The CFO and the Independent Director shall jointly assess if there are sufficient funds to meet the **Working Capital Requirement** of each company in the Group quarterly, based on the Monitoring Accountant's assessment of the items in paragraphs 1(a) to (e) above. Based on this, if and when required, the CFO and Independent Director will jointly manage the process of raising working capital ("**Working Capital Funding**") in accordance with the provisions below.

3) Working Capital Funding may be raised as follows:

a) the sales of the Sponsor Personal Assets;

b) external financing obtained by the Sponsor which may be secured by Sponsor's Personal Assets and Sponsor's Duniatex Assets;

c) the sales of unencumbered Sponsor Duniatex Assets;

d) financing obtained by the Debtors with such financing secured by unencumbered assets of the Debtors, including the Sponsor Personal Assets and Sponsor Duniatex Assets



(each a "**New Working Capital Facility**"); or

    e)   the sales of any other unencumbered assets of the Debtors.

Any Working Capital Funding must be approved by the CFO and the Independent Director.

4) The Sponsor's Personal Assets are defined at Appendix 2 (Sponsor's Personal Assets).

5) The Sponsor's Duniatex Assets are defined as DMDT 2 Assets, DMDT3 Assets, and DMDT 7 Assets the titles of which are under the name of the Sponsor.

6) The Sponsor's Duniatex Assets and the Sponsor Personal Assets are hereinafter referred to as the "**Sponsor's Assets**".

7) The Sponsor irrevocably and unconditionally undertakes to provide the Sponsor's Personal Assets and Sponsor's Duniatex Assets for use to raise new working capital for the Debtors at such time and in accordance with the process set out below and undertakes to provide the Independent Director with a power of attorney in respect of the Sponsor's Personal Assets and Sponsor's Duniatex Assets, within 30 Days of the appointment of the Independent Director to enable the Independent Director to take such actions as required to be taken by the Composition Plan including the sales of Sponsor's Personal Assets and Sponsor's Duniatex Assets.

8) Subject to Working Capital Funding requirements as determined in accordance with this Composition Plan, the Sponsor

irrevocably and unconditionally undertakes to assist and support the CFO and Independent Director in raising up to US$100,000,000 (one hundred million United States Dollars) of Working Capital Funding for the Group by:

a) firstly, making all reasonable attempts to sell Sponsor's Personal Assets; and

b) secondly, in the event the sales of Sponsor's Personal Assets fail to raise up to US$$100,000,000 (one hundred million United States Dollars), raising the remaining part of US$$100,000,000 (one hundred million United States Dollars) by raising external financing which may be secured against Sponsor's Duniatex Assets at such time as required and in accordance with the process set out below ("**Financed Sponsor Working Capital**"). The Sponsor agrees to pay any financing costs incurred in connection with the Financed Sponsor Working Capital.

9) If the obligation in paragraph 8(b) above is not met by the Sponsor, this in itself it shall not constitute a Default, provided that the Debtors have not defaulted on and continue to meet their scheduled payments of interest, margin/profit sharing, and principal to their Participating Creditors (i.e. payments as set forth in the Interest Payment Provisions, Margin/Profit Sharing Payment Provisions and Principal Payment Provisions) in accordance with the provisions of this Composition Plan.

10) In the event that more Working Capital Funding than that raised under paragraph 8 is required, the addition may, subject to approval by the Independent Director, be raised through financing secured by unencumbered Sponsor's Duniatex Assets, with financing costs paid for by the respective Debtors receiving such Working Capital Funding.

11) The Sponsor represents, warrants and undertakes that the details of the Sponsor's Assets are accurate, true and correct and that each Sponsor Assets is, and shall remain, unencumbered (other than from security created in favour of the Participating Secured Creditors or otherwise permitted under the terms of this Composition Plan) until all amounts owing by the Debtors to the Participating Secured Creditors under the Existing Facilities have been unconditionally and irrevocably fully repaid and discharged.

12) Any New Working Capital Facility must be approved by the CFO and the Independent Director.

13) The raising of Working Capital Funding by either the sales of or financing secured by DMDT 2 Assets, DMDT 3 Assets, assets titled to Damaitex and/or any other assets secured against Existing Facilities may only occur in accordance with Mandiri's policies and, the CFO and the Independent Director have determined that, all reasonable efforts to raise Working Capital Funding have already been made against: (i) Sponsor's Personal



Assets; (ii) DMDT 7 Assets; and (iii) any other unencumbered assets of the Debtors (if any). If all of the abovementioned requirements are met, the Participating Secured Creditors with security over the relevant assets shall release their security to enable such assets to be used to secure the Working Capital Funding, at such time and in such manner reasonably satisfactory to the relevant Participating Secured Creditors. .

14) The Sponsor shall open a Working Capital Account with an Account Bank of the relevant Debtor no later than 3 (three) months from the Effective Date and such account shall be controlled by the Independent Director. The Independent Director shall manage the Working Capital Account including the disbursement of funds in accordance with the terms and conditions of this Composition Plan. The Sponsor subject to the recommendations of the CFO and the Independent Director shall deposit all proceeds of the sales of Sponsor's Personal Assets, sales of Sponsor's Duniatex Assets, Financed Sponsor Working Capital, and any other Working Capital Funding raised into such account. The Sponsor agrees that its Working Capital Account shall be secured in favour of the Participating Secured Creditors and the Sponsor shall enter into Security Documents in the form and substance satisfactory to the Participating Secured Creditors, to create and perfect security over the Working Capital Account.

15) The Sponsor shall, and shall procure that any relevant title holder shall, enter into Security Documents in the form and substance satisfactory to the Participating Secured Creditors, to create and perfect security over the Sponsor's Personal Assets in favor of the Participating Secured Creditors.  If financing is obtained and secured by the Sponsor's Personal Assets, the Participating Secured Creditors with security over the relevant Sponsor's Personal Asset shall release their security to enable such Sponsor's Personal Assets to be secured in favor of the relevant creditor providing such Working Capital Funding, at such time and in such manner reasonably satisfactory to the relevant Participating Secured Creditors.

16) The CFO and the Independent Director shall jointly make recommendations on the sales and/or encumbrance of Sponsor's Personal Assets, Sponsor's Duniatex Assets, and/or unencumbered assets of Debtors to fund working capital requirements of the Debtors, with the following conditions:

a) Proceeds of the sales of any Sponsor's Personal Assets, Sponsor's Duniatex Assets, and/or unencumbered assets of the Debtors will constitute Working Capital Funding shall be distributed in accordance with this Composition Plan. Proceeds of the sales of any Sponsor's Personal Assets and Sponsor's Duniatex Assets shall be recorded as paid-up capital in the accounting records of the relevant Debtor.

b) The sales process shall be based on the following guidelines

   i) The process must be transparent and available to all Participating Secured Creditors when there is a request for information by the creditor in question.

   ii) Sales prices must be supported by valuation obtained from a licensed KJPP.

   iii) Sales must be made on an independent basis, either by a sales agent or an independent auction house.

   iv) The Sponsor shall and shall procure that the title holders of Sponsor's Personal Assets and/or Sponsor's Duniatex Assets shall cooperate and facilitate the sales process (including by taking such action and providing such documentation as may be required).

c) The Independent Director shall oversee and the MA shall report on the process on a quarterly basis to the Participating Secured Creditors.

17) If any of the Sponsor's Assets is recommended by the CFO and the Independent Director to be sold in accordance with the terms of this Composition Plan, the security over the relevant assets shall be released at such time and in such manner satisfactory to the Participating Secured Creditors and the Sponsor shall (and shall procure that the relevant title holders of such Sponsor Assets shall) take all steps and enter into such documentation as reasonably required by the Participating Secured Creditors in

order for any proceeds of sales to be applied in accordance with the process set out in this Composition Plan.

18) If Working Capital Funding is required to be raised through a New Working Capital Facility:

   a)  the Debtors shall not enter into such New Working Capital Facility without first offering the same terms to the Participating Creditors for consideration for a period of 30 Calendar Days. If an offer to provide such New Working Capital Facilities is made by the Participating Creditors during such 30 Day Calendar period, the Debtors must enter into New Working Capital Facility with such Participating Creditor. If no offer to provide such New Working Capital Facility is made by the Participating Creditors during such 30 Calendar Day period, the Debtors may proceed with any party(ies) that may provide the Debtors such working capital facilities (each a "**New Working Capital Creditor**");

   b)  the Debtors shall not pledge any collateral (including any inventory or receivables) to secure any New Working Capital Facility or any other financing in preference to or if such action would prejudice any existing Creditor in any manner (unless prior written consent of the affected Creditor is received), although, notwithstanding the above, the Debtors shall be permitted to grant security over: (i) receivables and inventories (to the extent these are not

68

secured in favor of any Participating Secured Creditors and provided that in doing so the obligations of the Debtors and rights of any Participating Creditors under any existing Security Documents or finance documents are not prejudiced in any way); (ii) DMDT 7 Assets; and/or; (iii) DMDT 2 Assets, DMDT 3 Assets, assets titled to Damaitex and/or any other assets secured against Existing Facilities of Mandiri to Damaitex providing that the Existing Facilities of Mandiri to Damaitex have been fully settled in accordance with Mandiri's policies and, of the CFO and the Independent Director have determined that, all reasonable efforts to raise Working Capital Funding have already been made against the other assets listed in paragraphs (i) and (ii) above and (iv) and (v) below; and/or (iv) any other unencumbered assets of the Sponsor (if any); and/or (v) any other unencumbered assets of the Debtors (if any).

c) New Working Capital Creditors shall have priority rights in the Cash Waterfall Mechanism in accordance with the terms of this Composition Plan; and

d) the principal of any New Working Capital Facility may be repaid with scheduled repayments or instalments subject to the relevant Debtors' funding capability. In the event of insufficient cash and/or lack of repayment capability, the remaining principal payment obligations may be settled in

69

such manner as the relevant Debtor and the relevant New Working Capital Creditor may agree and set out under a separate agreement, provided that the Debtors may only settle the payment of any New Working Capital Facility in a manner that does not breach the terms of the Composition Plan or prejudice the interests of any of the Participating Creditors in any manner (including under the CAMA).

19) If the CFO and the Independent Director are unable to agree on a decision regulated under this Composition Plan, regarding the amount of working capital required, they shall enter into good faith negotiations for 15 (fifteen) Calendar Days and use their best efforts to come to an agreement on such terms.  If the CFO and the Independent Director are unable to come to an agreement during the relevant 15 (fifteen) Calendar Days period (each, an "**Initial Period**"), the decision required will be made by the Monitoring Accountant, who will then have 15 (fifteen) Calendar Days from the end of the Initial Period to make such decision.

20) Non-fulfillment of the points in the provisions on Working Capital does not constitute a Default under the Composition Plan, provided that the Debtors have not defaulted on and continue to meet their scheduled payments of interest, margin/ profit sharing and principal to their Participating Creditors (i.e. payments made in the Interest Payment Provisions,

|  | Margin/Profit Sharing Payment Provisions and Principal Payment Provisions) in accordance with the terms of this Composition Plan. |
|---|---|
| **Capex Budget** | Each Debtor shall provide its annual maintenance capital expenditure budget, as approved under the annual budgeting process, to the Independent Director, no later than 15 December of the previous year.  Any capital expenditure exceeding each annual maintenance capital expenditure budget provided must be approved by the Independent Director before such excess capital expenditure, over and above annual maintenance capital expenditure, is able to be paid in accordance with the terms of the Cash Waterfall Mechanism (the "**Approved Capital Expenditure**"). For capital expenditure other than annual maintenance capital expenditure, each Debtor shall provide its detailed capital expenditure budget to the Participating Creditors for each of the 7 years falling after the Effective Date, at the start of each of its financial year, which shall be approved by the Independent Director. |
| **Refinancing** | Each Debtor on a best-efforts basis shall refinance its obligations set out under this Composition Plan, subject to market conditions at the time as applicable to the relevant Debtor. |
| **Entry of Investor** | In the event that any Debtor negotiates the transaction of the entry of an investor (either as an equity investor or a new lender) into |

71

| | |
|---|---|
| | such Debtor, the closing of the relevant transaction is subject to approval of the Independent Director and the relevant Participating Secured Creditors Approval (Debtor). |
| **Governance and Transparency** | The Group shall apply and implement the System Application and Product in Data Processing (SAP) to improve the quality of information and data to support decision making no later than 30 June 2021 and the Independent Director shall ensure the implementation of SAP. SAP modules that will be applied to the Group: <br><br>1) Sales and Distribution Module; <br>2) Material Management Module; <br>3) Production Planning Module; and <br>4) Financial and Control Module. <br><br>After SAP implementation is complete throughout the companies of the Group, the Group will be able to manage supply chains, production planning, product costing, inventory management, inter-company transactions and integrated financial reporting. <br><br>To support the Group's governance and transparency, the Group is to conduct professionalization of management by making improvements and professionalization of efficient management structure for all of the Group's operational assets, with the Group's organizational structure as follows: |





*Figure 1. Proposed Organizational Group Structure.*

Management professionalization will be carried out in line with SAP's implementation to better manage cost structures, production decisions and inventory management.

The Debtor is proposing to hire an experienced Chief Financial Officer ("**CFO**") positioned among other Key Hire positions.

The MA shall monitor the process of appointing Key Hires and shall provide a short list of candidates with the Group's preferred candidates (if any) to the Independent Director.

The Independent Director may veto at most 2 (two) out the three candidates of Key Hires.

No Key Hire role shall remain vacant for any consecutive period of longer than 6 months at any time after the Effective Date. The Independent Director, with the support of MA, will report to the Lenders on the management hiring process on a quarterly basis.

| | |
|---|---|
| **Change of Board of Directors** and **Board** of | To change the Board of Directors ("**BOD**") or the Board of Commissioners ("**BOC**") of each Debtor, the relevant Debtor shall first request the approval on the candidates in the change of |



| | |
|---|---|
| **Commissioners** | members of the BOD and/or the BOC by way of a notification letter by registered mail to the Participating Creditors. If there is no delivery of written objections from Participating Secured Creditors holding more than 33% of the value of outstanding principal of such Debtor within 30 Days of the date the notice was circulated by the relevant Debtor, then the Debtor is authorized to proceed with the change of the members of BOD and BOC. <br><br> Notwithstanding the above, the Independent Director may only be replaced in accordance with the relevant terms as set out in this Composition Plan. <br><br> The "change of the BOD and the BOC" shall include appointment, replacement, or extension of term of office. |
| **Appointment of the Independent Director** | An Independent Director shall be appointed within 60 (sixty) Days from the Effective Date in accordance with the following provisions: <br><br> 1) The Independent Director is an individual with appropriate financial and operational experience in business turn around preferably in the textile industry. The Independent Director has a duty of care to all parties of the Composition Plan and should not take any actions that benefit any one party at the expense of another. <br><br> 2) Any of and only the Participating Secured Creditors shall have the right to nominate a candidate for the role of Independent Director and shall provide the name and details of such |

nomination to the Monitoring Accountant no later than the date falling 30 (thirty) Days from the Effective Date. If fewer than 3 candidates have been nominated, the MA is to contact the Participating Secured Creditors to obtain the necessary additional nominations.

3) Only 1 (one) individual from any of the advisors (including from any affiliated companies, related parties and individuals of the advisors) involved in the PKPU with cases No. 22/Pdt.Sus-PKPU/2019/PN SMG or No. 25/Pdt.Sus-PKPU/2019/PN.SMG may be nominated for the role of the Independent Director.

4) The Monitoring Accountant shall circulate all the candidate names, with resumes and other relevant supporting details, which it has received to all the Participating Creditors no later than the date falling 35 (thirty five) Calendar Days from the Effective Date.

5) Each Participating Creditor who wishes to vote shall notify the Monitoring Accountant of their top three preferred candidates no later than the date falling 45 (forty five) Calendar Days from the Effective Date. The vote requires a quorum of 50% of the Participating Secured Creditors by value of the outstanding principal of the Participating Secured Creditors during the time such vote is being held. The MA will be responsible for managing the voting process.

6) The Monitoring Accountant shall notify the Debtors of the three



candidates with the highest number of votes by value of the outstanding principal of the Participating Secured Creditors during the time such vote is being held no later than the date falling 50 (fifty) Calendar Days from the Effective Date.

7) The candidate with the most number of votes by value of the outstanding principal of the Participating Secured Creditors during the time such vote is being held shall be appointed as the Independent Director, unless vetoed by the Debtors. In such instance the candidate with second most number of votes shall be appointed as the Independent Director, unless vetoed by the Debtors. If the Debtors veto the appointment of such candidate, the candidate with the third highest number of votes shall be appointed as the Independent Director.    The date the Independent Director is appointed, which shall be within 60 (sixty) Calendar Days from the Effective Date, shall be the **"Appointment Date"**.

8) The Independent Director will continue to be appointed so long as there are outstanding payments or other obligations owing to the Participating Creditors which have not been met or unconditionally and irrevocably paid and discharged in full subject to reasonable period for the replacement or substitution of the Independent Director (as the case may be).

9) The shareholders of each of the Debtors shall immediately and at the latest within 14 (fourteen)  Calendar Days, subject to

|   |   |
|---|---|
|   | obtaining necessary approvals from relevant ministries and other authorities of the Government of Indonesia, of the Appointment Date appoint the selected Independent Director:<br><br>a) to be on the Board of Directors of each of the Debtors; and<br><br>b) to be the signatory to the accounts set out in the Cash Waterfall Mechanism provisions.<br><br>10) Each Debtor's articles of association shall be amended no later than 30 (thirty) Calendar Days of the Appointment Date to allow the Independent Director to legally act on behalf of and represent each Debtor without the need for approval from the other directors and without any limitation whatsoever.<br><br>11) Prior to the appointment of the Independent Director, the MA will be responsible to carry out the responsibilities of the Independent Director (without board appointment).<br><br>12) Remuneration of the Independent Director shall be reasonable and in line with industry standards.<br><br>The MA will monitor this process, manage communication with the Participating Creditors and report on compliance with the above provisions.<br><br>Any replacement or substitution of the Independent Director shall follow the appointment process as stipulated in the provisions on the Appointment of the Independent Director. |
| **Duties of the Independent** | The Independent Director shall be appointed as a member of the board of directors of each of the Debtors. The Independent Director |

| | |
|---|---|
| **Director** | together with the Chief Financial Officer, and other members of management of the Debtors with the support of the MA shall be responsible for, with respect of each of the Debtors:<br><br>1) Financial and cash management:<br><br>   a) ensuring compliance of the application of the Cash Waterfall Mechanism as set out in this Composition Plan and entry into and compliance with the CAMA and any other relevant implementing documentation;<br><br>   b) assessing working capital needs of the Group, if required, raising working capital loans in accordance with the terms of this Composition Plan;<br><br>   c) ensuring the development of cash and working capital controls and procedures;<br><br>   d) ensuring the establishment of the monthly bank reconciliation process;<br><br>   e) ensuring (but not managing) the implementation of SAP;<br><br>   f) ensuring the compliance of independent auditors appointment and overseeing the audit process, including the adjustment to opening balances; and<br><br>   g) approving budgets and forecasts.<br><br>2) Inventory management:<br><br>   a) ensuring the establishment of controls over purchasing of inventory;<br><br>   b) reviewing aged monthly inventory listing; |

|  |  |
|---|---|
|  | c)  participating in quarterly stock take; and |

d)  approving any provision for stock obsolescence or expiry.

3)  Ensuring MA quarterly reports cover, among others:

   a)  covenant testing;

   b)  compliance with the Cash Waterfall Mechanism, cash flow and cash balances;

   c)  sales performance and profitability;

   d)  inventory balance and aging (by location);

   e)  receivables balances and aging;

   f)  payables balances and aging;

   g)  capital expenditure;

   h)  appropriateness of Operating Expenditure, including Capital Expenditure for Maintenance;

   i)  any exceptions noted from cash monitoring activities;

   j)  update on operational performance or developments; and

   k)  update on any strategic developments.

4)  Provision of approvals for:

   a)  distributions from the Spinning Proceeds Account and Weaving and Finishing Proceeds Account;

   b)  any sales or closure of any factories of the Group in accordance with this Composition Plan;

   c)  any sales of Sponsor Assets and any unsecured assets of the Debtors in accordance with the terms of this Composition Plan;

|  | |
|---|---|
|  | d) withdrawals from the Working Capital Account;<br><br>e) capital expenditure spending; and<br><br>f) realisation of assets for capital contribution.<br><br>5) Supervising and implementing and/or ensuring the implementation of the recommendation of the Turn Around Consultant. |
| **Sponsor's Directorship** | 1) The Sponsor shall be appointed as a director in each of the Debtors within 30 (thirty) Calendar Days after the Effective Date during the course of the implementation of the Composition Plan. However, the Sponsor can designate this directorship role from time to time to any member of his immediate family (a "**Designated Person**").<br><br>2) The Group shall:<br><br>a) legally appoint the Sponsor or his Designated Person as a director of each of the Debtors in accordance with Law No. 40 of 2007 on Limited Liability Company and other relevant regulations; and<br><br>b) ensure that the appointment of the Sponsor or his Designated Person as a director in each Debtor in the Group will not conflict with the scope of work of the Independent Director.<br><br>3) The Sponsor or relevant Designated Person will continue to be a director of the each Debtor until full repayment of all debts of the Participating Creditors. |



| | |
|---|---|
| **Monitoring**<br><br>**Accountant ("MA")** | 1) Appointment of MA<br><br>   a)  The Debtors shall appoint PKF as MA for the first 6 months after the Effective Date starting from the Effective Date. In the event that PKF is negligent in the fulfilment of any of its obligations as MA during that period, the Debtors shall immediately be entitled to carry out the MA Replacement Process set forth below.<br><br>   b)  At or after the end of the first 6 months after the Effective Date, Participating Creditors representing a minimum of 20% (twenty percent) of the principal outstanding of the Participating Creditors may jointly propose the replacement of PKF as an MA. This motion will be held based on Participating Secured Creditors Approval (Debtors) to be obtained within 30 Days from the date of the proposal.<br><br>   c)  From the Effective Date and throughout the Composition Plan period, the Debtors shall maintain that the appointment of the MA is continuing by ensuring that there are sufficient terms of the resignation notification period to carry out the MA Replacement Process or otherwise in accordance with this Composition Plan. In the event of a time period where the Debtors do not have an MA for any reason ("**MA Gap**"):<br><br>      i)  The scope of work of MA (referred to in point 3 below) appointed after MA GAP shall cover the MA Gap period. |

|  |  |
|---|---|
|  | ii)  The Debtor shall carry out the MA Replacement Process as soon as possible and at the latest within 14 (fourteen) Business Days after being aware of the occurrence of MA Gap.<br><br>2)  MA substitution through the appointment process shall be as follows ("**MA Replacement Process**"):<br><br>a)  List of nominations for 3 (three) public accounting firms ("**KAP**") as the role of the MA will be proposed by the Group from the big-10 KAP in Indonesia.<br><br>b)  Each nominated KAP will submit a proposal to the Group, which will be copied to Participating Creditors.<br><br>c)  From the nomination, the Group will choose the suitable candidate and submit it to the Participating Creditors. If Participating Secured Creditors Approval (Debtors) is obtained, the candidate shall be appointed.<br><br>3)  The scope of work of the MA is as follows:<br><br>a)  Provide quarterly reports for Participating Creditors, for each Debtor, regarding:<br><br>i)  financial performance for the quarter, including comparison against the budget;<br><br>ii)  updated current budget for each Debtor; and<br><br>iii)  source and use of cash;<br><br>b)  Assist the Independent Director in the implementationof the Composition Plan. |

82

|  |  |
|---|---|
|  | c) Conduct a review every six months on compliance with the Cash Waterfall Mechanism and determine the relevant Excess Cash to be distributed since the relevant Commence Date.<br><br>d) Monitor the process, manage communication with the Participating Creditors and report on compliance with the process of appointment of Independent Director.<br><br>e) Support the Independent Director in carrying out his/her duties.<br><br>4) Debtors are required to support the MA in carrying out its scope of work including:<br><br>a) provide access to information needed in carrying out its scope of work as referred to in point 3 above; and<br><br>b) meet payment obligations as set out in the terms of the MA appointment as agreed between the Debtors and the MA. |
| **Appointment of Auditor** | The Debtors shall appoint a Public Accountant (KAP) to audit the financial statements of the Debtors for the financial year of 2020 and the subsequent financial years. The appointment of KAP shall be one of the big-10 KAP in Indonesia or one of the KAP registered as the preferred KAP of the Participating Creditor holding the largest claim from each relevant Debtor. |
| **Operating Accounts** | Each Debtor shall open bank accounts in Rupiah and/or United States Dollar ("**Operating Account**") with the one of more of the |



83

following banks ("**Account Banks**") as detailed below:

1) BRI for DDT and DSSA,

2) Mandiri for DMST and Damaitex,

3) BNI for DDST and DMDT, or

4) if the banks detailed above are unable or decline to open the accounts, with other banks or the branches of the banks as determined by each Debtor. Such accounts shall be opened no later than 3 (three) months from the Effective Date.

With due consideration to the reasonable transition process, the Debtors will conduct all transactions through the Operating Accounts.

The management of the Operating Accounts will be set forth in a CAMA between the relevant Account Banks and the Debtors which will govern among other things: the mechanism and account for incoming payment, mechanism and account for outgoing payments, and prioritization of the use of funds subject to and in accordance with this Composition Plan. The CAMA shall be duly executed by all parties no later than the date falling 3 (three) months after the Effective Date and the form and substance of which has received Participating Secured Creditors Approval (Debtors).

No party shall unreasonably withhold approval of or refuse to sign the approved CAMA. Once the CAMA has been approved each party to each must sign it before the following payment date of interest or margin/profit sharing (as applicable for sharia Existing

| | |
|---|---|
| | Facilities). Any of the Creditors who does not sign the CAMA by such date will have their interest payments held in a reserve account for their benefit until such time that they sign the CAMA. |
| **Cash Waterfall Mechanism** | 1) All cash received by DDT, DMST and DDST identified as revenue from normal business operations shall be deposited into the Spinning Proceeds Account and shall be collectively applied in the following order of priority on a monthly basis, in accordance with the terms to be set out in the CAMA: <br><br> a) firstly, towards payment of interest, margin/profit sharing, and/or principal due and owing in accordance with the terms of New Working Capital Facility incurred by such Debtors, if any; <br><br> b) secondly, towards payment of scheduled interest, margin/profit sharing and principal to the Participating Creditors of such Debtors (i.e. payments made in the Interest Payment Terms, Margin/Profit Sharing Payment Conditions and Principal Payment Provisions) in accordance with the terms of this Composition Plan; <br><br> c) thirdly, towards topping up the relevant Operating Accounts for Operating Expenditure and Capital Expenditure for Maintenance of such Debtors, in an amount equal to amounts due and payable during the subsequent 30 Calendar Day period; <br><br> d) fourthly, towards topping up the Debt Service Reserve |

Account/DSRA of such Debtors to ensure that the balance in such account is not less than an amount equal to the sum of scheduled payment obligations of such Debtors that will fall due in the next 1 (one) quarter;

e) fifthly, towards topping up the Operating Account of such Debtors in an amount equal to any Approved Capital Expenditure of such Debtors;

f) sixthly, towards topping up the Operating Reserve Account of such Debtors to ensure that the balance in such account does not fall below the Operating Reserves of such Debtors; and

g) lastly, any remaining balance in the Spinning Proceeds Account after monies in the Spinning Proceeds Account are applied in accordance with paragraphs (a) to (f) above (the "**Spinning Excess Cash**") shall be applied for repayment as set out under this Composition Plan.

2) All cash received by DMDT and DSSA identified as revenue from normal business operations shall be deposited into the Weaving and Finishing Proceeds Account and shall be collectively applied in the following order of priority on a monthly basis, in accordance with the terms to be set out in the CAMA:

a) firstly, towards payment of interest, margin/profit sharing, and/or principal due and owing in accordance with the terms

of New Working Capital Facility incurred by such Debtors, if any;

b) secondly, towards payment of scheduled interest, margin/profit sharing and principal to the Participating Creditors of such Debtors (i.e. payments made in the Interest Payment Terms, Margin/Profit Sharing Payment Conditions and Principal Payment Provisions) in accordance with the terms of this Composition Plan;

c) thirdly, towards topping up the relevant Operating Accounts for Operating Expenditure and Capital Expenditure for Maintenance of such Debtors, in an amount equal to amounts due and payable during the subsequent 30 Calendar Day period;

d) fourthly, towards topping up the Debt Service Reserve Account/DSRA of such Debtors to ensure that the balance in such account is not less than an amount equal to the sum of scheduled payment obligations of such Debtors that will fall due in the next 1 (one) quarter;

e) fifthly, towards topping up the Operating Account of such Debtors in an amount equal to any Approved Capital Expenditure of such Debtors;

f) sixthly, towards topping up the Operating Reserve Account of such Debtors to ensure that the balance in such account does not fall below the Operating Reserves of such Debtors;

and

g) lastly, any remaining balance in the Weaving and Finishing Proceeds Account after monies in the Weaving and Finishing Proceeds Account are applied in accordance with paragraphs (a) to (f) above (the "**Weaving and Finishing Excess Cash**") shall be applied for repayment as set out under this Composition Plan.

The Spinning Excess Cash and Weaving and Finishing Excess Cash shall together, be "Excess Cash". Excess Cash calculations and distribution of funds will be reviewed by the CFO supported by the Independent Director and the Monitoring Accountant to ensure compliance with the terms in this Composition Plan and the CAMA. Any Spinning Excess Cash shall be distributed on the Commence Date and every 6 (six) months thereafter and will be used to accelerate repayment of the facilities granted to DDT, DMST and DDST by the relevant Participating Creditors.

Any Weaving and Finishing Excess Cash shall be distributed on the Commence Date and every 6 (six) months thereafter and will be used to accelerate repayment of the facilities granted to DMDT and DSSA by the relevant Participating Creditors.

However, once the Facility of Syndicated Creditors to DMDT (being the US$160,000,000 senior secured facility granted pursuant to the facility agreement dated 21 June 2018) is unconditionally and irrevocably repaid in full and discharged in full, the cash



received by each DMDT and DSSA will no longer be collectively applied.    At such time each DMDT and DSSA will apply its respective cash received in the order above in 2(a) to (g) for the benefit of its relevant Participating Creditors.

Each Excess Cash calculation shall be performed by the MA and shall be completed and reported to the relevant Participating Creditors no later than 60 (sixty) Calendar Days following the lapse of each relevant 6-month period and any Excess Cash (if any) shall be distributed to the relevant Participating Creditors no later than 2 (two) weeks following the report of the Excess Cash.

Details regarding accelerated repayment for each Debtor are contained in the details of the settlement per Debtor in the Appendix 5 (Settlement Details) of this Composition Plan.

For the avoidance of doubt, no Debtor is allowed to make any dividend payments as long as the obligations under the Existing Facilities remain outstanding.

All cash received by Damaitex identified as revenue from normal business operations shall be applied towards the repayment of Mandiri's Existing Facilities to Damaitex in the manner as agreed between Mandiri and Damaitex.

For this Cash Waterfall Mechanism section:

**Capital Expenditure for Maintenance** is capital expenditure needed to maintain operations necessary to achieve the financial performance targets of each company in the Group.

**Operating Expenditure** includes costs and expenses incurred in the normal course of business, insurance, expected working capital charges, duties or governmental charges or taxes payable, fees relating to the PKPU proceeding and subsequent documentation process in relation to the CSPA, CAMA, Notes A, and Notes B (including financial and legal advisors' fees) and any other operating expenses items set forth in the Debtors' budgets and/or forecasts including any reasonable minimum cash buffer. Reasonable financial and legal advisors' fees incurred after the Homologation Date shall be paid within 90 (ninety) Days upon finalization of amounts due or as otherwise agreed.

**Operating Reserves** shall be based on a rolling 3-month forward budget of Operating Expenditure. The reserve amount will change over the budget period. The budget is to be reviewed and approved by the Independent Director.

**Commence Date** is the date falling 1 (one) year after the Homologation Date.

**Spinning Proceeds Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold revenue from normal business operations of DDT, DMST and DDST. The disbursement of funds from this Spinning Proceeds Account requires the approval of the Independent Director and the CFO.

**Operating Account** is a bank account (or accounts) in IDR and/or

USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold the funds needed for the day-to-day operations of the relevant Debtor.

**Debt Service Reserve Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold the funds allocated for debt service of that Debtor for the next 1 (one) quarter. The disbursement of funds from this Debt Service Reserve Account shall be made in the event of any shortfall of scheduled payment obligations to the relevant Participating Creditors under this Composition Plan up to the amount of such shortfall.

**Operating Reserve Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold the funds allocated for Operating Reserves, being the Operating Expenditure of the relevant Debtor for the next 3 (three) months.

**Weaving and Finishing Proceeds Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold revenue from normal business operations of DMDT and DDSA. The disbursement of funds from this Weaving and Finishing Proceeds Account requires the approval of the Independent Director and the CFO.

All accounts referred to in this Cash Waterfall Mechanism section



| | |
|---|---|
| | shall be opened by the relevant Debtors no later than the date falling 3 months after the Effective Date. |
| **Settlement of the Existing Facilities** | Details of the terms of settlement of Existing Facilities are set out in Appendix 5 (Settlement Details) which is an integral part of this Composition Plan. In the event of conflict in meanings between the Definitions, Chapter 1 (Summary) to Chapter 8 (Closing) (the "**Body**" section) and Appendix 5 (Settlement Details), the applicable meaning is the one contained in the Body to the extent of the conflict. |
| **Settlement for Trade Creditors** | Details of the terms of settlement of obligations to Trade Creditors are set out in Appendix 5 (Settlement Details) which is an integral part of this Composition Plan. However, the Debtors may accelerate payment to Trade Creditors that are critical to their operations if agreed by the CFO and the Independent Director. |
| **Settlement for LWG Syndicated Creditors** | 1) DDT, DMDT, and DDST agree to severally enter into a Conditional Sale and Purchase Agreement ("**CSPA**") with any party designated by LWG Syndicated Creditors ("**LWG Designated Party**") in accordance with the term sheet set out in Appendix 4 (CSPA Term Sheet) that has been negotiated and agreed by the parties ("**Term Sheet**"). <br><br> 2) LWG Syndicated Creditors will enter into a conditional assignment of debt with LWG Designated Party ("**Assignment of LWG Debt**"). |

3) The CSPA, Assignment of LWG Debt and other relevant documents including but not limited to any revision of Security Documents for the implementation of CSPA and Assignment of LWG Debt will be entered into at the latest three (3) months after the Effective Date unless the LWG Designated Party agrees to extend the signing of the CSPA and Assignment of LWG Debt.

4) The CSPA will become effective following any default of DDT, DMDT or DDST of this Composition Plan in accordance with Appendix 4 (CSPA Term Sheet).

5) Subject to the CSPA in accordance with Appendix 4 (CSPA Term Sheet) and upon the effective date of the CSPA, the Debtors are not required to pay their debts to the LWG Syndicated Creditors in accordance with Appendix 5 (Settlement Details). However, for the avoidance of doubt, the Debtor's debts to the LWG Syndicated Creditors are not yet extinguished and will be fully settled in accordance with the Composition Plan, the CSPA and other ancillary documents. All debts of DDT, DMDT, and/or DDST to the relevant LWG Syndicated Creditors and/or LWG Designated Party will be deemed fully settled after the ownership title of LWG Assets are fully transferred from DDT, DMDT, and/or DDST (as applicable) to the relevant LWG Syndicated Creditors and/or LWG Designated Party in compliance with the CSPA.

6) Security Documents of LWG Syndicated Creditors shall continue to prevail to secure all sustainable and/or unsustainable debts owed to LWG Syndicated Creditors and LWG Designated Party (as the case may be). DDT, DMDT, and DDST agreed to revise the Security Documents or enter into any other required documents to continue to secure LWG Syndicated Creditors' rights and/or LWG Designated Party (as the case may be) following the CSPA as requested by LWG Syndicated Creditors and/or LWG Designated Party.

7) In the event that any provisions of the CSPA, the SPA (as defined in Appendix 4 (CSPA Term Sheet)) and any other required documents relating to the CSPA and the SPA cease to be valid, binding or enforceable (whether in whole or part), the Debtors and Sponsor will become liable to pay any remaining outstanding debts to Syndicated Lenders at the time the cessation of the validity of the CSPA and/or the SPA occurs.

| | |
|---|---|
| **Rights and Obligations of the holders of Notes A under a CSPA Event of Default** | In the event of Default under which the CSPA and/or the SPA held by the LWG Syndicated Creditors (or its designated party(ies)) at DMDT becomes effective, the rights and obligations of the holders of Notes A are as follows:<br><br>1) Any proceeds received from the sales of DMDT 5 Assets and DMDT 6 Assets in excess of the outstanding debt of the US$160,000,000 senior secured facility to DMDT granted pursuant to the facility agreement dated 21 June 2018 are to be |



| | |
|---|---|
| | distributed to the holders of Notes A.<br><br>2) The secondary rank of security rights of Notes A over DMDT 5 Assets and DMDT 6 Assets are to be released. |
| **Sponsor Warranty** | Breach of any terms by any Debtor or the Sponsor under this Composition Plan or a composition plan under case No. 25/Pdt.Sus-PKPU/2019/PN.SMG. will constitute a Default under this Composition Plan. |

4. **EVENTS OF DEFAULT**

4.1   Non-fulfillment of one or more provisions in this Composition Plan, and/or the CAMA, and/or any documents governing the Existing Facilities and its existing Security Documents and/or any Security Documents (or any of its amendments), and/or other ancillary documents to this Composition Plan entered into by or between any Debtor and any Creditor (or its designated party(ies) to further implement any terms of, or otherwise in connection with, this Composition Plan, by one or more Debtors or the Sponsor which is not rectified within 30  Calendar Days after a Participating Creditor giving notice to the Debtors or the Sponsor, will be considered an event of default ("**Default**").

4.2   Without prejudice to the provisions set out in clause 4.3, if a Default occurs, the relevant defaulting Debtor, the Sponsor (if applicable) and the Creditor may agree to settlement provisions other than those set out by this Composition Plan.

4.3   The filing of cancellation of the homologated Composition Plan as a result of a Default may be made by any Creditor which is being defaulted by their Debtor or the Sponsor. In the event of the cancellation, the Parties are subject to the provisions of Article 291 of the Bankruptcy Law along with other application regulations.

4.4    In the occurrence of failure to pay the principal and/or interest and/or margin/profit sharing in accordance with the terms of this Composition Plan ("**Payment Default**"), the Participating Secured Creditors of the relevant Debtor which has made a Payment Default may (but not obligated to) ask such Debtor to settle its Default through the sales and/or foreclosure of Operating Assets pledged to the Participating Secured Creditors concerned under the provisions to be agreed between the Debtor and the Participating Secured Creditors concerned ("**Operating Assets Settlement**"). At the first request of any Participating Secured Creditor, in the event of an Operational Assets Settlement, the Debtor committing the Payment Default shall ensure the availability of all documents requested for the purpose of Operating Assets Settlement, no later than 30 (thirty) Calendar Days since they are requested by the Participating Secured Creditors. Operating Assets Settlement does not constitute a default on the Homologated Composition Plan. For the avoidance of doubt, this provision will not be applicable for any Default relating to LWG Syndicated Creditors and their relevant Debtors.

4.5    If any Default occurs relating to the LWG Syndicated Creditors and their relevant Debtors, such Default will trigger any transfers of assets under the terms of the CSPA, in accordance with the terms of Settlement for LWG Syndicated Creditors of this Composition Plan and the terms of the CSPA and any related or ancillary documents in connection thereto.

5.    **MISCELLANEOUS PROVISIONS**

5.1    Creditors for Debts Outside Verification shall be subject to the Homologated Composition Plan, by taking into consideration the General Provisions, Specific Provisions and Miscellaneous Provisions of this Composition Plan based on the types and amounts of each of their claims. For the avoidance of doubt, Creditors for Debts Outside Verification do not form part of the Participating Secured Creditors and will

have no voting rights under the Participating Secured Creditors Approval (Debtor) or the Participating Secured Creditors Approval (Debtors).

5.2    Payments to Creditors affiliated to the Debtors (other than payments made in relation to expenses from normal business operations to generate revenue at arm's length terms) are subordinated to and will be paid following the full repayment of the Debtors' debts to Participating Creditors under this Composition Plan. For the purposes of this clause, "affiliate" means any person or entity which, directly, or indirectly, controls or is controlled by or is under common control with such person or entity.

5.3    Costs related to the Debtors' PKPU process, i.e., the fees of Administrator Team, the fees of legal counsels of the Debtors, the fees of financial advisors of the Debtors and the Participating Creditors in connection with the PKPU Process of the Debtors in the Commercial Court and the fees of legal counsels of the Creditors, as long as the obligations of Debtors to cover such costs have been previously set out in Prior Agreement (as defined below) or other letters of engagement or agreement with such legal counsels or financial advisors executed in relation with such obligations, shall be paid by the Homologation Date or on other dates as agreed.

5.4    All provisions in the agreements agreed upon before the PKPU Decision Date by and between the Debtor and Creditors are deemed to remain in effect as long as they do not conflict and are otherwise regulated by the provisions in this Composition Plan ("**Prior Agreements**") if the Composition Plan has been homologated by the Commercial Court. In the event that there is a conflict between the provisions in this Composition Plan and the provisions in the Prior Agreements, the provisions of this Composition Plan will prevail.

5.5    Every provision governing the rights and obligations of Creditors and Debtors in the Composition Plan has been adjusted to the provisions in the Bankruptcy Law. All

97

provisions governing the rights and obligations of Creditors and Debtors, if not regulated and determined in the Composition Plan, are governed by the Prior Agreements.

5.6   This Composition Plan may from time to time be made into a copy in a language other than the Indonesian language, which can be considered as an authentic copy. If a conflict arises and/or a difference exists between the Indonesian language copy and another language copy, the Indonesian language copy shall prevail.

## 6.   PERSONAL GUARANTEE

6.1   Any personal guarantee provided by Sponsor under the Existing Facilities (as applicable) shall remain in place.

6.2   Each Creditor of the Existing Facilities, at its discretion, may request (and the Sponsor must comply with) any amendment to the Existing Facilities, personal guarantee agreements and Security Documents to ensure the granting and the maintenance of any and all of the Creditor's (or any other assigned parties' as the case may be) rights under this Composition Plan, composition plan under case No. 25/Pdt.Sis-PKPU/2019/PN.SMG, and other ancillary documents to this Composition Plan.

6.3   If for any reason the Sponsor is declared bankrupt, the Creditors will have the right to claim against the Sponsor's bankruptcy regardless of any bankruptcy or default of the Debtors under this Composition Plan.

## 7.   COVENANTS AND INFORMATION UNDERTAKINGS

7.1   Within 14 (fourteen) Days from the request of the Participating Creditors, the Debtors and Sponsor agree to provide and to ensure the same is furnished immediately without delay to the Participating Creditors, their advisors or anyone else acting on their behalf any financial information (including all financial documents and records) of the Debtors and Sponsor and their subsidiaries if it is requested in writing by or on behalf of the



Participating Creditors so long as such requested financial information is relevant to determine the compliance of the Debtors to this Composition Plan.

7.2     The Independent Director shall be appointed following the Effective Date in accordance with terms set out in this Composition Plan and shall remain in place until all debts under the Existing Facilities are fully, irrevocably and unconditionally repaid. The Independent Director shall be a member of the board of directors of each Debtor assuming the same responsibilities and liabilities.

7.3     The Debtors shall ensure that the Independent Director is appointed and the Debtors are solely responsible for the fees of the Independent Director which shall by paid by the Debtors when due.

7.4     The Debtors shall provide such available information as may be reasonably required by the Independent Director and provide assistance to the Independent Director as may be reasonably requested to enable the Independent Director to fulfill its duties and obligations.

## 8.     CLOSING

8.1     The implementation of the Homologated Composition Plan shall be subject to and be carried out based on the provisions referred to in the Bankruptcy Law and the laws and legal provisions applicable within the territory of the Republic of Indonesia.

8.2     Correspondence related to the Composition Plan to any Debtor can be addressed through 1 (one) correspondence address as follows:

Address       : Jl. Raya Palur Km 7.1, Karanganyar, Jawa Tengah, Indonesia

Fax            : +62 271 825 954

Email          : dtx@duniatex.com

Attn.          : Board of Directors



99

Any change in the above correspondence address must be delivered in writing and jointly by the Debtors to the Creditors. If not notified in writing and jointly by the Debtors, the above correspondence address will remain valid and binding. Proof of delivery by registered mail to the address is sufficient and valid proof.

8.3    Correspondence related to the Composition Plan to any of the Creditors can be addressed and delivered in accordance with the relevant provisions set out in the Prior Agreements of the relevant Creditors.

Any change in the correspondence address of any Creditors must be delivered in writing by the relevant Creditors to the relevant Debtors. If not notified in writing and jointly by the Debtors, the correspondence address as set out in the Prior Agreement will remain valid and binding. Proof of delivery by registered mail to the address is sufficient and valid proof.



9.1.    Appendix 1 (Operating Assets)

Land assets detailed below includes building and or other fixed assets attached to them as it may

be set out in the relevant Security Document to the relevant Existing Facility.

| No | Reference | Description | Title-holder | Certificate | Certificate no | Village | Subdistrict |
|---|---|---|---|---|---|---|---|
| 1) | Damaitex | Land | Damaitex | HGB | 642 | Jl Simongan no. 100, Kelurahan Ngemplak Simongan | Semarang Barat |
| 2) | Damaitex | Land | Damaitex | HGB. | 643 | Jl Simongan no. 100, Kelurahan Ngemplak Simongan | Semarang Barat |
| 3) | Damaitex | Land | Damaitex | HGB. | 658 | Desa Bongsari | |
| 4) | DDST 1 & 2 | Land | DDST | SHGB | 14 | Tambakroto | Sayung |
| 5) | DDST 1 & 2 | Land | DDST | SHGB | 10 | Tambakroto | Sayung |
| 6) | DDST 1 & 2 | Land | DDST | SHGB | 18 | Tambakroto | Sayung |
| 7) | DDST 1 & 2 | Land | DDST | SHGB | 127 | Tambakroto | Sayung |
| 8) | DDST 1 & 2 | Land | DDST | SHGB | 8 | Tambakroto | Sayung |
| 9) | DDST 1 & 2 | Land | DDST | SHGB | 17 | Tambakroto | Sayung |
| 10) | DDST 1 & 2 | Land | DDST | SHGB | 9 | Tambakroto | Sayung |
| 11) | DDST 1 & 2 | Land | DDST | SHGB | 25 | Tambakroto | Sayung |
| 12) | DDST 3 | Land | DDST | SHGB | 1 | Tambakroto | Sayung |
| 13) | DDST 3 | Land | DDST | SHGB | 2 | Tambakroto | Sayung |
| 14) | DDST 3 | Land | DDST | SHGB | 126 | Tambakroto | Sayung |
| 15) | DDST 3 | Land | DDST | SHGB | 133 | Tambakroto | Sayung |
| 16) | DDT 1 | Land | DDT | SHGB | 1 | Kaling | Tasikmadu |
| 17) | DDT 2 | Land | DMDT | SHGB. | 1 | Pondok | Grogol |
| 18) | DDT 2 | Land | DMDT | SHGB. | 2 | Pondok | Grogol |
| 19) | DDT 2 | Land | DMDT | SHGB. | 21 | Pondok | Grogol |
| 20) | DDT 2 | Land | DMDT | SHGB. | 22 | Pondok | Grogol |
| 21) | DDT 2 | Land | DMDT | SHGB. | 25 | Pondok | Grogol |
| 22) | DDT 2 | Land | DMDT | SHGB. | 80 | Pondok | Grogol |
| 23) | DDT 2 | Land | DMDT | SHGB. | 106 | Pondok | Grogol |
| 24) | DDT 2 | Land | DMDT | SHGB. | 109 | Pondok | Grogol |

| 25) | DDT 2 | Land | DMDT | SHGB. | 111 | Pondok | Grogol |
|---|---|---|---|---|---|---|---|
| 26) | DDT 2 | Land | DMDT | SHGB. | 112 | Pondok | Grogol |
| 27) | DDT 2 | Land | DMDT | SHGB. | 113 | Pondok | Grogol |
| 28) | DDT 2 | Land | DMDT | SHGB. | 4 | Sroyo | Jaten |
| 29) | DDT 3 | Land | Sumitro | SHM | 207 | Jetis | Jaten |
| 30) | DDT 3 | Land | Sumitro | SHM | 443 | Jetis | Jaten |
| 31) | DDT 3 | Land | Sumitro | SHM | 672 | Jetis | Jaten |
| 32) | DDT 3 | Land | Sumitro | SHM | 673 | Jetis | Jaten |
| 33) | DDT 4 | Land | PT Delta Dunia Tekstil | SHGB | 1 | Rembun | Siwalan |
| 34) | DDT 4 | Land | PT. Delta Dunia Tekstil | SHGB | 2 | Rembun | Siwalan |
| 35) | DDT 4 | Machineries | | Fiducia Security | Machineries under certificate no. W13.00841605. AH.05.01 tahun 2017, as lastly amended by Certificate of Fiducia Security No. W.13.00434604 .AH.05.02 Tahun 2019 dated 31 May 2019 | Rembun | Siwalan |
| 36) | DMDT 1 | Land | Sumitro | SHM | 2535 | Nangsri | Kebakkramat |
| 37) | DMDT 1 | Land | Sumitro | SHM | 2188 | Nangsri | Kebakkramat |
| 38) | DMDT 1 | Land | Sumitro | SHM | 2016 | Nangsri | Kebakkramat |
| 39) | DMDT 1 | Land | Sumitro | SHM | 2885 | Nangsri | Kebakkramat |
| 40) | DMDT 1 | Land | Sumitro | SHM | 2869 | Nangsri | Kebakkramat |
| 41) | DMDT 1 | Land | Susana John Setiawan | SHM | 134 | Nangsri | Kebakkramat |
| 42) | DMDT 1 | Land | Susana John Setiawan | SHM | 39 | Nangsri | Kebakkramat |
| 43) | DMDT 1 | Land | Susana John Setiawan | SHM | 2848 | Nangsri | Kebakkramat |
| 44) | DMDT 1 | Land | Susana John Setiawan | SHM | 355 | Nangsri | Kebakkramat |
| 45) | DMDT 1 | Land | Susana John Setiawan | SHM | 356 | Nangsri | Kebakkramat |
| 46) | DMDT 1 | Land | Susana John Setiawan | SHM | 357 | Nangsri | Kebakkramat |
| 47) | DMDT 1 | Land | Susana John Setiawan | SHM | 358 | Nangsri | Kebakkramat |
| 48) | DMDT 1 | Land | Sumitro | SHGB | 257 | Gajahan | Pasar Kliwon |

| 49) | DMDT 1 | Land | Sumitro | SHGB | 255 | Gajahan | Pasar Kliwon |
|-----|--------|------|---------|------|------|---------|--------------|
| 50) | DMDT 2 | Land | Sumitro | SHM | 1936 | Pulosari | Kebakkramat |
| 51) | DMDT 2 | Land | Sumitro | SHM | 1939 | Pulosari | Kebakkramat |
| 52) | DMDT 2 | Land | Sumitro | SHM | 1713 | Pulosari | Kebakkramat |
| 53) | DMDT 2 | Land | Sumitro | SHM | 1938 | Pulosari | Kebakkramat |
| 54) | DMDT 2 | Land | Sumitro | SHM | 1937 | Pulosari | Kebakkramat |
| 55) | DMDT 2 | Land | Sumitro | SHM | 1983 | Pulosari | Kebakkramat |
| 56) | DMDT 2 | Land | Indriati | SHM | 171 | Pulosari | Kebakkramat |
| 57) | DMDT 2 | Land | Indriati | SHM | 170 | Pulosari | Kebakkramat |
| 58) | DMDT 2 | Land | Indriati | SHM | 169 | Pulosari | Kebakkramat |
| 59) | DMDT 2 | Land | Indriati | SHM | 168 | Pulosari | Kebakkramat |
| 60) | DMDT 2 | Land | Indriati | SHM | 1922 | Pulosari | Kebakkramat |
| 61) | DMDT 2 | Land | Indriati | SHM | 1923 | Pulosari | Kebakkramat |
| 62) | DMDT 2 | Land | Sumitro | SHM | 1704 | Pulosari | Kebakkramat |
| 63) | DMDT 2 | Land | Sumitro | SHM | 1706 | Pulosari | Kebakkramat |
| 64) | DMDT 2 | Land | Sumitro | SHM | 1629 | Pulosari | Kebakkramat |
| 65) | DMDT 2 | Land | Sumitro | SHM | 1705 | Pulosari | Kebakkramat |
| 66) | DMDT 2 | Land | Sumitro | SHM | 1628 | Pulosari | Kebakkramat |
| 67) | DMDT 2 | Land | Sumitro | SHM | 1726 | Pulosari | Kebakkramat |
| 68) | DMDT 2 | Land | Sumitro | SHM | 1627 | Pulosari | Kebakkramat |
| 69) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 70) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 71) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 72) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 73) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 74) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 75) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 76) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 77) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat |
| 78) | DMDT 2 | Ancillary facilities | DMDT | | | Pulosari | Kebakkramat |
| 79) | DMDT 2 | Machineries | DMDT | - | | Pulosari | Kebakkramat |



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 80) | DMDT 3 | Factory land | Sumitro | SHM | 141 | Nangsri | Kebakkramat |
| 81) | DMDT 3 | Factory land | Sumitro | SHM | 1358 | Nangsri | Kebakkramat |
| 82) | DMDT 3 | Factory land | Sumitro | SHM | 1824 | Nangsri | Kebakkramat |
| 83) | DMDT 3 | Factory land | Sumitro | SHM | 1870 | Nangsri | Kebakkramat |
| 84) | DMDT 3 | Factory land | Sumitro | SHM | 671 | Nangsri | Kebakkramat |
| 85) | DMDT 3 | Factory land | Sumitro | SHM | 1825 | Nangsri | Kebakkramat |
| 86) | DMDT 3 | Factory land | Sumitro | SHM | 1243 | Nangsri | Kebakkramat |
| 87) | DMDT 3 | Factory land | Sumitro | SHM | 1359 | Nangsri | Kebakkramat |
| 88) | DMDT 3 | Factory land | Sumitro | SHM | 669 | Nangsri | Kebakkramat |
| 89) | DMDT 3 | Factory land | Sumitro | SHM | 140 | Nangsri | Kebakkramat |
| 90) | DMDT 3 | Factory land | Sumitro | SHM | 2001 | Nangsri | Kebakkramat |
| 91) | DMDT 3 | Factory land | Sumitro | SHM | 1113 | Nangsri | Kebakkramat |
| 92) | DMDT 3 | Factory land | Sumitro | SHM | 1116 | Nangsri | Kebakkramat |
| 93) | DMDT 3 | Factory land | Sumitro | SHM | 1118 | Nangsri | Kebakkramat |
| 94) | DMDT 3 | Factory land | Sumitro | SHM | 127 | Nangsri | Kebakkramat |
| 95) | DMDT 3 | Factory land | Sumitro | SHM | 1999 | Nangsri | Kebakkramat |
| 96) | DMDT 3 | Factory land | Sumitro | SHM | 2017 | Nangsri | Kebakkramat |
| 97) | DMDT 3 | Factory land | Sumitro | SHM | 2019 | Nangsri | Kebakkramat |
| 98) | DMDT 3 | Factory land | Sumitro | SHM | 2022 | Nangsri | Kebakkramat |
| 99) | DMDT 3 | Factory land | Sumitro | SHM | 369 | Nangsri | Kebakkramat |
| 100) | DMDT 3 | Factory building | Sumitro | | | Nangsri | Kebakkramat |
| 101) | DMDT 3 | Machineries | Sumitro | | | Nangsri | Kebakkramat |
| 102) | DMDT 4 | Factory land | Sumitro | SHGB | 3 | Banyudono | Banyudono |
| 103) | DMDT 4 | Factory land | Sumitro | SHGB | 4 | Banyudono | Banyudono |
| 104) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 105) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 106) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 107) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 108) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 109) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 110) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

| 111) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
|---|---|---|---|---|---|---|---|
| 112) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 113) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 114) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono |
| 115) | DMDT 4 | Ancillary facilities | Sumitro | | | Banyudono | Banyudono |
| 116) | DMDT 4 | Machineries | Sumitro | - | | Banyudono | Banyudono |
| 117) | DMDT 4 | Persediaan | Sumitro | - | | Banyudono | Banyudono |
| 118) | DMDT 5 | Factory land | DMDT | SHGB | 15 | Pondok | Grogol |
| 119) | DMDT 5 | Factory land | DMDT | SHGB | 17 | Pondok | Grogol |
| 120) | DMDT 5 | Factory land | DMDT | SHGB | 82 | Pondok | Grogol |
| 121) | DMDT 5 | Factory land | DMDT | SHGB | 83 | Pondok | Grogol |
| 122) | DMDT 5 | Factory land | DMDT | SHGB | 84 | Pondok | Grogol |
| 123) | DMDT 5 | Factory land | DMDT | SHGB | 85 | Pondok | Grogol |
| 124) | DMDT 5 | Factory land | DMDT | SHGB | 95 | Pondok | Grogol |
| 125) | DMDT 5 | Factory land | DMDT | SHGB | 98 | Pondok | Grogol |
| 126) | DMDT 5 | Factory land | DMDT | SHGB | 105 | Pondok | Grogol |
| 127) | DMDT 5 | Factory land | DMDT | SHGB | 107 | Pondok | Grogol |
| 128) | DMDT 5 | Factory land | DMDT | SHGB | 108 | Pondok | Grogol |
| 129) | DMDT 5 | Factory land | DMDT | SHGB | 114 | Pondok | Grogol |
| 130) | DMDT 5 | Factory land | DMDT | SHGB | 110 | Pondok | Grogol |
| 131) | DMDT 5 | Factory building | DMDT | SHGB | | Pondok | Grogol |
| 132) | DMDT 5 | Machineries | DMDT | Fiducia Security | Machineries under certificate no. W.13.00480941.AH.05.01 Tahun 2018 dated 10 July 2018, as last amended by Certificate of Fiducia Security No. W13.00521617.AH.05.02 dated 4 July 2019. | Pondok | Grogol |
| 133) | DMDT 6 | Factory land | DMDT | SHGB | 7 | Jalan Songgorunggi - Jatipuro | Nguter |
| 134) | DMDT 6 | Factory land | DMDT | SHGB | 16 | Jalan Songgorunggi - Jatipuro | Nguter |
| 135) | DMDT 6 | Factory land | DMDT | SHGB | 20 | Jalan Songgorunggi - Jatipuro | Nguter |

| | | | | | | |
|---|---|---|---|---|---|---|
| 136) | DMDT 6 | Factory land | DMDT | SHGB | 19 | Jalan Songgorunggi - Jatipuro | Nguter |
| 137) | DMDT 6 | Factory land | DMDT | SHGB | 17 | Jalan Songgorunggi - Jatipuro | Nguter |
| 138) | DMDT 6 | Factory land | DMDT | SHGB | 36 | Jalan Songgorunggi - Jatipuro | Nguter |
| 139) | DMDT 6 | Factory building | DMDT | | | Jalan Songgorunggi - Jatipuro | Nguter |
| 140) | DMDT 6 | Machineries | DMDT | Fiducia Security | Machineries under certificate no. W.13.00480941 .AH.05.01 Tahun 2018 dated 10 July 2018, as lastly amended by Certificate of Fiducia Security No. W13.00521617. AH.05.02 dated 4 July 2019. | Jalan Songgorunggi - Jatipuro | Nguter |
| 141) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00078 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat |
| 142) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00034 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat |
| 143) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00696 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat |
| 144) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00242 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat |
| 145) | DMDT 7 | Factory land | Sumitro | SHM NO. | 01395 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat |
| 146) | DMDT 7 | Factory land | Sumitro | SHM NO. | 01393 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat |
| 147) | DMDT 7 | Factory land | Sumitro | SHM NO. | 01394 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat |
| 148) | DMDT 8 | Land | DMDT | SHGB | 160 | Purwosuman | Sidoharjo |
| 149) | DMDT 8 | Machineries | DMDT | Fiducia Security | No. W13.00002013. AH.05.01 year 2019 dated 2 January 2019). | Purwosuman | Sidoharjo |
| 150) | DMST 1 | Land | DMST | SHGB | 33 | Bumiaji | Gondang |
| 151) | DMST 1 | Land | DMST | SHGB | 45 | Bumiaji | Gondang |
| 152) | DMST 1 | Land | DMST | SHGB | 54 | Bumiaji | Gondang |
| 153) | DMST 1 | Land | DMST | SHGB | 39 | Bumiaji | Gondang |
| 154) | DMST 1 | Land | DMST | SHGB | 48 | Bumiaji | Gondang |
| 155) | DMST 1 | Land | DMST | SHGB | 50 | Bumiaji | Gondang |
| 156) | DMST 1 | Land | DMST | SHGB | 56 | Bumiaji | Gondang |
| 157) | DMST 1 | Land | DMST | SHGB | 57 | Bumiaji | Gondang |
| 158) | DMST 1 | Land | DMST | SHGB | 58 | Bumiaji | Gondang |
| 159) | DMST 1 | Land | DMST | SHGB | 34 | Bumiaji | Gondang |

| 160) | DMST 1 | Land | Indriati, Mrs. | SHM | 1561 | Bumiaji | Gondang |
| 161) | DMST 1 | Land | Susana John Setiawan | SHM | 2269 | Bumiaji | Gondang |
| 162) | DMST 1 | Land | Susana John Setiawan | SHM | 2270 | Bumiaji | Gondang |
| 163) | DMST 1 | Land | DMST | SHGB | 65 | Bumiaji | Gondang |
| 164) | DMST 1 | Land | DMST | SHGB | 70 | Bumiaji | Gondang |
| 165) | DMST 1 | Land | DMST | SHGB | 44 | Bumiaji | Gondang |
| 166) | DMST 1 | Land | DMST | SHGB | 47 | Bumiaji | Gondang |
| 167) | DMST 1 | Land | DMST | SHGB | 61 | Bumiaji | Gondang |
| 168) | DMST 1 | Land | DMST | SHGB | 92 | Bumiaji | Gondang |
| 169) | DMST 1 | Land | DMST | SHGB | 93 | Bumiaji | Gondang |
| 170) | DMST 1 | Land | DMST | SHGB | 94 | Bumiaji | Gondang |
| 171) | DMST 1 | Land | DMST | SHGB | 95 | Bumiaji | Gondang |
| 172) | DMST 1 | Land | DMST | SHGB | 96 | Bumiaji | Gondang |
| 173) | DMST 1 | Land | Susana John Setiawan | SHM | 1631 | Bumiaji | Gondang |
| 174) | DMST 1 | Land | Indriati, Mrs. | SHM | 1957 | Bumiaji | Gondang |
| 175) | DMST 1 | Land | Indriati, Mrs. | SHM | 2021 | Bumiaji | Gondang |
| 176) | DMST 1 | Land | DMST | SHGB | 37 | Bumiaji | Gondang |
| 177) | DMST 1 | Land | DMST | SHGB | 60 | Bumiaji | Gondang |
| 178) | DMST 1 | Land | DMST | SHGB | 55 | Bumiaji | Gondang |
| 179) | DMST 1 | Land | DMST | SHGB | 59 | Bumiaji | Gondang |
| 180) | DMST 1 | Land | DMST | SHGB | 86 | Bumiaji | Gondang |
| 181) | DMST 1 | Land | DMST | SHGB | 74 | Bumiaji | Gondang |
| 182) | DMST 1 | Land | DMST | SHGB | 85 | Bumiaji | Gondang |
| 183) | DMST 1 | Land | DMST | SHGB | 91 | Bumiaji | Gondang |
| 184) | DMST 1 | Land | DMST | SHGB | 66 | Bumiaji | Gondang |
| 185) | DMST 1 | Land | DMST | SHGB | 62 | Bumiaji | Gondang |
| 186) | DMST 2 | Land | Indriati, Mrs. | SHM | 56 | Purwosuman | Sidoharjo |
| 187) | DMST 2 | Land | Indriati, Mrs. | SHM | 92 | Purwosuman | Sidoharjo |
| 188) | DMST 2 | Land | Indriati, Mrs. | SHM | 149 | Purwosuman | Sidoharjo |
| 189) | DMST 2 | Land | Indriati, Mrs. | SHM | 219 | Purwosuman | Sidoharjo |
| 190) | DMST 2 | Land | Indriati, Mrs. | SHM | 3124 | Purwosuman | Sidoharjo |

| 191) | DMST 2 | Land | Indriati, Mrs. | SHM | 450 | Purwosuman | Sidoharjo |
|------|--------|------|----------------|-----|-----|------------|-----------|
| 192) | DMST 2 | Land | Indriati, Mrs. | SHM | 507 | Purwosuman | Sidoharjo |
| 193) | DMST 2 | Land | Indriati, Mrs. | SHM | 1045 | Purwosuman | Sidoharjo |
| 194) | DMST 2 | Land | Indriati, Mrs. | SHM | 1046 | Purwosuman | Sidoharjo |
| 195) | DMST 2 | Land | Indriati, Mrs. | SHM | 1503 | Purwosuman | Sidoharjo |
| 196) | DMST 2 | Land | Indriati, Mrs. | SHM | 1560 | Purwosuman | Sidoharjo |
| 197) | DMST 2 | Land | Indriati, Mrs. | SHM | 1564 | Purwosuman | Sidoharjo |
| 198) | DMST 2 | Land | Indriati, Mrs. | SHM | 1796 | Purwosuman | Sidoharjo |
| 199) | DMST 2 | Land | Indriati, Mrs. | SHM | 1866 | Purwosuman | Sidoharjo |
| 200) | DMST 2 | Land | Indriati, Mrs. | SHM | 1867 | Purwosuman | Sidoharjo |
| 201) | DMST 2 | Land | Indriati, Mrs. | SHM | 2006 | Purwosuman | Sidoharjo |
| 202) | DMST 2 | Land | Indriati, Mrs. | SHM | 2011 | Purwosuman | Sidoharjo |
| 203) | DMST 2 | Land | Indriati, Mrs. | SHM | 2050 | Purwosuman | Sidoharjo |
| 204) | DMST 2 | Land | Indriati, Mrs. | SHM | 2134 | Purwosuman | Sidoharjo |
| 205) | DMST 2 | Land | Indriati, Mrs. | SHM | 2146 | Purwosuman | Sidoharjo |
| 206) | DMST 2 | Land | Indriati, Mrs. | SHM | 2173 | Purwosuman | Sidoharjo |
| 207) | DMST 3 | Land | DMST | SHGB | 1 | Plumbon | Sambungmacan |
| 208) | DMST 3 | Land | DMST | SHGB | 2 | Plumbon | Sambungmacan |
| 209) | DMST 3 | Land | DMST | SHGB | 3 | Plumbon | Sambungmacan |
| 210) | DMST 4 | Land | DMST | SHGB | 7 | Pandeyan | Grogol |
| 211) | DSSA 1 | Land | Indriati, Mrs. | SHM | 140 | Dagen | Jaten |
| 212) | DSSA 1 | Land | Indriati, Mrs. | SHM | 387 | Dagen | Jaten |
| 213) | DSSA 1 | Land | Indriati, Mrs. | SHM | 455 | Dagen | Jaten |
| 214) | DSSA 1 | Land | Sumitro | SHM | 330 | Dagen | Jaten |
| 215) | DSSA 1 | Land | Sumitro | SHM | 1761 | Dagen | Jaten |
| 216) | DSSA 1 | Land | Sumitro | SHM | 1762 | Dagen | Jaten |
| 217) | DSSA 1 | Land | Sumitro | SHM | 1763 | Dagen | Jaten |
| 218) | DSSA 1 | Land | Sumitro | SHM | 1764 | Dagen | Jaten |
| 219) | DSSA 1 | Land | Sumitro | SHM | 1765 | Dagen | Jaten |
| 220) | DSSA 1 | Land | Sumitro | SHM | 1766 | Dagen | Jaten |
| 221) | DSSA 2 | Land | Indriati, Mrs. | SHM | 119 | Jetis | Jaten |

| 222) | DSSA 2 | Land | Indriati, Mrs. | SHM | 1125 | Jetis | Jaten |
|---|---|---|---|---|---|---|---|
| 223) | DSSA 2 | Land | Indriati, Mrs. | SHM | 889 | Jetis | Jaten |
| 224) | DSSA 2 | Land | Indriati, Mrs. | SHM | 715 | Jetis | Jaten |
| 225) | DSSA 2 | Land | Indriati, Mrs. | SHM | 690 | Jetis | Jaten |
| 226) | DSSA 2 | Land (warehouse) | Sumitro | SHM | 1543 | Jetis | Jaten |
| 227) | DSSA 3 | Land | DSSA | SHGB | 2 | Jaten | Jaten |
| 228) | DSSA 4 | Land | DSSA | SHGB | 8 | Gedanganak | Ungaran Timur |
| 229) | DSSA 4 | Land | DSSA | SHGB | 9 | Gedanganak | Ungaran Timur |
| 230) | DSSA 4 | Land | DSSA | SHGB | 19 | Langensari | Klepu |
| 231) | DSSA 4 | Land | DSSA | SHGB | 20 | Langensari | Klepu |
| 232) | DSSA 4 | Land | DSSA | SHGB | 55 | Langensari | Ungaran Barat |
| 233) | DSSA 4 | Land | DSSA | SHGB | 61 | Langensari | Ungaran Barat |
| 234) | DSSA 4 | Land | DSSA | SHGB | 62 | Langensari | Ungaran Barat |
| 235) | DSSA 4 | Land | DSSA | SHGB | 127 | Langensari | Ungaran Barat |
| 236) | DSSA 4 | Land | DSSA | SHGB | 208 | Gedanganak | Ungaran Timur |
| 237) | DSSA 4 | Land | DSSA | SHGB | 1136 | Beji | Ungaran Timur |
| 238) | DSSA 4 | Land | DSSA | SHGB | 1166 | Gedanganak | Ungaran Timur |
| 239) | DSSA 5 | Land | Samuel Hartono | SHM | 1514 | Dagen | Jaten |
| 240) | DSSA 5 | Land | Samuel Hartono | SHM | 138 | Dagen | Jaten |
| 241) | DSSA 5 | Land | Samuel Hartono | SHM | 127 | Dagen | Jaten |
| 242) | DSSA 5 | Land | Samuel Hartono | SHM | 324 | Dagen | Jaten |
| 243) | DSSA 5 | Land | Samuel Hartono | SHM | 520 | Dagen | Jaten |
| 244) | DSSA 5 | Land | Samuel Hartono | SHM | 521 | Dagen | Jaten |
| 245) | DSSA 5 | Land | Samuel Hartono | SHM | 610 | Dagen | Jaten |
| 246) | DSSA 5 | Land | Samuel Hartono | SHM | 609 | Dagen | Jaten |
| 247) | DSSA 5 | Land | Samuel Hartono | SHM | 588 | Dagen | Jaten |
| 248) | DSSA 5 | Land | Samuel Hartono | SHM | 626 | Dagen | Jaten |
| 249) | DSSA 5 | Land | Samuel Hartono | SHM | 589 | Dagen | Jaten |
| 250) | DSSA 5 | Land | Samuel Hartono | SHM | 1508 | Dagen | Jaten |
| 251) | DSSA 5 | Land | Samuel Hartono | SHM | 810 | Dagen | Jaten |
| 252) | DSSA 5 | Land | Samuel Hartono | SHM | 1324 | Dagen | Jaten |

| 222) | DSSA 2 | Land | Indriati, Mrs. | SHM | 1125 | Jetis | Jaten |
| 223) | DSSA 2 | Land | Indriati, Mrs. | SHM | 889 | Jetis | Jaten |
| 224) | DSSA 2 | Land | Indriati, Mrs. | SHM | 715 | Jetis | Jaten |
| 225) | DSSA 2 | Land | Indriati, Mrs. | SHM | 690 | Jetis | Jaten |
| 226) | DSSA 2 | Land (warehouse) | Sumitro | SHM | 1543 | Jetis | Jaten |
| 227) | DSSA 3 | Land | DSSA | SHGB | 2 | Jaten | Jaten |
| 228) | DSSA 4 | Land | DSSA | SHGB | 8 | Gedanganak | Ungaran Timur |
| 229) | DSSA 4 | Land | DSSA | SHGB | 9 | Gedanganak | Ungaran Timur |
| 230) | DSSA 4 | Land | DSSA | SHGB | 19 | Langensari | Klepu |
| 231) | DSSA 4 | Land | DSSA | SHGB | 20 | Langensari | Klepu |
| 232) | DSSA 4 | Land | DSSA | SHGB | 55 | Langensari | Ungaran Barat |
| 233) | DSSA 4 | Land | DSSA | SHGB | 61 | Langensari | Ungaran Barat |
| 234) | DSSA 4 | Land | DSSA | SHGB | 62 | Langensari | Ungaran Barat |
| 235) | DSSA 4 | Land | DSSA | SHGB | 127 | Langensari | Ungaran Barat |
| 236) | DSSA 4 | Land | DSSA | SHGB | 208 | Gedanganak | Ungaran Timur |
| 237) | DSSA 4 | Land | DSSA | SHGB | 1136 | Beji | Ungaran Timur |
| 238) | DSSA 4 | Land | DSSA | SHGB | 1166 | Gedanganak | Ungaran Timur |
| 239) | DSSA 5 | Land | Samuel Hartono | SHM | 1514 | Dagen | Jaten |
| 240) | DSSA 5 | Land | Samuel Hartono | SHM | 138 | Dagen | Jaten |
| 241) | DSSA 5 | Land | Samuel Hartono | SHM | 127 | Dagen | Jaten |
| 242) | DSSA 5 | Land | Samuel Hartono | SHM | 324 | Dagen | Jaten |
| 243) | DSSA 5 | Land | Samuel Hartono | SHM | 520 | Dagen | Jaten |
| 244) | DSSA 5 | Land | Samuel Hartono | SHM | 521 | Dagen | Jaten |
| 245) | DSSA 5 | Land | Samuel Hartono | SHM | 610 | Dagen | Jaten |
| 246) | DSSA 5 | Land | Samuel Hartono | SHM | 609 | Dagen | Jaten |
| 247) | DSSA 5 | Land | Samuel Hartono | SHM | 588 | Dagen | Jaten |
| 248) | DSSA 5 | Land | Samuel Hartono | SHM | 626 | Dagen | Jaten |
| 249) | DSSA 5 | Land | Samuel Hartono | SHM | 589 | Dagen | Jaten |
| 250) | DSSA 5 | Land | Samuel Hartono | SHM | 1508 | Dagen | Jaten |
| 251) | DSSA 5 | Land | Samuel Hartono | SHM | 810 | Dagen | Jaten |
| 252) | DSSA 5 | Land | Samuel Hartono | SHM | 1324 | Dagen | Jaten |

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

8.4    Appendix 2 (Sponsor Personal Assets)

| No | Certificate | Certificate No. | Area (m²) | Location |
|---|---|---|---|---|
| 1) | SHM | 592 | 5.570 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 2) | SHM | 2735 | 2.910 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 3) | SHM | 1223 | 5.795 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 4) | SHM | 1076 | 615 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 5) | SHM | 1074 | 1.935 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 6) | SHM | 588 | 675 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 7) | SHM | 587 | 4.305 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 8) | SHM | 58 | 5.410 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 9) | SHM | 3451 | 4.018 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 10) | SHM | 3763 | 5.799 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 11) | SHM | 3437 | 1.955 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 12) | SHM | 2229 | 2.700 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 13) | SHM | 66 | 1.174 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 14) | SHM | 138 | 951 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 15) | SHM | 139 | 780 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 16) | SHM | 140 | 306 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 17) | SHM | 141 | 642 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 18) | SHM | 142 | 556 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 19) | SHM | 205 | 2.611 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 20) | SHM | 2021 | 103 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 21) | SHM | 2018 | 223 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 22) | SHM | 3667 | 166 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 23) | SHM | 2923 | 180 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 24) | SHM | 1826 | 480 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 25) | SHM | 2023 | 400 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 26) | SHM | 3668 | 165 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 27) | SHM | 2705 | 250 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 28) | SHM | 2002 | 280 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 29) | SHM | 2076 | 145 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 30) | SHM | 2077 | 260 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 31) | SHM | 2110 | 421 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 32) | SHM | 3686 | 856 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 33) | SHM | 1869 | 715 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 34) | SHM | 2020 | 130 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 35) | SHM | 2922 | 177 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat,  Karanganyar |
| 36) | SHM | 3381 | 750 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 37) | SHM | 3380 | 586 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 38) | SHM | 3379 | 617 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 39) | SHM | 3409 | 177 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 40) | SHM | 3408 | 178 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 41) | SHM | 3410 | 168 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 42) | SHM | 3403 | 140 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 43) | SHM | 3407 | 148 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 44) | SHM | 3406 | 142 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 45) | SHM | 3404 | 140 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 46) | SHM | 3405 | 141 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 47) | SHM | 1039 | 9.505 | Jalan Lingkungan Desa dagen, Dagen, Jaten, Karanganyar |
| 48) | SHM | 189 | 3.327 | Jalan Raya Solo - Sragen KM. 7,1, Dagen, Jaten, Karanganyar |
| 49) | SHM | 1933 | 283 | Jalan Raya Palur, Dagen, Jaten, Karanganyar |
| 50) | SHM | 3166 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 51) | SHM | 3167 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 52) | SHM | 3168 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

| 53) | SHM | 3169 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
|---|---|---|---|---|
| 54) | SHM | 3170 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 55) | SHM | 3171 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 56) | SHM | 3172 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 57) | SHM | 3173 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 58) | SHM | 2639 | 5.990 | Jalan Raya Solo - Semarang, Mojosongo, Mojosongo, Boyolali |
| 59) | SHM | 2113 | 4.232 | Jalan Raya Solo - Semarang, Mojosongo, Mojosongo, Boyolali |
| 60) | SHM | 680 | 2.600 | Jalan Adi Sucipto, Solo |
| 61) | SHM | 737 | 2.450 | Jalan Adi Sucipto, Solo |
| 62) | SHM | 1504 | 275 | Jalan RM. Said No. 161, Mangkubumen, Banjarsari, Surakarta |
| 63) | SHM | 1590 | 104 | Jalan RM. Said No. 161, Mangkubumen, Banjarsari, Surakarta |
| 64) | SHM | 2454 | 1.492 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 65) | SHM | 2819 | 1.795 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 66) | SHM | 2820 | 1.924 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 67) | SHM | 2821 | 1.996 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 68) | SHM | 772 | 606 | Jebres, Kec. Jebres, Kota Surakarta |
| 69) | SHM | 1271 | 294 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 70) | SHM | 2829 | 233 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 71) | SHM | 1266 | 121 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 72) | SHM | 1267 | 122 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 73) | SHM | 550 | 112 | Jl Slamet Riyadi, Pasar Kliwon, Surakarta |
| 74) | SHGB | 1021 | 110 | Jl Ir Soekarno Ruko JC 20, Solo Baru, Madegondo |
| 75) | SHGB | 1025 | 110 | Jl Ir Soekarno Ruko JC 24, Solo Baru, Madegondo |
| 76) | SHGB | 1027 | 110 | Jl Ir Soekarno Ruko JC 26, Solo Baru, Madegondo |
| 77) | SHGB | 1014 | 110 | Jl Ir Soekarno Ruko JC 12, Solo Baru, Madegondo |
| 78) | SHM | 262 | 316 | Jl. Tentara Pelajar Banjarsari Solo |
| 79) | SHM | 1943 | 879 | Jalan Karanglo Sorogenen, Sleman, Yogyakarta |
| 80) | SHM | 1944 | 880 | Jalan Karanglo Sorogenen, Sleman, Yogyakarta |
| 81) | SHM | 2514 | 338 | Jalan Ahmad Yani, Gilingan, Banjarsari, Surakarta |
| 82) | SHM | 3010 | 134 | Jalan Ahmad Yani, Gilingan, Banjarsari, Surakarta |



## 8.5    Appendix 3 (Verified Creditors)

| No | Secured Creditors | Verified Claims |
|---|---|---|
| 1) | PT. BANK NEGARA INDONESIA (PERSERO), Tbk. | 485,079,274,747.00 |
| 2) | PT. BANK RAKYAT INDONESIA (PERSERO), Tbk. | 1,909,047,285,752.10 |
| 3) | PT. BANK PERMATA, Tbk. | 580,228,699,319.50 |
| 4) | PT. BANK NATIONALNOBU, Tbk. | 88,557,181,661.68 |
| 5) | PT. BANK HARDA INTERNASIONAL, Tbk. | 57,998,159,683.73 |
| 6) | PT. BANK DANAMON, Tbk | 237,390,000,000.00 |
| 7) | PT. BANK MULTIARTA SENTOSA | 184,259,220,629.62 |
| 8) | STANDARD CHARTERED BANK, CABANG JAKARTA | 620,820,172,243.26 |
| 9) | PT. BANK QNB INDONESIA, Tbk. | 146,288,931,697.82 |
| 10) | PT. BANK SBI INDONESIA | 34,084,949,462.00 |
| 11) | PT. BANK CIMB NIAGA, Tbk. | 367,012,756,271.55 |
| 12) | PT. BANK MASPION INDONESIA, Tbk. | 46,500,558,400.84 |
| 13) | PT. BANK CENTRAL ASIA, Tbk. | 3,183,480,400.00 |
| 14) | LEMBAGA PEMBIAYAAN EKSPOR INDONESIA (LPEI) / INDONESIA EXIMBANK | 3,133,615,225,062.82 |
| 15) | PT. BANK MANDIRI (PERSERO), Tbk. | 2,237,963,345,198.76 |
| 16) | PT. BANK MAYBANK INDONESIA, Tbk. | 536,500,829,759.93 |
| 17) | PT. BANK ICBC INDONESIA | 52,898,121,915.06 |
| 18) | PT. BANK BNI SYARIAH | 381,272,087,980.00 |
| 19) | PT. BANK BRI SYARIAH, Tbk. | 453,877,905,375.00 |
| 20) | PT. BANK MUAMALAT INDONESIA, Tbk. | 132,902,491,670.00 |
| 21) | PT. BANK SYARIAH MANDIRI | 527,773,626,668.27 |

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DEGREE OF DKI JAKARTA GOVERNOR
NO.1839/2009
PENERJEMAH BERSUMPAH

| | | |
|---|---|---|
| 22) | THE BANK OF NEW YORK MELLON | 3,306,895,483,151.80 |
| 23) | BANCO FINANTIA, S.A. | 118,798,199,880.58 |
| 24) | IP ALL SEASONS ASIAN CREDIT FUND | 91,321,443,202.12 |
| 25) | SEA TOWN MASTER FUND | 148,490,151,629.98 |
| 26) | FMAP ACL LIMITED | 106,244,703,378.78 |
| 27) | ATHOS ASIA EVENT DRIVEN MASTER FUND | 211,449,975,885.94 |
| 28) | INCOME PARTNERS MANAGED VOLATILITY HIGH YIELD BOND FUND | 95,033,697,003.50 |
| 29) | ST ASSET MANAGEMENT LIMITED | 89,094,090,807.90 |
| 30) | GOPHER GLOBAL FIXED INCOME FUND | 152,944,856,134.94 |
| 31) | ING Bank N.V. - Singapore Branch | 382,416,861,848.28 |
| 32) | UNION BANK OF INDIA, HONG KONG | 406,129,330,958.80 |
| 33) | MITSUBISHI UFJ LEASE (Singapore) Pte Ltd | 79,538,834,558.00 |
| 34) | THE SHANGHAI COMMERCIAL & SAVINGS BANK Ltd SINGAPORE BRANCH | 26,512,944,947.28 |
| 35) | BANK OF PANHSIN | 86,504,032,699.28 |
| 36) | PT. BANK BNP PARIBAS INDONESIA | 492,315,382,866.80 |
| 37) | ENTIE COMMERCIAL BANK | 13,256,472,331.90 |
| 38) | STANDARD CHARTERED BANK | 216,482,454,018.98 |
| 39) | TAIWAN COOPERATIVE BANK, MANILA OFFSHORE BANKING BRANCH | 217,024,278,697.51 |
| 40) | BNP PARIBAS (SINGAPORE BRANCH) | 15,712,406,981.50 |
| 41) | MALAYAN BANKING BERHAD, SINGAPORE BRANCH | 245,731,459,764.24 |
| 42) | AOZORA ASIA PACIFIC FINANCE LIMITED | 53,025,889,611.08 |
| 43) | CHAILEASE INTERNATIONAL FINANCIAL SERVICES CO., LTD | 13,256,472,331.90 |
| 44) | NEC CAPITAL SOLUTIONS SINGAPORE PTE. LIMITED | 26,512,944,947.28 |
| 45) | PT. BANK JTRUST INDONESIA TBK. | 26,531,233,234.26 |

113

| 46) | PT BANK SHINHAN INDONESIA | 496,478,235,138.26 |
|---|---|---|
| 47) | INDIAN BANK, SINGAPORE BRANCH | 319,292,631,645.08 |
| 48) | QATAR NATIONAL BANK (Q.P.S.C.), SINGAPORE BRANCH (QNB) | 540,299,433,409.54 |
| 49) | WOORI GLOBAL MARKETS ASIA LIMITED | 128,749,638,423.00 |
| 50) | YUANTA COMMERCIAL BANK CO., LTD HONG KONG BRANCH | 218,085,315,989.54 |
| 51) | STANDARD CHARTERED BANK SINGAPORE LIMITED | 162,898,732,322.00 |
| 52) | FIRST COMMERCIAL BANK, LTD., SINGAPORE BRANCH | 128,749,638,423.00 |
| 53) | FIRST ABU DHABI BANK PJSC, SINGAPORE BRANCH | 146,284,566,531.00 |
| 54) | THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, JAKARTA BRANCH (PT. BANK HSBC INDONESIA)) | 297,370,886,207.06 |
| 55) | SUMITOMO MITSUI BANKING CORPORATION, SINGAPORE BRANCH | 141,543,946,365.00 |
| 56) | CHINA CITIC BANK INTERNATIONAL LIMITED, SINGAPORE BRANCH | 110,227,245,438.36 |
| 57) | FEDERATED PROJECT AND TRADE FINANCE CORE FUND | 37,703,982,566.14 |
| 58) | PINPOINT MULTI STRATEGY MASTER FUND | 133,641,136,424.46 |



| No | Unsecured Creditors | Verified Claims |
|---|---|---|
| 1) | PT. BANK NEGARA INDONESIA (PERSERO), Tbk. | 63,128,069,699.00 |
| 2) | PT. BANK DANAMON, Tbk. | 23,895,798,936.64 |
| 3) | STANDARD CHARTERED BANK, CABANG JAKARTA | 46,310,000,000.00 |
| 4) | ING Bank N.V. - Singapore Branch | 20,685,121,010.50 |
| 5) | THE BANK OF NEW YORK MELLON | 2,267,840,000.00 |
| 6) | CV. CAHAYA ASIA | 3,604,618,800.00 |
| 7) | PT. SHINE GOLDEN BRIDGE | 1,697,880,000.00 |
| 8) | PT. PANCA ABADI NUSANTARA | 323,491,431,557.00 |
| 9) | PT. NUSANTARA ANUGERAH TEKSTIL | 66,670,179,091.00 |
| 10) | PT. KINERJA MUTIARA PERSADA | 3,270,865,925.00 |
| 11) | PT. KARIS SUN INDONESIA | 12,751,200.00 |
| 12) | CV. SURYA PUTERA ANUGERAH | 694,724,580.00 |
| 13) | PT. ASTER POLYCEM | 12,440,606,300.00 |
| 14) | PT. SUMBER ABADI ENERGINDO | 11,508,256,250.00 |
| 15) | PT. ADIL JAYA | 177,117,240.00 |
| 16) | PT. SOUTH PACIFIC VISCOSE | 59,510,381,573.40 |
| 17) | PT. PURINUSA EKAPERSADA | 88,524,023.00 |
| 18) | PT. LAUTAN LUAS, Tbk. | 56,584,000.00 |
| 19) | PT. SAMUDRA DWI TRANSPORINDO | 464,669,875.50 |
| 20) | UD. SAMUDRA TRANSPORT | 61,389,686.50 |
| 21) | CV. PRATAMA JAYA TRANSPORT | 131,520,541.00 |
| 22) | PT. MULTIKIMIA INTIPELANGI | 1,024,401,345.00 |
| 23) | DRIYANI YUNINGTYAS | 1,000,000.00 |
| 24) | GRACE CHRISNAWATI CHRISTIANTO | 1,000,000.00 |
| 25) | WAGIMAN | 1,000,000.00 |
| 26) | IRMA ADE NUGROHO | 1,000,000.00 |
| 27) | SHERLY PRICILIA SURYA | 1,000,000.00 |
| 28) | NONIK | 1,000,000.00 |
| 29) | PRISKILLA LAURENSIA | 1,000,000.00 |

| 30) | MONICA YUBI ASTARI | 1,000,000.00 |
|---|---|---|
| 31) | MICHEL CHRISA EFFENDI | 1,500,000.00 |
| 32) | SUNARDI | 1,000,000.00 |
| 33) | RELLA EDWIN H | 1,000,000.00 |
| 34) | EMA AMBAR M | 1,000,000.00 |
| 35) | RONNY KURNIAWAN | 1,000,000.00 |
| 36) | RISKA FEBRIAN UTOMO | 1,500,000.00 |
| 37) | YOHANES FATOMI | 1,000,000.00 |
| 38) | SHERLY PUTRI P | 1,000,000.00 |
| 39) | STEFFI INDAH | 1,000,000.00 |
| 40) | MERRY YANIKA PUTRI | 1,000,000.00 |
| 41) | EMEILYA KUMALA S | 1,000,000.00 |
| 42) | RIZKY K | 1,000,000.00 |
| 43) | KRISTIANI | 1,000,000.00 |
| 44) | MONICA | 1,000,000.00 |
| 45) | POPPY TJANDRA DEWI | 1,500,000.00 |
| 46) | YOHANES HENDRAKUSUMA | 1,000,000.00 |
| 47) | HERI LISTYONO | 1,000,000.00 |
| 48) | AGUSTINA PINDAWATI | 1,000,000.00 |
| 49) | NOVI UTAMI PRASETIO | 1,000,000.00 |
| 50) | ASIH ARIYANI | 1,000,000.00 |
| 51) | GERSON TULE | 1,000,000.00 |
| 52) | DEASI KUSTIANI | 1,000,000.00 |
| 53) | IRWAN BUDIYONO | 1,000,000.00 |
| 54) | MUHARI | 1,000,000.00 |
| 55) | DJOKO SUPARNO | 1,000,000.00 |
| 56) | RIYANA DEWI | 1,000,000.00 |
| 57) | ERNEST SETYAWAN | 1,500,000.00 |
| 58) | NATALIA INTAN S | 1,000,000.00 |
| 59) | SUJATMO | 1,000,000.00 |
| 60) | BUDHI SAPUTRA | 1,000,000.00 |

| 61) | LAURENTIUS EGA S | 1,500,000.00 |
| 62) | STEFFI SINATA | 1,000,000.00 |
| 63) | ANDRE PRASETYA | 1,000,000.00 |
| 64) | CATUR PRABOWO | 1,000,000.00 |
| 65) | HADIYONO | 1,000,000.00 |
| 66) | IVANDY PUTRA PRABUANA | 1,000,000.00 |
| 67) | NATASHA FELITA | 1,000,000.00 |
| 68) | WIDIANTO ADHI D | 1,000,000.00 |
| 69) | S. CHRISTIAN ANDREAS P | 1,000,000.00 |
| 70) | HASAN | 1,500,000.00 |
| 71) | LILIK PURIWIYANTO | 1,000,000.00 |
| 72) | BREMI ADI P | 1,000,000.00 |
| 73) | ARIS BUDIANTO | 1,000,000.00 |
| 74) | DAVID SETIAWAN RUDYANTO | 1,000,000.00 |
| 75) | ALVIN NATANAEL TANUJAYA | 1,000,000.00 |
| 76) | ELIZABETH PUTRI PERMATASARI | 1,000,000.00 |
| 77) | RACHELITA HARITAMA | 1,000,000.00 |
| 78) | SUKARJO | 1,000,000.00 |
| 79) | AMY AMELIA | 1,000,000.00 |
| 80) | SAMUEL FEBRIATNO | 1,500,000.00 |
| 81) | FRANSISKA MAYA SARI | 1,000,000.00 |
| 82) | YOHANES ENDRA KRISTIANTOMO | 1,000,000.00 |
| 83) | DARMI DARMO SUGONDO | 1,000,000.00 |
| 84) | SUGENG HARYANTO | 1,000,000.00 |
| 85) | SHYNINTA CANDRA PUTRI | 1,000,000.00 |
| 86) | DANY GUNAWAN | 1,000,000.00 |



9.4 Appendix 4 (CSPA Term Sheet)

Term Sheet for Conditional Sale and Purchase Agreement (**"CSPA"**)

| No. | Key Issues | Key Terms |
|---|---|---|
| 1) | Purchaser | Designated party(ies) by the LWG Syndicated Creditors, which will be receiving conditional assignment of LWG Syndicated Creditors' debts under the Existing Facilities (equivalent to the aggregate liquidation value of LWG Assets (as defined below)). <br><br> (hereinafter referred to as **"Purchaser"**) |
| 2) ` | Sellers | 1)  DMDT; <br><br> 2)  DDT; and <br><br> 3)  DDST. <br><br> (hereinafter collectively referred to as **"Sellers"** and each referred to as **"Seller"**). Each Seller will enter into a separate CSPA with the Purchaser. |
| 3) | Execution Date | No later than 3 (three) months after the Effective Date of the Composition Plan unless the Purchaser, at its sole discretion, decides to extend the Execution Date. |
| 4) | Effective Date | The CSPA becomes effective upon the occurrence of a Default against the LWG Syndicated Creditors under the Composition Plan by the Debtors and/or |

|  |  | Sponsor ("**CSPA Effective Date**"). |
|---|---|---|
| **5)** | Period | 1) Seven years or any time before seven years as decided, at its sole discretion, by the Purchaser as of the CSPA Effective Date. |
|  |  | 2) Subject to the completion of the CSPA period, the Purchaser has the right to purchase the LWG Assets or appoint another designated party to purchase the LWG Assets. |
|  |  | 3) Without prejudice to above, the Purchaser may also extend the CSPA period at its sole discretion by notifying the Sellers. |
| **6)** | Purchased Assets | secured Assets to the LWG Syndicated Creditors under the Existing Facilities ("**LWG Assets**"). |
| **7)** | Purchase Price and Settlement Method | 1) Pre-determined price based on the liquidation value of the LWG Assets as determined by the valuations a public appraisal service office (*kantor jasa penilai publik* or "KJPP") ("**Purchase Price**"). |
|  |  | 2) At the latest 7 Days following the CSPA Effective Date, the Sellers may request to the Purchaser for a new appraisal on the liquidation value ("**Request**"). A KJPP must be appointed at the sole discretion of the Purchaser at the latest 30 Days since the receipt the Request by the |



| | |
|---|---|
| | Purchaser. At the latest 30 Days following the receipt of the new liquidation value by the Purchaser, the Purchaser will have the right to continue with the CSPA or to enforce the security rights at the Purchaser's sole discretion. |
| | 3) The Purchaser will pay the Purchase Price by way of set-off against the Sellers' debt to the Purchaser (following the assignment of the Sellers' debts from the LWG Syndicated Creditors to the Purchaser), or any other methods determined at the sole discretion of the Purchaser. |
| | 4) It is agreed that the payment of Purchase Price may be done in multiple tranches or a one-time payment, as determined at the sole discretion of the Purchaser. |
| | 5) In the event that the ownership title of LWG Assets is transferred from DDT, DMDT, and DDST (as relevant), all debts of DDT, DMDT, and DDST (as relevant) to the relevant LWG Syndicated Creditors under the Existing Facilities and the Composition Plan are deemed fully paid. |
| **8)**  Right to Use | 1) During the CSPA period, the Purchaser has the |



right to possess, operate and utilize the LWG Assets. It is the parties' intention that the Sellers will grant (i) physical possession of the LWG Assets to the Purchaser and (ii) the right to operate the LWG Assets, from the Effective Date of the CSPA pending the transfer of ownership title of the LWG Assets to the Purchaser.

2) The Sellers agree to assign or novate any existing operating contracts related to LWG Assets to the Purchaser, including but not limited to water, electricity and any other relevant contracts in relation to the LWG Assets operation. The Purchaser is also entitled to enter into any other contracts with any third party(ies) for the operational activities of LWG Assets without the need to seek approval from the Sellers.

3) The Sellers must maintain the validity of applicable licenses for the operational activities of LWG Assets and, if necessary, will use their best endeavours to assist the Purchaser in obtaining any necessary licenses from any governmental body in order to operate the LWG



Assets.

4) During the Purchaser's utilization of LWG Assets, the Purchaser is entitled to fully receive any proceeds from the operational activities of LWG Assets. For the avoidance of doubt, any proceeds generated owned from the operational activities of the LWG Asset are fully owned by the Purchaser.

5) Subject to the terms and the conditions of CSPA and upon the CSPA Effective Date, the Debtors are not required to service their debts to the LWG Syndicated Creditors and/or the Purchaser (as relevant). However, for the avoidance of doubt, the Debtor's debts to the LWG Syndicated Creditors are not yet extinguished and will be fully settled in accordance with the Composition Plan, CSPA and other ancillary documents. All debts of the Sellers to the relevant LWG Syndicated Creditors and/or to the Purchaser (as relevant) will be deemed fully settled after the ownership title of LWG Assets are fully transferred from DDT, DMDT, and/or DDST (as relevant) to the Purchaser and/or other party designated by the LWG Syndicated



| | | Creditors and/or the Purchaser. |
|---|---|---|
| 9) | Grant of Security Rights | The Sellers must ensure that the existing Security Documents over the LWG Assets are still valid, binding and enforceable in favor of the Purchaser. Each Seller shall execute all documents and do all things necessary as the Purchaser may reasonably request for perfecting the existing security rights over LWG Asset (including, if necessary, re-executing the relevant Security Documents). |
| 10) | Conditions to Closing | 1) The completion of the CSPA would be subject to the satisfaction of the following conditions precedent within the CSPA period or at a later date as agreed between the parties: <br><br> a) settlement of the Purchase Price by way of set-off against the Sellers' debts to the Purchaser (following the assignment of the Sellers' debt from the LWG Syndicated Creditors to the Purchaser), either through tranches of payment or one-time payment based on the sole discretion of the Purchaser; <br><br> b) the existing Security Documents will be amended to reflect that until transfer of title occurs, the existing security documents will also secure the Purchaser's rights and claims |



against the Sellers;

c) the Sellers have obtained all resolutions and approvals, whether internal or from any third party to enter into such documents required in order to give such power, approval or consent to the closing of this sale and purchase of the LWG Assets to the Purchaser or its designated party;

d) the Sellers have paid all of the lands and building taxes (*pajak bumi dan bangunan* or "PBB") and any ownership costs in relation to the LWG Assets, including but not limited to severance pay of the Sellers' employees, as indebted until the closing date;

e) the Sellers are not in default of the Composition Plan which may result to the Sellers' bankruptcy;

f) no cancellation of the Composition Plan, bankruptcy, PKPU and/other similar proceedings initiated/threatened against the Sellers; and

g) other conditions precedent as the Purchaser (or its designated party) sees fit

2) The conditions precedent may only be waived or



|     |     |     |     |
| --- | --- | --- | --- |
|     |     |     | amended in writing at the sole discretion of the Purchaser. |
|     |     | 3)  | On the closing date, the Sellers and the Purchaser (or its designated party) shall sign the deed of sale and purchase of land for the LWG Assets (**"SPA"**). |
| **11)** | Tax / Cost | 1)  | Each party will be responsible to pay any land transfer taxes in relation to the transfer of LWG Assets from the Sellers to the Purchasers (or its designated party) at the completion date. |
|     |     | 2)  | The Sellers will remain responsible for any land tax or other ownership costs, including but not limited to any customs obligation, in connection with the LWG Assets until the transfer of title is completed. |
| **12)** | Representations and Warranties by the Sellers | | The Sellers shall provide representations and warranties that are common for this type of transaction, including but not limited to: |
|     |     | 1)  | The Sellers have conducted all of the required actions and have obtained all approvals, powers and formalities to validly enter into and perform their responsibilities in this CSPA and warrants that such responsibilities are legal, valid, binding and can be performed, fulfilled or executed on |



125

the closing date.

2) Only the Sellers are entitled and fully authorized to transfer rights and interests in the LWG Assets and except for the existing encumbrance acknowledged in the Composition Plan, the LWG Assets are free and clear of any mortgage, assignment of receivables, fiduciary security interest, debenture, lien, charge, pledge, security interest, title retention, right to acquire, option, restriction on transfer, contractual restriction, easement, right-of-way, option, right of first refusal, right of pre-emption, or any other type of preferential arrangement or any other encumbrance or condition whatsoever and any other arrangement having substantially the same or similar economic effect, or the security or right of the use thereof, or any agreement or arrangement to create the same.

3) The LWG Assets have been used and the construction, renovation and operation of the LWG Assets in accordance with the law, including environmental laws, and all authorizations from any agency, authority, official or instrumentality of any such



government, whether national, local, or regional which are required have been obtained by the Sellers.

4) All dues pertaining to the utilities installed at the LWG Assets have been cleared and paid in full, and all terms and conditions of the agreements and/or licenses for their use have been complied with, so the Purchaser will be able to continue using the utilities on the Effective Date of the CSPA.

5) There is no environment related issues on the LWG Assets, and the Sellers have not received any written notice or report regarding any actual or alleged violation of environmental, health, and safety requirements, or any liabilities or potential liabilities, including any investigatory, remedial or corrective obligations, relating to the LWG Assets or any of its facilities.

6) The insurance policy over the LWG Assets are in full force and effect, and the Sellers are (i) not in breach or default (including with respect to the payment of premiums or the giving of notices), (ii) no event has occurred which may render any such insurance policy void, and (iii)



|  | |
|---|---|
| | no party to the policy has repudiated any provision thereof. |
| | 7) The employees located or placed in the LWG Assets shall remain to be employed by the Sellers. If it is desired by the Purchaser (or its designated party) to hire the Sellers' employees at any time during the period of the CSPA, the Sellers must terminate and be responsible for the full severance payment either in the forms of statutory or ex-gratia, without any due and outstanding payment, to the employees (clean break). |
| **13)**    Indemnity | 1) The Sellers represent and warrant to the Purchaser that each of the statements set out in the Sellers' representations and warranties above is at the date of the CSPA, the Effective Date of the CSPA and will at completion and at all times before completion (by reference to the facts and circumstances existing at the relevant time) be, true and accurate and not misleading. |
| | 2) The Sellers undertake (without limiting any other rights of the Purchaser in any way including its rights in connecton with any loss in respect of a claim for breach of any Sellers' |



|  |  | warranty on any other basis) that, if there is a breach of any Sellers' warranties and the completion takes place, they shall pay in cash to the Purchaser (or its designated party) on demand a sum equal to:<br><br>a) the loss resulting from such breach; or<br><br>b) all loss which the Purchaser (or its designated party) incurs, whether before or after completion arising (directly or indirectly) out of the settlement of a claim in respect of a breach or an alleged breach of any representations and warranties under the CSPA, or the enforcement of a settlement. |
| 14) | Covenants | 1) Following the Effective Date of the CPSA, in the event that the CSPA, the SPA, and/or any other terms under this CSPA and the SPA cease to be valid, binding or enforceable (whether in whole or in part), the CSPA and the SPA will be unwound and the Sellers will become liable to pay the whole of the debt to LWG Syndicated Creditors and/or Purchaser (as the case may be) in the amounts verified under the Composition Plan (including, without limitation, the portion of the debt assigned from the LWG Syndicated |



|  |  | Creditors to the Purchaser). |
|---|---|---|
|  |  | 2) In the event that the Sponsor and/or the Debtor(s) go to bankruptcy or there is a claim to cancel the Composition Plan and/or the Sponsor's composition plan under Case No. 25/Pdt.Sus-PKPU/2019/PN.SMG., the Purchaser will have the right to exit the CSPA and the CSPA will be unwound and the Sellers will become liable to pay the whole of the debt to the LWG Syndicated Creditors and/or the Purchaser (as the case may be) in the number verified under Composition Plan (including, without limitation, the portion of the debt assigned from the LWG Syndicated Creditors to the Purchaser). The Debtors and the Sponsor agree that CSPA will not waive the right for LWG Syndicated Creditors and its designated party to submit claim during bankruptcy of the Debtors and/Sponsor. |
| 15) | Governing Law | Laws of the Republic of Indonesia |
| 16) | Dispute Resolution | Singapore International Arbitration Centre (SIAC) with three arbitrators. The seat of the arbitration shall be Singapore. |
| 17) | Language | This CSPA is prepared in the English language and |



the Indonesian language. For the avoidance of any doubt, the Indonesian language text will prevail in the event of any inconsistencies or differences of interpretation with the English language text.



9.5 Appendix 5 (Settlement Details)



*Private & Confidential*

# DDT
## Outstanding Debt

| Creditors | Principal IDR Mn | Principal USD 000 | Interest / Margin IDR Mn | Interest / Margin USD 000 | Penalty IDR Mn | Penalty USD 000 | Other Fees IDR Mn | Other Fees USD 000 | Total Debt IDR Mn | Total Debt USD 000 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | |
| BRI | 804,176 | 27,440 | 22,369 | 167 | 99 | 0 | - | - | 826,644 | 27,607 |
| LPEI | 1,051,564 | - | 19,405 | - | - | - | 6,722 | - | 1,077,690 | - |
| Mandiri | 500,000 | 15,345 | 14,409 | 176 | 9,193 | - | 4,531 | 24 | 528,133 | 15,545 |
| Mega | 200,048 | - | 1,465 | - | - | - | 1,168 | - | 202,682 | - |
| SCB Indonesia | - | 13,220 | - | 21 | - | - | - | - | - | 13,241 |
| Shinhan Indonesia | 249,607 | - | 4,162 | - | - | - | - | - | 253,769 | - |
| Sub-total Bilateral Loan | 2,805,395 | 56,005 | 61,810 | 364 | 9,292 | - | 12,421 | 24 | 2,888,918 | 56,393 |
| | | | | | | | | | | |
| **Syndicated Loan** | | | | | | | | | | |
| Bank of Panshin | - | 4,118 | - | 114 | - | - | - | - | - | 4,232 |
| BNPP Indonesia | - | 4,314 | - | 133 | - | - | - | - | - | 4,447 |
| BNPP Singapore[1] | - | 574 | - | - | - | - | - | - | - | 574 |
| First Abu Dhabi Bank, Singapore | - | 10,000 | - | 321 | - | - | - | - | - | 10,321 |
| First Commercial Bank Ltd, Singapore | - | 8,824 | - | 260 | - | - | - | - | - | 9,084 |
| Indian Bank, Singapore | - | 18,236 | - | 550 | - | - | - | - | - | 18,786 |
| LPEI | - | 13,236 | - | 416 | - | - | - | - | - | 13,652 |
| Maybank Indonesia | - | 6,111 | - | 208 | - | 1 | - | - | - | 6,320 |
| Maybank Singapore | - | 5,948 | - | 165 | - | - | - | - | - | 6,114 |
| QNB Singapore | - | 17,648 | - | 519 | - | - | - | - | - | 18,167 |
| SCB London[1] | - | 574 | - | - | - | - | - | - | - | 574 |
| SCB Singapore | - | 11,177 | - | 315 | - | - | - | - | - | 11,493 |
| Union Bank of India, HK | - | 15,099 | - | 420 | - | - | - | - | - | 15,519 |
| Woori Global Markets Asia | - | 8,824 | - | 260 | - | - | - | - | - | 9,084 |
| Yuanta Commercial Bank | - | 8,824 | - | 260 | - | - | - | - | - | 9,084 |
| Sub-total Syndicated Loan | - | 133,507 | - | 3,941 | - | 1 | - | - | - | 137,491 |
| | | | | | | | | | | |
| Total Outstanding Debt | 2,805,394 | 189,512 | 61,810 | 4,303 | 9,292 | 1 | 12,421 | 24 | 2,888,918 | 193,840 |
| Total Outstanding Debt (IDR Mn Eqv.)[2] | 5,491,542 | | 122,799 | | 9,307 | | 12,764 | | 5,636,411 | |

[1] Fee related to DDT Syndicated Loan
[2] Bank Indonesia middle rate USD/IDR: 14,174 as of PKPU Date 30 September 2019

1

*Private & Confidential*

# DDT
## Sustainable and Unsustainable Debt Allocation



| | Pledged to | Settlement Via | Descriptions |
|---|---|---|---|
| Operational Asset DDT 1 | Mandiri | Tranche A1 | Sustainable Portion |
| | | Tranche A2 | Sustainable Portion |
| | | Tranche C | Unsustainable Portion |
| Operational Asset DDT 2 | BRI | Tranche A1 | Sustainable Portion |
| | | Tranche A2 | Sustainable Portion |
| | | Tranche C | Unsustainable Portion |
| Operational Asset DDT 3 | LPEI | Tranche A1 | Sustainable Portion |
| | | Tranche A2 | Sustainable Portion |
| | | Tranche C | Unsustainable Portion |
| Operational Asset DDT 4 | Syndicated Lenders DDT - USD 135,000,000 Facilities Agreement | Tranche A1 | Sustainable Portion |
| | | Tranche A2 | Sustainable Portion |
| | | Tranche DDT Syndication A | Sustainable Portion |
| | | Tranche DDT Syndication C | Unsustainable Portion |
| | | Tranche C | Unsustainable Portion |
| Non-Operating Assets DDT | Mega, Shinhan Indonesia and SCB Indonesia[1] | Sale of Non-Operating Asset and/or AYDA | Settlement via Sale of Non-Operating Asset and/or AYDA |

Note:
1) Non-Operating Assets pledged to SCB Indonesia are cross collateral with SCB Indonesia facilities in DDST and DMST.

2

*Private & Confidential*

# DDT
## Proposed Debt Settlement (1/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche Syndication A | Tranche Syndication C | Tranche C |
|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | |
| BRI | IDR Mn | 804,176 | 190,000 | 140,000 | - | - | - | 474,176 |
| | USD 000 | 27,440 | 6,350 | 4,939 | - | - | - | 16,152 |
| LPEI | IDR Mn | 1,051,564 | 200,000 | 150,000 | - | - | - | 701,564 |
| | USD 000 | - | - | - | - | - | - | - |
| Mandiri | IDR Mn | 500,000 | 200,000 | 150,000 | - | - | - | 150,000 |
| | USD 000 | 15,345 | 5,644 | 4,233 | - | - | - | 5,468 |
| **Sub-total Bilateral Loan** | IDR Mn | 2,355,740 | 590,000 | 440,000 | - | - | - | 1,325,740 |
| | USD 000 | 43,788 | 11,994 | 9,172 | | | | 21,620 |

3

---

*Private & Confidential*

# DDT
## Proposed Debt Settlement (2/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche Syndication A | Tranche Syndication C | Tranche C |
|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | |
| Bank of Panhsin | USD 000 | 4,118 | - | - | - | 2,381 | 1,737 | - |
| BNPP Indonesia | USD 000 | 4,314 | - | - | - | 2,494 | 1,820 | - |
| BNPP Singapore[1] | USD 000 | 574 | - | - | - | 332 | 242 | - |
| First Abu Dhabi Bank PJBC, Singapore | USD 000 | 10,000 | - | - | - | 5,781 | 4,219 | - |
| First Commercial Bank Ltd, Singapore | USD 000 | 8,824 | - | - | - | 5,101 | 3,723 | - |
| Indian Bank, Singapore Branch | USD 000 | 18,236 | - | - | - | 10,542 | 7,694 | - |
| LPEI | USD 000 | 13,236 | 2,822 | 2,117 | - | - | - | 8,297 |
| Maybank Singapore | USD 000 | 5,948 | - | - | - | 3,438 | 2,510 | - |
| Maybank Indonesia | USD 000 | 6,111 | - | - | - | 3,533 | 2,578 | - |
| QNB Singapore | USD 000 | 17,648 | - | - | - | 10,202 | 7,446 | - |
| SCB London[1] | USD 000 | 574 | - | - | - | 332 | 242 | - |
| SCB Singapore | USD 000 | 11,177 | - | - | - | 6,461 | 4,716 | - |
| Union Bank of India, HK | USD 000 | 15,099 | - | - | - | 8,729 | 6,370 | - |
| Woori Global Markets Asia | USD 000 | 8,824 | - | - | - | 5,101 | 3,723 | - |
| Yuanta Commercial Bank | USD 000 | 8,824 | - | - | - | 5,101 | 3,723 | - |
| **Sub-total Syndicated Loan** | USD 000 | 133,507 | 2,822 | 2,117 | - | 69,527 | 50,744 | 8,297 |
| **Total Bilateral and Syndicated Loans** | IDR Mn | 2,355,740 | 590,000 | 440,000 | - | - | - | 1,325,740 |
| | USD 000 | 176,293 | 14,816 | 11,288 | - | 31,147 | 50,744 | 29,917 |

[1] Fee related to DDT Syndicated Loan

4

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for BRI (1/2)

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 804,178,000,000 | 27,440,257 | 1,193,114,196,198 |
| Interest / Margin | 22,369,180,386 | 166,579, | 24,730,272,691 |
| Penalty | 99,089,198 | 122 | 100,818,426 |
| **Total BRI Bilateral Loan** | 826,644,269,584 | 27,606,958 | 1,217,945,287,315 |

| | Proposed Debt Settlement |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 190,000,000,000 and USD 6,349,654 / 10 years from Effective Date. |
| Tranche A2 Principal / Tenor | IDR 140,000,000,000 and USD 4,938,620 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 474,178,000,000 and USD 16,151,982 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and Tranche A2, and last principal payment paid on the last day of the 12th year for Tranche C ("Scheduled Principal Payment"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 and Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

5

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for BRI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR mn) – Tranche A1 | 190,000 | 190 | 190 | 4,750 | 9,500 | 14,250 | 19,000 | 19,000 | 22,800 | 25,650 | 74,670 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 6,350 | 6 | 6 | 159 | 317 | 476 | 635 | 635 | 762 | 857 | 2,497 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche A2 | 140,000 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 49,000 | 49,000 | 41,020 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 4,939 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 1,729 | 1,729 | 1,446 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche C | 474,178 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 71,126 | 398,310 |
| Principal Repayment (USD 000) – Tranche C | 16,152 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 2,423 | 13,569 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

6

135

Private & Confidential

# DDT

Debt Restructuring Terms – Settlement for Mandiri (1/2)

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 500,000,000,000 | 15,344,973 | 717,499,642,483 |
| Interest / Margin | 14,408,867,516 | 176,351 | 16,908,464,605 |
| Penalty | 9,192,622,752 | | 9,192,622,752 |
| Other Fees | 4,531,481,400 | 24,156 | 4,873,871,662 |
| **Total Mandiri Bilateral Loan** | 528,132,971,667 | 15,545,480 | 748,474,601,502 |

| | Proposed Debt Settlement |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 200,000,000,000 and USD 5,644,137 / 10 years from Effective Date. |
| Tranche A2 Principal / Tenor | IDR 150,000,000,000 and USD 4,233,103 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 150,000,000,000 and USD 5,467,733 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and Tranche A2, and last principal payment paid on the last day of the 12th year for Tranche C ("Scheduled Principal Payment"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 and Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

7

Private & Confidential

# DDT

Debt Restructuring Terms – Settlement for Mandiri (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR mn) – Tranche A1 | 200,000 | 200 | 200 | 5,000 | 10,000 | 15,000 | 20,000 | 20,000 | 24,000 | 27,000 | 78,600 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 5,644 | 6 | 6 | 141 | 282 | 423 | 564 | 564 | 677 | 762 | 2,219 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche A2 | 150,000 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 52,500 | 52,500 | 43,950 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 4,233 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 1,482 | 1,482 | 1,241 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche C | 150,000 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 22,500 | 126,000 |
| Principal Repayment (USD 000) – Tranche C | 5,468 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 820 | 4,598 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

8

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH



*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for LPEI (1/3)

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 1,051,563,562,663 | - | 1,051,563,562,663 |
| Interest / Margin | 19,405,065,921 | - | 19,405,065,921 |
| Penalty | 6,721,543,157 | - | 6,721,543,157 |
| **Total LPEI Bilateral Loan** | **1,077,690,171,742** | **-** | **1,077,690,171,742** |
| | | | |
| **Syndicated Loan** | | | |
| Principal | - | 13,236,000 | 187,607,064,000 |
| Interest / Margin | - | 415,546 | 5,889,955,38? |
| Penalty | | | |
| **Total LPEI Syndicated Loan** | **-** | **13,651,546** | **193,497,019,382** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 280.000.000.000 and USD 2,822,069 / 10 years from Effective Date. |
| Tranche A2 Principal / Tenor | IDR 210.000.000.000 and USD 2,116,551 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 561.563.562.663 and USD 8,297,380 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and Tranche A2, and last principal payment paid on the last day of the 12th year for Tranche C ("Scheduled Principal Payment"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 and Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

9

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for LPEI (2/3)

| Proposed Debt Settlement |
|---|
| **Key terms** |

| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to LPEI and/or debt reduction through AYDA shall be used as accelerated repayment of outstanding principal of LPEI's portion in Tranche C at DDT or DMST with inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of LPEI.

Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

10

137



Private & Confidential

# DDT
Debt Restructuring Terms – Settlement for LPEI (3/3)

| Bilateral and Syndicated Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment (IDR mn) – Tranche A1 | 280,000 | 280 | 280 | 7,000 | 14,000 | 21,000 | 28,000 | 28,000 | 33,600 | 37,800 | 110,040 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 2,822 | 3 | 3 | 71 | 141 | 212 | 282 | 282 | 339 | 381 | 1,108 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche A2 | 210,000 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 73,500 | 73,500 | 61,530 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 2,117 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 741 | 741 | 621 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche C | 561,564 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 84,235 | 471,709 |
| Principal Repayment (USD 000) – Tranche C | 8,297 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 1,245 | 6,972 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

11

Private & Confidential

# DDT
Debt Restructuring Terms – Settlement for DDT Syndicated Lenders[1] (1/2)

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| Syndicated Loan[1] | | | |
| Principal | - | 120,271,450 | 1,704,727,532,300 |
| Interest / Margin | - | 3,523,452 | 49,941,408,675 |
| Penalty | - | 945 | 13,398,775 |
| Total Syndicated Loan | - | 123,795,847 | 1,754,682,339,749 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche DDT Syndication A Principal / Tenor | USD 69,527,672 / 7 years from Effective Date |
| Tranche DDT Syndication C Principal / Tenor | USD 50,743,778 / 15 years from Effective Date |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 7th year for Tranche DDT Syndication A. Tranche DDT Syndication C shall be paid through a single balloon payment on the last day of the 15th year. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DDT Syndication A principal, quarterly payments. No interest / margin payment for Tranche DDT Syndication C. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 15th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

[1] excluding LPEI portion in DDT syndication

12



*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for DDT Syndicated Lenders[1] (2/2)

| Syndicated Loan[1] | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment – Tranche DDT Syndication A (USD 000) | 69,257 | 3,426 | 7,787 | 9,344 | 10,590 | 11,514 | 11,514 | 15,352 | - |
| Cash Interest / Margin Rate – Tranche DDT Syndication A (USD denominated Loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | - |
| Principal Repayment – Tranche DDT Syndication C (USD 000) | 50,744 | - | - | - | - | - | - | - | 50,744 |

| DDT Syndicated Lenders Principal Repayment by Banks (USD 000) | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|
| Bank of Panhsin | 4,118 | 117 | 267 | 320 | 363 | 394 | 394 | 526 | 1,737 |
| BNPP Indonesia | 4,314 | 123 | 279 | 335 | 380 | 413 | 413 | 551 | 1,820 |
| First Abu Dhabi Bank PJSC, Singapore | 10,000 | 285 | 647 | 777 | 881 | 957 | 957 | 1,276 | 4,219 |
| First Commercial Bank Ltd, Singapore | 8,824 | 251 | 571 | 686 | 777 | 845 | 845 | 1,126 | 3,723 |
| Indian Bank, Singapore Branch | 18,236 | 519 | 1,181 | 1,417 | 1,606 | 1,746 | 1,746 | 2,328 | 7,694 |
| Maybank Singapore | 5,948 | 169 | 385 | 462 | 524 | 569 | 569 | 759 | 2,510 |
| Maybank Indonesia | 6,111 | 174 | 396 | 475 | 538 | 585 | 585 | 780 | 2,578 |
| QNB Singapore | 17,648 | 503 | 1,143 | 1,371 | 1,554 | 1,690 | 1,690 | 2,253 | 7,446 |
| SCB Singapore | 11,177 | 318 | 724 | 868 | 984 | 1,070 | 1,070 | 1,427 | 4,716 |
| Union Bank of India, HK | 15,099 | 430 | 978 | 1,173 | 1,329 | 1,445 | 1,445 | 1,927 | 6,370 |
| Woori Global Markets Asia | 8,824 | 251 | 571 | 686 | 777 | 845 | 845 | 1,126 | 3,723 |
| Yuanta Commercial Bank | 8,824 | 251 | 571 | 686 | 777 | 845 | 845 | 1,126 | 3,723 |
| BNPP Singapore | 574 | 16 | 37 | 45 | 51 | 55 | 55 | 73 | 242 |
| SCB London | 574 | 16 | 37 | 45 | 51 | 55 | 55 | 73 | 242 |
| Total | 120,271 | 3,426 | 7,787 | 9,344 | 10,590 | 11,514 | 11,514 | 15,352 | 50,744 |

[1] excluding LPEI portion in DDT syndication

13

---

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for Mega

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 200,048,000,000 | - | 200,048,000,000 |
| Interest / Margin | 1,465,264,363 | - | 1,465,264,363 |
| Penalty | 1,168,240,000 | - | 1,168,240,000 |
| **Total Mega Bilateral Loan** | 202,681,504,363 | - | 202,681,504,363 |

| Key terms | Proposed Debt Settlement |
|---|---|
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Mega through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DDT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Mega.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA (Agunan yang Diambil Alih) provision. |

14



*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for Shinhan

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 249,606,557,612 | - | 249,606,557,612 |
| Interest / Margin | 4,162,044,621 | - | 4,162,044,621 |
| Penalty | - | - | - |
| **Total Shinhan Bilateral Loan** | 253,768,602,233 | - | 253,768,602,233 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Shinhan through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DDT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Shinhan.

Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision |

15

---

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for SCB Indonesia

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 13,219,651 | 187,375,328,880 |
| Interest / Margin | - | 20,900 | 296,239,435 |
| Penalty | - | - | - |
| **Total SCB Bilateral Loan** | - | 13,240,551 | 187,671,568,315 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to SCB Indonesia through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DMIST, DDT and DDGT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of SCB Indonesia.

Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

16



Private & Confidential

**DDT**
Cash Waterfall Mechanism

| Cash Sweep | Available Cash Sweep from the Excess Cash combined from DDT, DDST, and DMST shall be used for accelerated repayment, with the following priority order: <br><br> 1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DDT, DDST, and DMST, on a pro rata basis based on total outstanding principal; then <br> 2. Accelerated repayment for Tranche A1 & A2 DDT, Tranche A1 DDST, and Tranche A1 & A2 DMST, on a pro rata basis based on total outstanding principal; then <br> 3. Accelerated repayment for Tranche C DDT, Tranche C DDST, Tranche C DMST, Tranche DDT Syndication C, Tranche DDST Syndication C, Tranche DMST Syndication, remaining principal of Mandiri Syariah in DDST and remaining principal of BRI Syariah in DMST, on a pro rata basis based on total outstanding principal; then <br> 4. Accelerated repayment for Tranche DDT Syndication A, DDST Syndication A, on a pro rata basis based on total outstanding principal. <br><br> Cash sweep allocation for Tranche DDST Syndication C and DDST Syndication C shall be used for accelerated repayment with Reverse Dutch Auction mechanism. <br><br> Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |
|---|---|

17

---

Private & Confidential

**DDT**
Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 617,352,000 | – | 617,352,000 |
| PT Adil Jaya | 127,734,100 | – | 127,734,100 |
| PT Purinusa Ekapersada | 76,933,134 | – | 76,933,134 |
| PT South Pacific Viscose | 4,279,693,364 | – | 4,279,693,364 |
| **Total Unsecured Creditors** | 5,101,712,598 | – | 5,101,712,598 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |

18

---

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH



*Private & Confidential*

## DDST
### Outstanding Debt

| Creditors | Principal | | Interest / Margin | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BNI | 167,500 | - | 4,691 | - | 174 | - | - | - | 172,365 | - |
| Mandiri Syariah | 10,623 | 8,647 | 2,580 | - | 98 | - | - | - | 13,301 | 8,647 |
| Nobu | 88,182 | - | 375 | - | - | - | - | - | 88,557 | - |
| QNB Indonesia | - | 10,000 | - | 161 | - | 160 | - | - | - | 10,321 |
| SCB Indonesia | - | 17,959 | - | 77 | - | - | - | - | - | 18,036 |
| Sub-total Bilateral Loan | 266,305 | 36,606 | 7,646 | 238 | 272 | 160 | - | - | 274,223 | 37,004 |
| **Syndicated Loan** | | | | | | | | | | |
| BNI | - | 21,338 | - | 680 | - | 45 | - | - | - | 22,063 |
| BNPP Indonesia[1] | 106,824 | 18,312 | 845 | 635 | - | - | - | - | 107,669 | 18,947 |
| China Citic Bank, Singapore | - | 7,565 | - | 212 | - | - | - | - | - | 7,777 |
| Federated Project and Trade Finance Core Fund | - | 2,565 | - | 95 | - | - | - | - | - | 2,660 |
| HSBC[1] | 18,850 | 19,045 | - | 604 | - | - | - | - | 18,850 | 19,650 |
| ING Bank Singapore | - | 15,260 | - | 497 | - | - | - | - | - | 15,757 |
| LPEI | - | 20,364 | - | 721 | - | - | - | - | - | 21,085 |
| Maybank Indonesia[1] | 57,958 | 26,914 | - | 496 | - | 32 | - | - | 57,958 | 27,443 |
| QNB Singapore | - | 19,325 | - | 627 | - | - | - | - | - | 19,952 |
| SBI | - | 2,309 | - | 89 | - | 7 | - | - | - | 2,405 |
| SMBC Singapore | - | 9,669 | - | 317 | - | - | - | - | - | 9,986 |
| Taiwan Cooperative Bank, Manila | - | 9,400 | - | 300 | - | - | - | - | - | 9,700 |
| Union Bank of India, HK | - | 5,405 | - | 247 | - | - | - | - | - | 5,652 |
| Yuanta Commercial Bank | - | 6,104 | - | 199 | - | - | - | - | - | 6,303 |
| Sub-total Syndicated Loan | 183,632 | 183,575 | 845 | 5,719 | - | 84 | - | - | 184,477 | 189,380 |
| **Total Outstanding Debt** | 449,937 | 220,181 | 8,491 | 5,957 | 273 | 244 | - | - | 458,700 | 226,382 |
| **Total Outstanding Debt (IDR Mn Eqv.)[2]** | | 3,570,776 | | 92,931 | | 3,735 | | - | | 3,667,442 |

[1] Including bilateral portion which are cross collateral with syndication
[2] Bank Indonesia middle rate USD/IDR: 14,174 as of PKPU Date 30 September 2019

20

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH





*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for DDST Syndicated Lenders[1] (1/3)

| Outstanding Loan[1] | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Syndicated Loan** | | | |
| Principal | 183,631,657,814 | 141,872,381 | 2,194,530,786,108 |
| Interest / Margin | 845,292,287 | 4,318,298 | 62,052,848,139 |
| Penalty | - | 39,809 | 564,252,766 |
| **Total Syndicated Loan** | **184,476,950,101** | **146,230,488** | **2,257,147,887,013** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche DDST Syndication A Principal / Tenor | IDR 105,957,252,824 and USD 81,861,744 / 8 years from Effective Date |
| Tranche DDST Syndication C Principal / Tenor | IDR 77,674,404,990 and USD 60,010,637 / 15 years from Effective Date |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 8th year for Tranche DDST Syndication A. Tranche DDST Syndication C shall be paid through a single balloon payment on the last day of the 15th year. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DDST Syndication A principal, quarterly payments. No interest / margin payment for Tranche DDST Syndication C. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 15th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

Note:
[1] Including BNPP Indonesia, HSBC, and Maybank Indonesia bilateral loan. Excluding BNI and LPEI  23

---

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for DDST Syndicated Lenders[1] (2/3)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | | | |
| Principal Repayment –Tranche DDST Syndication A (IDR Mn) | 105,957 | 2,216 | 4,433 | 8,865 | 13,298 | 15,514 | 20,544 | 20,544 | 20,544 | - |
| Principal Repayment –Tranche DDST Syndication A (USD 000) | 81,862 | 1,712 | 3,425 | 6,849 | 10,274 | 11,986 | 15,872 | 15,872 | 15,872 | - |
| Cash Interest / Margin Rate – Tranche DDST Syndication A (IDR denominated Loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | - |
| Cash Interest / Margin Rate – Tranche DDST Syndication A (USD denominated Loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | - |
| Principal Repayment –Tranche DDST Syndication C (IDR Mn) | 77,674 | - | - | - | - | - | - | - | - | 77,674 |
| Principal Repayment –Tranche DDST Syndication C (USD 000) | 60,011 | - | - | - | - | - | - | - | - | 60,011 |

Note:
[1] Including BNPP Indonesia, HSBC, and Maybank Indonesia bilateral loan. Excluding BNI and LPEI  24

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for DDST Syndicated Lenders[1] (3/3)

| | Unit | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DDST Syndicated Lenders Principal Repayment by Banks** | | | | | | | | | | | |
| BNPP Indonesia | IDR Mn | 106,824 | 1,289 | 2,579 | 5,157 | 7,736 | 9,025 | 11,951 | 11,951 | 11,951 | 45,186 |
| BNPP Indonesia | USD 000 | 18,312 | 221 | 442 | 884 | 1,326 | 1,547 | 2,049 | 2,049 | 2,049 | 7,746 |
| Maybank Indonesia | IDR Mn | 57,958 | 700 | 1,399 | 2,798 | 4,197 | 4,897 | 6,484 | 6,484 | 6,484 | 24,516 |
| Maybank Indonesia | USD 000 | 26,914 | 325 | 650 | 1,299 | 1,949 | 2,274 | 3,011 | 3,011 | 3,011 | 11,384 |
| HSBC | IDR Mn | 18,850 | 228 | 455 | 910 | 1,365 | 1,593 | 2,109 | 2,109 | 2,109 | 7,973 |
| HSBC | USD 000 | 19,046 | 230 | 460 | 919 | 1,379 | 1,609 | 2,131 | 2,131 | 2,131 | 8,056 |
| ING Bank Singapore | USD 000 | 15,260 | 184 | 368 | 737 | 1,105 | 1,289 | 1,707 | 1,707 | 1,707 | 6,455 |
| SBI | USD 000 | 2,309 | 28 | 56 | 111 | 167 | 195 | 258 | 258 | 258 | 976 |
| GNB Singapore | USD 000 | 19,328 | 233 | 466 | 933 | 1,399 | 1,633 | 2,162 | 2,162 | 2,162 | 8,174 |
| SMBC Singapore | USD 000 | 9,669 | 117 | 233 | 467 | 700 | 817 | 1,082 | 1,082 | 1,082 | 4,090 |
| Taiwan Cooperative Bank Manila | USD 000 | 9,400 | 113 | 227 | 454 | 681 | 794 | 1,052 | 1,052 | 1,052 | 3,976 |
| Yuanta HK | USD 000 | 6,104 | 74 | 147 | 295 | 442 | 516 | 683 | 683 | 683 | 2,582 |
| China Citic Bank Singapore | USD 000 | 7,565 | 91 | 183 | 365 | 548 | 639 | 846 | 846 | 846 | 3,200 |
| Federated Project and Trade Finance Core Fund | USD 000 | 2,565 | 31 | 62 | 124 | 186 | 217 | 287 | 287 | 287 | 1,085 |
| Union Bank of India HK | USD 000 | 5,405 | 65 | 130 | 261 | 391 | 457 | 605 | 605 | 605 | 2,286 |
| **Total** | IDR Mn | 183,632 | 2,218 | 4,433 | 8,865 | 13,298 | 15,514 | 20,544 | 20,544 | 20,544 | 77,674 |
| **Total** | USD 000 | 141,872 | 1,712 | 3,425 | 6,849 | 10,274 | 11,986 | 15,872 | 15,872 | 15,872 | 60,011 |

Note:
[1] Including BNPP Indonesia, HSBC, and Maybank Indonesia bilateral loan. Excluding BNI and LPEI portion in DDST syndication

25

---

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for LPEI (1/2)

| | Outstanding Loan | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Syndicated Loan** | | | |
| Principal | - | 20,364,000 | 288,639,336,000 |
| Interest / Margin | - | 720,996 | 10,219,400,125 |
| Penalty | - | - | - |
| **Total Syndicated Loan** | - | 21,084,996 | 298,858,736,125 |

| | Proposed Debt Settlement |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | USD 12,058,182 / 10 years from Effective Date |
| Tranche C Principal / Tenor | USD 8,305,818 / 11 years from Effective Date |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment on the last day of the 11th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 2.5% for USD denominated loan, respectively, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 11th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

26



**Private & Confidential**

# DDST
Debt Restructuring Terms – Settlement for LPEI (2/2)

| Syndicated Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment (USD '000) – Tranche A1 | 12,058 | 60 | 60 | 121 | 121 | 121 | 121 | 121 | 121 | 7,235 | 3,977 | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 2.50% | 2.50% | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | - | - | - |
| Principal Repayment (USD '000) – Tranche C | 8,306 | 8 | 855 | 855 | 1,137 | 1,137 | 1,137 | 1,137 | 1,137 | 831 | 71 | - |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | - |

27

**Private & Confidential**

# DDST
Debt Restructuring Terms – Settlement for BNI (1/2)

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 167,500,000,000 | - | 167,500,000,000 |
| Interest / Margin | 4,690,798,336 | - | 4,690,798,336 |
| Penalty | 174,417,149 | - | 174,417,149 |
| **Total BNI Bilateral Loan** | 172,365,215,485 | - | 172,365,215,485 |
| **Syndicated Loan** | | | |
| Principal | - | 21,338,000 | 302,444,812,000 |
| Interest / Margin | - | 680,002 | 9,638,348,348 |
| Penalty | - | 44,511 | 630,898,914 |
| **Total BNI Syndicated Loan** | - | 22,062,513 | 312,714,059,262 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Debt novation to DMST | Propose to novate the BNI Bilateral Loan of IDR 172,365,215,485 to DMST and will be serviced via DMST operational cash flow. |
| Syndicated Loan | BNI Portion in DDST Syndicated Loan shall be settled using DDST cash flow through Tranche A1 and C, as described below. |
| Tranche A1 Principal / Tenor | USD 12,634,918 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | USD 8,703,082 / 11 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 11th year for Tranche C ("Scheduled Principal Payment"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 2.5% for USD denominated loan, respectively, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 11th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

28

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for SCB Indonesia

| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Outstanding Loan** | | | |
| **Bilateral Loan** | | | |
| Principal | - | 17,958,787 | 254,547,848,497 |
| Interest / Margin | - | 77,117 | 1,093,053,948 |
| Penalty | - | - | - |
| **Total Bilateral Loan** | - | 18,035,904 | 255,640,902,446 |

| **Proposed Debt Settlement** | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to SCB Indonesia through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DMST, DDT and DDST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of SCB Indonesia.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

31

---

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for Mandiri Syariah (1/2)

| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Outstanding Loan** | | | |
| **Bilateral Loan** | | | |
| Principal | 10,623,400,000 | 8,647,387 | 133,191,464,047 |
| Interest / Margin | 2,579,547,886 | - | 2,579,547,886 |
| Penalty | 98,480,396 | - | 98,480,396 |
| **Total Bilateral Loan** | 13,301,428,282 | 8,647,387 | 135,869,492,328 |

| **Proposed Debt Settlement** | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to Mandiri Syariah and/or debt reduction through *AYDA* as repayment of outstanding principal and unpaid interest / margin. Any excess shall be used to repay Mandiri Syariah outstanding debt at DSSA. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Mandiri Syariah. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Currency Conversion | Mandiri Syariah outstanding principal, interest / margin, and penalty in USD denominated loan shall be converted into IDR denominated loan using conversion date exchange rate based on Mandiri Syariah internal system. The calculation of interest/margin payment of Mandiri Syariah USD denominated loan will use BI middle rate on 14 May 2020 of USD/IDR 14,946. |
| Principal Payment | Outstanding principal to Mandiri Syariah will be settled with scheduled principal payment as noted in the table below ("**Scheduled Payment**"), monthly payments, and shall be adjusted on a pro-rata basis based on Settlement via Orderly Sale of Non-Operating Asset and/or AYDA, and with accelerated repayment via Cash Sweep. For the avoidance of doubt, total principal payment from Settlement via Cash Collateral, Settlement via Orderly Sale of Non-operating Asset and/or AYDA and Scheduled Principal Payment may not exceed Mandiri Syariah outstanding principal |
| Settlement via Cash Collateral | DDST's existing time deposit of IDR 7,500,000,000 in Mandiri Syariah shall be used to reduce the outstanding principal on the Effective Date. |
| Cash Interest / Margin | Applied Cash Interest/Margin as noted in the table below as annual payment, will be paid monthly, and shall be adjusted on a pro-rata basis based on Settlement via Orderly Sale of Non-Operating Asset and/or AYDA. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be settled through the proceeds from the Orderly Sale of Non-operating Asset. Any remaining Outstanding Interest / Margin & Penalty will be paid at the end of the last day of the 12th year. |

32

148



**Private & Confidential**

# DDST
Debt Restructuring Terms – Settlement for Mandiri Syariah (2/2)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment[1,3] (IDR Mn) | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 124,183 |
| Cash Interest / Margin[2] (IDR denominated loan) | 662 | 661 | 660 | 660 | 659 | 658 | 658 | 657 | 656 | 656 | 655 | 654 | |

Note:
1) Assumed Bank Indonesia middle rate USD/IDR: 14,174 on PKPU date of 30 September 2019, conversion rate that may be used on the Currency Conversion may differ.
2) Scheduled payment has been adjusted with settlement via cash collateral amounting IDR 7,500,000,000

33

**Private & Confidential**

# DDST
Debt Restructuring Terms – Settlement for QNB Indonesia

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 10,000,000 | 141,740,000,000 |
| Interest / Margin | - | 161,000 | 2,282,007,622 |
| Penalty | - | 159,935 | 2,266,924,076 |
| **Total Bilateral Loan** | - | 10,320,935 | 146,288,931,698 |
| **Proposed Debt Settlement** | | | |
| **Key terms** | | | |
| Effective Date | Homologation Date. | | |
| Novate to Property Company | With regards to the non-operating assets pledged to QNB Indonesia are crossed collateral with QNB Indonesia facility in Property Company, we propose to novate the debt to Property Company and will be serviced via Property Company operational cash flow. | | |

34

149

*Private & Confidential*

# DDST
Cash Waterfall Mechanism

| Cash Sweep | Available Cash Sweep from the Excess Cash combined from DDT, DDST, and DMST shall be used for accelerated repayment, with the following priority order:<br><br>1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DDT, DDST, and DMST, on a pro rata basis based on total outstanding principal; then<br>2. Accelerated repayment for Tranche A1 & A2 DDT, Tranche A1 DDST, and Tranche A1 & A2 DMST, on a pro rata basis based on total outstanding principal; then<br>3. Accelerated repayment for Tranche C DDT, Tranche C DDST, Tranche C DMST, Tranche DDT Syndication C, Tranche DDST Syndication C, Tranche DMST Syndication, remaining principal of Mandiri Syariah in DDST and remaining principal of BRI Syariah in DMST, on a pro rata basis based on total outstanding principal; then<br>4. Accelerated repayment for Tranche DDT Syndication A, DDST Syndication A, on a pro rata basis based on total outstanding principal.<br><br>Cash sweep allocation for Tranche DDT Syndication C and DDST Syndication C shall be used for accelerated repayment with Reverse Dutch Auction mechanism.<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |
| --- | --- |

35

---

*Private & Confidential*

# DDST
Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 592,992,000 | - | 592,992,000 |
| PT Adil Jaya | 44,443,940 | - | 44,443,940 |
| PT South Pacific Viscose | 14,320,210,905 | - | 14,320,210,905 |
| **Unsecured Creditors - Banks** | | | |
| BNI | 63,128,069,699 | - | 63,128,069,699 |
| **Total Unsecured Creditors** | 78,085,716,544 | - | 78,085,716,544 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| BNI Settlement | 1. Outstanding loan of IDR 825,000,000 shall be paid maximum one year from the Effective Date.<br>2. Outstanding loan of IDR 62,303,069,699 is a corporate guarantee claim relating to personal loan of Sumitro registered as secured creditor at PKPU Case 25. This amount shall be settled at Sumitro's PKPU Case 25. |

36

150



Private & Confidential

# DMST
Outstanding Debt

| Creditors | Principal | | Interest / Margin / Profit Sharing | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BNI | 167,500 | - | 4,691 | - | 174 | - | - | - | 172,365 | - |
| BRI Syariah | 122,331 | - | 902 | - | - | - | - | - | 123,234 | - |
| CIMB Niaga | 70,000 | 15,723 | 700 | - | - | - | - | - | 70,700 | 15,723 |
| Danamon | 11,750 | - | - | - | - | - | - | - | 11,750 | - |
| LPEI | 1,472,975 | - | 27,802 | - | - | - | 9,729 | - | 1,510,507 | - |
| Mandiri | 1,064,500 | 19,239 | 30,420 | 323 | 9,644 | - | 6,890 | 27 | 1,111,453 | 19,588 |
| Permata | 100,990 | 25,017 | 187 | 77 | 4 | 3 | - | - | 101,180 | 25,097 |
| SCB Indonesia | - | 12,487 | - | 37 | - | 37 | - | - | - | 12,523 |
| **Sub-total Bilateral Loan** | 3,010,047 | 72,465 | 64,702 | 436 | 9,822 | 3 | 16,619 | 27 | 3,101,189 | 72,931 |
| **Syndicated Loan** | | | | | | | | | | |
| ICBC Indonesia | - | 3,600 | - | 97 | - | 34 | - | 1 | - | 3,732 |
| Permata | - | 8,400 | - | 171 | - | 130 | - | - | - | 8,701 |
| **Sub-total Syndicated Loan** | - | 12,000 | - | 268 | - | 164 | - | 1 | - | 12,433 |
| **Total Outstanding Debt** | 3,010,047 | 84,465 | 64,702 | 705 | 9,822 | 167 | 16,619 | 27 | 3,101,189 | 85,364 |
| **Total Outstanding Debt (IDR Mn Eqv.)[1]** | 4,207,258 | | 74,689 | | 12,189 | | 17,005 | | 4,311,141 | |

Note:
1) Bank Indonesia middle rate USD/IDR: 14,174 as of PKPU Date 30 September 2019    38



*Private & Confidential*

# DMST
Debt Restructuring Terms – Settlement for BNI (1/2)

### Outstanding Loan

| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Bilateral Loan** | | | |
| Principal | 167,500,000,000 | - | 167,500,000,000 |
| Interest / Margin | 4,690,798,336 | - | 4,690,798,336 |
| Penalty & Other Fees | 174,417,149 | - | 174,417,149 |
| **Total BNI Bilateral Loan** | 172,365,215,485 | - | 172,365,215,485 |

### Proposed Debt Settlement

| Key terms | |
|---|---|
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 92,300,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 75,200,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C. For the evidence of doubt, Principal and Cash Interest/Margin Payment will apply from the Effective Date until the required novation process from DDST to DMST is completed. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate will increase to 5% per annum for IDR denominated loan, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to BNI and/or debt reduction through AYDA shall be used to repay BNI Tranche C and Tranche A1 principal in inverse order of maturity. For the evidence of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BNI. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, and Power of Attorney (PoA), and AYDA (*Agunan yang Diambil Alih*) provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

41

---

*Private & Confidential*

# DMST
Debt Restructuring Terms – Settlement for BNI (2/2)

### Proposed Debt Settlement

| Key terms | |
|---|---|
| Novation | Facility of BNI to DDST consist of Rp167.500.000.000 working capital financing facility granted pursuant to the agreement made between DDST and PT Bank Negara Indonesia (Persero) Tbk under credit agreement no 2014.033 dated 15 October 2014 which was last amended by the 7th amendment dated 27 September 2019 ("BNI Facility"), shall be novated to DMST in accordance with the terms stipulated in Novation Provisions in clause 3. Specific Provisions of the Composition Plan. For the avoidance of doubt, all securities attached to BNI Facility, shall be pledged as securities at DMDT (after novation) and as securities of Debtors and the Sponsor debts provided by BNI. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A1 | 92,300 | 923 | 1,385 | 1,846 | 4,615 | 4,615 | 11,076 | 11,538 | 13,384 | 15,691 | 27,227 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR Mn) – Tranche C | 75,200 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 15,040 | 59,410 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |

42

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for LPEI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 1,472,975,000,000 | - | 1,472,975,000,000 |
| Interest / Margin | 27,802,468,702 | - | 27,802,468,702 |
| Penalty & Other Fees | 9,729,362,500 | - | 9,729,362,500 |
| **Total LPEI Bilateral Loan** | 1,510,506,831,202 | - | 1,510,506,831,202 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 811,900,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 661,075,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% per annum for IDR denominated loan, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to LPEI and/or debt reduction through AYDA shall be used as accelerated repayment of outstanding principal of LPEI's portion in Tranche C at DDT or DMST with inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of LPEI.

Please refer to clause "Deleveraging Via Non-operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

43

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for LPEI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A1 | 811,900 | 8,119 | 12,179 | 16,238 | 40,595 | 40,595 | 97,428 | 101,488 | 117,726 | 138,023 | 239,509 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR Mn) – Tranche C | 661,075 | 661 | 3,661 | 3,661 | 4,661 | 4,661 | 4,661 | 4,661 | 4,661 | 661 | 661 | 132,215 | 496,250 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |

44

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

Private & Confidential

# DMST
Debt Restructuring Terms – Settlement for Mandiri (1/2)

| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Outstanding Loan** | | | |
| Bilateral Loan | | | |
| Principal | 1,064,500,000,000 | 19,238,687 | 1,337,189,147,412 |
| Interest / Margin | 30,419,525,249 | 322,901 | 34,998,328,700 |
| Penalty & Other Fees | 16,533,122,063 | 26,625 | 16,910,498,010 |
| Total Mandiri Bilateral Loan | 1,111,452,647,313 | 19,588,213 | 1,389,095,974,122 |

**Proposed Debt Settlement**

| Key terms | |
|---|---|
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 586,700,000,000 and USD 10,603,923 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 477,800,000,000 and USD 8,634,764 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

45

Private & Confidential

# DMST
Debt Restructuring Terms – Settlement for Mandiri (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A1 | 586,700 | 5,867 | 8,801 | 11,734 | 29,335 | 29,335 | 70,404 | 73,338 | 85,072 | 99,739 | 173,075 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 10,604 | 106 | 159 | 212 | 530 | 530 | 1,272 | 1,325 | 1,538 | 1,803 | 3,129 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.25% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.25% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR Mn) – Tranche C | 477,800 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 95,560 | 377,460 |
| Principal Repayment (USD 000) – Tranche C | 8,635 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 1,727 | 6,818 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

46

155

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

*Private & Confidential*

## DMST
Debt Restructuring Terms – Settlement for Permata (1/2)

| Outstanding Loan | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Bilateral Loan** | | | |
| Principal | 100,990,221,000 | 25,016,991 | 455,581,058,379 |
| Interest / Margin | 186,575,516 | 76,967 | 1,277,509,176 |
| Penalty & Other Fees | 3,556,859 | 2,794 | 43,153,204 |
| **Total Permata Bilateral Loan** | 101,180,353,375 | 25,096,752 | 456,901,720,759 |

| Key terms | Proposed Debt Settlement |
|---|---|
| Effective Date | Homologation Date. |
| Tranche A2 Principal / Tenor | IDR 55,700,000,000 and USD 13,785,805 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 45,290,221,000 and USD 11,231,186 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A2 and last principal payment paid on the last day of the 12th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

47

*Private & Confidential*

## DMST
Debt Restructuring Terms – Settlement for Permata (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A2 | 55,700 | 557 | 836 | 4,178 | 5,570 | 5,570 | 6,963 | 6,963 | 8,355 | 8,355 | 8,355 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 13,786 | 138 | 207 | 1,034 | 1,379 | 1,379 | 1,723 | 1,723 | 2,068 | 2,068 | 2,068 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.25% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.25% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR Mn) – Tranche C | 45,290 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 9,058 | 35,782 |
| Principal Repayment (USD 000) – Tranche C | 11,231 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 2,246 | 8,875 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

48



*Private & Confidential*

# DMST
Debt Restructuring Terms – Settlement for DMST Syndicated Lenders

| Outstanding Loan | | | |
|---|---|---|---|
| Syndicated Loan | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| Principal | - | 12,000,000 | 170,088,000,000 |
| Interest / Margin | - | 268,132 | 3,800,500,842 |
| Penalty | - | 164,851 | 2,327,572,496 |
| Total DMST Syndicated Loan | - | 12,432,983 | 176,225,100,617 |

| Key terms | Proposed Debt Settlement |
|---|---|
| Effective Date | Homologation Date. |
| Tranche Syndication Principal / Tenor | USD 12,000,000 / 5 years from Effective Date. |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 5th year for Tranche DMST Syndication. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DMST Syndication, quarterly payments. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty will be paid on the last day of the 5th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| Syndicated Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| Principal Repayment (USD 000) | 12,000 | 1,800 | 1,800 | 1,800 | 2,400 | 4,200 |
| Cash Interest / Margin Rate (USD denominated loan) | | 1.25% | 1.50% | 2.50% | 2.50% | 2.50% |

49



*Private & Confidential*

# DMST
Debt Restructuring Terms – Settlement for BRI Syariah (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| Bilateral Loan | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| Principal | 122,331,318,369 | - | 122,331,318,369 |
| Interest / Margin / Profit Sharing | 902,193,473 | - | 902,193,473 |
| Penalty & Other Fees | | - | |
| Total BRI Syariah Bilateral Loan | 123,233,511,842 | - | 123,233,511,842 |

| Key terms | Proposed Debt Settlement |
|---|---|
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to BRI Syariah and/or debt reduction through AYDA as repayment of outstanding principal and unpaid interest / margin / profit sharing in DMST and DSSA. Any excess shall be used to repay BRI Syariah outstanding debt at DMDT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BRI Syariah. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Principal Payment | Pre non-operating asset sale:<br>As noted in the table below, monthly payments, up to the date of Orderly Sale of the Non-operating Asset.<br>Post non-operating asset sale:<br>In the event that the proceeds from the Orderly Sale of Non-operating Assets is less than the total outstanding principal, the remaining principal (the "Remaining Principal") shall be serviced with the below principal repayment debt schedule, monthly payments, with last principal payment paid on the end of the last day of the 12th year. |
| Cash Interest / Margin / Profit Sharing | As noted in the table below as annual rate, applied to the outstanding principal if the non-operating assets has not been sold or applied to the Remaining Principal post non-operating asset sales, monthly payments. |
| Outstanding Interest / Margin / Profit Sharing and Penalty | Any Outstanding Interest / Margin / Profit Sharing and Penalty shall be settled through the proceeds from the Orderly Sale of Non-operating Asset. Any remaining Outstanding Interest / Margin / Profit Sharing & Penalty will be paid at the last day of the 12th year. |

50

157



Private & Confidential

## DMST
Debt Restructuring Terms – Settlement for BRI Syariah (2/2)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 98.80% |
| Cash Interest / Margin / Profit Sharing (IDR denominated loan) | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | |

51

## DMST
Debt Restructuring Terms – Settlement for CIMB Niaga

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 70,000,000,000 | 15,722,809 | 292,855,090,372 |
| Interest / Margin | 700,000,000 | - | 700,000,000 |
| Penalty & Other Fees | - | - | - |
| **Total CIMB Niaga Bilateral Loan** | 70,700,000,000 | 15,722,809 | 293,555,090,372 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to CIMB Niaga through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DMST and DSSA to CIMB Niaga. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of CIMB Niaga.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

52

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH

*Private & Confidential*

# DMST

Debt Restructuring Terms – Settlement for Danamon

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 11,750,000,000 | - | 11,750,000,000 |
| Interest / Margin | - | - | - |
| Penalty & Other Fees | - | - | - |
| **Total Danamon Bilateral Loan** | 11,750,000,000 | - | 11,750,000,000 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to Danamon through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement at DMST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Danamon. Any excess net proceeds from sale shall be used to repay Danamon Tranche C and Tranche A2 principal at DSSA.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA) and AYDA *(Agunan yang Diambil Alih)* provision. |

53

---

*Private & Confidential*

# DMST

Debt Restructuring Terms – Settlement for SCB Indonesia

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 12,486,854 | 176,988,665,619 |
| Interest / Margin | - | 36,619 | 519,035,863 |
| Penalty & Other Fees | - | - | - |
| **Total SCB Indonesia Bilateral Loan** | - | 12,523,473 | 177,507,701,483 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to SCB Indonesia through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DMST, DDT and DDST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of SCB Indonesia.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA) and AYDA *(Agunan yang Diambil Alih)* provision. |

54





*Private & Confidential*

# DMST
Cash Waterfall Mechanism

| Cash Sweep | Available Cash Sweep from the Excess Cash combined from DDT, DDST, and DMST shall be used for accelerated repayment, with the following priority order:<br><br>1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DDT, DDST, and DMST, on a pro rata basis based on total outstanding principal; then<br>2. Accelerated repayment for Tranche A1 & A2 DDT, Tranche A1 DDST, and Tranche A1 & A2 DMST, on a pro rata basis based on total outstanding principal; then<br>3. Accelerated repayment for Tranche C DDT, Tranche C DDST, Tranche C DMST, Tranche DDT Syndication C, Tranche DDST Syndication C, Tranche DMST Syndication, remaining principal of Mandiri Syariah in DDST and remaining principal of BRI Syariah in DMST, on a pro rata basis based on total outstanding principal; then<br>4. Accelerated repayment for Tranche DDT Syndication A, DDST Syndication A, on a pro rata basis based on total outstanding principal.<br><br>Cash sweep allocation for Tranche DDT Syndication C and DDST Syndication C shall be used for accelerated repayment with Reverse Dutch Auction mechanism.<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |
| --- | --- |

55

---

*Private & Confidential*

# DMST
Debt Restructuring Terms – Settlement for Unsecured Creditors

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 588,734,800 | | 588,734,800 |
| PT Adil Jaya | 4,939,200 | | 4,939,200 |
| PT South Pacific Viscose | 40,910,477,304 | - | 40,910,477,304 |
| **Unsecured Creditors – Banks** | | | |
| Standard Chartered Bank Indonesia | - | 3,267,250 | 46,310,000,000 |
| **Total Unsecured Creditors** | **41,504,151,304** | **3,267,250** | **87,814,151,304** |

| Proposed Debt Settlement | |
| --- | --- |
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| Standard Chartered Bank Indonesia Settlement | SCB Indonesia outstanding loan shall be paid on the last day of the 12th year from Effective Date. |

56

---

160



**Private & Confidential**

# DMDT
Outstanding Debt

| Creditors | Principal | | Interest / Margin / Profit Sharing | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BCA | - | 177 | - | - | - | - | - | - | - | 177 |
| BNI Syariah | 278,302 | - | 102,970 | - | - | - | - | - | 381,272 | - |
| BRI Syariah | 279,977 | - | 5,454 | - | - | - | - | - | 285,431 | - |
| Muamalat | 124,890 | - | 8,012 | - | - | - | - | - | 132,902 | - |
| **Sub-total Bilateral Loan** | **683,169** | **177** | **116,436** | **-** | **-** | **-** | **-** | **-** | **799,605** | **177** |
| **Senior Notes** | - | 300,000 | - | 14,231 | - | - | - | - | - | 314,231 |
| **Syndicated Loan** | | | | | | | | | | |
| Aozora Asia Pacific | - | 3,069 | - | 72 | - | - | - | - | - | 3,741 |
| Bank of Panhsin | - | 1,834 | - | 36 | - | - | - | - | - | 1,871 |
| BNPP Indonesia | - | 3,069 | - | 75 | - | - | - | - | - | 3,744 |
| BNPP Singapore[1] | - | 535 | - | - | - | - | - | - | - | 535 |
| CIFC International | - | 917 | - | 18 | - | - | - | - | - | 935 |
| Ertie Commercial Bank | - | 917 | - | 18 | - | - | - | - | - | 935 |
| Indian Bank, Singapore | - | 3,069 | - | 72 | - | - | - | - | - | 3,741 |
| ING Bank Singapore | - | 11,006 | - | 217 | - | - | - | - | - | 11,223 |
| Jtrust Indonesia | - | 1,834 | - | 38 | - | - | - | - | - | 1,872 |
| LPEI | - | 3,069 | - | 75 | - | - | - | - | - | 3,744 |
| Maybank Singapore | - | 11,006 | - | 217 | - | - | - | - | - | 11,223 |
| MUFJ Lease Singapore | - | 5,503 | - | 109 | - | - | - | - | - | 5,612 |
| NEC Capital Singapore | - | 1,834 | - | 36 | - | - | - | - | - | 1,871 |
| SCB London[2] | - | 14,482 | - | 217 | - | - | - | - | - | 14,699 |
| Shanghai Commercial & Savings Bank | - | 1,834 | - | 36 | - | - | - | - | - | 1,871 |
| Shinhan Indonesia | - | 3,069 | - | 75 | - | - | - | - | - | 3,744 |
| TCB, Manila | - | 5,503 | - | 109 | - | - | - | - | - | 5,612 |
| Union Bank of India, HK | - | 7,337 | - | 145 | - | - | - | - | - | 7,482 |
| **Sub-total Syndicated Loan** | **-** | **82,886** | **-** | **1,567** | **-** | **-** | **-** | **-** | **-** | **84,453** |
| **Total Outstanding Debt** | **683,169** | **383,063** | **116,436** | **15,798** | **-** | **-** | **-** | **-** | **799,605** | **398,861** |
| **Total Outstanding Debt (IDR Mn Eqv.)[3]** | **6,112,706** | | **340,360** | | | | | | **6,453,066** | |

[1] fee related to DMDT Syndicated Loan
[2] Including fee of USD 3,476,000 related to DMDT Syndicated Loan
[3] Bank Indonesia mid rate USD:IDR: 14,174

58



**DMDT**
Proposed Debt Settlement (1/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche ASmsy | Tranche Syndi-cation | Notes A | Notes B | Tranche C |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | |
| BNI Syariah | IDR Mn | 278,302 | - | - | - | 278,302 | - | - | - | - |
| | USD 000 | - | - | - | - | - | - | - | - | - |
| BRI Syariah | IDR Mn | 279,977 | - | - | 129,977 | 150,000 | - | - | - | - |
| | USD 000 | - | - | - | - | - | - | - | - | - |
| **Total Bilateral Loan** | IDR Mn | 558,279 | - | - | 129,977 | 428,302 | - | - | - | - |
| | USD 000 | - | - | - | - | - | - | - | - | - |
| **Senior Notes** | USD 000 | 300,000 | - | - | - | - | - | 150,000 | 150,000 | - |

Private & Confidential

# DMDT
Proposed Debt Settlement (2/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche ASmsy | Tranche Syndi-cation | Notes A | Notes B | Tranche C |
|---|---|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | | | |
| Aozora Asia Pacific | USD 000 | 3,669 | - | - | - | - | 3,668 | - | - | - |
| Bank of Panhsin | USD 000 | 1,834 | | | | | 1,834 | | | |
| BNPP Indonesia | USD 000 | 3,669 | | | | | 3,669 | | | |
| BNPP Singapore[1] | USD 000 | 535 | - | - | - | - | 535 | - | - | - |
| CIFC International | USD 000 | 917 | - | - | - | - | 917 | - | - | - |
| Entie Commercial Bank | USD 000 | 917 | - | - | - | - | 917 | - | - | - |
| Indian Bank, Singapore | USD 000 | 3,669 | - | - | - | - | 3,669 | - | - | - |
| ING Bank Singapore | USD 000 | 11,006 | - | - | - | - | 11,006 | - | - | - |
| Jtrust Indonesia | USD 000 | 1,834 | - | - | - | - | 1,834 | - | - | - |
| LPEI | USD 000 | 3,669 | 3,669 | - | - | - | - | - | - | - |
| Maybank Singapore | USD 000 | 11,006 | - | - | - | - | 11,006 | - | - | - |
| MUFJ Lease Singapore | USD 000 | 5,503 | - | - | - | - | 5,503 | - | - | - |
| NEC Capital Singapore | USD 000 | 1,834 | - | - | - | - | 1,834 | - | - | - |
| SCB London[2] | USD 000 | 14,482 | - | - | - | - | 14,482 | - | - | - |
| Shanghai Commercial & Savings Bank | USD 000 | 1,834 | - | - | - | - | 1,834 | - | - | - |
| Shinhan Indonesia | USD 000 | 3,669 | - | - | - | - | 3,669 | - | - | - |
| TCB, Manila | USD 000 | 5,503 | - | - | - | - | 5,503 | - | - | - |
| Union Bank of India, HK | USD 000 | 7,337 | - | - | - | - | 7,337 | - | - | - |
| **Total Syndication Loan** | USD 000 | 82,886 | | | | | 79,217 | | | |
| **Total Bilateral Loan, Senior Notes and Syndicated Loan** | IDR Mn | 558,279 | | - | 129,977 | 428,302 | - | - | - | - |
| | USD 000 | 382,887 | 3,669 | - | - | - | 79,217 | 150,000 | 150,000 | - |

[1] fee related to DMDT Syndicated Loan
[2] including fee of USD 3,476,000 related to DMDT Syndicated Loan

61

---

Private & Confidential

# DMDT
Debt Restructuring Terms – Settlement for BCA

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 177,000 | 2,508,798,000 |
| Interest / Margin | - | | - |
| Penalty | - | | |
| **Total BCA Bilateral Loan** | - | 177,000 | 2,508,798,000 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Cash Collateral | BCA outstanding loan shall be settled fully within 1 (one) month from Effective Date. For avoidance of doubt, proceeds for debt settlement will be from DMDT's existing deposit amount in BCA. |

62



*Private & Confidential*

## DMDT
Debt Restructuring Terms – Settlement for BNI Syariah

| Outstanding Loan | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Bilateral Loan** | | | |
| Principal | 278,302,398,785 | - | 278,302,398,785 |
| Interest / Margin | 36,614,859,968 | - | 36,614,859,968 |
| Penalty | - | - | - |
| **Total BNI Syariah Bilateral Loan** | **314,917,258,753** | - | **314,917,258,753** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche ASmsy Principal / Tenor | IDR 278,302,398,785 / 7 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 7ᵗʰ year for Tranche ASmsy. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to BNI Syariah Tranche ASmsy outstanding principal, monthly payments. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to BNI Syariah Tranche ASmsy outstanding principal, paid on the last day of the 7ᵗʰ year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 7ᵗʰ year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment – Tranche ASmsy (IDR mn) | 278,302 | 2,783 | 5,566 | 13,915 | 13,915 | 13,915 | 48,703 | 179,505 | |
| Cash Interest / Margin – Tranche ASmsy (IDR denominated loan) | | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | |
| Deferred Interest / Margin – Tranche ASmsy (IDR denominated loan) | | 2.50% | 2.50% | - | - | - | - | - | |
| Outstanding Interest / Margin & Penalty (IDR mn) | 36,615 | - | - | - | - | - | - | - | 36,615 |

63

---

*Private & Confidential*

## DMDT
Debt Restructuring Terms – Settlement for BRI Syariah (1/2)

| Outstanding Loan | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Bilateral Loan** | | | |
| Principal | 279,977,000,000 | - | 279,977,000,000 |
| Interest / Margin / Profit Sharing | 5,453,898,616 | - | 5,453,898,616 |
| Penalty | - | - | - |
| **Total BRI Syariah Bilateral Loan** | **285,430,898,616** | - | **285,430,898,616** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche ASmsy Principal / Tenor | IDR 150,000,000,000 / 7 years from Effective Date. |
| Tranche ASmbh Principal / Tenor | IDR 129,977,000,000 / 7 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 7ᵗʰ year for Tranche ASmsy and Asmbh |
| Cash Interest / Margin / Profit Sharing Payment | As noted in the table below as annual rate, applied to BRI Syariah Tranche ASmsy and Tranche ASmbh outstanding principal, monthly payments. |
| Deferred Interest / Margin / Profit Sharing Payment | As noted in the table below as annual rate, applied to the outstanding Tranche ASmsy, paid on the last day of the 7ᵗʰ year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin / Profit Sharing Payment | One month after Effective Date. |
| Outstanding Interest / Margin / Profit Sharing and Penalty | Any Outstanding Interest / Margin / Profit Sharing and Penalty shall be paid on the last day of the 7ᵗʰ year. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from the sale of all non-operating assets pledged to BRI Syariah through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used to repay BRI Syariah Tranche ASmsy portion in inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BRI Syariah. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA (*Agunan yang Diambil Alih*) provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

64

---



*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for BRI Syariah (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | |
| Principal Repayment – Tranche ASmbh (IDR mn) | 129,977 | 1,300 | 2,600 | 6,499 | 6,499 | 6,499 | 22,746 | 83,834 |
| Principal Repayment – Tranche ASmsy (IDR mn) | 150,000 | 1,500 | 3,000 | 7,500 | 7,500 | 7,500 | 26,250 | 96,750 |
| Cash Interest / Margin / Profit Sharing Tranche ASmbh and Tranche Asmsy (IDR denominated loan) | | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| Deferred Interest / Margin / Profit Sharing – Tranche ASmbh and Tranche ASmsy (IDR denominated loan) | | 2.50% | 2.50% | - | - | - | - | - |

65

---

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for DMDT Syndicated Lenders[1] (1/2)

| | Outstanding Loan | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Syndicated Loan** | | | |
| Principal | - | 79,217,489 | 1,122,828,683,275 |
| Interest / Margin | - | 1,491,938 | 21,146,732,614 |
| Penalty | - | - | - |
| **Total DMDT Syndicated Loan** | - | 80,709,427 | 1,143,975,415,888 |

| **Proposed Debt Settlement** | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche DMDT Syndication Principal / Tenor | USD 79,217,489 / 7 years from Effective Date |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 7th year, subject to the Option for Principal Extension. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DMDT Syndication, quarterly payments. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 7th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Option for Tranche DMDT Syndication Principal Extension | Six month prior to end of year sixth anniversary, DMDT has an option to request Tranche DMDT Syndication principal payment due in year 7 to be extended to 8 (eight) years. Should this option be triggered by DMDT, principal amount due in year 7 (seven) shall be equally installed in year 7 and 8 with an interest / margin of 5% per annum in year 7 and 8. |

Note:
[1] Excluding LPEI portion in DMDT syndication

66

165



*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for DMDT Syndicated Lenders[1] (2/2)

| Syndicated Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| Principal Repayment – Tranche DMDT Syndication (USD 000) | 79,217 | 2,805 | 7,012 | 8,415 | 9,817 | 15,350 | 17,909 | 17,909 |
| Cash Interest / Margin Rate – Tranche DMDT Syndication (USD denominated Loan) | | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |

| DMDT Syndicated Lenders Principal Repayment by Banks (in USD 000) | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| Aozora Asia Pacific | 3,668 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| Bank of Panhsin | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| BNPP Indonesia | 3,669 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| BNPP Singapore | 535 | 19 | 47 | 57 | 66 | 104 | 121 | 121 |
| CIFC International | 917 | 32 | 81 | 97 | 114 | 178 | 207 | 207 |
| Entie Commercial Bank | 917 | 32 | 81 | 97 | 114 | 178 | 207 | 207 |
| Indian Bank, Singapore | 3,669 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| ING Bank Singapore | 11,006 | 390 | 974 | 1,169 | 1,364 | 2,133 | 2,488 | 2,488 |
| Jtrust Indonesia | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| Maybank Singapore | 11,006 | 390 | 974 | 1,169 | 1,364 | 2,133 | 2,488 | 2,488 |
| MUFJ Lease Singapore | 5,503 | 195 | 487 | 585 | 682 | 1,066 | 1,244 | 1,244 |
| NEC Capital Singapore | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| SCB London | 14,482 | 513 | 1,282 | 1,538 | 1,795 | 2,806 | 3,274 | 3,274 |
| Shanghai Commercial & Savings Bank | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| Shinhan Indonesia | 3,669 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| TCB, Manila | 5,503 | 195 | 487 | 585 | 682 | 1,066 | 1,244 | 1,244 |
| Union Bank of India, HK | 7,337 | 260 | 649 | 779 | 909 | 1,422 | 1,659 | 1,659 |
| Total | 79,217 | 2,805 | 7,012 | 8,415 | 9,817 | 15,350 | 17,909 | 17,909 |

Note:
[1] Excluding LPEI portion in DMDT syndication

67

---

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for LPEI

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Syndicated Loan** | | | |
| Principal | - | 3,668,805 | 51,998,802,309 |
| Interest / Margin | - | 75,043 | 1,063,664,301 |
| Penalty | - | | |
| Total DMDT Syndicated Loan | - | 3,743,848 | 53,062,466,610 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | USD 3,668,805 / 7 years from Effective Date |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 7th year. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 principal, monthly payments. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 7th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| Syndicated Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| Principal Repayment – Tranche A1 (USD 000) | 3,669 | 183 | 459 | 550 | 642 | 550 | 642 | 642 |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated Loan) | | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |

68

166

Private & Confidential

# DMDT

Debt Restructuring Terms – Settlement for Muamalat

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 124,890,000,000 | - | 124,890,000,000 |
| Interest / Margin | 8,012,491,670 | - | 8,012,491,670 |
| Penalty | - | - | - |
| **Total Muamalat Bilateral Loan** | 132,902,491,670 | - | 132,902,491,670 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-Operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Muamalat through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / margin. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Muamalat.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

69

---

Private & Confidential

# DMDT

Debt Restructuring Terms – Settlement for Senior Notes

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Senior Notes** | | | |
| Principal | - | 300,000,000 | 4,252,200,000,000 |
| Coupon | - | 14,231,250 | 201,713,737,500 |
| Penalty | - | - | - |
| **Total Senior Notes** | - | 314,231,250 | 4,453,913,737,500 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Notes A Principal / Tenor | USD 150 million with a term of 8 years from the Effective Date. |
| Notes B Principal / Tenor | USD 150 million with a term of 12 years from the Effective Date. |
| Security rights | Notes A to be granted secondary pledge over the land, buildings and machinery regarding factories DMDT 4, DMDT 5 and DMDT 6. |
| Notes Redemption | Notes A: a single balloon payment paid on the last day of the 8th year. DMDT, on a best effort basis, shall refinance Notes A at the end of year 7 subject to market conditions at the time.<br><br>Notes B: shall be redeemed via excess cash (as defined in Cash Waterfall Mechanism) using Reverse Dutch Auction. A maturity premium of 10% of amount outstanding at maturity shall apply. |
| Coupon Payment | Notes A: interest for the first year of 1.5% annually and thereafter 2.5% annually, with payment semi-annual.<br>Notes B: Zero Coupon |
| Outstanding Coupon Payment | Outstanding coupon as of 30 September 2019 shall be paid down by the amount in the Interest Reserve Account, amounting to USD 12,937,500 within 30 days of the Homologation of the Composition Date. The remaining coupon of USD 1,293,750 shall be waived. |
| Undertaking | DMDT to incur no further financial indebtedness secured against assets secured to the Noteholders unless subordinated to the Noteholders. |

70

167



*Private & Confidential*

## DMDT
### Cash Waterfall Mechanism

| Cash Sweep | Available Cash Sweep from the Excess Cash combined from DMDT and DSSA shall be used for accelerated repayment, with the following priority order:<br><br>1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DMDT and DSSA, on a pro rata basis based on total outstanding principal; then<br>2. Accelerated repayment for Tranche ASmbh DMDT, Tranche ASmsy DMDT, Notes B, Tranche A1 & A2 DSSA, and Tranche ASmbh DSSA, on a pro rata basis based on total outstanding principal; then<br>3. Accelerated repayment for Tranche A1 DMDT, Tranche DMDT Syndication, Tranche C DSSA, and remaining principal of BRI Syariah in DSSA, on a pro rata basis based on total outstanding principal.<br><br>Cash sweep allocation for Notes B shall be used for accelerated repayment with Reverse Dutch Auction mechanism.<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |
|---|---|

71

---

*Private & Confidential*

## DMDT
### Debt Restructuring Terms – Settlement for Unsecured Creditors

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 603,432,000 | - | 603,432,000 |
| CV Surya Putera Anugerah | 372,980,080 | - | 372,980,080 |
| PT Aster Polycem | 12,240,527,300 | - | 12,240,527,300 |
| PT Kinerja Mutiara Persada | 3,270,865,925 | - | 3,270,865,925 |
| PT Shine Golden Bridge | 1,697,880,000 | - | 1,697,880,000 |
| PT Sumber Abadi Energindo | 5,681,108,550 | - | 5,681,108,550 |
| **Unsecured Creditors – Banks** | | | |
| ING Bank N.V – Singapore Branch | - | 1,459,371 | 20,695,121,011 |
| The Bank of New York Mellon | - | 160,000 | 2,267,840,000 |
| **Unsecured Creditors – Individuals (64 persons)** | 67,500,000 | - | 67,500,000 |
| **Total Unsecured Creditors** | 23,934,293,855 | 1,619,371 | 46,897,254,866 |

| | Proposed Debt Settlement |
|---|---|
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Unsecured Creditors – Individuals Settlement | All Unsecured Creditors Individuals shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 12th month from the Effective Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| ING Bank N.V – Singapore Branch Settlement | ING Bank N.V – Singapore Branch outstanding loan shall be paid on the last day of the 12th year from Effective Date. |
| The Bank of New York Mellon ("BONY") - Trustee Cost Settlement | Trustee costs related to BONY and its legal advisors, up to Homologation Date, shall be paid within 90 (ninety) days from the Effective Date. For avoidance of doubt, the amount of USD 160,000 was the portion claimed by BONY up to PKPU Date, 30 September 2019. |

72



Private & Confidential

# DSSA

Outstanding Debt

| Creditors | Principal | | Interest / Margin / Profit Sharing | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BCA | - | 48 | - | - | - | - | - | - | - | 48 |
| BRI | 670,833 | - | 19,955 | - | 314 | - | - | - | 691,102 | - |
| BRI Syariah | 38,490 | - | 6,723 | - | - | - | - | - | 45,213 | - |
| CIMB Niaga | 73,218 | - | 240 | - | - | - | - | - | 73,458 | - |
| Danamon[1] | 240,200 | - | 4,814 | - | 4,522 | - | - | - | 249,536 | - |
| Harda | 55,743 | - | 1,807 | - | 388 | - | - | - | 57,998 | - |
| Mandiri Syariah | 339,710 | - | 52,875 | - | 1,839 | - | - | - | 394,425 | - |
| Maspion | 46,059 | - | 215 | - | 2 | - | 225 | - | 46,501 | - |
| Mega Syariah | 124,282 | - | 274 | - | - | - | 125 | - | 124,681 | - |
| Multiarta Sentosa | 183,733 | - | 527 | - | - | - | - | - | 184,259 | - |
| Shinhan Indonesia | 184,603 | - | 5,044 | - | - | - | - | - | 189,647 | - |
| **Total Outstanding Debt** | **1,956,870** | **48** | **92,534** | **-** | **7,065** | **-** | **350** | **-** | **2,056,819** | **48** |
| **Total Outstanding Debt (IDR Mn Eqv. )[2]** | | **1,957,545** | | **92,534** | | **7,065** | | **350** | | **2,057,494** |

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH





*Private & Confidential*

## DSSA
Debt Restructuring Terms – Settlement for BCA

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 47,600 | 674,682,400 |
| Interest / Margin | - | - | - |
| Penalty | - | - | - |
| **Total BCA Bilateral Loan** | - | 47,600 | 674,682,400 |
| **Proposed Debt Settlement** | | | |
| **Key terms** | | | |
| Effective Date | Homologation Date. | | |
| Settlement via Cash Collateral | BCA outstanding loan shall be settled fully within 1 (one) month from Effective Date. For avoidance of doubt, proceeds for debt settlement will be from DSSA's existing deposit amount in BCA. | | |

77

*Private & Confidential*

## DSSA
Debt Restructuring Terms – Settlement for BRI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 670,833,000,000 | - | 670,833,000,000 |
| Interest / Margin | 19,954,984,377 | - | 19,954,984,377 |
| Penalty | 314,014,060 | - | 314,014,060 |
| **Total BRI Bilateral Loan** | 691,101,998,437 | - | 691,101,998,437 |
| **Proposed Debt Settlement** | | | |
| **Key terms** | | | |
| Effective Date | Homologation Date. | | |
| Tranche A1 Principal / Tenor | IDR 650,000,000,000 / 10 years from Effective Date. | | |
| Tranche C Principal / Tenor | IDR 20,833,000,000 / 12 years from Effective Date. | | |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C ("Scheduled Principal Payment"). | | |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% for IDR denominated loan, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. | | |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. | | |
| First Principal & Interest / Margin Payment | One month after Effective Date. | | |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. | | |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. | | |

78



*Private & Confidential*

# DSSA
Debt Restructuring Terms – Settlement for BRI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment – Tranche A1 (IDR mn) | 650,000 | 500 | 8,060 | 10,560 | 38,000 | 68,500 | 68,500 | 96,500 | 98,500 | 124,500 | 138,320 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | - | - | - | - | - | - | - | | |
| Principal Repayment – Tranche C (IDR mn) | 20,833 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 208 | 20,415 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.25% | 0.25% | 0.25% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 5.00% | 5.00% |

79

---

*Private & Confidential*

# DSSA
Debt Restructuring Terms – Settlement for Danamon (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 240,200,000,000 | - | 240,200,000,000 |
| Interest / Margin | 4,814,138,103 | - | 4,814,138,103 |
| Penalty | 4,521,660,833 | - | 4,521,660,833 |
| **Total Danamon Bilateral Loan** | 249,535,798,936 | - | 249,535,798,936 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A2 Principal / Tenor | IDR 200,000,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 40,200,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A2 and last principal payment paid on the last day of the 12th year for Tranche C ("Scheduled Principal Payment"). |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% for IDR denominated loan, upon full settlement of Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to Danamon through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement at DMST. Any excess net proceeds (after deducted with transaction costs) from sale shall be used to pay Danamon Tranche C and Tranche A2 principal at DSSA with inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Danamon. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA (Agunan yang Diambil Alih) provision. |

80



*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Danamon (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment – Tranche A2 (IDR mn) | 200,000 | 200 | 200 | 200 | 10,000 | 20,000 | 20,000 | 30,000 | 30,000 | 40,000 | 49,400 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | - | - | - | - | - | - | - | - | - |
| Principal Repayment – Tranche C (IDR mn) | 40,200 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 402 | 39,398 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.25% | 0.25% | 0.25% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 5.00% | 5.00% |

81

---

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Multiarta Sentosa (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 183,732,674,177 | - | 183,732,674,177 |
| Interest / Margin | 526,546,453 | - | 526,546,453 |
| Penalty | - | - | - |
| **Total Multiarta Sentosa Bilateral Loan** | 184,259,220,630 | - | 184,259,220,630 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A2 Principal / Tenor | IDR 150,000,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 33,732,674,177 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A2 and last principal payment paid on the last day of the 12th year for Tranche C ("Scheduled Principal Payment"). |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% for IDR denominated loan, upon full settlement of Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

82

173



*Private & Confidential*

# DSSA
Debt Restructuring Terms – Settlement for Multiarta Sentosa (2/2)

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Multiarta Sentosa through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as fully repayment on Facility Agreement No. 4 on 9th July 2018 made before Notary Soes Asmara Argawati, SH which has been amended on Amendment of Facility Agreement (Restructure) No.004/PDA1/GLC/07/2019 on 25th July 2019 ("PDA 1 Facility") amounting IDR 65,561,225,480 pledged with non-operating assets. Fully repayment on PDA 1 Facility equal to fully repayment on Tranche C amounting IDR 33,732,674,177 and accelerated repayment on Tranche A2 amounting IDR 31,828,551,303 with inverse order of maturity. Any excess proceeds, if any, shall be used as accelerated repayment on Tranche A2 with inverse order of maturity.

Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

| Bilateral Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 4 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment (IDR mn) – Tranche A2 | 150,000 | 150 | 150 | 150 | 7,500 | 15,000 | 15,000 | 22,500 | 22,500 | 30,000 | 37,050 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche C | 33,733 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 337 | 33,056 |
| Cash Interest / Margin Rate (IDR denominated loan) | | 0.25% | 0.25% | 0.25% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 5.00% | 5.00% |

83

---

*Private & Confidential*

# DSSA
Debt Restructuring Terms – Settlement for Mandiri Syariah (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 339,710,000,000 | - | 339,710,000,000 |
| Interest / Margin | 52,875,464,583 | - | 52,875,464,583 |
| Penalty | 1,839,059,848 | - | 1,839,059,848 |
| **Total Mandiri Syariah Bilateral Loan** | 394,424,524,431 | - | 394,424,524,431 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche ASmbh Principal / Tenor | IDR 339,710,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 12th year for Tranche ASmbh |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche ASmbh, monthly payments. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche ASmbh, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep.. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to Mandiri Syariah through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as installment reduction of Mandiri Syariah Tranche ASmbh portion in inverse order of maturity.

Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

84

174



*Private & Confidential*

# DSSA
Debt Restructuring Terms – Settlement for Mandiri Syariah (2/2)

| Bilateral Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment – Tranche A Smbh (IDR mn) | 339,710 | 340 | 340 | 340 | 14,268 | 28,536 | 28,536 | 42,464 | 42,464 | 56,052 | 71,339 | 679 | 54,352 |
| Cash Interest / Margin – Tranche A Smbh (IDR denominated loan) | | 2.10% | 2.10% | 2.10% | 4.20% | 4.20% | 4.20% | 4.20% | 4.00% | 3.50% | 3.00% | 5.00% | 5.00% |
| Deferred Interest / Margin – Tranche A Smbh (IDR denominated loan) | | 2.10% | 2.10% | 2.10% | - | - | - | - | - | - | - | - | - |

85

*Private & Confidential*

# DSSA
Debt Restructuring Terms – Settlement for BRI Syariah

| | Outstanding Loan | | |
|---|---|---|---|
| Bilateral Loan | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| Principal | 38,490,000,000 | - | 38,490,000,000 |
| Interest / Margin / Profit Sharing | 6,723,494,917 | - | 6,723,494,917 |
| Penalty | - | - | - |
| Total BRI Syariah Bilateral Loan | 45,213,494,917 | - | 45,213,494,917 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset and/or debt reduction through AYDA as repayment of outstanding principal and unpaid interest / Margin / Profit Sharing in DMST and DSSA. Any excess shall be used to repay BRI Syariah outstanding debt at DMDT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BRI Syariah. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Principal Payment | Pre non-operating asset sales: <br> As noted in the table below, monthly payments, up to the sale of the non-operating asset. <br> Post non-operating asset sales: <br> In the event that the proceeds from the orderly sale of all the non-operating assets is less than the total outstanding principal, the remaining principal (the "Remaining Principal") shall be serviced with the below principal repayment debt schedule, monthly payments, with last principal payment paid on the end of the last day of the 12th year. |
| Interest / Margin / Profit Sharing | As noted in the table below as annual rate, applied to the outstanding principal if the non-operating assets has not been sold or applied to the Remaining Principal post non-operating asset sales, monthly payments. |
| Outstanding Interest / Margin / Profit Sharing and Penalty | Any Outstanding Interest / Margin / Profit Sharing and Penalty shall be settled through the proceeds from the orderly sale of non-operating asset. Any remaining Outstanding Interest / Margin / Profit Sharing & Penalty will be paid at the last day of the 12th year. |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 98.80% |
| Cash Interest / Margin / Profit Sharing (IDR denominated loan) | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | |

86

AUTHORIZED & SWORN TRANSLATOR
NIKÉ SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH



*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for CIMB Niaga

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 73,217,665,899 | - | 73,217,665,899 |
| Interest / Margin | 240,000,000 | - | 240,000,000 |
| Penalty | - | - | - |
| **Total CIMB Niaga Bilateral Loan** | 73,457,665,899 | - | 73,457,665,899 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to CIMB Niaga through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DMST and DSSA to CIMB Niaga. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of CIMB Niaga. <br><br> Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

---

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Harda

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 55,742,600,413 | - | 55,742,600,413 |
| Interest / Margin | 1,867,250,997 | - | 1,867,250,997 |
| Penalty | 388,308,274 | - | 388,308,274 |
| **Total Harda Bilateral Loan** | 57,998,159,684 | - | 57,998,159,684 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Harda through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / Margin & penalty. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Harda. <br><br> Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |



*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Maspion

| | Outstanding Loan | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 46,058,788,516 | - | 46,058,788,516 |
| Interest / Margin | 214,941,013 | - | 214,941,013 |
| Penalty | 226,828,872 | - | 226,828,872 |
| **Total Maspion Bilateral Loan** | **46,500,558,401** | **-** | **46,500,558,401** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Maspion through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / Margin & penalty. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Maspion.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

89

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Mega Syariah

| | Outstanding Loan | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 124,282,228,015 | - | 124,282,228,015 |
| Interest / Margin | 274,000,000 | - | 274,000,000 |
| Penalty | 125,000,000 | - | 125,000,000 |
| **Total Mega Syariah Bilateral Loan** | **124,681,228,015** | **-** | **124,681,228,015** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Mega Syariah through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / Margin & penalty. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Mega Syariah.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

90

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH



Private & Confidential

# DSSA
Debt Restructuring Terms – Settlement for Shinhan

| | Outstanding Loan | | |
| --- | --- | --- | --- |
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 184,603,000,000 | - | 184,603,000,000 |
| Interest / Margin | 5,044,000,000 | - | 5,044,000,000 |
| Penalty | - | - | - |
| **Total Shinhan Bilateral Loan** | 189,647,000,000 | - | 189,647,000,000 |

| Proposed Debt Settlement | |
| --- | --- |
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Shinhan through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DSSA. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Shinhan. <br><br> Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision |

91



Private & Confidential

# DSSA
Cash Waterfall Mechanism

| | |
| --- | --- |
| **Cash Sweep** | Available Cash Sweep from the Excess Cash combined from DMDT and DSSA shall be used for accelerated repayment, with the following priority order: <br><br> 1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DMDT and DSSA, on a pro rata basis based on total outstanding principal; then <br> 2. Accelerated repayment for Tranche ASmbh DMDT, Tranche ASmsy DMDT, Notes B, Tranche A1 & A2 DSSA, and Tranche ASmbh DSSA, on a pro rata basis based on total outstanding principal; then <br> 3. Accelerated repayment for Tranche A1 DMDT, Tranche DMDT Syndication, Tranche C DSSA, and remaining principal of BRI Syariah in DSSA, on a pro rata basis based on total outstanding principal. <br><br> Cash sweep allocation for Notes B shall be used for accelerated repayment with Reverse Dutch Auction mechanism. <br><br> Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

92



Private & Confidential

# DSSA

Debt Restructuring Terms – Settlement for Unsecured Creditors

| | Outstanding Loan | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 584,872,000 | - | 584,872,000 |
| CV Pratama Jaya Transport | 131,520,541 | - | 131,520,541 |
| CV Surya Putera Anugerah | 321,744,500 | - | 321,744,500 |
| PT Aster Polycem | 200,079,000 | - | 200,079,000 |
| PT Karis Sun Indonesia | 12,751,200 | - | 12,751,200 |
| PT Lautan Luas Tbk | 56,584,000 | - | 56,584,000 |
| PT Multikimia Intipelangi | 1,024,401,345 | - | 1,024,401,345 |
| PT Purimusa Ekapersada | 11,590,889 | - | 11,590,889 |
| PT Samudra Dwi Transporindo | 464,669,876 | - | 464,669,876 |
| PT Sumber Abadi Energindo | 5,061,173,550 | - | 5,061,173,550 |
| UD Samudra Transport | 61,389,687 | - | 61,389,687 |
| **Unsecured Creditors - Banks** | | | |
| Danamon | 23,895,798,937 | - | 23,895,798,937 |
| **Total Unsecured Creditors** | **31,826,575,524** | | **31,826,575,524** |

| Proposed Debt Settlement | |
|---|---|
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| Danamon Settlement | The unsecured portion of Danamon outstanding loan will be settled through Tranche C. Please refer to "Debt Restructuring Terms – Settlement for Danamon" for the detailed settlement terms. |

## DAMAITEX

AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH



*Private & Confidential*

# DAMAITEX
## Outstanding Debt

| Creditors | Principal | | Interest / Margin | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| Mandiri | 100,000 | - | 331 | - | 62 | - | - | - | 100,393 | - |
| **Total Outstanding Debt** | 100,000 | - | 331 | - | 62 | - | - | - | 100,393 | - |
| **Total Outstanding Debt (IDR Mn Eqv.)¹** | | 100,000 | | 331 | | 62 | | - | | 100,393 |

Note:
1) Bank Indonesia mid rate USD/IDR: 14,174

95

---

*Private & Confidential*

# DAMAITEX
## Debt Restructuring Terms – Settlement for Mandiri

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 100,000,000,000 | - | 100,000,000,000 |
| Interest / Margin | 330,669,745 | - | 330,669,745 |
| Penalty | 62,099,829 | - | 62,099,829 |
| **Total Mandiri Bilateral Loan** | 100,392,769,574 | - | 100,392,769,574 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Outstanding Principal / Tenor | IDR 100,000,000,000 / 10 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year. |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding principal, monthly payments. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding principal, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 10th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment (IDR mn) | 100,000 | 500 | 2,500 | 3,500 | 5,000 | 5,000 | 6,000 | 8,000 | 9,500 | 10,000 | 10,000 | 40,000 |
| Cash Interest / Margin Rate (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | |
| Deferred Interest / Margin Rate (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | |

96

180


AUTHORIZED & SWORN TRANSLATOR
NIKE SINTA KARINA
DECREE OF DKI JAKARTA GOVERNOR
NO.1836/2009
PENERJEMAH BERSUMPAH



**DAMAITEX**

Cash Waterfall

*Private & Confidential*

| | |
|---|---|
| **Cash Waterfall** | Available Cash Sweep from the Excess Cash shall be used for accelerated repayment, with the following priority order: <br><br> 1. Any outstanding deferred interest and/or Margin and deferred principal during the restructuring period; <br> 2. Accelerated repayment for Outstanding Principal <br><br> Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

97



**DAMAITEX**

Debt Restructuring Terms – Settlement for Unsecured Creditors

*Private & Confidential*

| | Outstanding Loan | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 617,236,000 | | 617,236,000 |
| PT Sumber Abadi Energindo | 765,974,150 | - | 765,974,150 |
| **Total Unsecured Creditors** | 1,383,210,150 | - | 1,383,210,150 |

| **Proposed Debt Settlement** | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |

98

181





Considering, that because the Court does not find any reason to reject the ratification of the composition plan and therefore the Composition Plan has been made into a Composition Agreement, in accordance with the provisions of Article 285 of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment, the Panel of Judges must issue a decision regarding the approval of the Composition Agreement;

Considering, that with the approval of the Composition Agreement, in accordance with Article 286 of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment, then the Composition Agreement dated 23 June 2020 binds all creditors of (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU);

Considering, that with the approval of the Composition Agreement, by law the Suspension of Payment (PKPU) ends in accordance with Article 288 of Law No.37 of 2004 on Bankruptcy and Suspension of Payment;

Considering, that regarding the case costs in the PKPU process it should be borne by the Petitioner in PKPU;

Observing, Article 222 paragraph (3) in conjunction with Article 281 paragraph (1) letter a, in conjunction with Article 281 paragraph (1) letter b, in conjunction with Article 284 paragraph (1), in conjunction with Article 285 paragraph (1) in conjunction with Article 285 paragraph (2) and other articles of Law No.37 of 2004 on Bankruptcy and Suspension of Payment and other relevant provisions;

183

## HAVE ADJUDICATED AND DECIDED:

1. to declare as legal and legally binding the Composition Agreement dated 23 June 2020 between (i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU); and their Creditors;

2. to punish the Respondents in PKPU Debtor/(i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) and all of their creditors to submit and comply with and implement the content of the Composition Agreement dated 23 June 2020;

3. to declare the Suspension of Payment (PKPU) Number 22/Pdt.Sus-PKPU/2019/PN Smg., ends by the operation of law;

4. to punish the Respondents in PKPU Debtor/(i) PT. DELTA MERLIN DUNIA TEXTILE (IN PKPU), (ii) PT. DELTA DUNIA TEKSTIL (IN PKPU), (iii) PT. DELTA MERLIN SANDANG TEKSTIL (IN PKPU), (iv) PT. DELTA DUNIA SANDANG TEKSTIL (IN PKPU), (v) PT. DUNIA SETIA SANDANG ASLI TEKSTIL (IN PKPU) and (vi) PT. PERUSAHAAN DAGANG DAN PERINDUSTRIAN DAMAI (IN PKPU) to pay the court costs of Rp. 3,392,000.00 (three million three hundred ninety two thousand rupiah);

184

It is decided in the Hearing of Panel of Judges at the Commercial Court at Semarang District Court on **Thursday, 25 June 2020** by us, **Muhamad Yusuf, S.H., M.H.,** as Presiding Judge, **Aloysius P. Bayuaji, S.H., M.H.,** and **Esther Megaria Sitorus, S.H., M.Hum.** each Member Judge, appointed based on the Decision of Head of Semarang District/Commercial/Industrial Relation/Corruption Court, Nomor 22/Pdt.Sus.PKPU/2019/PN Smg dated 11 February 2020, the decision on Friday, 26 June 2020, is read out in a open hearing by the Presiding Judge, accompanied by: **Aloysius P. Bayuaji,** and **Yogi Arsono, S.H., Kn., M.H,** Member Judges, assisted by Heru Sungkowo SH., Substitute Registrar in the presence of the legal representatives of the Petitioner in PKPU/Respondents in PKPU, Administrative Team and the Creditors.

<table>
<tr><td align="center">**Member Judges**</td><td align="center">**Presiding Judge**</td></tr>
<tr><td align="center">Signature</td><td align="center">Signature</td></tr>
<tr><td align="center">**Aloysius P Bayuaji, S.H.MH.**</td><td align="center">**Mohamad Yusuf, SH.MH.**</td></tr>
</table>

**Signature**

**Yogi Arsono, S.H., Kn., M.H.**

**Substitute Registrar**

**Signature**

**Evi Roesliana, SH.**



185

## CERTIFICATE OF TRANSLATION

I, Nike Sinta Karina, certified and sworn translator, hereby certify that to the best of my knowledge and belief this English translation is a true and correct translation of the document presented to me in Indonesian.

Jakarta, 7 August 2020



Nike Sinta Karina
English ◇ Indonesian Certified and Sworn Translator
Decrees of Governor of DKI Jakarta No. 1836/2009 &  No. 1955/2011
**Indoscript International Translation Services**
Beltway Office Park Tower B 5th Floor
Jl. TB. Simatupang No 41 Jakarta 12550
Tel: +6221 29857377; Fax: +6221 29857201

**<u>Exhibit C</u>**

Plan Approval Order Approving Case 25 Composition Plan

## DECISION

## Number: 25/Pdt.Sus-PKPU/2019/PN.Smg.

## FOR JUSTICE BASED ON ALMIGHTY GOD

The Commercial Court of Semarang District Court which investigates and hears the case of the petition of Suspension of Debt Payment (PKPU) as the court of first instance has issued the decision submitted by:

> **SUMITRO,** Indonesian citizen, holder of Resident's Identity Card (KTP) No. 3372042512690002, residing at Tegalharjo, Jebres Sub-district, Surakarta City, Central Java, Indonesia, in his capacity as himself, in this matter granting thw power to GP. Aji Wijaya, SH, Hardiansyah, SH, MH, and Pradana Snehabandhana Paska, SH, LLM, the advocates at Aji Wijaya & Co. Law Office, having its address at Gedung Ciber 2 31st Floor, Jl. HR Rasuna Said Blok X-5 No.13, South Jakarta 12950, Indonesia, by virtue of Special Power of Attorney dated 23 September 2019;

The Commercial Court;

Having read the case files:

Having heard the two parties to a dispute;

### ON THE MERITS OF THE CASE

Considering, that the Petitioner in its letter of petition dated 25 September 2019 which was received and registered with the Registrar's Office of the Commercial Court of Semarang District Court on 25 September 2019 under Case Register Number 25/Pdt.Sus-PKPU/2019/PN Smg and on the petition for Suspension of Payment

1



(hereinafter, "PKPU") the Panel of Judges issued the decision on September 30, 2019, with the rulings as follows:

### HAS ADJUDICATED AND DECIDED

1. To grant the Petitioner's petition for Suspension of Payment (PKPU) for 45 (forty five) days from the date the decision was read out;

2. To appoint Mr. Edy Suwanto, S.H., M.H., Commercial Judge at Semarang District Court as the Supervisory Judge;

3. To appoint

   a.   Mr. VERRY SITORUS, S.H., having his office at Law Office of Dss and Partners, having its address at Plaza Pupuk Kaltim, Gedung B 1st Floor, Jl. Kebun Sirih Raya No.6A, Central Jakarta 10110, Receiver and Administrator registered with the Ministry of Law and Human Rights of the Republic of Indonesia Number: AHU-AH.04.03-47 dated 9 April 2015; and

   b.   Mr. ULI INGOT HAMONANGAN SIMANUNGKALIT, S.H., having his office at Simanungkalit Sihombing & Rekan, having its address at Gedung Manggala Wanabakti, Blok IV, Wing B, 3rd Floor, Suite 332, Jl. Jend. Gatot Subroto No.6, Jakarta Pusat, Receiver and Administrator registered with the Ministry of Law and Human Rights of the Republic of Indonesia Number: AHU-AH.04.03-128 dated 19 May 2016;

   as the Administrator Team in the PKPU proceedings and as the Receiver Team in the event that SUMITRO/Petitioner in PKPU is declared bankrupt.



2

4. To set the hearing of the Panel of Judges on Thursday, 14 November 2019 at the Commercial Court at Semarang District Court, at Jalan Siliwangi No. 512 Semarang;

5. To order the Administrator Team to summon the Petitioner in PKPU and its Creditors known by registered mail so that they appear at the hearing as specified above;

6. To determine the administration fees and service fees for the Administrators, which will be determined later after the end of duration of PKPU;

7. To defer the court costs until the end of duration of PKPU.

Considering, that Decision Number: 25/Pdt.Sus-PKPU/2019/PN.Smg., dated 14 November 2019 established the Permanent PKPU for 90 (ninety) days since the said Decision was read out;

Considering, that Decision Number: 25/Pdt.Sus-PKPU/2019/PN.Smg., dated 12 February 2020 established the Permanent PKPU for 76 (seventy six) days since the said Decision was read out;

Considering, that Decision Number:25/Pdt.Sus-PKPU/2019/PN.Smg., dated 27 April 2020 established the Permanent PKPU for 23 (twenty three) days since the said Decision was read out;

Considering, that Decision Number:25/Pdt.Sus-PKPU/2019/PN.Smg., dated 20 May 2020 the Permanent PKPU for 37 (thirty seven) days since the said Decision was read out;

Considering, that on 25 June 2020, the Supervisory Judge submitted a Report on the PKPU proceedings of SUMITRO (IN PKPU);



3

Considering, that the Supervisory Judge's Report principally reports that a settlement has been achieved between SUMITRO (IN PKPU) and its Creditors;

Considering, that based on the report of the Supervisory Judge on the settlement in the PKPU proceedings SUMITRO (IN PKPU) is achieved through voting on the Composition Plan submitted by SUMITRO (IN PKPU), so that it has satisfied the provisions of Article 281 of Law Number 37 of 2004 on Bankruptcy and Suspension of Payment.

Considering that based on the above considerations, and in compliance with Article 223 Paragraph (3) in conjunction with Article 281 Paragraph (1) in conjunction with Article 285 Paragraph (1) and Article 234 Paragraph (5) of Law Number 37 of 2004 on and Suspension of Payment, and other relevant provisions, the Supervisory Judge recommends the Approval of the Composition Plan dated 23 June 2020 at the Hearing of Panel of Judges which will be held on Friday, 26 June 2020.

Considering, that based on the above reasons, I as the Supervisory Judge hereby proposes to the Panel of Judges hearing Case Number: 25/Pdt.Sus-PKPU/2019/PN.SMGto approve the making of the Composition Plan into the Composition Agreement dated 23 June 2020 at the Hearing of the Panel of Judges on Friday, 26 June 2020 in order to fulfill the provisions stipulated in Article 285 Paragraph (1) of Law Number 37 of 2004 on Bankruptcy and Suspension of Payment.

Considering, that at the meeting on Friday, 26 June 2020, the Creditors and the Debtor confirmed the Report of the Supervisory Judge and the statement of the Administrator Team and pray the Panel of Judges approve the compositon plan that has

4



been approved by the Debtor and their Creditors in accordance with Article 281

paragraph (1) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment;

Considering, that in order to summarize the description of this decision, it shall further

refer to the matters contained in the minutes of hearing and the Supervisory Judge's Report,

Considering, that since there are no other matters that need to be conveyed by the

parties, the Court will subsequently issue its decision;

### ON THE LEGAL CONSIDERATIONS:

Considering, that the purpose and objective of the approval of the settlement as

mentioned above;

Considering, that the Composition Plan was achieved by means of voting  as

referred to in Article 281 paragraph (1) of Law No. 37 of 2004 on Bankruptcy and

Suspension of Payment;

Considering, that at the time of voting on 23 June 2020, Creditors who were

present and cast their votes were as follows:

<u>Table of Voting of Secured Creditors</u>

| VOTING | SECURED CREDITORS | | | | |
|---|---|---|---|---|---|
| | NUMBER OF CREDITORS | % | CLAIMS (RP) | VOTES | % |
| APPROVED | 3 | 100% | 92,378,962,408.95 | 9.238 | 100% |
| REJECTED | 0 | 0% | - | 70,483 | 0% |
| TOTAL | 3 | 100% | 92,378,962,408.95 | 9.238 | 100% |

Based on the result of online voting, 3 (three) Secured Creditors representing 100% (one

hundred percent) of the Secured Creditors present at the online voting meeting with a

total of amount of claims of Rp92,378,962,408.95 (ninety two billion three hundred

seventy eight million nine hundred sixty two thousand four hundred eight Rupiah ninety



five cents) which is equivalent to 9,238 (nine thousand two hundred and thirty eight) votes representing 100% (one hundred percent) of recognized claims of Secured Creditors present at the online voting meeting who approved the Composition Plan submitted by the Debtor.

Table of Voting of Unsecured Creditors

| VOTING | UNSECURED CREDITORS | | | | |
|---|---|---|---|---|---|
| | NUMBER OF CREDITORS | % | CLAIMS (RP) | VOTES | % |
| APPROVED | 43 | 97.73% | 3,440,939,619,101.40 | 1,344,094 | 96.16% |
| REJECTED | 1 | 1 | 536,500,829,759.93 | 53,650 | 3.84% |
| TOTAL | 44 | 100.00% | 3,977,440,448,861.30 | 1,397,744 | 100.00% |

Based on the result of online voting, 44 (forty four) Unsecured Creditors with a total of amount of claims of Rp13,977,440,448,861.30 (*thirteen trillion nine hundred seventy seven billion four hundred forty million four hundred forty eight thousand eight hundred sixty one Rupiah thirty cents*) which is equivalent to 1,397,744 (one million three hundred ninety seven thousand seven hundred forty four) votes representing 100% (one hundred percent) of recognized claims of Secured Creditors present at the online voting meeting.

Of all of the Unsecured Creditors present, 43 (forty three) Unsecured Creditors representing 97.73% (ninety seven point seven three percent) of the Unsecured Creditors present at the online voting meeting with a total of amount of claims of Rp13,440,939,619,101.40 (*thirteen trillion four hundred forty billion nine hundred thirty nine million six hundred nineteen thousand one hundred and one Rupiah forty cents*) which is equivalent to 1,344,094 (one million three hundred and forty four thousand ninety four) votes representing 96.16% (ninety six point sixteen percent) of recognized of



6

claims of Unsecured Creditors present at the online voting meeting who **approved** the Composition Plan submitted by the Debtor.

Then, 1 (one) Unsecured Creditor representing 2.27% (two point twenty seven percent) of Unsecured Creditors present at the online voting meeting with a total of amount of claims Rp536,500,829,759.93 (*five hundred thirty six billion five hundred million eight hundred twenty nine thousand seven hundred fifty nine Rupiah ninety three cents*) which is equivalent to 53,650 (fifty three thousand six hundred fifty) votes representing 3.84% (three point eighty four percent) of recognized claims of Unsecured Creditors present at the online voting meeting who **rejected** the Composition Plan submitted by the Debtor.

Considering, that based on article 281 paragraph (1) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment, the Panel of Judges is of the opinion that the quorum for voting for the approval of the composition plan has been fulfilled and is binding on the parties and legally valid;

Considering, that following the hearing and examination of the Report of the Supervisory Judge, the Administrator Team, Debtors and Creditors, there are no reasons to refuse to approve the composition plan as required in Article 285 paragraph (2) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment;

Considering, that for the Composition Agreement agreed upon between the Debtor and the Creditors for payment of the amount of claims of each creditor the following terms and conditions are agreed:

7



On this day, Tuesday, 23 June 2020, at the Commercial Court at Semarang District Court, a Composition Plan is made and executed by and between the Debtor (as described below) and Creditors (as described below) as evidence and proof of the agreement between the Debtor and Creditors on the Composition Plan ("Composition Plan"), as follows:

1. Sumitro, Indonesian citizen, holder of Resident's Identity Card (KTP) No. 3372042512690002, having his address at Tegalharjo, Jebres Subdistrict, Surakarta City, Central Java, Indonesia ("Debtor")

and

2. Creditors, as referred to in Meeting for Discussion on Composition Plan and Voting which are the creditors listed in the List of Fixed Claims dated 25 November 2019, which was verified by the Administrator Team in Attachment 1 (Verified Creditors);

Hereinafter they shall be referred to individually as a "Creditor" and collectively as "Creditors".

The Debtor and Creditors are collectively referred to as "Parties".

The Debtor and Creditors first explain the following:

I.    That, on 10 September 2019, a Petition for Suspension of Payment (PKPU) was submitted against the Debtor by one of its creditors under case register No. 25/Pdt.Sus-PKPU/2019/PN.SMG.

II.   That, based on the PKPU Petition, the Panel of Judges of the Commercial Court at the Semarang District Court granted the PKPU Petition and granted a Temporary PKPU to the Debtor, as determined in Court Decision No. 25/Pdt.Sus-



8

PKPU/2019/PN.SMG ("PKPU Decision"), which was read out during the trial on 30 September 2019 ("PKPU Decision Date").

III.   That, the Panel of Judges of Case No. 25/Pdt.Sus-PKPU/2019/PN.SMG read out the PKPU Decision by virtue of which it: (i) granted the PKPU Petition; (ii) granted the Debtor to be in the Temporary PKPU for 45 (forty five) days since the date the decision was read; (iii) declared that the Debtor is under PKPU; (iv) stated the appointment of Verry Sitorus, S.H., Uli Ingot Hamonangan Simanungkalit, S.H. as the administrator team of the Debtor (in PKPU); and (v) appointed Mr. Edy Suwanto, S.H., M.H. as the Supervisory Judge.

IV.   That in accordance with Decision No. 25/Pdt.Sus-PKPU/2019/PN.Smg on 8 April, the Panel of Judges at the Commercial Court established and appointed Mr. Andreas Purwantyo Setiyadi, S.H., M.H., as the Supervisory Judge in Case No. 25/Pdt.Sus-PKPU/2019/PN.Smh, replacing Mr. Edy Suwanto, S.H., M.H.

V.   That, the Debtor has followed the Temporary PKPU and the extensions granted thorugh the Permanent PKPU with schedules and agenda as determined by the Administrator Team and Supervisory Judge.

VI.   That, the content of this Composition Plan has been presented in the creditors meetings, both within and outside of the Commercial Court at the Semarang District Court to the Creditors together with the Supervisory Judge concerning the Composition Plan submitted by the Debtor.

VII.   That, in the Creditors' meeting convened today on, Tuesday, 23 June 2020, which was attended by the Supervisory Judge, Administrator Team and the Parties at the Commercial Court at the Semarang District Court either via physical meeting or



through electronic communication facilities that was held by the Administrator Team, a meeting was held with the agenda of Discussion on the Composition Plan and Voting to agree or reject the Composition Plan.

VIII. That, in relation to the voting as mentioned above, the Debtor and Creditors that agree to the Composition Plan intend to make and execute a Composition Plan as evidence and proof to show that a settlement has been reached by the Debtor and Creditors.

Subsequently, based on the abovementioned, in this Composition Plan, the Debtor and Creditors hereby mutually agree to the matters as provided in the Composition Plan, as follows:

Definitions

Unless defined otherwise in this Composition Plan, the terms used in the Composition Plan (Duniatex) shall have the meanings as ascribed to the terms in this Composition Plan.

"Security Documents" means deeds and/or certificates of *Hak Tanggungan*, fiducia security rights and/or pledges and any other relevant documents pursuant to the Existing Facilities (Duniatex) including but not limited to the security sharing agreements and any ancillary documents in the relevant deeds and/or certificates which are required for perfection, implementation and enforcement of any Security Documents (Duniatex)."

"Supervisory Judge" is the judge as referred to in the Bankruptcy Law that was appointed by the Panel of Judges.



**"Day" or "Days" or "Calendar Day"** or **"Calendar Days"** means each day or days in 1 (one) year without exception including Saturdays, Sundays, and national holidays as determined by the Government and Business Day.

**"Business Day"** means a day (other than a Saturday, Sunday, or national holidays) on which banks are open for general banking business (including dealings in foreign currencies) in New York City, London, Jakarta, Hong Kong, and Singapore.

**"Existing Personal Guarantees"** means personal guarantee given by debtor as defined in **Error! Reference source not found;**

**"Panel of Judges"** is the panel of judges examining and adjudicating the PKPU Petition case.

**"Commercial Court"** is the Commercial Court at the Semarang District Court, having its address at Jl. Siliwangi No. 512, Kembangarum, Semarang Barat Subdistrict, Semarang City, Central Java 50146.

**"Administrators (Administrator Team)"** are the administrators as referred to in the Bankruptcy Law that were appointed by the Panel of Judges.

**"Homologated Composition Plan"** is the entire provisions of the Composition Plan homologated by the Panel of Judges.

**"Composition Plan"** is this Composition Plan as the Composition Plan that was approved through voting by the entitled Creditors of the Debtor in accordance with Article 281 paragraph (1) of the Bankruptcy Law on 23 June 2020.

**"Composition Plan (Duniatex)"** is the composition plan approved in a voting at the creditors' meeting as regulated in Article 281 paragraph (1) of the Bankruptcy Law on 23 June 2020.

**"PG Claims"** means claim to the Debtor based on Existing Personal Guarantee.

**"Year"** is calendar year.

**"Effective Date"** means the Homologation Date.

**"Homologation Date"** is the date of the homologation or the ratification of the Composition Plan by the Panel of Judges of Case No. 25/Pdt.Sus-PKPU/2019/PN.SMG at the Commercial Court. The Composition Plan will take effect on and from the Homologation Date regardless of any pending cassation proceedings, or any other legal remedy taken against this Composition Plan, the Composition Plan (Duniatex) or Case No. 22/Pdt.Sus-PKPU/2019/PN.SMG and/or No. 25/Pdt.Sus-PKPU/2019/PN.SMG.

**"Bankruptcy Law"** is Law No. 37 of 2004 on Bankruptcy and Suspension of Payments.


SUMMARY

This Composition Plan was prepared to help reach a consensual restructuring with the entire Creditors of the Debtor. This Composition Plan was made and prepared by the Debtor for the purpose of the Creditors' voting at the creditors meeting held at the Commercial Court pursuant to the provisions of Article 281 paragraph (1) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payments.

In making their decision, the Creditors must rely on their own considerations and analysis of this Composition Plan, the terms and conditions, and all information provided in this Composition Plan, including all benefits and risks contained therein.

This Composition Plan is made with attachments as may be referred to in certain parts of this Composition Plan. The Attachments are an integral part of this Composition Plan.



GENERAL PROVISIONS OF THE COMPOSITION PLAN

<u>Transfer of Rights</u>. Each Creditor may at any time assign any of its rights and obligations overs its claims under the Homologated Composition Plan, to another party, which assignment or transfer will come into force without any requirement to obtain the consent of the Debtor or the courts of Indonesia and will be effective as of the date provided under the relevant assignment or transfer document, subject to the following provisions:

Any third party transferee or assignee of such novation or transfer of claim rights and obligations based on the Homologated Composition Plan will be bound and subject to all provisions of the Homologated Composition Plan.

Any Creditor who assigns or transfers its rights and obligations to any third party shall give a notice in writing to the Debtor regarding such transfer or assignment of claims, using the notice details set out in this Composition Plan, in accordance with applicable laws and regulations in Indonesia. The Debtor must execute and do all such acts and things as the Creditors may request for perfecting and completing any assignment or transfer.

Pending receipt of the notification of transfer or assignment and such transfer or assignment being fully complete, the Debtor must continue to make payment to the relevant original Creditor as if no transfer or assignment has occurred.

The terms in this Composition Plan apply to the following Creditors:

     a.    **Verified Creditor.**

          A Verified Creditor is any Creditor of a Debtor that has a claim against the Debtor, and has been verified by the Administrator Team in relation to the

13



formality requirements of a PKPU process, and registered in the List of Fixed Claims dated 25 November 2019 made by the Administrator Team.

b.   **Non-Verified Creditor.**

A Non-Verified Creditor is: 1) a creditor of the Debtor that has a claim against the Debtor but did not participate or submit its claim in the PKPU process of case No. 25/Pdt.Sus-PKPU/2019/PN.Smg; or 2) a creditor that was not identified or acknowledged by the Debtor prior to the Composition Plan being homologated by the Panel of Judges. For a creditor or creditors classified in this paragraph b, the following terms apply:

(i).   The claim or claims can only be accepted and acknowledged by the Debtor later on if it is in line with the principles of Indonesian accounting (Statement of Financial Accounting Standards - "PSAK") and applicable laws and regulations; and

(ii).   The claim or claims if later on accepted and acknowledged by the Debtor will only be paid after the relevant Debtor irrevocably and fully settles its entire obligations to the Creditors under both this Composition Plan and the Composition Plan (Duniatex), and is subject to the contents of both this Composition Plan and the Composition Plan (Duniatex).

After the Composition Plan has been homologated by the Panel of Judges at Semarang Commercial Court in Case No. 25/Pdt.Sus-PKPU/2019/PN SMG, the Composition Plan that has been ratified binds all Creditors, except the secured creditors who do not approve



14

the Composition Plan (the "Dissenting Secured Creditors") as referred to in Article 281

paragraph (2) of the Bankruptcy Law.


## SPECIFIC PROVISIONS OF THE COMPOSITION PLAN

| | |
|---|---|
| Existing Facilities | The following is a list of agreements (and the maximum amount (limit) based on the agreements), which underlies the obligations of the Debtor to the relevant Creditors. The amount of claims based on the verification are set out in **Error! Reference source not found.** |
| | PT Bank Central Asia Tbk |
| | 1. Refinancing housing loan (KPR) in the maximum amount (limit) of IDR 29,750,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Central Asia Tbk under notification letter on the consumer credit application approval No. 7850/181/16623/17/A ("BCA Facility") |
| | PT. Bank Negara Indonesia (Persero) Tbk |
| | 2. Aflopend loan in the maximum amount (limit) of IDR 70,000,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Negara Indonesia (Persero) Tbk under Credit Agreement No. SLO/011.2016/656/GRIYAMULTIGUNA dated 28 September 2016 ("BNI Facility") |
| | PT Bank Rakyat Indonesia (Persero) Tbk |
| | 3. KPR Take Over Facility in the maximum amount (limit) of IDR |

| | |
|---|---|
| | 3,300,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Rakyat Indonesia (Persero) Tbk under Credit Decision Offering Letter No. B.39 KC-VII/ADK/KONS/OL/07/2018 dated 5 July 2018; and<br><br>4. KPR Facility in the maximum amount (limit) of IDR 11,000,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Rakyat Indonesia (Persero) Tbk under Credit Decision Offering Letter No. KC-VII/ADK/KONS/OL/08/2018.<br><br>(Point number 3 and 4 above hereinafter referred to as "BRI Facility")<br><br>(collectively referred to as "Existing Facilities" and each referred to as "Existing Facility") |
| Amount in Arrears | As of the PKPU Decision Date, the amount of debt in arrears with regards to the Existing Facilities are as follows:<br><br><table><tr><th>No.</th><th>Facility</th><th>Currency</th><th>Amount in Arrears</th></tr><tr><td>1.</td><td>BCA Facility</td><td>IDR</td><td>17,720,255,133.95</td></tr><tr><td>2.</td><td>BNI Facility</td><td>IDR</td><td>62,303,069,699.00</td></tr><tr><td>3.</td><td>BRI Facility</td><td>IDR</td><td>12,355,637,576.00</td></tr></table> |
| Debt Settlement | 1. The Existing Facilities will be settled in accordance with the original/existing provisions that are regulated by each prevailing |



|  | facility document. |
|---|---|
|  | 2. The Debtor should fulfill the required terms at any time for the performance of the Non-Operational Asset Sales and/or AYDA as regulated under the Composition Plan (Duniatex), including but not limited to the obligation to be present at the Notary/PPAT office.<br><br>3. If one or more of the debtor in case No. 22/Pdt.Sus-PKPU/2019/PN.Smg in default in make payment to creditors based on the Composition Plan (Duniatex), then as request of the relevant creditors, the Debtor should make payment to the relevant creditor. |
| Settlement in relation to PG Claims | 1. Settlement of all PG Claims shall be performed based on legal principles of personal guarantees as which the debtor has committed himself as a personal guarantor to creditors for debt in case No. 22/Pdt.Sus-PKPU/2019/PN.Smg<br><br>2. Specifically for the LWG Syndicated Creditors, all the provisions under the Existing Personal Guarantees shall mutatis mutandis be applicable to this Composition Plan unless expressly stated otherwise in this Composition Plan. For the avoidance of doubt, the application of the Existing Personal Guarantee includes but not limited to:<br><br>    a. the Debtor's unconditional and irrevocable guarantees to the Creditors as a continuing obligation; |



    b.  the Debtor's waiver in favor of the Creditors and any and all of his rights, protection, privileges and defenses provided by law to a guarantor and in particular the provisions in Article 1430, 1831, 1833, 1837, 1843, 1847 of the Indonesian Civil Code; and

    c.  the Debtor's unconditional and irrevocable agreement to fully indemnify the Creditors upon demand for and against any loss from time to time.

3.  The Existing Personal Guarantees shall continue to prevail to secure all debts secured by Personal Guarantees. The Verified Creditors may request the amendment of the Existing Personal Guarantees granted in their favor or others (and the Debtor must comply with) to ensure such Creditor's right under the relevant Personal Guarantees are maintained in accordance with and with due observance of the terms of this Composition Plan and the Composition Plan (Duniatex). Such rights shall be secured by the Debtor under the same terms as the Existing Guarantees.

4.  In the event that the amendment is made based point 2 above, the process of amending and perfecting any new Personal Guarantees required under the terms of this Composition Plan:

    a.  It starts on the Homologation Date and must be completed within 3 (three) months from the Homologation Date unless the LWG Syndicated



|  | |
| --- | --- |
|  | Creditors give an extension for the amendment and perfection of the Existing Personal Guarantees.<br><br>b. It is to be done by assigning notaries/PPAT approved by the relevant Creditors who are granted the personal guarantee.<br><br>c. The Debtor shall ensure that all documents and letters required for the preparation and/or perfection of new Personal Guarantee must be available no later than 14 calendar days from the date requested by the relevant Creditors and/or by the Notary/PPAT.<br><br>5. If for any whatsoever reason the Debtor is declared bankrupt, the Verified Creditors will have the right to claim against the Debtor's bankruptcy regardless of any bankruptcy or default under case No. 22/Pdt.Sus.-PKPU/2019/PN.Smg or the Composition Plan (Duniatex). |
| Debtor Warranty | The Debtor shall comply with all its undertakings and obligations under the Composition Plan (Duniatex), including but not limited to his obligation to provide Working Capital (as defined in the Composition Plan (Duniatex)), and ancillaries document to the Composition Plan (Duniatex). Non-fulfillment of any terms by the Debtor under this Composition Plan or the Composition Plan (Duniatex) will constitute a default under this Composition Plan. |



## EVENT OF DEFAULT

Non-fulfillment of one or more provisions in this Composition Plan, the Existing Personal Guarantees (or any of its amendment), and the Composition Plan (Duniatex) by the Debtor and/or any of the Group, which is not rectified within 30 calendar days after the receipt of a notification letter of default from any Creditor by the Debtor or any of the Group, or any creditors in the Composition Plan (Duniatex) will be considered as an event of default ("Default").

Without prejudice to provisions in Article 4.3, if a Default occurs, the Debtor and Creditor may agree to settlement provisions other than those set out by this Composition Plan.

Filing for cancellation of the homologated Composition Plan as a result of a Default may be made by any Creditor which is being defaulted by the Debtor or the Group. In the event of the cancellation, the Parties are subject to the provisions of Article 291 of the Bankruptcy Law along with other application regulations.

## MISCELLANEOUS PROVISIONS

Non-Verified Creditors will be bound by and subject to the Homologated Composition Plan by taking into consideration the General Provisions, Specific Provisions and Miscellaneous Provisions of this Composition Plan based on the types and amounts of each of their claims. For the avoidance of the doubt, Non-Verified Creditors will have no voting rights.



20

All costs and fees in relation to the PKPU process of the Debtor, i.e., service fees of the Administrator Team, service costs and fees of the Debtor's legal consultants and financial consultants must be paid before the Homologation Date or other agreed dates.

All provisions in the agreements agreed upon before the PKPU Decision Date by and between the Debtor and Creditors are deemed to remain in effect as long as they do not conflict and are otherwise regulated by the provisions of this Composition Plan ("Prior Agreements") if the Composition Plan has been homologated by the Commercial Court. In the event that there is a conflict between the provisions of this Composition Plan and the provisions of the Prior Agreements, the provisions of this Composition Plan shall prevail.

Every provision governing the rights and obligations of Creditors and the Debtor in the Composition Plan is subject to the provisions of the Bankruptcy Law. All provisions governing the rights and obligations of the Creditors and the Debtor, if not regulated and determined in the Composition Plan, are governed by the Prior Agreements.

CLOSING

The implementation of this Homologated Composition Plan is subject to and performed in accordance with the provisions of the Bankruptcy Law and the statutes and the applicable laws in the territory of Indonesia.

Correspondence related to the Composition Plan to Debtor can be addressed as follows:

Jl. Raya Palur Km 7.1, Karanganyar, Central Java, Indonesia

+62 271 825 954

dtx@duniatex.com



Any change in the above correspondence address must be delivered in writing by the Debtor to the Creditors. If not notified in writing by the Debtor, the above correspondence address will remain valid and binding. Proof of delivery by registered mail to that address is sufficient and valid proof.

Correspondence related to the Composition Plan addressed to each Creditor may be addressed through the address and delivered in the manned as stipulated in the Prior Agreements.

Any changes to the correspondence address of each Creditor must be notified in writing and collectively by the relevant Creditor to the relevant Debtor. If the Creditor is not notified in writing, then the correspondence address set forth in the Previous Agreements remains valid and binding. Proof of delivery by registered mail to that address is sufficient and valid evidence.

ATTACHMENTS

Attachment 1 (Personal Guarantees)

The following is a list of personal guarantee agreements that underlie the obligations of the Debtor to the relevant Creditors that his capacity as the personal guarantor. The amount of verified claims is set out in Error! Reference source not found.

1. Deed of Personal Guarantee No. 15 dated 29 September 2016, made before Putut Mahendra S.H., Notary in Jakarta;

2. Deed of Personal Guarantee No. 26 dated 21 November 2017, made before Pujiastuti Pangestu S.H., Notary in Karanganyar;



22

3.    Personal Guarantee Agreement by the Debtor as Guarantor in favor of PT Bank
      Central Asia Tbk. as Security Agent dated 22 June 2018;

4.    Personal Guarantee Agreement between the Debtor and Standard Chartered Bank
      for DMST dated 28 April 2008;

5.    Deed of Personal Guarantee No.6 dated 9-7-2018 made before Soes Asmara
      Argawati,SH Notary in Semarang and Deed of Personal Guarantee No.17 dated
      28-11-2018 made before Asih Sari Dewanti, SH Notary in Surakarta both for PT.
      Bank Multiarta Sentosa for DSSA.

Atttachment 2 (Verified Creditors)

| No | Secured Creditors | Verified Claims |
|---|---|---|
| 1. | PT. BANK CENTRAL ASIA, TBK. | 17,720,255,133.95 |
| 2. | PT. BANK RAKYAT INDONESIA (PERSERO), TBK. | 12,355,637,576.00 |
| 3. | PT. BANK NEGARA INDONESIA (PERSERO), TBK. | 62,303,069,699.00 |
| No | Unsecured Creditors | Verified Claims |
| 1. | AOZORA ASIA PACIFIC FINANCE LIMITED | 53,025,889,611.08 |
| 2. | BANK OF PANHSIN | 86,504,032,699.28 |
| 3. | BNP PARIBAS, BRANCH SINGAPORE | 15,712,406,981.50 |
| 4. | CHAILEASE INTERNATIONAL FINANCIAL SERVICE CO., LTD. | 13,256,472,331.90 |
| 5. | CHINA CITIC BANK INTERNASIONAL LIMITED, SINGAPORE BRANCH | 110,227,245,438.36 |
| 6. | ENTIE COMMERCIAL BANK | 13,256,472,331.90 |
| 7. | FEDERATED PROJECT AND TRADE FINANCE CORE FUND | 37,703,982,566.14 |
| 8. | FIRST ABU DHABI BANK PJSC, SINGAPORE BRANCH | 146,284,566,531.00 |
| 9. | FIRST COMMERCIAL BANK, LTD., SINGAPORE BRANCH | 128,749,638,423.00 |
| 10. | INDIAN BANK, SINGAPORE BRANCH | 319,292,631,645.08 |
| 11. | ING BANK N.V., SINGAPORE BRANCH | 382,416,861,848.28 |
| 12. | LEMBAGA PEMBIAYAAN EKSPOR INDONESIA/INDONESIA | 1,623,108,393,858.71 |

|     | EXIMBANK |  |
| --- | --- | --- |
| 13. | MALAYAN BANKING BERHAD, SINGAPORE | 245,731,459,764.24 |
| 14. | MITSUBISHI UFJ LEASE (SINGAPORE) PTE LTD | 79,538,834,558.36 |
| 15. | NEC CAPITAL SOLUTIONS SINGAPORE PTE.LTD | 26,512,944,947.28 |
| 16. | PT. BANK BNP PARIBAS INDONESIA | 384,646,105,317.80 |
| 17. | PT. BANK CIMB NIAGA, TBK. | 367,012,756,271.55 |
| 18. | PT. BANK DANAMON INDONESIA, TBK. | 261,285,798,936.64 |
| 19. | PT. BANK ICBC INDONESIA | 52,898,121,915.06 |
| 20. | PT. BANK JTRUST INDONESIA, TBK. | 26,531,233,234.26 |
| 21. | PT. BANK MANDIRI (PERSERO), TBK. | 2,237,963,345,198.76 |
| 22. | PT. BANK MASPION INDONESIA, TBK. | 46,500,558,400.84 |
| No. | Secured Creditors | Verified Claims |
| 23. | PT. BANK MULTIARTA SENTOSA | 184,259,220,629.62 |
| 24. | PT. BANK NASIONALNOBU, TBK. | 88,557,181,661.68 |
| 25. | PT. BANK NEGARA INDONESIA (PERSERO), TBK. | 485,079,274,747.00 |
| 26. | PT. BANK BNI SYARIAH | 381,272,087,980.00 |
| 27. | PT. BANK PERMATA, TBK. | 123,326,978,560.00 |
| 28. | PT. BANK RAKYAT INDONESIA (PERSERO), TBK. | 1,217,945,287,316.10 |
| 29. | PT. BANK BRI SYARIAH, TBK. | 285,430,898,616.00 |
| 30. | PT. BANK SBI INDONESIA | 34,084,949,461.88 |
| 31. | PT. BANK SHINHAN INDONESIA | 496,478,235,138.26 |
| 32. | PT. BANK SYARIAH MANDIRI | 527,773,626,668.27 |
| 33. | PT. MAYBANK INDONESIA, TBK | 536,500,829,759.93 |
| 34. | QATAR NATIONAL BANK (Q.P.S.C), SINGAPORE BRANCH | 540,299,433,409.54 |
| 35. | STANDARD CHARTERED BANK SINGAPORE LIMITED | 162,898,732,322.00 |
| 36. | STANDARD CHARTERED BANK | 216,482,454,018.98 |
| 37. | STANDARD CHARTERED BANK, JAKARTA BRANCH | 603,475,164,171.96 |
| 38. | SUMITOMO MITSUI BANKING CORPORATION, SINGAPORE BRANCH | 141,543,946,365.92 |
| 39. | TAIWAN COOPERATIVE BANK, MANILA OFFSHORE BANKING BRANCH | 217,024,278,697.51 |
| 40. | PT. BANK HSBC INDONESIA | 297,370,886,207.06 |
| 41. | THE SHANGHAI COMMERCIAL & SAVING BANK LTD. SINGAPORE BRANCH | 26,512,944,947.28 |
| 42. | UNION BANK OF INDIA, HONG KONG | 406,129,330,958.80 |
| 43. | WOORI GLOBAL MARKETS ASIA LIMITED | 128,749,638,423.00 |
| 44. | YUANTA COMMERCIAL BANK CO., LTD HONGKONG BRANCH | 218,085,315,989.54 |



Considering, that because the Court does not find any reason to reject the ratification of the composition plan and therefore the Composition Plan has been made into a Composition Agreement, in accordance with the provisions of Article 285 of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment, the Panel of Judges is obliged to issue a decision regarding the approval of the Composition Agreement;

Considering, that with the approval of the composition agreement, in accordance with Article 286 of Law No. 37 of 2004 on Bankruptcy and Suspension of Payment, then the Composition Agreement dated 23 June 2020 binds all Creditors of SUMITRO (IN PKPU);

Considering, that with the approval of the composition agreement, by the operation of law the Suspension of Payment (PKPU) ends in accordance with Article 288 of Law No.37 of 2004 on Bankruptcy and Suspension of Payment;

Considering, that regarding the case costs in the PKPU process it should be borne by the Debtor;

Observing, Article 222 paragraph (3) in conjunction with Article 281 paragraph (1) letter a, in conjunction with Article 281 paragraph (1) letter b, in conjunction with Article 284 paragraph (1), in conjunction with Article 285 paragraph (1) in conjunction with Article 285 paragraph (2) and other articles of Law No.37 of 2004 on Bankruptcy and Suspension of Payment and other relevant provisions;

### HAVE ADJUDICATED AND DECIDED:

1.   to declare as legal and legally binding the Composition Agreement dated 23 June 2020 between SUMITRO (IN PKPU) and his Creditors;



2.   to punish the Debtor/SUMITRO (IN PKPU) and its creditors to submit to and to comply with and implement the content of the Composition Agreement dated 23 June 2020;

3.   to declare the Suspension of Payment (PKPU) Number 25/Pdt.Sus-PKPU/2019/PN SMG., ends by the operation of law;

4.   to punish the Debtor or the Respondents in the Suspension of Payment to pay the court costs of Rp. 3,126,000.00 (three million one hundred twenty six thousand rupiah);

It is decided in the Hearing of Panel of Judges at the Commercial Court at Semarang District Court on **Thursday**, **25 June 2020** by us, **Muhamad Yusuf, S.H., M.H.,** as Presiding Judge, **Aloysius P. Bayuaji, S.H., M.H.,** and **Esther Megaria Sitorus, S.H., M.Hum.** each Member Judge, appointed based on the Decision of Head of Semarang District   /Commercial/Industrial   Relation/Corruption   Court,   Nomor 25/Pdt.Sus.PKPU/2019/PN Smg dated 11 February 2020, the decision on Friday, 26 June 2020, is read out in a open hearing by the Presiding Judge, accompanied by: **Aloysius P. Bayuaji,** and **Yogi Arsono, S.H., Kn., M.H,** Member Judges, assisted by Evi Roesliana, SH., Substitute Registrar in the presence of the legal representatives of the Petitioner in PKPU/Debtor in PKPU, Administrative Team and the Creditors of SUMITRO (IN PKPU).

|  |  |
|---|---|
| **Member Judges** | **Presiding Judge** |
| **Signature** | **Signature** |
| **Aloysius P Bayuaji, S.H.MH.** | **Mohamad Yusuf, SH.MH.** |



Signature

**Yogi Arsono, S.H., Kn., M.H.**

**Substitute Registrar**

**Signature**

**Evi Roesliana, SH.**

Note:

On this day, Wednesday, 8 July 2020, the verified Official Copy of Decision Number 25/Pdt.Sus-PKPU/2019/PN Smg is officially issued and given to the Administrator Team;

**Commercial Junior Registrar**

**(signed and sealed on a duty stamp)**

**Afdlori, S.H., M.H.,**
**NIP. 19640319 198703 1 002**

Costs of Copy of Decision:

— Duty Stamp          Rp. 6,000

— Local Tax           Rp.10,000

— Delivery of Copy  Rp 10,000

Total                 Rp.26,000



## CERTIFICATE OF TRANSLATION

I, Nike Sinta Karina, certified and sworn translator, hereby certify that to the best of my knowledge and belief this English translation is a true and correct translation of the document presented to me in Indonesian.

Jakarta, 7 August 2020



Nike Sinta Karina
English ◇ Indonesian Certified and Sworn Translator
Decrees of Governor of DKI Jakarta No. 1836/2009 &  No. 1955/2011
**Indoscript International Translation Services**
Beltway Office Park Tower B 5th Floor
Jl. TB. Simatupang No 41 Jakarta 12550
Tel: +6221 29857377; Fax: +6221 29857201

**<u>Exhibit D</u>**

Unofficial English Translation of Case 22 Composition Plan

20 June 2020 Version                                                    Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

Unofficial Translation of the Bahasa Indonesia version of Composition Plan ("**Composition Plan**")

PT Delta Merlin Dunia Textile, PT Delta Dunia Tekstil, PT Delta Merlin Sandang Tekstil, PT Delta Dunia Sandang Tekstil, PT Dunia Setia Sandang Asli Tekstil, and PT Perusahaan Dagang dan Perindustrian Damai (the "**Debtors**")

In the matter of Suspension of Payment Case no. 22/Pdt.Sus-PKPU/2019/PN SMG

Semarang, Tuesday, 23 June 2020

20 June 2020 Version                                        Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

On this day, Tuesday, 23 June 2020 at the Commercial Court in the District Court of Semarang, the Composition Plan made and signed by and between the Debtors (as described below) and the Creditors (as described below) as an evidence and approval between the Debtors and the Creditors to the Composition Plan, namely:

1. **PT Delta Merlin Dunia Textile**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen Km. 14, Pulosari village, Kebakkramat sub-district, Karanganyar regency, Central Java, Indonesia (heretofore "**DMDT**"), in this regards represented by Tan Sauw Hwa, in his capacity as President Director, therefore lawfully acting for and on behalf of DMDT.

2. **PT Delta Dunia Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Solo – Sragen Km. 10.8, Kaling village, Tasikmadu sub-district, Karanganyar regency, Central Java, Indonesia (heretofore "**DDT**"), in this regards represented by Tan Sauw Hwa, in his capacity as Director, therefore lawfully acting for and on behalf of DDT.

3. **PT Delta Merlin Sandang Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Raya Timur Km. 10, Bumiaji village, Gondang sub-district, Sragen regency, Central Java, Indonesia (heretofore "**DMST**"), in this regards represented by Tan Sauw Hwa, in his capacity as President Director, therefore lawfully acting for and on behalf of DMST.

4. **PT Delta Dunia Sandang Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Semarang – Demak Km. 14, Tambakroto village, Sayung sub-district, Demak regency, Central Java, Indonesia (heretofore "**DDST**"), in this regards represented by Yohanes Hendrawan in his capacity as President Director therefore lawfully acting for and on behalf of DDST.

5. **PT Dunia Setia Sandang Asli Tekstil**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Raya Palur Km. 7.1, Dagen village, Jaten sub-district, Karanganyar regency, Central Java, Indonesia (heretofore "**DSSA**"), in this regards represented by Yohanes Hendrawan in his capacity as President Director therefore lawfully acting for and on behalf of DSSA.

6. **PT Perusahaan Dagang Dan Perindustrian Damai**, a limited liability company, duly established under the laws of the Republic of Indonesia, having its registered office at Jl. Simongan No. 100, Ngemplak village, Semarang Barat sub-district, Semarang City, Central Java, Indonesia (heretofore "**Damaitex**"), in this regards represented by Megawati in her capacity as President Director therefore lawfully acting for and on behalf of Damaitex.

Hereinafter, DMDT, DDT, DMST, DDST, DSSA, and Damaitex, are jointly referred to as the "**Debtors**" or "**Group**", and each a "**Debtor**")

and

7. The Creditors, as set forth in Appendix 3 (Verified Creditors), are creditors registered in the final debt list dated 25 November 2019 as verified by the Administrator Team as detailed on Appendix 3 (Verified Creditors) ("**Final Debt List**").

The Creditors are individually and collectively referred to as "**The Creditors**".

The Debtors and The Creditors are together referred to as the "**Parties**".

Whereas:

2

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

A. On 10 September 2019, an application of PKPU petition ("**PKPU Petition**") was submitted by one of the creditors of the Debtors against the Debtors with case register number No. 22/Pdt.Sus-PKPU/2019/PN SMG.

B. The Panel Judges at the Commercial Court of Semarang District Court have granted and declared the Debtors being in Temporary PKPU, as determined in Court Decision No. 22/Pdt.Sus-PKPU/2019/PN SMG ("**PKPU Decision**") which was read on the Court Hearing dated 30 September 2019 ("**PKPU Decision Date**").

C. The Panel Judges of case 22/Pdt.Sus-PKPU/2019/PN SMG read the decision on the case by the virtue of which: (i) granted the PKPU Petition; (ii) granted the Companies of temporary PKPU for duration of 45 (forty-five) Days since the date the decision was read ("**Temporary PKPU**"); (iii) stated the appointment of Hamonangan Syahdan Hutabarat, S.H., Alfin Sulaiman, S.H., M.H., Januardo Sulung P. Sihombing, S.H., M.H., M.A., BKP., and Nila Asriyanti, S.H. as the Administrator Team of the Companies (under PKPU); and (iv) appointed Mr. Pudjo Hunggul HW, S.H., M.H. as the Supervisory Judge.

D. Whereas in accordance with the decision No. 22/Pdt.Sus-PKPU/2019/PN SMG dated April 8, 2020, the Commercial Court Panel Judge appointed Mr. Andreas Purwantyo Setiyadi, S.H., M.H., as Supervisory Judge in Case No.22/Pdt.Sus-PKPU/2019/PN SMG, replacing Mr. Pudjo Hunggul HW, S.H., M.H. who is being reassigned as High Court Judge at the Kupang High Court.

E. Whereas the Debtors have followed the Temporary PKPU and its extensions granted through permanent PKPU proceedings with the schedules and agenda as determined by the Administrator Team and the Supervisory Judge.

F. Whereas the content of the Composition Plan has been presented in creditors meetings via court or out-of-court proceedings in Commercial Court of Semarang District Court as attended by the Creditors with the Supervisory Judge on the matter of the Composition Plan as proposed by the Debtors.

G. Whereas in the creditors meeting convened today, Tuesday, 23 June 2020 the Supervisory Judge, Administrator Team, the Creditors, and the Debtors attended the creditors meeting held in Commercial Court of Semarang District Court either via physical meeting or electronic communication facilities as arranged by Administrator Team for the discussion on the Composition Plan and on voting to approve or reject the Composition Plan.

H. With regards to the above, the Debtors and the Creditors who approved the Composition Plan, intend to make and sign this Composition Plan as an evidence that a settlement has been reached between the Debtors and the Creditors.

Now, therefore, in consideration of the above promises, herein set out in this Composition Plan, the Debtors and the Creditors each declares that it agrees to the following terms and conditions as set forth in the Composition Plan:

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

### TABLE OF CONTENT

DEFINITIONS ........................................................................................................... 5
1.       SUMMARY ..................................................................................................... 8
2.       GENERAL PROVISIONS OF THE COMPOSITION PLAN .................................... 8
3.       SPECIFIC PROVISIONS OF THE COMPOSITION PLAN ...................................10
4.       EVENT OF DEFAULT.......................................................................................44
5.       MISCELLANEOUS PROVISIONS .......................................................................44
6.       PERSONAL GUARANTEE ................................................................................45
7.       COVENANTS AND INFORMATION UNDERTAKINGS..........................................46
8.       CLOSING .......................................................................................................46
9.       APPENDICES .................................................................................................48
9.1      Appendix 1 (Operating Assets) .......................................................................48
9.2      Appendix 2 (Sponsor Personal Assets) ............................................................65
9.3      Appendix 3 (Verified Creditors).......................................................................69
9.4      Appendix 4 (CSPA Term Sheet) ......................................................................76
9.5      Appendix 5 (Settlement Details) .....................................................................83

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

## DEFINITIONS

Each definition hereunder, unless explicitly stated otherwise within the context of each sentence under this Composition Plan and has been separately defined in this Composition Plan (including as used in the various Appendices), has the following definition:

"**Administrator (Team)**" means the administrator as referred to in the Bankruptcy Law as appointed and authorized by the Panel Judge.

"**AYDA**" means a transfer of ownership title from a debtor to a creditor for the purpose of partial or complete debt settlement.

"**Bankruptcy Law**" means Law No. 37 year 2004 on Bankruptcy and Suspension of Payment.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general banking business (including dealings in foreign currencies) in New York City, London, Jakarta, Hong Kong, and Singapore.

"**CAMA**" means a cash account management agreement entered into or to be entered into by (among others) the relevant Debtors and the relevant Account Banks in accordance with the terms of this Composition Plan.

"**Commercial Court**" is the Commercial Court of the Semarang District Court which is located at Jl. Siliwangi No.512, Kembangarum, Kec. Semarang Barat, Kota Semarang, Jawa Tengah 50146.

"**Composition Plan**" is this Composition Plan as the Composition Plan that was approved through voting by the entitled Creditors of the Debtors in accordance to Article 281 paragraph (1) of the Bankruptcy Law on Tuesday, 23 June 2020.

"**Day**" or "**Days**" or "**Calendar Day**" or "**Calendar Days**" means each day or days in 1 (one) year without exception including Saturdays, Sundays, and national holidays as determined by the Government and Business Day.

"**Debt Settlement via Non-Operating Asset and/or AYDA**" means the process of sale of Non-Operating Assets and/or AYDA for debt settlement as set out in Debt Settlement Via Non-Operating Asset provisions in this Composition Plan.

"**DMDT 2 Assets**" are assets with reference of DMDT 2 as detailed in Appendix 1 (Operating Assets).

"**DMDT 3 Assets**" are assets with reference of DMDT 3 as detailed in Appendix 1 (Operating Assets).

"**DMDT 4 Assets**" are assets with reference of DMDT 4 as detailed in Appendix 1 (Operating Assets).

"**DMDT 5 Assets**" are assets with reference of DMDT 5 as detailed in Appendix 1 (Operating Assets).

"**DMDT 6 Assets**" are assets with reference of DMDT 6 as detailed in Appendix 1 (Operating Assets).

"**DMDT 7 Assets**" are assets with reference of DMDT 7 as detailed in Appendix 1 (Operating Assets).

"**Effective Date**" means Homologation Date.

"**Homologated Composition Plan**" means the Composition Plan which has been homologated or ratified by the Panel Judge on the Homologation Date.

"**Homologation Date**" is the date of homologation or ratification by the Panel Judge on the Case No. 22/Pdt.Sus-PKPU/2019/PN SMG at Semarang Commercial Court in regard to the Composition Plan, regardless of any cassation or any other legal actions taken against the homologation of this Composition Plan by the Panel of Judges of Case No. 22/Pdt.Sus-PKPU/2019/PN SMG.

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

"**Key Hire**" means the chief financial officer ("**CFO**"), the operational director, and sales and marketing director.

"**Maturity Date**" is the date falling on the last Day (determined by Point to Point calculation) of the relevant Tenor (as set out in the debt restructuring terms in Appendix 5 (Settlement Details)) provided however, that, if any Maturity Date would otherwise fall on a date which is not a Business Day, the Maturity Date will be deemed to be the previous Business Day,

(and for illustration, if the Homologation Date falls on 26 June 2020, then the Maturity Date for the settlement with 10 year Tenor is 25 June 2030).

"**Non-Operating Assets**" are assets securing the Existing Facilities other than Operating Assets.

"**Operating Assets**" are assets defined in Appendix 1 (Operating Assets).

"**Outstanding Interest/Margin/Profit Sharing and Penalty**" or "**Outstanding Interest/Margin and Penalty**" means the outstanding interests, margin, profit sharing, and/or penalties outstanding as of PKPU Decision Date as detailed in Appendix 5 (Settlement Details).

"**Panel Judge**" is the judge who adjudicates and hears this PKPU Petition.

"**Participating Creditors**" are the creditors of the Existing Facilities that granted approval to this Composition Plan.

"**Participating Secured Creditors**" are the secured creditors of the Existing Facilities that granted approval to this Composition Plan and their successors from time to time in the event of assignment or novation as set out under this Composition Plan.

"**Participating Secured Creditors Approval (Debtor)**" means approval from more than half of the Participating Secured Creditors of a relevant Debtor by numbers and two-thirds of the Participating Secured Creditors of a relevant Debtor by value, to be calculated based on the actual number of Participating Secured Creditors and total value of outstanding principal debts of the relevant Debtor during the time such approval is being sought.

"**Participating Secured Creditors Approval (Debtors)**" means approval from more than half of all Participating Secured Creditors by number and two-thirds of all the Participating Secured Creditors by value, to be calculated based on the actual number of Participating Secured Creditors and total value of outstanding principal debts of all the Debtors during the time such approval is being sought.

"**PKF**" means the public accountant office of Paul Hadiwinata, Hidayat, Arsono, Retno, Palilingan & Rekan by virtue of Menteri Keuangan Republik Indonesia no. 855/KM.1/2017 with its registered address in UOB Plaza 30th and 42nd floor, Jl. M.H. Thamrin Lot 8-10, Jakarta Pusat 10230 as PKF International Limited member firm.

"**Point to Point**" means the determination of an Interest Payment Date, a Margin/Profit Sharing Payment Date, and a Principal Payment Date:

1)  the first of which falls on the date one calendar month (for Monthly Interest Payment Date, Monthly Margin/Profit Sharing Payment Date, and Monthly Principal Payment Date) or three calendar months (for Quarterly Interest Payment Date, Quarterly Margin/Profit Sharing Payment Date and Quarterly Principal Payment Date) after the Homologation Date; and

2)  subsequent such dates fall exactly on one calendar month (for Monthly Interest Payment Date, Monthly Margin/Profit Sharing Payment Date and Monthly Principal Payment Date) or three calendar months (for Quarterly Interest Payment Date, Quarterly Margin/Profit Sharing Payment Date, and Quarterly Principal Payment Date) after the prior relevant Monthly Interest Payment

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

Date, Monthly Margin/Profit Sharing Payment Date, and Monthly Principal Payment Date or Quarterly Interest Payment Date, Quarterly Margin/Profit Sharing Payment Date, and Quarterly Principal Payment Date.

"**Reverse Dutch Auction**" means a bidding process where the buyer (in this case the Debtors or other party(ies) as appointed by the Debtors) bids on the settlement price of certain debt against cash from available funds beginning from the lowest settlement price. If there is no settlement from the price, the buyer increases its bid until settlement closes.

"**Security Documents**" mean deeds and/or certificates of Hak Tanggungan, fiducia security rights and/or pledges and any other relevant documents including pursuant to the Existing Facilities and including but not limited to the security sharing agreements and any ancillary documents in the relevant deeds and/or certificates which are required for perfection, implementation and enforcement of any Security Documents.

"**Sponsor**" means Sumitro, an Indonesian citizen, born in Surakarta on 25 December 1969 holder of Kartu Tanda Penduduk no. 3372042512690002, with his registered address in Tegalharjo, Kecamatan Jebres, Kota Surakarta, Jawa Tengah Indonesia as debtor in case No 25.Pdt.Sus-PKPU/2019/PN SMG.

"**Sponsor Duniatex Assets**" refers to assets defined under Working Capital provisions as detailed in paragraph (5).

"**Sponsor Personal Assets**" refers to assets defined under Working Capital provisions as detailed in paragraph (4)..

"**Supervisory Judge**" is the Judge as mentioned under Bankruptcy Law, appointed and assigned by the Panel Judge who adjudicates and hears this PKPU Petition.

"**Sustainable Debt**" means such debt as set out in Appendix 5 (Settlement Details).

"**Trade Creditors**" are Creditors with dues from any of the Debtors generated by production or operational activities which have been verified by the Administrator Team.

"**Year**" means calendar year.

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

1. **SUMMARY**

1.1 This Composition Plan has been prepared to help achieve a consensual restructuring with all Creditors of the Debtors. This Composition Plan was composed and prepared by the Debtors to be voted on by the Creditors at the creditors meeting held in the Commercial Court based on the provisions of Article 281 paragraph (1) of Law No. 37 of 2004 concerning Bankruptcy and Suspension of Payment.

1.2 In making their decisions, Creditors must rely on their own judgment and analysis of this Composition Plan, the terms and conditions, and all information contained in this Composition Plan, including all the benefits and risks contained therein.

1.3 This Composition Plan is made with annexes as may be referred to in certain sections of this Composition Plan. The annexes are inseparable parts of this Composition Plan.

2. **GENERAL PROVISIONS OF THE COMPOSITION PLAN**

2.1 The provisions in this Composition Plan are based on a financial projection that considers (i) improved governance and transparency, necessary working capital to support the needs of the business, and sustainable debt loads; (ii) the commitments of the Sponsor via his personal guarantees, the debt capacity of each operating company within the Group, the operating versus non-operating assets and creditors security rights against them, and the impact of the Covid-19 pandemic; (iii) maintaining staffing levels to provide employment; and (iv) ensuring alignment of stakeholder objectives.

2.2 Subject to the terms of the Composition Plan, the settlement plan for the Creditors under this Composition Plan is prepared with the following general provisions subject to and in observance with this Composition Plan and Appendix 5 (Settlement Details):

    I.    Creditors solely secured by Non-Operating Assets shall be settled through Debt Settlement via Non-Operating Asset and/or AYDA.

    II.    Creditors secured by Operating Assets shall be settled through the operating cash flows as set out in the Cash Waterfall Mechanism.

    III.    Excess Cash, on a bi-annual basis, will be used to accelerate repayment of the facilities of each Debtor.

    IV.    Cash interest (or profit sharing/margin for sharia financing) on sustainable debt portion will then increase to 5% for IDR denominated loans and 2.5% for USD denominated loans.

2.3 Transfer of Rights. Each Creditor may at any time assign any of its rights and obligations over their claims under the Homologated Composition Plan, to another party, which assignment or transfer will come into force without any requirement to obtain the consent of the Debtors or the courts of Indonesia and will be effective as of the date provided under the relevant assignment or transfer document, subject to the following provisions:

    I.    Any third party transferee or assignee of such novation or transfer of claim rights and obligations based on the Homologated Composition Plan will be bound and subject to all provisions of the Homologated Composition Plan.

    II.    Any Creditor who assigns or transfers its rights and obligations to any third party shall give a notice in writing to the Debtors regarding such transfer or assignment of claims, using the notice details set out in clauses 8.2 and 8.3 in this Composition Plan, in accordance with applicable laws and regulations in Indonesia. The Debtors

20 June 2020 Version                                                    Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

must execute and do all such acts and things as the Creditors may request for perfecting and completing any assignment or transfer.

III. Pending receipt of the notification of transfer or assignment and such transfer or assignment being fully complete, the Debtors must continue to make payment to the relevant original Creditor as if no transfer or assignment has occurred.

2.4 The following provisions of the Composition Plan shall apply to these following Creditors:

I. The Homologated Composition Plan shall be enforceable and binding on:

**A.** Creditors Participating in PKPU

These are the Debtors' Creditors whose claims against the Debtors have been verified by the Administrator and listed in the Final Debt List dated 25 November 2019 as prepared by the Administrator Team.

**B.** Creditors for Debts Outside Verification

These are (1) creditors who have claims against Debtors but did not participate in or register their claims in the PKPU Case No. 22/Pdt.Sus-PKPU/2019/PN SMG; or (2) creditors that are not identified or have not been recognized by the Debtors prior to the Composition Plan being homologated by the Panel of Judges. For the creditors or group of creditors as referred to in this paragraph B, the following conditions apply:

1) These claim or claims can only be accepted and acknowledged later by the respective Debtor(s) if they conform with Indonesian standardized accounting principles and applicable laws and regulations; and

2) The claim or claims if received and acknowledged later by the relevant Debtor will only be paid and discharged after the Debtor concerned has unconditionally and irrevocably paid and discharged all of his obligations to the Creditors party to this Composition Plan and the Debtors and Creditors party to this Composition Plan must comply with the contents of this Composition Plan.

2.5 After the Composition Plan has been homologated by the Semarang Commercial Court Panel Judge in Case No. 22/Pdt.Sus-PKPU/2019/PN SMG, the Composition Plan that has been ratified binds all Creditors, except the secured creditors who do not approve the Composition Plan (the "**Dissenting Secured Creditors**") as referred to in Article 281 paragraph (2) of the Bankruptcy Law.

20 June 2020 Version                                                    Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

3.      **SPECIFIC PROVISIONS OF THE COMPOSITION PLAN**

| Existing Facilities | The following is a list of agreements (as well as the amount of the facilities under those agreements) that underlie the obligations of the Debtors to the relevant Creditors. The amount of claims based on the results of verification are detailed in Appendix 3 (Verified Creditors). |
|---|---|
| | **Bilateral Facilities** |
| | PT Bank BNI Syariah ("**BNI Syariah**") |
| | 1) Facility of BNI Syariah to DMDT consist of Rp300.000.000.000 non-revolving loan granted pursuant to a financing agreement made between DMDT and PT Bank BNI Syariah under Akta Akad Plafond Pembiayaan No.165, dated 27 December 2018 drawn down through: |
| | a) Musyarakah Mutanaqisah Financing No.369/MMQ800/884/XII/2018 dated. 27 December 2018 first drawdown Rp186.900.000.000,- |
| | b) Musyarakah Mutanaqisah Financing No.025/MMQ800/884/I/2019 dated 16 January 2019 second draw down Rp113.100.000.000,- |
| | PT Bank BNP Paribas ("**BNPP Indonesia**") |
| | 2) Facility of BNPP Indonesia to DDST consist of Transactions pursuant to a Foreign Exchange Facility Letter No. LC/DR-158/LA/2016 made between DDST and PT Bank BNP Paribas Indonesia. |
| | PT Bank BRI Syariah ("**BRI Syariah**") |
| | 3) Facilities of BRI Syariah to DMDT consist of |
| | a) Rp130.000.000.000 line facility granted pursuant to a financing agreement made between DMDT and PT Bank BRI Syariah under deed No. 11 dated 17 January 2018 jo. Surat Persetujuan Prinsip Pembiayaan (SP3), Addendum Nomor: 12/AO-SOLO/I/2018 dated 17 January 2018 jo. Surat Persetujuan Prinsip Pembiayaan (SP3) No.127/AO-SOLO/VII/2019 dated 30 July 2019 jo. Surat Persetujuan Prinsip Pembiayaan (SP3) Penarikan I No.128/AO-SOLO/VII/2019 dated 31 July 2019 jo. Surat Persetujuan Prinsip Pembiayaan (SP3) Penarikan II No.129/AO-SOLO/VII/2019 dated 31 July 2019. |
| | b) Rp150.000.000.000 line facility granted pursuant to a financing agreement made between DMDT and PT Bank BRI Syariah under deed No. 77 dated 13 November 2009 jo. Akta Addendum Perjanjian Pemberian Line Facility (Musyarakah) No.12 dated 17 January 2018 jo. Surat Persetujuan Prinsip Pembiayaan (SP3) Addendum Nomor: 12/AO-SOLO/I/2017 dated 17 January 2018 jo. Surat Persetujuan Prinsip Pembiayaan (SP3) No.125/AO-SOLO/VII/2019 dated 30 July 2019 jo. Surat Persetujuan Prinsip Pembiayaan (SP3) Penarikan No.126/AO-SOLO/VII/2019 dated 30 July 2019. |
| | 4) Facilities of BRI Syariah to DMST consist of |
| | a) Rp100.000.000.000 musyarakah financing granted pursuant to a financing agreement made between DMST and PT Bank BRI Syariah under deed No. 130 dated 29 September 2017 made before Rahayu Utami Sari, SH, MKn in Karanganyar juncto surat |

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

<table>
<tr><td></td><td>

BRI Syariah No. 132/AO-SOLO/VII/2019 dated 30 July 2019 and addendum No. 114 dated 31 July 2019.

b) Rp80.000.000.000 musyarakah financing granted pursuant to a financing agreement made between DMST and BRI Syariah No. 15 dated 12 February 2016 Jo. Letter no 131/AO-SOLO/VII/2019 dated 30 July 2019.

5) Facility of BRI Syariah to DSSA consist of Rp38.500.000.000 line facility granted pursuant to a financing agreement made between DSSA and PT Bank BRI Syariah under deed no 69 dated 9 December 2011 which was last amended under addendum No. 115 dated 31 July 2019.

PT Bank Central Asia Tbk ("**BCA**")

6) Facility of BCA to DMDT consist of letter of credit granted pursuant to a letter of credit application made by DMDT to PT Bank Central Asia Tbk dated 15 July 2019.

7) Facility of BCA to DSSA consist of usance letter of credit granted pursuant to a credit agreement no 668/7850/KRD/SLV/19 made between DSSA and PT Bank Central Asia Tbk dated 11 July 2019.

PT Bank CIMB Niaga Tbk ("**CIMB Niaga**")

8) Facility of CIMB Niaga to DSSA consist of checking account and special transaction financing agreement made between DSSA and PT Bank CIMB Niaga Tbk granted pursuant to 13th amended and restated credit agreement no 106/PK/CSC.JTG-SLB/VI/2007 dated 13 June 2007, duly executed on 27 December 2019.

9) Facility of CIMB Niaga to DMST consist of trade financing facility granted pursuant to a credit agreement made between DMST and PT Bank CIMB Niaga Tbk under the 18th amendment and restatement No. 6, dated 06 May 2008 duly executed on 27 December 2019.

PT Bank Danamon Indonesia Tbk ("**Danamon**")

10) Facility of Danamon to DMST consist of foreign exchange and derivative transaction facility granted pursuant to the Perjanjian Pokok Transaksi Valuta Asing dan Derivatif and its related Appendices made between DMST and Danamon dated 11 August 2015.

11) Facility of Danamon to DSSA consist of Omnibus (Sight Letter of Credit (L/C) Impor/Surat Kredit Berdokumen Dalam Negeri (SKBDN), Usance Letter of Credit (L/C) Impor/Surat Kredit Berdokumen Dalam Negeri (SKBDN), Trust Receipt (TR), Open Account Financing (OAF) Seller, dan Bank Garansi facility granted pursuant to the agreement between DSSA and Danamon under deed no 138 dated 28 October 2010 and its amendments which was last executed under Extension Agreement No. 199/PPWK/EB/0619 dated 3 June 2019.

PT Bank Harda Internasional Tbk ("**Harda**")

12) Facility of Harda to DSSA consist of Rp75.000.000.000 working capital with instalment facility granted pursuant to the agreement made between DSSA and PT Bank Harda Internasional Tbk under credit approval letter no: 018/OL-Krd/BHI-SOLO/XI-2017 jo. Credit agreement deed No. 57 dated 14 November 2017 made before Sunarto, SH., notary public in Surakarta city.

</td></tr>
</table>

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

PT Bank HSBC Indonesia ("**HSBC Indonesia**")

13) Facility of HSBC Indonesia to DDST consist of US$23.000.000 facility granted pursuant to the agreement made between DDST and PT Bank HSBC Indonesia under Facility Agreement No.JAK/000241/U/170713 dated 14 August 2017 .

PT Bank Mandiri (Persero) Tbk ("**Mandiri**")

14) Facilities of Mandiri to DDT consist of

   a) Rp250.000.000.000 fixed working capital facility granted pursuant to the agreement made between DDT and PT Bank Mandiri (Persero) Tbk under Perjanjian Kredit Modal Kerja-Fixed Loan deed No.37 dated 10 May 2012 juncto. addendum dated 8 May 2018 juncto. addendum dated 9 May 2019.

   b) Rp250.000.000.000 revolving working capital facility granted pursuant to the agreement made between DDT and PT Bank Mandiri (Persero) Tbk under Perjanjian Kredit Modal Kerja-Revolving deed No.36 dated 10 May 2012 juncto. 7th addendum dated 8 May 2018 juncto. 8th addendum dated 9 May 2019.

   c) US$20.000.000 non-cash loan facility granted pursuant to the agreement made between DDT and PT Bank Mandiri (Persero) Tbk under Non Cash Loan facility deed No.38 dated 10 May 2012 juncto. 8th addendum dated 8 May 2018 juncto. 9th addendum dated 9 May 2019.

15) Facilities of Mandiri to Damaitex consist of

   a) Rp10.000.000.000 working capital facility granted pursuant to the agreement made between Damaitex and PT Bank Mandiri (Persero) Tbk under deed no 92 dated 11 September 2002 with regards to working capital agreement no 136/010/PK-KMK/CO/2002 which was last amended by 21st amendment dated 30 August 2019 .

   b) Rp90.000.000.000 working capital facility granted pursuant to the agreement made between Damaitex and PT Bank Mandiri (Persero) Tbk under agreement no RCO/SMG/172/PK-MK/2010 dated 22 July 2010 which was last amended by 11th amendment dated 30 August 2019.

16) Facilities of Mandiri to DMST consist of

   a) Rp350,000,000,000 investment loan facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under agreement deed no 53 dated 23 December 2013 made before Pujiastuti Pangestu SH notary public in Karanganyar and its subsequent amendments and/or restatements.

   b) Rp500,000,000,000 working capital facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under agreement deed no 13 dated 17 November 2014 made before Pujiastuti Pangestu SH notary public in Karanganyar and its subsequent amendments and/or restatements.

   c) Rp1,170,000,000,000 investment loan facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under agreement deed no 55 dated 16 September 2015 made before Pujiastuti Pangestu SH notary public in

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

Karanganyar and its subsequent amendments and/or restatements.

d) A US$20,000,000 non-cash loan facility granted pursuant to the agreement made between DMST and PT Bank Mandiri Persero (Tbk) under agreement deed no 23 dated 6 May 2015 made before Pujiastuti Pangestu SH notary public in Karanganyar and its subsequent amendments and/or restatements.

PT Bank Maspion Indonesia Tbk ("**Maspion**")

17) Facility of Maspion to DSSA consist of Rp50.000.000.000 annuity instalment fixed loan granted pursuant to the agreement made between DSSA and PT Bank Maspion Indonesia Tbk under credit facility deed no 03 dated 9 November 2018.

PT Bank Maybank Indonesia Tbk ("**Maybank Indonesia**")

18) Facility of Maybank Indonesia to DDST consist of Trade financing facility granted pursuant to the agreement made between DDST and PT Bank Maybank Indonesia Tbk under credit agreement deed No.99 dated 27 November 2012 made before Ina Megahwati, SH., notary public in Surakarta jo. Amendment dated 12 December 2017 jo. Credit restatement letter No.S.2018.220/DIR Global Banking – LC & MNC dated 22 November 2018.

PT Bank Muamalat Indonesia Tbk ("**Muamalat**")

19) Facility of Muamalat to DMDT consist of Rp125.000.000.000 checking account financing facility granted pursuant to the agreement made between DMDT and PT Bank Muamalat Indonesia Tbk under Musyarakah financing deed No.61 dated 19 December 2014 jo. Line Facility Al Murabahah deed No.62 dated 19 December 2014 jo. Line Facility Al Murabahah Revolving addendum deed No.53 dated 17 March 2016 jo. Line Facility Al Murabahah Revolving addendum deed No.103 dated 29 March 2017 jo. Facility extension offer letter No.09/BMI-CBWEST/OL/IV/2019 dated 29 April 2019.

PT Bank Multiarta Sentosa ("**Multiarta Sentosa**")

20) Facilities of Multiarta Sentosa to DSSA consist of

a) Credit facilities provided in pursuant to the agreement made between DSSA and Multiarta Sentosa based on Credit Agreement No.4 dated 9 July 2018 made before the Notary Soes Asmara Argawati, SH which has been amended by Amendment to Credit Agreement (Restruktur) No.004/PDA1/SLO/072019 dated 25 July 2019.

b) Credit facilities provided pursuant to the agreement made between DSSA and Multiarta Sentosa based on Credit Agreement No.15 dated November 28, 2018 made before the Notary Asih Sari Dewanti, SH which has been amended by Amendment Agreement (Restruktur) No.005/ PDA2&3/SLO/072019 dated July 25, 2019.

PT Bank Nationalnobu Tbk ("**Nobu**")

21) Facility of Nobu to DDST consist of Rp20.000.000.000 checking account facility and Rp.71.000.000.000 fixed loan instalment facility granted pursuant to the agreement made between DDST and PT Bank

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  | Nationalnobu Tbk under credit agreement deed No.22 dated 22 April 2019 made before Agustine Esther, SH., notary public in Surakarta. |
| --- | --- |
|  | **PT Bank Negara Indonesia (Persero) Tbk ("BNI")** |
|  | 22) Facility of BNI to DDST consist of Rp167.500.000.000 working capital financing facility granted pursuant to the agreement made between DDST and PT Bank Negara Indonesia (Persero) Tbk under credit agreement no 2014.033 dated 15 October 2014 which was last amended by the 7th amendment dated 27 September 2019. |
|  | **PT Bank Permata Tbk ("Permata")** |
|  | 23) Facilities of Permata to DMST consist of |
|  | a)  US$10.000.000 omnibus revolving loan facility granted pursuant to the agreement made between DMST and PT Bank Permata Tbk under credit agreement deed no 34 dated 31 October 2014 made before Elly Halida, SH, MKn notary public in Jakarta which was last amended in the amendment deed no 10 dated 28 January 2019 made before Erfan Yuniarto SH, MKn, notary public in Jakarta. |
|  | b)  US$20.000.000 revolving loan facility granted pursuant to the agreement made between DMST and PT Bank Permata Tbk under credit agreement No. 124 dated 27 December 2011 made before Ina Megahwati, SH, MKn notary public in Surakarta and its subsequent amendments. |
|  | **PT Bank QNB Indonesia Tbk ("QNB Indonesia")** |
|  | 24) Facility of QNB Indonesia to DDST consist of US$10.000.000 demand loan facility granted pursuant to the agreement made between DDST and PT Bank QNB Indonesia Tbk under credit agreement deed No.16 dated 16 January 2015 and its subsequent amendments. |
|  | **PT Bank Rakyat Indonesia (Persero) Tbk ("BRI")** |
|  | 25) Facilities of BRI to DDT consist of |
|  | a)  US$70.000.000 foreign exchange line facility granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under credit agreement deed no 109 dated 20 June 2016 and its subsequent amendments. |
|  | b)  Rp23.796.000.000 investment credit facility in the form of pseudo checking account referred to as Tranche B Investment Credit granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero)Tbk under credit agreement deed no 107 dated 20 June 2016. |
|  | c)  Rp727.520.000.000 working capital facility granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under credit agreement deed no 104 dated 20 June 2016 and its subsequent amendments. |
|  | d)  US$30.000.000 working capital import facility and US$30.000.000 import guarantee deferment facility granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under credit agreement deed no 105 dated 20 June 2015 and its subsequent amendments. |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

e) Rp40.000.000.000 Trade Line credit facility granted pursuant to the agreement made between DDT and PT Bank Rakyat Indonesia (Persero) Tbk under credit agreement deed no 108 dated 20 June 2016 and its subsequent amendments.

26) Facility of BRI to DSSA consist of

a) Rp700.000.000.000 investment loan facility granted pursuant to the agreement made between DSSA and PT Bank Rakyat Indonesia (Persero) Tbk under credit agreement deed no. 08 dated 21 January 2019 made before Fessy Farizqoh Alwi, SH., M.Kn., notary public in Jakarta Selatan.

PT Bank Shinhan Indonesia ("**Shinhan Indonesia**")

27) Facility of Shinhan Indonesia to DSSA consist of Rp50.000.000.000 corporate loan 1 (working capital) and Rp100.000.000.000 corporate loan 2 (working capital) facilities granted pursuant to the agreement made between DSSA and PT Bank Shinhan Indonesia under credit agreement deed no 34 dated 16 April 2018.

28) Facilities of Shinhan Indonesia to DDT consist of

a) Rp100.000.000.000 checking account loan facility granted pursuant to the agreement made between DDT and PT Bank Shinhan Indonesia under facility agreement deed no 51 dated 18 April 2017 and its subsequent amendments.

b) Rp200.000.000.000 corporate loan facility (working capital) granted pursuant to the agreement made between DDT and PT Bank Shinhan Indonesia under facility agreement deed no 48 dated 28 September 2017.

PT Bank Syariah Mandiri ("**Mandiri Syariah**")

29) Facility of Mandiri Syariah to DDST consist of Rp250.000.000.000 wakalah bin ujroh LC/SKBDN facility and Rp250.000.000.000 revolving murabahah facility granted pursuant to the agreement made between DDST and PT Bank Syariah Mandiri under deed of Akad Line Facility – Wa'Ad (Al Murabahah, Al Musyarakah, Al-Kafalah dan Wakalah) Switchable No.38 dated 29 September 2014 made before Ny. Agustina Junaedi, SH., notary public in Jakarta.

30) Facility of Mandiri Syariah to DSSA consist of

a) Line Facility Commitment granted pursuant to the agreement made between DSSA and PT Bank Syariah Mandiri under deed No. 22 dated 21 November 2012 made before Efran Yuniarto, SH., MKn, notary public in Jakarta and its subsequent amendments.

b) Line Facility Commitment granted pursuant to the agreement made between DSSA and PT Bank Syariah Mandiri under deed No. 08 dated 17 May 2013 made before Efran Yuniarto, SH., MKn, notary public in Jakarta and its subsequent amendments.

c) Line Facility Commitment granted pursuant to the agreement made between DSSA and PT Bank Syariah Mandiri under deed No. 06 dated 28 June 2018 made before Hendra Wismal, SH., MKn, notary public in Jakarta and its subsequent amendments.

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

Lembaga Pembiayaan Ekspor Indonesia ("**LPEI**")

31) Facility of LPEI to DMST consist of (a)Rp530.000.000.000 export financing facility, and (b) 800.000.000.000 and US$15.000.000 export financing facility granted pursuant to the agreement made between DMST and Lembaga Pembiayaan Ekspor Indonesia under facility agreement deeds No. 39 dated 28 March 2018 and No.44 dated 26 May 2010, respectively and its subsequent amendments.

32) Facility of BNI to DDT consist of (a) Rp699.200.000.000 export financing facility and (b) US$ 28,333,328 export financing facility granted pursuant to the agreement made between DDT and Lembaga Pembiayaan Ekspor Indonesia under facility agreement deeds no 15 dated 23 March 2017 and 16 dated 23 March 2017, respectively, and its subsequent amendments .

Standard Chartered Bank, Jakarta Branch ("**SCB Indonesia**")

33) Facility of SCB Indonesia to DMST consist of US Dollar denominated trade facility granted pursuant to the agreement made between DMST and Standard Chartered Bank, Jakarta Branch under the facility letter dated 18 May 2007 no JKT/ATG/2102 and its subsequent amendments.

34) Facility of SCB Indonesia to DDT consist of US Dollar denominated trade facility granted pursuant to the agreement made between DDT and Standard Chartered Bank, Jakarta Branch under the facility letter no. JKT/EDF/5076 dated 18 May 2018 which was later amended and restated with facility letter no. JKT/EDF/5331 dated 12 April 2019.

PT Bank Mega Tbk ("**Mega**")

35) Facility of Mega to DDT consist of Rp50,000,000,000 fixed loan and Rp170,000,000,000 fixed loan facilities granted pursuant to the agreement made between DDT and PT Bank Mega Tbk under credit restructuring approval letter no. 070/CMBS/SPPK/19 dated 31 July 2019 jo. Credit agreement deed no 22 dated 17 November 2014 and foreign exchange transaction facility agreement no SPJ 026.MKTS-MKT/16 and their subsequent amendments.

PT Bank Mega Syariah ("**Mega Syariah**")

36) Facility of Mega Syariah to DSSA consist of Rp25,000,000,000 restructured checking account, Rp25,000,000,000 restructured line facility, Rp26,139,323,032 restructured investment financing, and Rp48,144,904,954 restructured line facilities granted under the facility approval letter from PT Bank Mega Syariah to DSSA no SPRP.180/CBC.Solo/VII/19 dated 19 July 2019 and no.074/CBC.Solo/III/19 28 March 2019.

**Syndicated Creditors**

1) Facility of Syndicated Creditors to DMDT consist of the US$160,000,000 senior secured facility granted pursuant to the facility agreement dated 21 June 2018 and made between DMDT as borrower, Sumitro as personal guarantor, BNP Paribas, ING Bank N.V., Singapore Branch, Maybank Kim Eng Securities Pte. Ltd. and Standard Chartered Bank as arrangers, Standard Chartered Bank (Hong Kong) Limited as agent, PT Bank Central Asia as security agent, and the original lenders, including claims of BNP Paribas acting

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | through its Singapore Branch and Standard Chartered Bank (Hong Kong) Limited as the agent of this facility. |
|  | 2) US$135,000,000 syndicated facilities granted pursuant to the facilities agreement dated 15 November 2017 made between DDT as borrower, BNP Paribas, Maybank Kim Eng Securities Pte. Ltd., Qatar National Bank (Q.P.S.C.), Singapore Branch and Standard Chartered Bank as arrangers, Standard Chartered Bank (Hong Kong) Limited as agent, PT Bank QNB Indonesia Tbk as security agent and common security agent, and the original lenders which was subsequently amended as of 31 January 2018, including claims of BNP Paribas acting through its Singapore Branch and Standard Chartered Bank (Hong Kong) Limited as the agent of this facility. |
|  | 3) Facility of Syndicated Creditors to DDST consist of US$260,000,000 syndicated facilities granted pursuant to the facilities agreement dated 29 September 2016 made between DDST as borrower, BNP Paribas, PT HSBC Securities Indonesia and The Hongkong Shanghai Banking Corporation Limited as mandated lead arrangers and bookrunners, PT Bank Negara Indonesia (Persero) Tbk as agent and security agent, and the original lenders |
|  | (Hereinafter the Syndicated Creditors under the facility agreements listed in paragraphs 1 to 3 above are referred to as "**LWG Syndicated Creditors**") |
|  | 4) Facility of Syndicated Creditors to DMST consist of US$50,000,000 syndicated term facility granted pursuant to the agreement made between DMST, PT Bank Permata Tbk, PT Bank ICBC Indonesia under the facility agreement dated 31 October 2014. |
|  | **Senior Noteholders** |
|  | 1) Facility of Senior Noteholders to DMDT consist of US$300,000,000 8.625% senior notes due 2024 issued by DMDT. |
|  | (together the "**Existing Facilities**" and each an "**Existing Facility**"). |
| **Security Rights** | 1) DMDT 2 Assets and DMDT 3 Assets which on the PKPU Decision Date are secured to Mandiri, will be encumbered to be first rank security securing Mandiri claims against DDT, DMST, and Damaitex under Mandiri's Existing Facilities with such Debtors with security amount in compliance with Mandiri's regulations. For the avoidance of doubt, such encumbrance of DMDT 2 Assets and DMDT 3 Assets are subject to terms and conditions set out in this Composition Plan regarding their use for working capital funding on as set out in paragraph (5) of the Working Capital provisions. |
|  | 2) DMDT 4 Assets which, on the PKPU Decision date are pledged to LPEI, will be encumbered to be first rank security securing LPEI claims against DDT and DMST under LPEI's which are part of the Existing Facilities with such Debtors. |
|  | 3) DMDT 4 Assets, DMDT 5 Assets, and DMDT 6 Assets will be encumbered to become the second rank security for Notes A (as stipulated in the Settlement for Senior Notes in Appendix 5 (Settlement Details). Specifically for DMDT 5 Assets and DMDT 6 Assets, the creation of the second rank security for Notes A is subject to the holders of Notes A providing all documents required by LWG |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| | |
|---|---|
| | Syndicated Creditors to ensure the enforcement of the release of security over DMDT 5 Assets and DMDT 6 Assets following the effective date of the CSPA in accordance with the Composition Plan and its ancillary documents including the CSPA

For the avoidance of doubt:

a) DMDT 4 Assets are charged as a first rank security to LPEI.

b) DMDT 5 Assets and DMDT 6 Assets are and remain secured, as a first ranking security, in favor of the Syndicated Creditors of DMDT under the US$160,000,000 senior secured facility granted pursuant to the facility agreement dated 21 June 2018.

4) Unless otherwise stipulated in this Composition Plan, the existing security interests under various existing Security Documents and security sharing agreements created under and securing the Existing Facilities shall remain in place to secure the obligations of the relevant Debtors relating to the relevant Creditors of the Existing Facilities under the Existing Facilities and this Composition Plan.

5) Debtors are required to pay all taxes and insure (or maintain insurance cover for) collateralised assets which are based on Security Documents of the Existing Facilities and / or this Composition Plan.

6) Each Participating Creditor at its discretion, can request (and the relevant Debtor must comply with) any amendment to the relevant Security Documents to the extent such request is made to ensure such Creditor's security rights under the relevant Existing Facilities and Security Documents are maintained in accordance with and with due observance of the terms of this Composition Plan.

7) Nothing under this Composition Plan waives the obligations of the Debtors under the Existing Facilities and Security Documents to which they are party and the Debtors have the obligation to continue discharging any obligations they have under the Existing Facilities and Security Documents except to the extent amended or expressly superseded by this Composition Plan, with due observance of the terms of this Composition Plan.  For the avoidance of doubt and without limiting the scope of the Debtors' obligations under the Existing Facilities and Security Documents, the Debtors are obligated to provide the necessary information to the relevant Creditors and to update the list of security objects under the Existing Facilities and Security Documents (as applicable).

8) To the extent necessary, the relevant Creditors of the Existing Facilities will provide (or will procure to provide) all approvals and actions (including to effect of the release of security, attachment of security, and/or the granting of security rights subordinated to such relevant creditor) required to ensure the validity of the Creditor's rights under this Composition Plan.

9) The process of preparing and perfecting any new Security Documents required under the terms of this Composition Plan:

a) starts on the Effective Date and must be completed within 3 (three) months from the Effective Date or within any other period as required by the notaries/PPAT approved by the relevant Creditors or on such other date as agreed by the Debtors and |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | the relevant Creditors who are granted the relevant security rights referred to in these Security Rights provisions; |
|  | b) is to be done by assigning notaries/PPAT approved by the relevant Creditors who are granted the relevant security rights based on these Security Rights provisions; and |
|  | c) the Debtors shall ensure that all documents and letters required for the preparation and / or perfection of Security Documents must be available no later than 14 (fourteen) Calendar Days from the date requested by the relevant Participating Secured Creditors and / or by the notaries/PPAT. |
|  | 10) With due consideration to article 281 paragraph 2 of the Bankruptcy Law Dissenting Secured Creditors shall be entitled to compensation payments calculated as follows ("**Compensation Payments**"): |
|  | a) each Dissenting Secured Creditor may appoint a licensed independent valuer (*Kantor Jasa Penilai Publik "KJPP"*) to determine the liquidation value of the assets secured under existing Security Documents which secure the relevant Existing Facilities owed to the relevant Dissenting Secured Creditor (the "**Existing Secured Assets**"); and |
|  | b) each relevant Dissenting Secured Creditor shall be entitled to enforce such existing Security Documents based on the terms under the relevant Security Documents.  Alternatively, the relevant Debtor(s), at their own election, may offer the relevant Dissenting Secured Creditor(s) a one time payment of compensation in the amount equal to the lower of the amount of the outstanding debt owed to them that is secured by Existing Secured Assets and the value of their Existing Secured Assets. The terms of the payment are to be agreed between the relevant Dissenting Secured Creditor and the relevant Debtor(s). |
| **Interest Payment Provisions** | Payment of interest for the amount of Interest Payable is to be paid in cash on the Interest Payment Date to each relevant Creditor, further details of which are provided in Appendix 5 (Settlement Details) and / or other parts of this Composition Plan. To accommodate the uncertainty caused by the COVID-19 outbreak, in the event that any of the Debtors fails to meet any of the monthly interest payments in the first year, the Debtor may elect to defer up to 3 (three) monthly interest payments but not consecutively and 1 (one) quarterly interest payment in the first year after the Homologation Date. The deferred interest shall be repaid through Excess Cash under the Cash Waterfall Mechanism, but in any case and if there is no available Excess Cash, all unpaid and deferred interest shall be fully paid by the end of the third year after the Homologation Date and the relevant Debtor is still required to make payment from other sources of funds. For the avoidance of doubt, no deferral of monthly and quarterly interest payments is allowed after the end of the first year after the Homologation Date.<br><br>(for illustration, if the Homologation Date falls on 26 June 2020, a Debtor may defer the payment of monthly interest for August, October, and December 2020 until 24 June 2023. However as 24 June 2023 is a Saturday and 25 June 2023 is a Sunday, then the payment of the deferred interest shall be made by 23 June 2023.  Regardless of whether |

20 June 2020 Version                                                    Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | there is any Excess Cash or any other reason, such deferred interest must be paid no later than by 23 June 2023.)<br><br>With due consideration to this Interest Payment Provisions the following provisions govern interest payments:<br><br>1) The monthly interest payment dates are determined on a Point to Point basis until and including the relevant debt Maturity Date or such date where all the relevant debt is unconditionally and irrevocably repaid in full ("**Monthly Interest Payment Date**"). However, if a Monthly Interest Payment Date falls on a day other than a Business Day, then the Monthly Interest Payment Date is advanced to the preceding Business Day.<br><br>2) The quarterly interest payment dates are determined on a Point to Point basis until and including the relevant debt Maturity Date or such date where the relevant debt is unconditionally and irrevocably repaid in full ("**Quarterly Interest Payment Date**"). However, if a Quarterly Interest Payment Date falls on a day other than a Business Day, then the Quarterly Interest Payment Date is advanced to the preceding Business Day.<br><br>(Any Monthly Interest Payment Dates and Quarterly Interest Payment Dates are called "**Interest Payment Dates**")<br><br>3) Interest Period is a period that starts on (and includes) the Effective Date (if it is the first Interest Period) or, if applicable, an Interest Payment Date and ends on (and does not include) the next Interest Payment Date or relevant Maturity Date or such date where all the relevant debt is unconditionally and irrevocably repaid in full (if it is the last Interest Period).<br><br>4) Interest that must be paid on an Interest Payment Date ("**Interest Payable**") is calculated by applying the interest rate applicable to the said interest period for the relevant principal outstanding as detailed in Appendix 5 (Settlement Details), multiplied by the number of days on the Interest Period divided by 360. |
| **Margin/Profit Sharing Payment Provisions**<br><br>(Applicable for sharia financing) | Payment of margin or profit sharing for the amount of Margin/Profit Sharing Payable is to be paid in cash on the Margin/Profit Sharing Payment Date to each relevant Creditor, further details of which are provided in Appendix 5 (Settlement Details) and / or other parts of this Composition Plan. To accommodate the uncertainty caused by the COVID-19 outbreak, in the event that any of the Debtors fails to meet any of the monthly margin / profit sharing payments in the first year, the Debtor may elect to defer up to 3 (three) monthly margin / profit sharing payments but not consecutively and 1 (one) quarterly margin / profit sharing payment in the first year after the Homologation Date. The deferred margin / profit sharing shall be repaid through Excess Cash under the Cash Waterfall Mechanism, but in any case and if there is no available Excess Cash, all unpaid and deferred margin / profit sharing shall be fully paid by the end of the third year after the Homologation Date and the relevant Debtor is still required to make payment from other sources of funds. For the avoidance of doubt, no deferral of monthly and |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | quarterly margin / profit sharing payments is allowed after the end of the first year after the Homologation Date. |
|  | (for illustration, if the Homologation Date falls on 26 June 2020, a Debtor may defer the payment of monthly margin / profit sharing for August, October, and December 2020 until 24 June 2023. However as 24 June 2023 is a Saturday and 25 June 2023 is a Sunday, then the payment of the deferred margin / profit sharing shall be made by 23 June 2023. Regardless of whether there is any Excess Cash or any other reason, such deferred margin / profit sharing must be paid no later than by 23 June 2023.) |
|  | With due consideration to this Margin/Profit Sharing Payment Provisions, the following provisions govern margin payments: |
|  | 1) The monthly margin / profit sharing payment dates are determined on a Point to Point basis until and including the relevant debt Maturity Date or such date where all the relevant debt is unconditionally and irrevocably repaid in full  ("**Monthly Margin / Profit Sharing Payment Date**"). However, if a Monthly Margin / Profit Sharing Payment Date falls on a day other than a Business Day, then the Monthly Margin / Profit Sharing Payment Date is advanced to the preceding Business Day. |
|  | 2) The quarterly margin / profit sharing payment dates are determined on a Point to Point basis until and including the relevant debt Maturity Date or such date where the relevant debt is unconditionally and irrevocably repaid in full ("**Quarterly Margin / Profit Sharing Payment Date**"). However, if a Quarterly Margin / Profit Sharing Payment Date falls on a day other than a Business Day, then the Quarterly Margin / Profit Sharing Payment Date is advanced to the preceding Business Day. |
|  | (Any Monthly Margin / Profit Sharing Payment Dates and Quarterly Margin / Profit Sharing Payment Dates are called "**Margin / Profit Sharing Payment Dates**") |
|  | 3) Margin / Profit Sharing Period is a period that starts on (and includes) the Effective Date (if it is the first Margin / Profit Sharing Period) or, if applicable, an Margin / Profit Sharing Payment Date and ends on (and does not include) the next Margin / Profit Sharing Payment Date or relevant Maturity Date or such date where all the relevant debt is unconditionally and irrevocably repaid in full (if it is the last Margin / Profit Sharing Period). |
|  | 4) Margin / profit sharing that must be paid on an Margin / Profit Sharing Payment Date ("**Margin/Profit Sharing Payable**") is calculated by applying the margin / profit sharing rate applicable to the said margin / profit sharing period for the relevant principal outstanding as detailed Appendix 5 (Settlement Details), multiplied by the number of days on the Margin / Profit Sharing Period divided by 360. |
| **Principal Repayment** | Principal payments for the Principal Payable are to be paid in cash on the Principal Payment Date to the relevant Creditors as set out in detail in Appendix 5 (Settlement Details) and / or other parts of this Composition |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

Plan. In connection with the uncertainty caused by the COVID-19 outbreak, in the event that any of the Debtors fail to meet the principal payment obligations in the first year, that Debtor may elect to defer up to 3 (three) monthly principal payments but not consecutively and one quarterly principal payment in the first year after the Homologation Date. The deferred principal is to be paid through Excess Cash as stipulated in the Cash Waterfall Mechanism, but in any case and if there is no available Excess Cash, the deferred principal shall be unconditionally and irrevocably fully paid by the end of the third year falling after the Homologation Date and the relevant Debtor shall be required to make payments from other sources of funds. For the avoidance of doubt, no deferral of monthly and quarterly principal payments is allowed after the end of the first year falling after the Homologation Date.

(for illustration, if the Homologation Date falls on 26 June 2020, a Debtor may defer the payment of monthly principal for August, October, and December 2020 until 24 June 2023. However as 24 June 2023 is a Saturday and 25 June 2023 is a Sunday, then the payment of the deferred principal shall be made by 23 June 2023. Regardless of whether there is any Excess Cash or any other reason, such deferred principal must be paid no later than by 23 June 2023.)

With due consideration to this Principal Repayment provisions, the following provisions govern principal payments:

1) Monthly principal payment dates are determined on a Point to Point basis up to and including the relevant debt Maturity Date or the date on which the relevant debt is unconditionally and irrevocably repaid in full ("**Monthly Principal Payment Date**"). If there is a Monthly Principal Payment Date that falls on a day other than a Business Day, then the Principal Payment Date is advanced to the preceding Business Day.

2) Quarterly principal payment dates are determined on a Point to Point basis up to and including the relevant debt Maturity Date or the date on which the relevant debt is unconditionally and irrevocably repaid in full ("**Quarterly Principal Payment Date**"). If there is a Quarterly Principal Payment Date which falls on a day other than a Business Day, then the Quarterly Principal Payment Date is advanced to the preceding Business Day.

   (Each Monthly Principal Payment Date and Quarterly Principal Payment Date are "**Principal Payment Dates**").

3) Principal Period is a period that starts on (and includes) the Effective Date (if it is the first Principal Period) or, if applicable, a Principal Payment Date and ends on (and excludes) the next Principal Payment Date or Maturity Date (if it is the last Principal Period).

4) Principal that must be paid on the Principal Payment Date ("**Principal Payable**") is calculated using the Principal Repayment amount of the relevant debt and the relevant year as detailed in Appendix 5 (Settlement Details), divided by 12 multiplied by the number of calendar months in the Principal Period.

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| | |
|---|---|
| **Debt Settlement Via Non-Operating Asset** | 1) Settlement through Debt Settlement Via Non-Operating Asset applies to debts secured against Non-Operating Assets.<br><br>2) Debt Settlement Via Non-Operating Asset are made, based on the relevant Creditor's discretion through:<br><br>a) Orderly sale of non-operating assets ("**Sale of Non-Operating Assets**"); or<br><br>b) the transfer of Non-Operating Assets through AYDA.<br><br>3) Relevant Creditors can proceed with Debt Settlement Via Non-Operating Asset from the Effective Date.<br><br>4) Each relevant Creditor will be given the authority to manage the sales process and sales decisions for its respective security including:<br><br>a) The selection and appointment of a public appraisal service office ("**KJPP**"), and a notary/PPAT;<br><br>b) Determination of the composition of Non-Operating Assets that will be subjected to the Sale of Non- Operating Assets and Non-Operating Assets that will be subjected to AYDA;<br><br>c) The timing of the Sale of Non-Operating Assets and AYDA including changing the decision to conduct Sale of Non-Operating Assets (in the event that the sale is difficult to do) into AYDA;<br><br>d) The selection and appointment of sales agents;<br><br>e) Determination of sales prices and fees of third parties' assisting the sale process; and<br><br>f) Sales and transfer of ownership (this will be supported by a power of attorney to sell).<br><br>5) Transaction costs for Debt Settlement Via Non-Operating Asset (if any), given the cash and working capital constraints of the Group, will be deducted from the proceeds of sale, including:<br><br>a) Seller property tax (2.5%) from land and buildings;<br><br>b) Independent appraisal fee / KJPP;<br><br>c) Sales agent fees;<br><br>d) Notary/PPAT fees; and<br><br>e) Other reasonable costs related to the sale of Non-Operating Assets and AYDA.<br><br>6) The Debtors undertake that at any time they will  fulfill all the requirements needed for the implementation of the sale of Non-Operating Assets and / or AYDA including but not limited to (a) providing power of attorney to sell and other supporting documents, (b) providing access to documents and locations for KJPP to conduct |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | an assessment, and (c) requesting documents and / or approvals from the relevant agencies as may be needed, provided that:<br><br>a)  The relevant Debtor is required to fulfill all of these requirements within 30 (thirty) Calendar Days from the moment the request letter from the relevant Creditor is received.<br><br>b)  In the event that the fulfillment depends on the receipt of documents and / or approval from the relevant agencies, the fulfillment of the required requirements is completed within 30 (thirty) Calendar Days from the date the documents and / or approvals from the relevant agencies are received.<br><br>c)  If the required documents submitted by the relevant Debtor in relation to Debt Settlement Via Non-Operating Asset are rejected by the land office or the competent authority, the relevant Debtor is required to provide other required documents as requested by the relevant Creditor, including by way of execution of other documents required for Debt Settlement Via Non-Operating Asset purposes and/or AYDA.<br><br>7)  At the first request of the relevant Participating Creditor, the relevant Debtor undertakes (and as may be required, guarantees that the parties holding the title to the Non-Operational Assets are willing) to at any time vacate the Non-Operational Assets subjected to the sale of the Non-Operational Assets or AYDA, and the relevant Debtor shall bear all costs associated with the vacating.<br><br>8)  No Debtor shall rent out or extend the tenor of any rent of Non-Operational Assets without the prior written approval from the relevant Participating Creditor(s).<br><br>9)  The Debtors guarantee that the party holding title rights to the Non-Operating Assets is willing to fulfill the requirements at any (reasonable) time for the Sale of Non-Operational Asset and / or AYDA including but not limited to being present at the Notary Office / PPAT.<br><br>10) Provisions for debt settlement through Debt Settlement Via Non-Operating Asset of each Creditors must be read together with Appendix 5 (Settlement Details) relating to each of the Creditors. |
| **Novation Provisions** | The settlement of Existing Facilities by way of transfer of debt settlement obligation ("**Novation**") as detailed in Appendix 5 (Settlement Details) shall be subject to and carried out in accordance with the following provisions:<br><br>1)  The effectiveness of the Novation agreement, release of security and encumbrance of security after the signing of the Novation (either for asset security or guarantee) must be completed within a period of 6 (six) months from the Effective Date, or within such other period as agreed by the Debtors and the relevant Participating Creditors.<br><br>2)  Each Debtor undertakes, guarantees, and ensures the furnishing of irrevocable powers of attorney to re-register the security to be |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| | |
|---|---|
| | encumbered after the Novation, being either a security granted by the Debtor or from the guarantor or other third party on the execution date of the Novation. |
| | 3) Each Debtor undertakes, guarantees, and ensures: (a) the signing of the Novation deed and its effective execution are in accordance with the Articles of Association of the Debtor, and (b) the availability of the required documents. |
| | 4) Prior to the effectiveness of the Novation, the relevant Debtor must continue to carry out its obligations to the relevant Creditor in accordance with the payment schedule stipulated in the Composition Plan. |
| | 5) Failure to complete the obligations stated in paragraphs 1, 2, 3 and 4 above shall constitute an event of default and shall be treated in accordance with the provisions of the Default under the Composition Plan. |
| | 6) If the effectiveness of the Novation is prevented for any reason, including due to objection from any third parties the relevant Debtor must continue to carry out its obligations to the relevant Creditor in accordance with the payment schedule stipulated in the Composition Plan. |
| | 7) The Participating Creditor relevant to the Novation, acting on the request of the relevant Debtor to the Novation may but is not obligated to amend and/or waive the terms set out under this Novation Provisions. |
| | 8) Any costs incurred in the preparation and the perfection of the documentation to render this novation effective are borne by the relevant Debtor. |
| **Turn Around Consultant** | The Group shall engage a global consulting firm to be tasked substantially with the review of and/or preparation of turn around and operational plans, including the planning for capital expenditure and estimated working capital needs for the Group ("**Turn Around Consultant**"). |
| | The Turn Around Consultant with the appropriate experience, shall be selected from the list below (the "**Agreed List**") and shall be appointed within 90 (ninety) Days of the Effective Date. |
| | The Agreed List of global consultants is as follows: |
| | 1) Partners in Performance; |
| | 2) Strategy&; |
| | 3) McKinsey & Company; and |
| | 4) AT Kearney |
| | The selection of any Turn Around Consultant outside of the Agreed List requires the approval of the Independent Director. |

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | The operational and turn around review is to form the basis of a business plan to be developed by the Board of Directors, including the Independent Director. |
| **Working Capital** | 1) The CFO shall provide an annual budget for the Group to the Independent Director no later than the date falling 15 (fifteen) Days prior to the end of each financial year (each, an "**Annual Budget**"). Each Annual Budget shall be approved by the CFO and Independent Director. Each Annual Budget shall include a calculation for working capital requirements of each company in the Group based on the following metrics (unless amended as agreed by the CFO and Independent Director):<br><br>a) Cash; plus<br><br>b) Inventory at a minimum of 45 days of sales; plus<br><br>c) Accounts Receivable at a minimum of 30 days of sales; less<br><br>d) Accounts Payable at a maximum of 60 days of sales; plus<br><br>e) Any Approved Capital Expenditure or Operating Expenditure approved by the Independent Director, with consideration of the detailed business review and turnaround plan.<br><br>("**Working Capital Requirement**").<br><br>2) The CFO together with the Independent Director shall assess if there are sufficient funds to meet the Working Capital Requirement of each company in the Group quarterly, based on the Monitoring Accountant's assessment of the items in paragraphs 1(a) to (e) above. Based on this, if and when required, the CFO and Independent Director will jointly manage the process of raising working capital ("**Working Capital Funding**") in accordance with the terms below.<br><br>3) Working Capital Funding may be raised as follows:<br><br>a) the sale of the Sponsor Personal Assets;<br><br>b) external financing obtained by the Sponsor which may be secured by Sponsor Personal Assets and Sponsor Duniatex Assets;<br><br>c) the sale of unencumbered Sponsor Duniatex Assets;<br><br>d) financing obtained by the Debtors with such financing secured by unencumbered assets of the Debtors, including the Sponsor Personal Assets and Sponsor Duniatex Assets (each a "**New Working Capital Facility**"); or<br><br>e) the sale of any other unencumbered assets of the Debtors.<br><br>Any Working Capital Funding must be approved by the CFO and the Independent Director. |

20 June 2020 Version

Unofficial Translation of Composition Plan

Private and Confidential

In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

4) The Sponsor Personal Assets are defined at Appendix 2 (Sponsor Personal Assets).

5) The Sponsor Duniatex Assets are defined as DMDT 2 Assets, DMDT3 Assets, and DMDT 7 Assets the titles of which are under the name of the Sponsor.

6) The Sponsor Duniatex Assets and the Sponsor Personal Assets are together the "**Sponsor Assets**".

7) The Sponsor irrevocably and unconditionally undertakes to provide the Sponsor Personal Assets and Sponsor Duniatex Assets for use to raise new working capital for the Debtors at such times and in accordance with the process set out below and undertakes to provide the Independent Director with a Power of Attorney in respect of the Sponsor Personal Assets and Sponsor Duniatex Assets, within 30 Days of the appointment of the Independent Director to enable the Independent Director to take such actions as required to be taken by the Composition Plan including the sales of Sponsor Personal Assets and Sponsor Duniatex Assets.

8) Subject to Working Capital Funding requirements as determined in accordance with this Composition Plan, the Sponsor irrevocably and unconditionally undertakes to assist and support the CFO and Independent Director in raising up to US$100,000,000 (one hundred million United States Dollars) of Working Capital Funding for the Group by:

   a) firstly, making all reasonable attempts to sell Sponsor Personal Assets; and

   b) secondly, in the event the sales of Sponsor Personal Assets do not raise up to US$$100,000,000 (one hundred million United States Dollars), raise the remaining part of US$$100,000,000 (one hundred million United States Dollars) through raising external financing which may be secured against Sponsor Duniatex Assets at such times as required and in accordance with the process set out below ("**Financed Sponsor Working Capital**").  The Sponsor agrees to pay any financing costs incurred in connection with the Financed Sponsor Working Capital.

9) If the obligation in paragraph 8(b) above is not met by the Sponsor, this in itself shall not constitute a Default, provided that the Debtors have not defaulted on and continue to meet their payments of scheduled interest, margins / profit sharing, and principal to their Participating Creditors (i.e. payments made in the Interest Payment Terms, Margin/Profit Sharing Payment Conditions and Principal Payment Provisions) in accordance with the terms of this Composition Plan.

10) In the event that more Working Capital Funding is required than that raised under paragraph 8, this may, subject to approval by the Independent Director, be raised through financing secured by

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  | unencumbered Sponsor Duniatex Assets, with financing costs paid for by the respective Debtors receiving such Working Capital Funding. |

11) The Sponsor represents, warrants and undertakes that the details of the Sponsor Assets are accurate, true and correct and that each Sponsor Assets is, and shall remain, unencumbered (other than from security created in favour of the Participating Secured Creditors or otherwise permitted under the terms of this Composition Plan) until all amounts owing from the Debtors to the Participating Secured Creditors under the Existing Facilities have been unconditionally and irrevocably fully repaid and discharged.

12) Any New Working Capital Facility must be approved by the CFO and the Independent Director.

13) The raising of Working Capital Funding by either the sale of or financing secured by DMDT 2 Assets, DMDT 3 Assets, assets titled to Damaitex and/or any other assets secured against Existing Facilities of Mandiri to Damaitex may only occur provided that the Existing Facility of Mandiri to Damaitex has been fully settled in accordance with Mandiri's policies and, the CFO and the Independent Director have determined that, all reasonable attempts to raise Working Capital Funding have already been taken against: (i) Sponsor Personal Assets; (ii) DMDT 7 Assets; and (iii) any other unencumbered assets of the Debtors (if any). Provided these conditions are met, the Participating Secured Creditors with security over the relevant assets shall release their security to enable such asset to be used to secured Working Capital Funding, at such time and in such manner reasonably satisfactory to the relevant Participating Secured Creditors. .

14) The Sponsor shall open a Working Capital Account with an Account Bank of the relevant Debtor no later than 3 (three) months from the Effective Date and such account shall be controlled by the Independent Director. The Independent Director shall manage the Working Capital Account including the disbursement of funds in accordance with the terms and conditions of this Composition Plan. The Sponsor subject to the recommendations of the CFO and the Independent Director, shall deposit all proceeds from the sale of Sponsor Personal Assets, sale of Sponsor Duniatex Assets, Financed Sponsor Working Capital, and any other Working Capital Funding raised into such account. The Sponsor agrees that its Working Capital Account shall be secured in favour of the Participating Secured Creditors and the Sponsor shall enter into Security Documents in form and substance satisfactory to the Participating Secured Creditors, to create and perfect security over the Working Capital Account.

15) The Sponsor shall, and shall procure that any relevant title holder shall, enter into Security Documents in form and substance satisfactory to the Participating Secured Creditors, to create and perfect security over the Sponsor Personal Assets in favour of the Participating Secured Creditors. If financing is obtained and secured by the Sponsor Personal Assets, the Participating Secured Creditors with security over the relevant Sponsor Personal Asset shall release

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

their security to enable such Sponsor Personal Asset to be secured in favour of the relevant creditor providing such Working Capital Funding, at such time and in such manner reasonably satisfactory to the relevant Participating Secured Creditors.

16) The CFO and the Independent Director shall jointly make recommendations on the sale and/or encumbrances of Sponsor Personal Assets, Sponsor Duniatex Assets, and/or unencumbered assets of Debtors to fund working capital requirements of the Debtors, with the following conditions:

    a) Proceeds from the sale of any Sponsor Personal Assets, Sponsor Duniatex Assets, and/or unencumbered assets of the Debtors will constitute Working Capital Funding, shall be distributed in accordance with this Composition Plan. Proceeds from the sale of any Sponsor Personal Assets and Sponsor Duniatex Assets shall be recorded as paid-up capital in the accounting records of the relevant Debtor.

    b) The sale process shall be based on the following guidelines

        i) The process must be transparent and available to all Participating Secured Creditors when there is a request for information by the creditor in question.

        ii) Sales prices must be supported by valuations obtained from licensed KJPP.

        iii) Sales must be made on an independent basis, either by a sales agent or an independent auction house.

        iv) The Sponsor shall and shall procure that the title holders of Sponsor Personal Assets and/or Sponsor Duniatex Assets shall cooperate and facilitate the sale process (including by taking such action and providing such documentation as may be required).

    c) The Independent Director shall oversee and the MA shall report on the process on a quarterly basis to the Participating Secured Creditors.

17) If any of the Sponsor Assets is recommended by the CFO and the Independent Director to be sold in accordance with the terms of this Composition Plan, the security over the relevant asset shall be released at such time and in such manner satisfactory to the Participating Secured Creditors and the Sponsor shall (and shall procure that the relevant title holders of such Sponsor Assets shall) take all steps and enter into such documentation as reasonably required by the Participating Secured Creditors in order for any proceeds of sale to be applied in accordance with the process set out in this Composition Plan.

18) If Working Capital Funding is required to be raised through a New Working Capital Facility:

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

a)  the Debtors shall not enter into such New Working Capital Facility without first offering the same terms to the Participating Creditors for consideration for a period of 30 Calendar Days. If an offer to provide such New Working Capital Facilities is made by the Participating Creditors during such 30 Day period, the Debtors must enter into New Working Capital Facility with such Participating Creditor. If no offer to provide such New Working Capital Facility is made by the Participating Creditors during such 30 Day period, the Debtors may proceed with any party(ies) that may provide the Debtors such working capital facilities (each a "**New Working Capital Creditor**");

b)  the Debtors shall not pledge any collateral (including any inventory or receivables) to secure any New Working Capital Facility or any other financings in preference to or if such action would prejudice any existing Creditor in any way (unless the prior written consent of the affected Creditor is received), although, notwithstanding the above, the Debtors shall be permitted to grant security over: (i) receivables and inventories (to the extent these are not secured in favour of any Participating Secured Creditors and provided that in doing so the obligations of the Debtors and rights of any Participating Creditors under any existing Security Documents or finance documents are not prejudiced in any way); (ii) DMDT 7 Assets; and/or; (iii) DMDT 2 Assets, DMDT 3 Assets, assets titled to Damaitex and/or any other assets secured against Existing Facilities of Mandiri to Damaitex providing that the Existing Facility of Mandiri to Damaitex has been fully settled in accordance with Mandiri's policies and, of the CFO and the Independent Director have determined that, all reasonable attempts to raise Working Capital Funding have already been taken against the other assets listed in paragraphs (i) and (ii) above and (iv) and (v) below; and/or (iv) any other unencumbered assets of the Sponsor (if any); and/or (v) any other unencumbered assets of the Debtors (if any).

c)  New Working Capital Creditors shall have priority rights in the Cash Waterfall Mechanism in accordance with the terms of this Composition Plan; and

d)  the principal of any New Working Capital Facility may be repaid with scheduled repayments or instalments subject to the relevant Debtors' funding capability. In the event of insufficient cash and/or lack of repayment capability, the remaining principal payment obligations may be settled in such manner as the relevant Debtor and the relevant New Working Capital Creditor may agree and set out under a separate agreement, provided that the Debtors may only settle payment of any New Working Capital Facility in a manner that does not breach the terms of the Composition Plan or prejudice the interests of any of the Participating Creditors in any way (including under the CAMA).

19) If the CFO and the Independent Director are unable to agree on a decision regulated under this Composition Plan, regarding Working Capital Funding or otherwise, they shall enter into good faith

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | negotiations for 15 (fifteen) Days and use their best efforts to come to an agreement on such terms. If the CFO and the Independent Director are unable to come to an agreement during the relevant 15 (fifteen) Days period (each, an "**Initial Period**"), the decision required will be made by the Monitoring Accountant, who will then have 15 (fifteen) Days from the end of the Initial Period to make such decision.<br><br>20) No Default under the Working Capital provisions of the Composition Plan may be called provided that the Debtors have not defaulted on and continue to meet their payments of scheduled interest, margins/ profit sharing and principal to their Participating Creditors (i.e. payments made in the Interest Payment Terms, Margin/Profit Sharing Payment Conditions and Principal Payment Provisions) in accordance with the terms of this Composition Plan. |
| **Capex Budget** | Each Debtor shall provide its annual maintenance capital expenditure budget, as approved under the annual budgeting process, to the Independent Director, no later than 15 December of the previous year. Any capital expenditure above each annual maintenance capital expenditure budget provided must be approved by the Independent Director before such excess capital expenditure, over and above annual maintenance capital expenditure, is able to be paid in accordance with the terms of the Cash Waterfall Mechanism (the "**Approved Capital Expenditure**").<br><br>For capital expenditures other than annual maintenance capital expenditures, each Debtor shall provide its detailed capital expenditure budget to the Participating Creditors for each of the 7 years falling after the Effective Date, at the start of each of its financial years, which shall be approved by the Independent Director. |
| **Refinancing** | Each Debtor on a best efforts basis, shall refinance its obligations set out under this Composition Plan, subject to market conditions at the time as applicable to the relevant Debtor. |
| **Entry of Investor** | In the event that any Debtor negotiates the transaction of the entry of an investor (either as an equity investor or a new lender) into such Debtor, the closing of the relevant transaction is subject to approval of the Independent Director and the relevant Participating Secured Creditors Approval (Debtor). |
| **Governance and Transparency** | The Group shall implement System Application and Product in Data Processing (SAP) to improve the quality of information and data to support decision making by 30 June 2021 and the Independent Director shall ensure the implementation of SAP.<br><br>SAP modules that will be applied to the Group:<br><br>1) Sales and Distribution Module;<br><br>2) Material Management Module; |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

3)  Production Planning Module; and

4)  Financial and control module.

After SAP implementation is complete throughout the companies of the Group, the Group will be able to manage supply chains, production planning, product costing, inventory management, inter-company transactions and integrated financial reporting.

To support the Group's governance and transparency, the Group is to conduct professionalization of management by making improvements and professionalization of efficient management structure for all of the Group's operational assets, with the Group's organizational structure as follows:



*Figure 1. Proposed Organizational Group Structure.*

Management professionalization will be carried out in line with SAP's implementation to better manage cost structures, production decisions and inventory management.

The Debtor is proposing to hire an experienced Chief Financial Officer ("**CFO**") position among other Key Hire positions.

The MA shall monitor the process of appointing Key Hires and shall provide a short list of candidates with the Group's preferred candidate (if any) to the Independent Director.

The Independent Director may veto at most 2 (two) out the three candidates of Key Hire.

No Key Hire role shall remain vacant for any consecutive period of longer than 6 months at any time after the Effective Date.  The Independent Director, with support of MA, will report to the Lenders on the management hiring process on a quarterly basis.

| | |
|---|---|
| **Change of Board of Directors and Board of Commissioners** | To change the Board of Directors ("**BOD**") or the Board of Commissioners ("**BOC**") of each Debtor, the relevant Debtor shall first request the approval on the candidates in the change of members of the BOD and/or the BOC by way of a notification letter delivered via registered mail to the Participating Creditors. If there is no delivery of written objections from Participating Secured Creditors holding more than 33% of the value of outstanding principal of such Debtor within 30 Days of the date the |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

<table>
<tr>
<td></td>
<td>notice was circulated by the relevant Debtor, then the Debtor is authorized to proceed with the change of the members of BOD and BOC.

Notwithstanding the above, the Independent Director may only be replaced in accordance with the relevant terms as set out in this Composition Plan.

The "change of the BOD and the BOC" shall include appointment, replacement, or extension of tenure.</td>
</tr>
<tr>
<td><strong>Appointment of the Independent Director</strong></td>
<td>An Independent Director shall be appointed within 60 (sixty) Days from the Effective Date in accordance with the following provisions:

1)  The Independent Director is to be an individual with appropriate financial and operational experience in business turn around preferably in the textile industry. The Independent Director has duty of care to all parties of the Composition Plan and should not take any actions that benefits any one party at the expense of another.

2)  Any of and only the Participating Secured Creditors has the right to nominate a candidate for the role of Independent Director and shall provide the name and details of such nomination to the Monitoring Accountant no later than the date falling 30 (thirty) Days from the Effective Date. If fewer than 3 candidates have been nominated, the MA is to contact the Participating Secured Creditors to obtain the necessary additional nominations.

3)  Only 1 (one) individual from any of the advisors (including from any affiliated companies, related parties and individuals of the advisors) involved in the PKPU with cases No. 22/Pdt.Sus-PKPU/2019/PN SMG or No. 25/Pdt.Sus-PKPU/2019/PN.SMG may be nominated for the role of the Independent Director.

4)  The Monitoring Accountant shall circulate all the candidate names, with resumes and other relevant supporting details, which it has received to all the Participating Creditors no later than the date falling 35 (thirty five) Days from the Effective Date.

5)  Each Participating Creditor who wishes to vote shall notify the Monitoring Accountant of their top three preferred candidates no later than the date falling 45 (forty five) Days from the Effective Date. The vote requires a quorum of 50% of the Participating Secured Creditors by value of the outstanding principal of the Participating Secured Creditors during the time such vote is being held. The MA will be responsible for managing the voting process.

6)  The Monitoring Accountant shall notify the Debtors of the three candidates with the highest number of votes by value of the outstanding principal of the Participating Secured Creditors during the time such vote is being held no later than the date falling 50 (fifty) Days from the Effective Date.

7)  The candidate with the most number of votes by value of the outstanding principal of the Participating Secured Creditors during the time such vote is being held shall be appointed as the</td>
</tr>
</table>

33

20 June 2020 Version                                                      Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  | Independent Director, unless vetoed by the Debtors. In such instance the candidate with second most number of votes shall be appointed as the Independent Director, unless vetoed by the Debtors. If the Debtors veto the appointment of such candidate, the candidate with the third highest number of votes shall be appointed as the Independent Director.  The date the Independent Director is appointed, which shall be within 60 (sixty) Days from the Effective Date, shall be the "**Appointment Date**". |
|---|---|
|  | 8)  The Independent Director will continue to be appointed so long as there are outstanding payments or other obligations owing to the Participating Creditors which have not been met or unconditionally and irrevocably paid and discharged in full subject to reasonable period for the replacement or substitution of the Independent Director (as the case may be). |
|  | 9)  The shareholders of each of the Debtors shall immediately and at the latest within 14 (fourteen)  Calendar Days, subject to obtaining necessary approvals from relevant ministries and other authorities of the Government of Indonesia, of the Appointment Date appoint the selected Independent Director: |
|  | a)  to be on the Board of Directors of each of the Debtors; and |
|  | b)  to be the signatory to the accounts set out in the Cash Waterfall Mechanism provisions. |
|  | 10) Each Debtor's articles of association shall be amended no later than 30 (thirty) Days of the Appointment Date to allow the Independent Director to legally act on behalf of and represent each Debtor without the need for approval from the other directors and without any limitation whatsoever. |
|  | 11) Prior to the appointment of the Independent Director, the MA will be responsible to carry out the responsibilities of the Independent Director (without board appointment). |
|  | 12) Remuneration of the Independent Director shall be reasonable and in line with industry standards. |
|  | The MA will monitor this process, manage communication with the Participating Creditors and report on compliance with the above provisions. |
|  | Any replacement or substitution of the Independent Director shall follow the appointment process as stipulated in this Appointment of the Independent Director provisions. |
| **Duties    of    the Independent Director** | The Independent Director shall be appointed as a member of the board of directors of each of the Debtors. The Independent Director together with the Chief Financial Officer, and other members of management of the Debtors with the support of the MA shall be responsible for, with respect of each of the Debtors: |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
| | 1) Financial and cash management: |
| |   a) ensuring compliance of the application of the Cash Waterfall Mechanism as set out in this Composition Plan and entry into and compliance with the CAMA and any other relevant implementing documentation; |
| |   b) assessing working capital needs of the Group, if required, raising working capital loans in accordance with the terms of this Composition Plan; |
| |   c) ensuring the development of cash and working capital controls and procedures; |
| |   d) ensuring the establishment of the monthly bank reconciliation process; |
| |   e) ensuring (but not managing) the implementation of SAP; |
| |   f) ensuring the compliance of independent auditors appointment and overseeing the audit process, including the adjustment to opening balances; and |
| |   g) approving budgets and forecasts. |
| | 2) Inventory management: |
| |   a) ensuring the establishment of controls over purchasing of inventory; |
| |   b) reviewing aged monthly inventory listing; |
| |   c) participating in quarterly stock take; and |
| |   d) approving any provision for stock obsolescence or expiry. |
| | 3) Ensuring MA quarterly reports cover, among others: |
| |   a) covenant testing; |
| |   b) compliance with the Cash Waterfall Mechanism, cash flow and cash balances; |
| |   c) sales performance and profitability; |
| |   d) inventory balance and aging (by location); |
| |   e) receivables balances and aging; |
| |   f) payables balances and aging; |
| |   g) capital expenditure; |
| |   h) appropriateness of Operating Expenditure, including Capital Expenditure for Maintenance; |

20 June 2020 Version                                                    Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  |    i)   any exceptions noted from cash monitoring activities;<br><br>   j)   update on operational performance or developments; and<br><br>   k)   update on any strategic developments.<br><br>4)  Provision of approval for:<br><br>   a)   distributions from the Spinning Proceeds Account and Weaving and Finishing Proceeds Account;<br><br>   b)   any sale or closure of any factories of the Group in accordance with this Composition Plan;<br><br>   c)   any sale of Sponsor Assets and any unsecured assets of the Debtors in accordance with the terms of this Composition Plan;<br><br>   d)   withdrawals from the Working Capital Account;<br><br>   e)   capital expenditure spending; and<br><br>   f)   realisation of assets for capital contribution.<br><br>5)  Supervising and implementing and/or ensuring the implementation of the recommendation of the Turn Around Consultant. |
| **Sponsor's Directorship** | 1)  The Sponsor shall be appointed as a director in each of the Debtors within 30 (thirty)  Calendar Days after the Effective Date during the course of the implementation of the Composition Plan. However, the Sponsor can designate this directorship role from time to time to any member of his immediate family (a "**Designated Person**").<br><br>2)  The Group shall:<br><br>   a)   legally appoint the Sponsor or his Designated Person as a director of each of the Debtors in accordance with Law No. 40 of 2007 on Limited Liability Company and other relevant regulations; and<br><br>   b)   ensure that the appointment of the Sponsor or his Designated Person as a director in each Debtor in the Group will not conflict with the scope of work of the Independent Director.<br><br>3)  The Sponsor or relevant Designated Person will continue to be a director of the each Debtor until full repayment of all debt of the Participating Creditors. |
| **Monitoring Accountant ("MA")** | 1)  Appointment of MA<br><br>   a)   The Debtors shall appoint PKF as MA for the first 6 months after the Effective Date starting from the Effective Date. In the event that PKF is negligent in the fulfilment of any of its obligations as MA during that period, the Debtors shall immediately be entitled to carry out the MA Replacement Process set forth below. |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | b) At or after the end of the first 6 months after the Effective Date, Participating Creditors representing a minimum of 20% (twenty percent) of the principal outstanding of the Participating Creditors, may jointly propose the replacement of PKF as an MA. This motion will be held based on Participating Secured Creditors Approval (Debtors) to be obtained within 30 Days from the date of the proposal.<br><br>c) From the Effective Date and throughout the Composition Plan period, the Debtors must maintain that the appointment of the MA is continuing by ensuring that there are sufficient terms of the resignation notification period to carry out the MA Replacement Process or otherwise in accordance with this Composition Plan. In the event of a time period where the Debtors do not have an MA for any reason ("**MA Gap**"):<br><br>    i) The scope of work of MA (referred to in point 3 below) appointed after MA GAP must cover the MA Gap period.<br><br>    ii) The Debtor must carry out the MA Replacement Process as soon as possible and at the latest within 14 (fourteen) working Days after being aware of the occurrence of MA Gap.<br><br>2) MA substitution through the appointment process shall be as follows ("**MA Replacement Process**"):<br><br>    a) List of nominations for 3 (three) public accounting firms ("**KAP**") as the role of the MA will be proposed by the Group from the big-10 KAP in Indonesia.<br><br>    b) Each nominated KAP will submit a proposal to the Group, which will be copied to Participating Creditors.<br><br>    c) From the nomination, the Group will choose the suitable candidate and submit it to the Participating Creditors. If Participating Secured Creditors Approval (Debtors) is obtained, the candidate shall be appointed.<br><br>3) The scope of work of the MA is as follows:<br><br>    a) Provide quarterly reports for Participating Creditors, for each Debtor, regarding:<br><br>        i) financial performance for the quarter, including comparison with the budget;<br><br>        ii) updated current budget for each Debtor; and<br><br>        iii) source and use of cash;<br><br>    b) Assist the Independent Director in the     implementation    of the Composition Plan. |

20 June 2020 Version                                                Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | c) Conduct a review every six months on compliance with the Cash Waterfall Mechanism and determine the relevant Excess Cash to be distributed since the relevant Commence Date. |
|  | d) Monitor the process, manage communication with the Participating Creditors and report on compliance with the process of Independent Director appointment. |
|  | e) Support the Independent Director in carrying out his/her duties. |
|  | 4) Debtors are required to support the MA in carrying out its scope of work including: |
|  | a) provide access to information needed in carrying out its scope of work as referred to in point 3 above; and |
|  | b) meet payment obligations as set out in the terms of the MA appointment as agreed between the Debtors and the MA. |
| **Appointment of Auditor** | The Debtors shall appoint a Public Accountant ("**KAP**") to audit the financial statements of the Debtors for the financial year of 2020 and the subsequent financial years. The appointment of KAP shall be one of the big-10 KAP in Indonesia or one of the KAP registered as the preferred KAP of the Participating Creditor holding the largest claim from each relevant Debtor. |
| **Operating Accounts** | Each Debtor shall open bank accounts in Rupiah and/or United States Dollar ("**Operating Account**") with the one of more of the following banks ("**Account Banks**") as detailed below:<br><br>1) BRI for DDT and DSSA,<br><br>2) Mandiri for DMST and Damaitex,<br><br>3) BNI for DDST and DMDT, or<br><br>4) if the banks detailed above are unable or decline to open the accounts, with other banks or the branches of the banks as determined by each Debtor. Such accounts shall be opened no later than 3 (three) months from the Effective Date.<br><br>With due consideration to the reasonable transition process, the Debtors will conduct all transactions through the Operating Accounts.<br><br>The management of the Operating Accounts will be set forth in a CAMA between the relevant Account Banks and the Debtors which will govern among other things: the mechanism and account for incoming payment, mechanism and account for outgoing payments, and prioritization of the use of funds subject to and in accordance with this Composition Plan. The CAMA shall be duly executed by all parties no later than the date falling 3 (three) months after the Effective Date and the form and substance of which has received Participating Secured Creditors Approval (Debtors).<br><br>No party shall unreasonably withhold approval of or refuse to sign the approved CAMA.  Once the CAMA has been approved each party to each |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| | |
|---|---|
| | must sign it before the following payment date of interest or margins/profit sharing (as applicable for sharia Existing Facilities). Any of the Creditors who does not sign the CAMA by such date will have their interest payments held in a reserve account for their benefit until such time that they sign the CAMA. |
| **Cash Waterfall Mechanism** | 1) All cash received by DDT, DMST and DDST identified as revenue from normal business operations shall be deposited into the Spinning Proceeds Account and shall be collectively applied in the following order of priority on a monthly basis, in accordance with the terms to be set out in the CAMA:<br><br>a) firstly, towards payment of interest, margins/profit sharing, and/or principal due and owing in accordance with the terms of New Working Capital Facility incurred by such Debtors, if any;<br><br>b) secondly, towards payment of scheduled interest, margins/profit sharing and principal to the Participating Creditors of such Debtors (i.e. payments made in the Interest Payment Terms, Margin/Profit Sharing Payment Conditions and Principal Payment Provisions) in accordance with the terms of this Composition Plan;<br><br>c) thirdly, towards topping up the relevant Operating Accounts for Operating Expenditure and Capital Expenditure for Maintenance of such Debtors, in an amount equal to amounts due and payable during the subsequent 30 Day period;<br><br>d) fourthly, towards topping up the Debt Service Reserve Account/DSRA of such Debtors to ensure that the balance in such account is not less than an amount equal to the sum of scheduled payment obligations of such Debtors that will fall due in the next 1 (one) quarter;<br><br>e) fifthly, towards topping up the Operating Account of such Debtors in an amount equal to any Approved Capital Expenditure of such Debtors;<br><br>f) sixthly, towards topping up the Operating Reserve Account of such Debtors to ensure that the balance in such account does not fall below the Operating Reserves of such Debtors; and<br><br>g) lastly, any remaining balance in the Spinning Proceeds Account after monies in the Spinning Proceeds Account are applied in accordance with paragraphs (a) to (f) above (the "**Spinning Excess Cash**") shall be applied for repayment as set out under this Composition Plan.<br><br>2) All cash received by DMDT and DSSA identified as revenue from normal business operations shall be deposited into the Weaving **and Finishing** Proceeds Account and shall be collectively applied in the following order of priority on a monthly basis, in accordance with the terms to be set out in the CAMA: |

20 June 2020 Version                                                Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

a) firstly, towards payment of interest, margins/profit sharing, and/or principal due and owing in accordance with the terms of New Working Capital Facility incurred by such Debtors, if any;

b) secondly, towards payment of scheduled interest, margins/profit sharing and principal to the Participating Creditors of such Debtors (i.e. payments made in the Interest Payment Terms, Margin/Profit Sharing Payment Conditions and Principal Payment Provisions) in accordance with the terms of this Composition Plan;

c) thirdly, towards topping up the relevant Operating Accounts for Operating Expenditure and Capital Expenditure for Maintenance of such Debtors, in an amount equal to amounts due and payable during the subsequent 30 Day period;

d) fourthly, towards topping up the Debt Service Reserve Account/DSRA of such Debtors to ensure that the balance in such account is not less than an amount equal to the sum of scheduled payment obligations of such Debtors that will fall due in the next 1 (one) quarter;

e) fifthly, towards topping up the Operating Account of such Debtors in an amount equal to any Approved Capital Expenditure of such Debtors;

f) sixthly, towards topping up the Operating Reserve Account of such Debtors to ensure that the balance in such account does not fall below the Operating Reserves of such Debtors; and

g) lastly, any remaining balance in the Weaving and Finishing Proceeds Account after monies in the Weaving and Finishing Proceeds Account are applied in accordance with paragraphs (a) to (f) above (the "**Weaving and Finishing Excess Cash**") shall be applied for repayment as set out under this Composition Plan.

The Spinning Excess Cash and Weaving and Finishing Excess Cash shall together, be "Excess Cash". Excess Cash calculations and distribution of funds will be reviewed by the CFO supported by the Independent Director and the Monitoring Accountant to ensure compliance with the terms in this Composition Plan and the CAMA.

Any Spinning Excess Cash shall be distributed on the Commence Date and every 6 (six) months thereafter and will be used to accelerate repayment of the facilities granted to DDT, DMST and DDST by the relevant Participating Creditors.

Any Weaving and Finishing Excess Cash shall be distributed on the Commence Date and every 6 (six) months thereafter and will be used to accelerate repayment of the facilities granted to DMDT and DSSA by the relevant Participating Creditors.

However, once the Facility of Syndicated Creditors to DMDT (being the US$160,000,000 senior secured facility granted pursuant to the facility agreement dated 21 June 2018) is unconditionally and irrevocably repaid in full and discharged in full, the cash received by each DMDT and DSSA

20 June 2020 Version                                                                 Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

will no longer be collectively applied.  At such time each DMDT and DSSA will apply its respective cash received in the order above in 2(a) to (g) for the benefit of its relevant Participating Creditors.

Each Excess Cash calculation shall be performed by the MA and shall be completed and reported to the relevant Participating Creditors no later than 60 (sixty) Days following the lapse of each relevant 6-month period and any Excess Cash (if any) shall be distributed to the relevant Participating Creditors no later than 2 (two) weeks following the report of the Excess Cash.

Details regarding accelerated repayment for each Debtor are contained in the details of the settlement per Debtor in the Appendix 5 (Settlement Details) of this Composition Plan.

For the avoidance of doubt, no Debtor is allowed to make any dividend payments as long as the obligations under the Existing Facilities remain outstanding.

All cash received by Damaitex identified as revenue from normal business operations shall be applied towards the repayment of Mandiri's Existing Facilities to Damaitex in the manner as agreed between Mandiri and Damaitex.

For this Cash Waterfall Mechanism section:

**Capital Expenditure for Maintenance** are capital expenditures needed to maintain operations necessary to achieve the financial performance targets of each company in the Group.

**Operating Expenditure** shall include costs and expenses incurred in the normal course of business, insurance, expected working capital charges, duties or governmental charges or taxes payable, fees relating to the PKPU proceeding and subsequent documentation process in relation to the CSPA, CAMA, Notes A, and Notes B (including financial and legal advisors' fees) and any other operating expenses items set forth in the Debtors' budgets and/or forecasts including any reasonable minimum cash buffer. Reasonable financial and legal advisors' fees incurred after the Homologation Date shall be paid within 90 (ninety) Days upon finalization of amounts due or as otherwise agreed.

**Operating Reserves** shall be based on a rolling 3-month forward budget of Operating Expenditure.  The reserve amount will change over the budget period. The budget is to be reviewed and approved by the Independent Director.

**Commence Date** is the date falling 1 (one) year after the Homologation Date.

**Spinning Proceeds Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold revenue from normal business operations of DDT, DMST and DDST. The disbursement of funds from this Spinning Proceeds Account requires the approval of the Independent Director and the CFO.

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

|  |  |
|---|---|
|  | **Operating Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold the funds needed for the day-to-day operations of the relevant Debtor.

**Debt Service Reserve Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold the funds allocated for debt service of that Debtor for the next 1 (one) quarter. The disbursement of funds from this Debt Service Reserve Account shall be made in the event of any shortfall of scheduled payment obligations to the relevant Participating Creditors under this Composition Plan up to the amount of such shortfall.

**Operating Reserve Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold the funds allocated for Operating Reserves, being the Operating Expenditure of the relevant Debtor for the next 3 (three) months.

**Weaving and Finishing Proceeds Account** is a bank account (or accounts) in IDR and/or USD as appropriate, under the name of each relevant Debtor opened with the relevant Account Bank to hold revenue from normal business operations of DMDT and DDSA. The disbursement of funds from this Weaving and Finishing Proceeds Account requires the approval of the Independent Director and the CFO.

All accounts referred to in this Cash Waterfall Mechanism section shall be opened by the relevant Debtors no later than the date falling 3 months after the Effective Date. |
| **Settlement of the Existing Facilities** | Details of the terms of settlement of Existing Facilities are set out in Appendix 5 (Settlement Details) which is an integral part of this Composition Plan. In the event of conflict in understanding between the Definitions, Chapter 1 (Summary) to Chapter 8 (Closing) (the "**Body**" section) and Appendix 5 (Settlement Details) then the applicable understanding is that which is contained in the Body to the extent of the conflict. |
| **Settlement for Trade Creditors** | Details of the terms of settlement of obligations to Trade Creditors are set out in Appendix 5 (Settlement Details) which is an integral part of this Composition Plan. However, the Debtors may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| **Settlement for LWG Syndicated Creditors** | 1) DDT, DMDT, and DDST agree to severally enter into a Conditional Sale and Purchase Agreement ("**CSPA**") with any party designated by LWG Syndicated Creditors ("**LWG Designated Party**") in accordance with the term sheet set out in Appendix 4 (CSPA Term Sheet) that has been negotiated and agreed by the parties ("**Term Sheet**"). |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| | |
|---|---|
| | 2) LWG Syndicated Creditors will enter into a conditional assignment of debt with LWG Designated Party ("**Assignment of LWG Debt**"). |
| | 3) The CSPA, Assignment of LWG Debt and other relevant documents including but not limited to any revision of Security Documents for the implementation of CSPA and Assignment of LWG Debt will be entered into at the latest three (3) months after the Effective Date unless the LWG Designated Party agrees to extend the signing of the CSPA and Assignment of LWG Debt. |
| | 4) The CSPA will become effective following any Default of DDT, DMDT or DDST of this Composition Plan in accordance with Appendix 4 (CSPA Term Sheet). |
| | 5) Subject to the CSPA in accordance with Appendix 4 (CSPA Term Sheet) and upon the effective date of the CSPA, the Debtors are not required to service their debts to the LWG Syndicated Creditors in accordance with payment schedule in Appendix 5 (Settlement Details). However, for the avoidance of doubt, the Debtor's debts to the LWG Syndicated Creditors are not yet extinguished and will be fully settled in accordance with the Composition Plan, CSPA and other ancillary documents. All debts of DDT, DMDT, and/or DDST to the relevant LWG Syndicated Creditors and/or LWG Designated Party will be deemed fully settled after the ownership title of LWG Assets are fully transferred (or after the execution of Right to Use in accordance with CSPA terms under Appendix 4 (CSPA Term Sheet)) from DDT, DMDT, and/or DDST (as relevant) to the relevant LWG Syndicated Creditors and/or LWG Designated Party in compliance with the CSPA. |
| | 6) Security Documents of LWG Syndicated Creditors shall continue to prevail to secure all sustainable and/or unsustainable debts owed to LWG Syndicated Creditors and LWG Designated Party (as the case may be). DDT, DMDT, and DDST agreed to revise the Security Documents or enter into any other required documentation to continue to secure LWG Syndicated Creditors's rights and/or LWG Designated Party (as the case may be) following the CSPA as requested by LWG Syndicated Creditors and/or LWG Designated Party. |
| | 7) In the event that any provisions of the CSPA, the SPA (as defined in Appendix 4 (CSPA Term Sheet)) and any other required documents relating to the CSPA and the SPA cease to be valid, binding or enforceable (whether in whole or part), the Debtors and Sponsor will become liable to pay any remaining outstanding debt to Syndicated Lenders at the time the cessation of the validity of the CSPA and /or the SPA occurs. |
| **Rights and Obligations of the holders of Notes A under a CSPA Event of Default** | In the event of Default under which the CSPA and/or the SPA held by the LWG Syndicated Creditors (or its designated party(ies)) at DMDT becomes effective, the rights and obligations of the holders of Notes A are as follows: |
| | 1) Any proceeds received on the sale of DMDT 5 Assets and DMDT 6 Assets in excess of the outstanding debt of the US$160,000,000 senior secured facility to DMDT granted pursuant to the facility |

20 June 2020 Version                                                    Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| | |
|---|---|
| | agreement dated 21 June 2018 are to be distributed to the holders of Note A.<br><br>2) The secondary rank of security rights of Note A over DMDT 5 Assets and DMDT 6 Assets are to be released. |
| **Sponsor Warranty** | Breach of any terms by any Debtor or the Sponsor under this Composition Plan or composition plan under Case  No.  25/Pdt.Sus-PKPU/2019/PN. SMG. will constitute a Default under this Composition Plan. |

4.      **EVENT OF DEFAULT**

4.1     Non-fulfillment of one or more provisions in this Composition Plan, and/or the CAMA, and/or any documents documenting the Existing Facilities and its existing Security Documents and/or any Security Documents (or any of its amendment), and/or other ancillary documents to this Composition Plan entered into by or between any Debtor and any Creditor (or its designated party(ies) to further implement any terms of, or otherwise in connection with, this Composition Plan, by one or more Debtors or the Sponsor which is not rectified within 30  Calendar Days after a Participating Creditor giving notice to the Debtors or the Sponsor, will be considered an event of default ("**Default**").

4.2     With no prejudice to the provisions set out in clause 4.3, if a Default occurs, the relevant defaulting Debtor, Sponsor (if applicable) and Creditor may agree to settlement provisions other than those set out by this Composition Plan.

4.3     Filing for cancellation of the homologated Composition Plan as a result of a Default can be made by any Creditor which is being defaulted by their Debtor or the Sponsor. In the event of the cancellation, the Parties are subject to the provisions of Article 291 of the Bankruptcy Law along with other application regulations.

4.4     In the occurrence of failure to pay principal and/or interest and/or margin/profit sharing in accordance with the terms of this Composition Plan ("**Payment Default**"), the Participating Secured Creditors of the relevant Debtor which has made a Payment Default can (but not obligated to) ask such Debtor to settle its Default through the sale and / or foreclosure of Operating Assets pledged to the Participating Secured Creditors concerned with the provisions to be agreed between the Debtor and the Participating Secured Creditors concerned ("**Operating Assets Settlement**"). At the first request of any Participating Secured Creditor, in the event of an Operational Assets Settlement, the Debtor committing the payment default is shall ensure the availability of all documents requested for the Operating Assets Settlement purposes, no later than 30 (thirty) Calendar Days as requested by the Participating Secured Creditors. Operating Assets Settlement does not constitute a default to the Homologated Composition Plan. For the avoidance of doubt, this provision will not be applicable for any Default relating to LWG Syndicated Creditors and their relevant Debtors.

4.5     If any Default occurs relating to the LWG Syndicated Creditors and their relevant Debtors, such Default will trigger any transfers of assets under the terms of the CSPA, in accordance with the terms of Settlement for LWG Syndicated Creditors of this Composition Plan and the terms of the CSPA and any related or ancillary documents in connection thereto.

5.      **MISCELLANEOUS PROVISIONS**

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

5.1     Creditors for Debts Outside Verification shall be subject to the Homologated Composition Plan, by taking into consideration the General Provisions, Specific Provisions and Miscellaneous Provisions of this Composition Plan based on the types and amounts of each of their claims.  For the avoidance of doubt, Creditors for Debts Outside Verification do not form part of the Participating Secured Creditors and will have no voting rights under the Participating Secured Creditors Approval (Debtor) or the Participating Secured Creditors Approval (Debtors).

5.2     Payments to Creditors who are affiliated to the Debtors (other than payments made in relation to expenses from normal business operations to generate revenue at arm's length terms) are subordinated to and will be paid following the full repayment of the Debtors' debts to Participating Creditors under this Composition Plan. For the purposes of this clause, "affiliate" means any person or entity which, directly, or indirectly, controls or is controlled by or is under common control with such person or entity.

5.3     Costs related to the Debtors' PKPU process, the fees of Administrator Team, legal counsels of the Debtors, the fees of financial advisors of the Debtors and the Participating Creditors in connection with the PKPU Process of the Debtors in the Commercial Court and the fees of legal counsels of the Creditors, as long as the obligations of Debtors to cover such costs have been previously set out in Prior Agreement (as defined below) or other letters of engagement or agreements with such legal counsels or financial advisors executed in relation with such obligations, shall be paid by the Homologation Date or on other dates as agreed.

5.4     All provisions in the agreements agreed upon before the PKPU Decision Date by and between the Debtor and Creditors are deemed to remain in effect as long as they do not conflict and are otherwise regulated by the provisions in this Composition Plan ("**Prior Agreement**") if the Composition Plan has been homologated by the Commercial Court. In the event that there is a conflict between the provisions in this Composition Plan and the provisions in the Prior Agreement, the provisions of this Composition Plan will prevail.

5.5     Every provision governing the rights and obligations of Creditors and Debtors in the Composition Plan has been adjusted to the provisions in the Bankruptcy Law. All provisions governing the rights and obligations of Creditors and Debtors, if not regulated and determined in the Composition Plan, are governed by the Prior Agreement.

5.6     This Composition Plan may from time to time be made into a copy in a language other than the Indonesian language, which can be considered as an authentic copy. If a conflict arises and/or differences exists between an Indonesian language copy and another language copy, the Indonesian language copy shall prevail.

6.      **PERSONAL GUARANTEE**

6.1     Any personal guarantee provided by Sponsor under the Existing Facilities (as applicable) shall remain in place.

6.2     Each Creditor of the Existing Facilities, at its discretion, can request (and the Sponsor must comply) with any amendment to the Existing Facilities, personal guarantee agreements and Security Documents to ensure the granting and the maintenance of any and all of the Creditor's (or any other assigned parties' as the case may be) rights under this Composition Plan, composition plan under case No. 25/Pdt.Sis-PKPU/2019/PN.SMG, and other ancillary documents to this Composition Plan.

6.3     If for any reason the Sponsor is declared bankrupt, the Creditors will have the right to claim against the Sponsor's bankruptcy regardless of any bankruptcy or default of the Debtors under this Composition Plan.

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

## 7.   COVENANTS AND INFORMATION UNDERTAKINGS

7.1   Within 14 (fourteen) Days from the request of the Participating Creditors, the Debtors and
Sponsor agree to provide and to ensure the same is furnished immediately without delay to
the Participating Creditors, their advisors or anyone else acting on their behalf any financial
information (including all financial documents and records) of the Debtors and Sponsor and
their subsidiaries if it is requested in writing by or on behalf of the Participating Creditors
so long as such requested financial information is relevant to determine the compliance of
the Debtors to this Composition Plan.

7.2   The Independent Director shall be appointed following the Effective Date in accordance with
terms set out in this Composition Plan and shall remain in place until all debts under the
Existing Facilities are fully, irrevocably and unconditionally repaid. The Independent Director
shall be a member of the board of directors of each Debtor assuming the same
responsibilities and liabilities.

7.3   The Debtors shall ensure that the Independent Director is appointed and the Debtors are
solely responsible for the fees of the Independent Director which shall by paid by the
Debtors when due.

7.4   The Debtors shall provide such available information as may be reasonably required by the
Independent Director and provide assistance to the Independent Director as may be
reasonably requested to enable the Independent Director to fulfill its duties and obligations.

## 8.   CLOSING

8.1   The implementation of the Homologated Composition Plan shall be subject to and be carried
out based on the provisions referred to in the Bankruptcy Law and the laws and legal
provisions in force within the territory of the Republic of Indonesia.

8.2   Correspondence related to the Composition Plan to any Debtor can be addressed through 1
(one) correspondence address as follows:

Address   :   Jl. Raya Palur Km 7.1, Karanganyar, Jawa Tengah, Indonesia

Fax :     :   +62 271 825 954

Email     :   dtx@duniatex.com

Attn      :   Board of Directors

Any change in the above correspondence address must be delivered in writing and jointly
by the Debtors to the Creditors. If not notified in writing and jointly by the Debtors, the
above correspondence address will remain valid and binding. Proof of delivery by registered
mail to the address is sufficient and valid proof.

8.3   Correspondence related to the Composition Plan to any of the Creditors can be addressed
and delivered in accordance with the relevant provisions set out in the Prior Agreement of
the relevant Creditors.

Any change in the correspondence address of any Creditors must be delivered in writing by
the relevant Creditors to the relevant Debtors. If not notified in writing and jointly by the
Debtors, the correspondence address as set out in the Prior Agreement will remain valid
and binding. Proof of delivery by registered mail to the address is sufficient and valid proof.

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

Thus, this Composition Plan is made and to be signed by the legal representatives of the parties before the Supervising Judge,  Andreas Purwantyo Setiyadi SH, MH, and the Administrator Team, Hamonangan Syahdan Hutabarat, SH, Alfin Sulaiman, SH, MH, Januardo Sulung P. Sihombing, SH, MH, MA, BKP., And Nila Asriyanti, SH as the management team in Semarang, on the day and date as mentioned above for the first time.

| **PT Delta Merlin Dunia Textile** | **PT Delta Dunia Tekstil** | **PT Delta Merlin Sandang Tekstil** | **PT Delta Dunia Sandang Tekstil** | **PT Dunia Setia Sandang Asli Tekstil** | **PT Perusahaan dan Perindustrian Damai** |
|---|---|---|---|---|---|

*Materai Rp. 6000,-*

| Tan Sauw Hwa *President Director* | Tan Sauw Hwa *Director* | Tan Sauw Hwa *President Director* | Yohanes Hendrawan *President Director* Acknowledged and approved by | Yohanes Hendrawan *President Director* | Megawati *President Director* |
|---|---|---|---|---|---|

**Sponsor**

Sumitro

Acknowledged and witnessed by,
**Administrator Team,**

| Hamonangan Syahdan Hutabarat, S.H. | Alfin Sulaiman, S.H., M.H. | Januardo Sulung P. Sihombing, S.H., M.H., M.A., BKP. | Nila Asriyanti, S.H. |
|---|---|---|---|

**Supervisory Judge,**

Andreas Purwanto Setiyadi, S.H., M.H.,

47

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

## 9.   **APPENDICES**

9.1   Appendix 1 (Operating Assets)

Land assets detailed below includes building and or other fixed assets attached to them as it may be set out in the relevant Security Document to the relevant Existing Facility.

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1) | Damaitex | Land | Damaitex | HGB | 642 | Jl Simongan no. 100, Kelurahan Ngemplak Simongan | Semarang Barat | Semarang | Jawa Tengah | 1,807 |
| 2) | Damaitex | Land | Damaitex | HGB. | 643 | Jl Simongan no. 100, Kelurahan Ngemplak Simongan | Semarang Barat | Semarang | Jawa Tengah | 1,095 |
| 3) | Damaitex | Land | Damaitex | HGB. | 658 | Desa Bongsari | | Semarang | Jawa Tengah | 13,800 |
| 4) | DDST 1 & 2 | Land | DDST | SHGB | 14 | Tambakroto | Sayung | Demak | Jawa Tengah | 120,307 |
| 5) | DDST 1 & 2 | Land | DDST | SHGB | 10 | Tambakroto | Sayung | Demak | Jawa Tengah | 53,461 |
| 6) | DDST 1 & 2 | Land | DDST | SHGB | 18 | Tambakroto | Sayung | Demak | Jawa Tengah | 10,331 |
| 7) | DDST 1 & 2 | Land | DDST | SHGB | 127 | Tambakroto | Sayung | Demak | Jawa Tengah | 10,367 |
| 8) | DDST 1 & 2 | Land | DDST | SHGB | 8 | Tambakroto | Sayung | Demak | Jawa Tengah | 86,286 |
| 9) | DDST 1 & 2 | Land | DDST | SHGB | 17 | Tambakroto | Sayung | Demak | Jawa Tengah | 4,456 |
| 10) | DDST 1 & 2 | Land | DDST | SHGB | 9 | Tambakroto | Sayung | Demak | Jawa Tengah | 45,611 |

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 11) | DDST 1 & 2 | Land | DDST | SHGB | 25 | Tambakroto | Sayung | Demak | Jawa Tengah | 12,110 |
| 12) | DDST 3 | Land | DDST | SHGB | 1 | Tambakroto | Sayung | Demak | Jawa Tengah | 27,115 |
| 13) | DDST 3 | Land | DDST | SHGB | 2 | Tambakroto | Sayung | Demak | Jawa Tengah | 32,431 |
| 14) | DDST 3 | Land | DDST | SHGB | 126 | Tambakroto | Sayung | Demak | Jawa Tengah | 39,007 |
| 15) | DDST 3 | Land | DDST | SHGB | 133 | Tambakroto | Sayung | Demak | Jawa Tengah | 21,207 |
| 16) | DDT 1 | Land | DDT | SHGB | 1 | Kaling | Tasikmadu | Karanganyar | Jawa Tengah | 153,992 |
| 17) | DDT 2 | Land | DMDT | SHGB. | 1 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 17,747 |
| 18) | DDT 2 | Land | DMDT | SHGB. | 2 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 28,155 |
| 19) | DDT 2 | Land | DMDT | SHGB. | 21 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 24,493 |
| 20) | DDT 2 | Land | DMDT | SHGB. | 22 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 23,787 |
| 21) | DDT 2 | Land | DMDT | SHGB. | 25 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 41,017 |
| 22) | DDT 2 | Land | DMDT | SHGB. | 80 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 29,370 |
| 23) | DDT 2 | Land | DMDT | SHGB. | 106 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 1,194 |
| 24) | DDT 2 | Land | DMDT | SHGB. | 109 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 787 |
| 25) | DDT 2 | Land | DMDT | SHGB. | 111 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 1,265 |
| 26) | DDT 2 | Land | DMDT | SHGB. | 112 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 1,849 |
| 27) | DDT 2 | Land | DMDT | SHGB. | 113 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 1,147 |

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 28) | DDT 2 | Land | DMDT | SHGB. | 4 | Sroyo | Jaten | Karanganyar | Jawa Tengah | 16,137 |
| 29) | DDT 3 | Land | Sumitro | SHM | 207 | Jetis | Jaten | Karanganyar | Jawa Tengah | 16,551 |
| 30) | DDT 3 | Land | Sumitro | SHM | 443 | Jetis | Jaten | Karanganyar | Jawa Tengah | 13,329 |
| 31) | DDT 3 | Land | Sumitro | SHM | 672 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,362 |
| 32) | DDT 3 | Land | Sumitro | SHM | 673 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,596 |
| 33) | DDT 4 | Land | PT. Delta Dunia Tekstil | SHGB | 1 | Rembun | Siwalan | Pekalongan | Jawa Tengah | 71,600 |
| 34) | DDT 4 | Land | PT. Delta Dunia Tekstil | SHGB | 2 | Rembun | Siwalan | Pekalongan | Jawa Tengah | 86,300 |
| 35) | DDT 4 | Machineries | | Fiducia Security | Machineries under certificate no. W13.00841605.AH.05.01 tahun 2017, as lastly amended by Certificate of Fiducia Security No. W.13.00434604.AH.05.02 Tahun 2019 dated 31 May 2019 | Rembun | Siwalan | Pekalongan | Jawa Tengah | |
| 36) | DMDT 1 | Land | Sumitro | SHM | 2535 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 110 |

50

20 June 2020 Version

Private and Confidential

Unofficial Translation of Composition Plan

In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 37) | DMDT 1 | Land | Sumitro | SHM | 2188 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 354 |
| 38) | DMDT 1 | Land | Sumitro | SHM | 2016 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 688 |
| 39) | DMDT 1 | Land | Sumitro | SHM | 2885 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,570 |
| 40) | DMDT 1 | Land | Sumitro | SHM | 2869 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,390 |
| 41) | DMDT 1 | Land | Susana John Setiawan | SHM | 134 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,350 |
| 42) | DMDT 1 | Land | Susana John Setiawan | SHM | 39 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,470 |
| 43) | DMDT 1 | Land | Susana John Setiawan | SHM | 2848 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,265 |
| 44) | DMDT 1 | Land | Susana John Setiawan | SHM | 355 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,265 |
| 45) | DMDT 1 | Land | Susana John Setiawan | SHM | 356 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,547 |
| 46) | DMDT 1 | Land | Susana John Setiawan | SHM | 357 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,546 |
| 47) | DMDT 1 | Land | Susana John Setiawan | SHM | 358 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 2,455 |
| 48) | DMDT 1 | Land | Sumitro | SHGB | 257 | Gajahan | Pasar Kliwon | Surakarta | Jawa Tengah | 1,810 |
| 49) | DMDT 1 | Land | Sumitro | SHGB | 255 | Gajahan | Pasar Kliwon | Surakarta | Jawa Tengah | 770 |
| 50) | DMDT 2 | Land | Sumitro | SHM | 1936 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,876 |
| 51) | DMDT 2 | Land | Sumitro | SHM | 1939 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,495 |
| 52) | DMDT 2 | Land | Sumitro | SHM | 1713 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,480 |
| 53) | DMDT 2 | Land | Sumitro | SHM | 1938 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,490 |

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 54) | DMDT 2 | Land | Sumitro | SHM | 1937 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,442 |
| 55) | DMDT 2 | Land | Sumitro | SHM | 1983 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,480 |
| 56) | DMDT 2 | Land | Indriati | SHM | 171 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,467 |
| 57) | DMDT 2 | Land | Indriati | SHM | 170 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,337 |
| 58) | DMDT 2 | Land | Indriati | SHM | 169 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,571 |
| 59) | DMDT 2 | Land | Indriati | SHM | 168 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,485 |
| 60) | DMDT 2 | Land | Indriati | SHM | 1922 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,115 |
| 61) | DMDT 2 | Land | Indriati | SHM | 1923 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 2,955 |
| 62) | DMDT 2 | Land | Sumitro | SHM | 1704 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,777 |
| 63) | DMDT 2 | Land | Sumitro | SHM | 1706 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,086 |
| 64) | DMDT 2 | Land | Sumitro | SHM | 1629 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,107 |
| 65) | DMDT 2 | Land | Sumitro | SHM | 1705 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,040 |
| 66) | DMDT 2 | Land | Sumitro | SHM | 1628 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,257 |
| 67) | DMDT 2 | Land | Sumitro | SHM | 1726 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,160 |
| 68) | DMDT 2 | Land | Sumitro | SHM | 1627 | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 3,280 |
| 69) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 20,160 |
| 70) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 16,128 |

52

20 June 2020 Version

Private and Confidential

Unofficial Translation of Composition Plan

In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 71) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 2,880 |
| 72) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 864 |
| 73) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 780 |
| 74) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 780 |
| 75) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 56 |
| 76) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 30 |
| 77) | DMDT 2 | Factory building | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | 224 |
| 78) | DMDT 2 | Ancillary facilities | DMDT | | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | - |
| 79) | DMDT 2 | Machineries | DMDT | - | | Pulosari | Kebakkramat | Karanganyar | Jawa Tengah | - |
| 80) | DMDT 3 | Factory land | Sumitro | SHM | 141 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 2,875 |
| 81) | DMDT 3 | Factory land | Sumitro | SHM | 1358 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 2,305 |
| 82) | DMDT 3 | Factory land | Sumitro | SHM | 1824 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 2,975 |
| 83) | DMDT 3 | Factory land | Sumitro | SHM | 1870 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 2,975 |
| 84) | DMDT 3 | Factory land | Sumitro | SHM | 671 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 1,415 |
| 85) | DMDT 3 | Factory land | Sumitro | SHM | 1825 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,070 |
| 86) | DMDT 3 | Factory land | Sumitro | SHM | 1243 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 2,750 |
| 87) | DMDT 3 | Factory land | Sumitro | SHM | 1359 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 2,920 |

20 June 2020 Version

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|----|-----------|-------------|--------------|-------------|----------------|------|-----------|-----------|----------|-----------|
| 88) | DMDT 3 | Factory land | Sumitro | SHM | 669 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 1,420 |
| 89) | DMDT 3 | Factory land | Sumitro | SHM | 140 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,103 |
| 90) | DMDT 3 | Factory land | Sumitro | SHM | 2001 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,140 |
| 91) | DMDT 3 | Factory land | Sumitro | SHM | 1113 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 1,040 |
| 92) | DMDT 3 | Factory land | Sumitro | SHM | 1116 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 1,060 |
| 93) | DMDT 3 | Factory land | Sumitro | SHM | 1118 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 1,040 |
| 94) | DMDT 3 | Factory land | Sumitro | SHM | 127 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,140 |
| 95) | DMDT 3 | Factory land | Sumitro | SHM | 1999 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,370 |
| 96) | DMDT 3 | Factory land | Sumitro | SHM | 2017 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 1,420 |
| 97) | DMDT 3 | Factory land | Sumitro | SHM | 2019 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 1,445 |
| 98) | DMDT 3 | Factory land | Sumitro | SHM | 2022 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 3,515 |
| 99) | DMDT 3 | Factory land | Sumitro | SHM | 369 | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 7,660 |
| 100) | DMDT 3 | Factory building | Sumitro | | | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | 49,160 |
| 101) | DMDT 3 | Machineries | Sumitro | | | Nangsri | Kebakkramat | Karanganyar | Jawa Tengah | - |
| 102) | DMDT 4 | Factory land | Sumitro | SHGB | 3 | Banyudono | Banyudono | Boyolali | Jawa Tengah | 60,036 |
| 103) | DMDT 4 | Factory land | Sumitro | SHGB | 4 | Banyudono | Banyudono | Boyolali | Jawa Tengah | 3,913 |
| 104) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 19,584 |

54

20 June 2020 Version

Private and Confidential

Unofficial Translation of Composition Plan

In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 105) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 5,760 |
| 106) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 6,048 |
| 107) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 6,048 |
| 108) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 360 |
| 109) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 1,760 |
| 110) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 952 |
| 111) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 264 |
| 112) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 820 |
| 113) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 288 |
| 114) | DMDT 4 | Factory building | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | 38 |
| 115) | DMDT 4 | Ancillary facilities | Sumitro | | | Banyudono | Banyudono | Boyolali | Jawa Tengah | |
| 116) | DMDT 4 | Machineries | Sumitro | - | | Banyudono | Banyudono | Boyolali | Jawa Tengah | - |
| 117) | DMDT 4 | Persediaan | Sumitro | - | | Banyudono | Banyudono | Boyolali | Jawa Tengah | - |
| 118) | DMDT 5 | Factory land | DMDT | SHGB | 15 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 100,710 |
| 119) | DMDT 5 | Factory land | DMDT | SHGB | 17 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 32,569 |
| 120) | DMDT 5 | Factory land | DMDT | SHGB | 82 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 6,263 |
| 121) | DMDT 5 | Factory land | DMDT | SHGB | 83 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 20,217 |

20 June 2020 Version

Private and Confidential

Unofficial Translation of Composition Plan

In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 122) | DMDT 5 | Factory land | DMDT | SHGB | 84 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 10,292 |
| 123) | DMDT 5 | Factory land | DMDT | SHGB | 85 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 2,241 |
| 124) | DMDT 5 | Factory land | DMDT | SHGB | 95 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 2,050 |
| 125) | DMDT 5 | Factory land | DMDT | SHGB | 98 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 2,475 |
| 126) | DMDT 5 | Factory land | DMDT | SHGB | 105 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 417 |
| 127) | DMDT 5 | Factory land | DMDT | SHGB | 107 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 735 |
| 128) | DMDT 5 | Factory land | DMDT | SHGB | 108 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 481 |
| 129) | DMDT 5 | Factory land | DMDT | SHGB | 114 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 2,685 |
| 130) | DMDT 5 | Factory land | DMDT | SHGB | 110 | Pondok | Grogol | Sukoharjo | Jawa Tengah | 1,473 |
| 131) | DMDT 5 | Factory building | DMDT | SHGB |  | Pondok | Grogol | Sukoharjo | Jawa Tengah | 122,639 |
| 132) | DMDT 5 | Machineries | DMDT | Fiducia Security | Machineries under certificate no. W.13.004809 41.AH.05.01 Tahun 2018 dated 10 July 2018, as lastly amended by Certificate of Fiducia Security No. W13.0052161 7.AH.05.02 | Pondok | Grogol | Sukoharjo | Jawa Tengah | - |

56

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | dated 4 July 2019. | | | | | |
| 133) | DMDT 6 | Factory land | DMDT | SHGB | 7 | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | 203,655 |
| 134) | DMDT 6 | Factory land | DMDT | SHGB | 16 | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | 1,545 |
| 135) | DMDT 6 | Factory land | DMDT | SHGB | 20 | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | 1,697 |
| 136) | DMDT 6 | Factory land | DMDT | SHGB | 19 | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | 5,900 |
| 137) | DMDT 6 | Factory land | DMDT | SHGB | 17 | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | 5,461 |
| 138) | DMDT 6 | Factory land | DMDT | SHGB | 36 | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | 188 |
| 139) | DMDT 6 | Factory building | DMDT | | | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | 115,698 |
| 140) | DMDT 6 | Machineries | DMDT | Fiducia Security | Machineries under certificate no. W.13.00480941.AH.05.01 Tahun 2018 dated 10 July 2018, as lastly amended by Certificate of Fiducia Security No. W13.0052161 | Jalan Songgorunggi -Jatipuro | Nguter | Sukoharjo | Jawa Tengah | - |

57

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 7.AH.05.02 dated 4 July 2019. | | | | | |
| 141) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00078 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat | Karanganyar | Jawa Tengah | 4,176 |
| 142) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00034 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat | Karanganyar | Jawa Tengah | 4,289 |
| 143) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00696 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat | Karanganyar | Jawa Tengah | 4,000 |
| 144) | DMDT 7 | Factory land | Sumitro | SHM NO. | 00242 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat | Karanganyar | Jawa Tengah | 2,635 |
| 145) | DMDT 7 | Factory land | Sumitro | SHM NO. | 01395 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat | Karanganyar | Jawa Tengah | 1,500 |
| 146) | DMDT 7 | Factory land | Sumitro | SHM NO. | 01393 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat | Karanganyar | Jawa Tengah | 1,500 |
| 147) | DMDT 7 | Factory land | Sumitro | SHM NO. | 01394 | Jl Raya Solo-Sragen KM. 12.8 | Kebakkramat | Karanganyar | Jawa Tengah | 1,257 |
| 148) | DMDT 8 | Land | DMDT | SHGB | 160 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 53,163 |
| 149) | DMDT 8 | Machineries | DMDT | Fiducia Security | No. W13.0000201 3.AH.05.01 year 2019 dated 2 January 2019). | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | |
| 150) | DMST 1 | Land | DMST | SHGB | 33 | Bumiaji | Gondang | Sragen | Jawa Tengah | 73,800 |
| 151) | DMST 1 | Land | DMST | SHGB | 45 | Bumiaji | Gondang | Sragen | Jawa Tengah | 32,500 |

20 June 2020 Version
Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 152) | DMST 1 | Land | DMST | SHGB | 54 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,290 |
| 153) | DMST 1 | Land | DMST | SHGB | 39 | Bumiaji | Gondang | Sragen | Jawa Tengah | 6,535 |
| 154) | DMST 1 | Land | DMST | SHGB | 48 | Bumiaji | Gondang | Sragen | Jawa Tengah | 7,200 |
| 155) | DMST 1 | Land | DMST | SHGB | 50 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,575 |
| 156) | DMST 1 | Land | DMST | SHGB | 56 | Bumiaji | Gondang | Sragen | Jawa Tengah | 20 |
| 157) | DMST 1 | Land | DMST | SHGB | 57 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,100 |
| 158) | DMST 1 | Land | DMST | SHGB | 58 | Bumiaji | Gondang | Sragen | Jawa Tengah | 833 |
| 159) | DMST 1 | Land | DMST | SHGB | 34 | Bumiaji | Gondang | Sragen | Jawa Tengah | 23,925 |
| 160) | DMST 1 | Land | Indriati, Ny. | SHM | 1561 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,725 |
| 161) | DMST 1 | Land | Susana John Setiawan | SHM | 2269 | Bumiaji | Gondang | Sragen | Jawa Tengah | 850 |
| 162) | DMST 1 | Land | Susana John Setiawan | SHM | 2270 | Bumiaji | Gondang | Sragen | Jawa Tengah | 865 |
| 163) | DMST 1 | Land | DMST | SHGB | 65 | Bumiaji | Gondang | Sragen | Jawa Tengah | 6,869 |
| 164) | DMST 1 | Land | DMST | SHGB | 70 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,204 |
| 165) | DMST 1 | Land | DMST | SHGB | 44 | Bumiaji | Gondang | Sragen | Jawa Tengah | 4,445 |
| 166) | DMST 1 | Land | DMST | SHGB | 47 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,540 |
| 167) | DMST 1 | Land | DMST | SHGB | 61 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,287 |
| 168) | DMST 1 | Land | DMST | SHGB | 92 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,770 |

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 169) | DMST 1 | Land | DMST | SHGB | 93 | Bumiaji | Gondang | Sragen | Jawa Tengah | 6,436 |
| 170) | DMST 1 | Land | DMST | SHGB | 94 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,535 |
| 171) | DMST 1 | Land | DMST | SHGB | 95 | Bumiaji | Gondang | Sragen | Jawa Tengah | 2,925 |
| 172) | DMST 1 | Land | DMST | SHGB | 96 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,287 |
| 173) | DMST 1 | Land | Susana John Setiawan | SHM | 1631 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,315 |
| 174) | DMST 1 | Land | Indriati, Ny. | SHM | 1957 | Bumiaji | Gondang | Sragen | Jawa Tengah | 2,760 |
| 175) | DMST 1 | Land | Indriati, Ny. | SHM | 2021 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,575 |
| 176) | DMST 1 | Land | DMST | SHGB | 37 | Bumiaji | Gondang | Sragen | Jawa Tengah | 7,710 |
| 177) | DMST 1 | Land | DMST | SHGB | 60 | Bumiaji | Gondang | Sragen | Jawa Tengah | 48 |
| 178) | DMST 1 | Land | DMST | SHGB | 55 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,765 |
| 179) | DMST 1 | Land | DMST | SHGB | 59 | Bumiaji | Gondang | Sragen | Jawa Tengah | 2,152 |
| 180) | DMST 1 | Land | DMST | SHGB | 86 | Bumiaji | Gondang | Sragen | Jawa Tengah | 2,546 |
| 181) | DMST 1 | Land | DMST | SHGB | 74 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,399 |
| 182) | DMST 1 | Land | DMST | SHGB | 85 | Bumiaji | Gondang | Sragen | Jawa Tengah | 651 |
| 183) | DMST 1 | Land | DMST | SHGB | 91 | Bumiaji | Gondang | Sragen | Jawa Tengah | 1,413 |
| 184) | DMST 1 | Land | DMST | SHGB | 66 | Bumiaji | Gondang | Sragen | Jawa Tengah | 530 |
| 185) | DMST 1 | Land | DMST | SHGB | 62 | Bumiaji | Gondang | Sragen | Jawa Tengah | 3,394 |

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 186) | DMST 2 | Land | Indriati, Ny. | SHM | 56 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,610 |
| 187) | DMST 2 | Land | Indriati, Ny. | SHM | 92 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,595 |
| 188) | DMST 2 | Land | Indriati, Ny. | SHM | 149 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,400 |
| 189) | DMST 2 | Land | Indriati, Ny. | SHM | 219 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,600 |
| 190) | DMST 2 | Land | Indriati, Ny. | SHM | 3124 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,285 |
| 191) | DMST 2 | Land | Indriati, Ny. | SHM | 450 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,590 |
| 192) | DMST 2 | Land | Indriati, Ny. | SHM | 507 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,615 |
| 193) | DMST 2 | Land | Indriati, Ny. | SHM | 1045 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 1,880 |
| 194) | DMST 2 | Land | Indriati, Ny. | SHM | 1046 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 1,885 |
| 195) | DMST 2 | Land | Indriati, Ny. | SHM | 1503 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 25,550 |
| 196) | DMST 2 | Land | Indriati, Ny. | SHM | 1560 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,600 |
| 197) | DMST 2 | Land | Indriati, Ny. | SHM | 1564 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,695 |
| 198) | DMST 2 | Land | Indriati, Ny. | SHM | 1796 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,770 |
| 199) | DMST 2 | Land | Indriati, Ny. | SHM | 1866 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,490 |
| 200) | DMST 2 | Land | Indriati, Ny. | SHM | 1867 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,570 |
| 201) | DMST 2 | Land | Indriati, Ny. | SHM | 2006 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,305 |
| 202) | DMST 2 | Land | Indriati, Ny. | SHM | 2011 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,395 |

20 June 2020 Version
Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 203) | DMST 2 | Land | Indriati, Ny. | SHM | 2050 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,435 |
| 204) | DMST 2 | Land | Indriati, Ny. | SHM | 2134 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,565 |
| 205) | DMST 2 | Land | Indriati, Ny. | SHM | 2146 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,615 |
| 206) | DMST 2 | Land | Indriati, Ny. | SHM | 2173 | Purwosuman | Sidoharjo | Sragen | Jawa Tengah | 3,585 |
| 207) | DMST 3 | Land | DMST | SHGB | 1 | Plumbon | Sambungmacan | Sragen | Jawa Tengah | 9,536 |
| 208) | DMST 3 | Land | DMST | SHGB | 2 | Plumbon | Sambungmacan | Sragen | Jawa Tengah | 68,605 |
| 209) | DMST 3 | Land | DMST | SHGB | 3 | Plumbon | Sambungmacan | Sragen | Jawa Tengah | 71,618 |
| 210) | DMST 4 | Land | DMST | SHGB | 7 | Pandeyan | Grogol | Sukoharjo | Jawa Tengah | 127,268 |
| 211) | DSSA 1 | Land | Indriati, Ny. | SHM | 140 | Dagen | Jaten | Karanganyar | Jawa Tengah | 4,957 |
| 212) | DSSA 1 | Land | Indriati, Ny. | SHM | 387 | Dagen | Jaten | Karanganyar | Jawa Tengah | 5,079 |
| 213) | DSSA 1 | Land | Indriati, Ny. | SHM | 455 | Dagen | Jaten | Karanganyar | Jawa Tengah | 5,067 |
| 214) | DSSA 1 | Land | Sumitro | SHM | 330 | Dagen | Jaten | Karanganyar | Jawa Tengah | 5,246 |
| 215) | DSSA 1 | Land | Sumitro | SHM | 1761 | Dagen | Jaten | Karanganyar | Jawa Tengah | 3,650 |
| 216) | DSSA 1 | Land | Sumitro | SHM | 1762 | Dagen | Jaten | Karanganyar | Jawa Tengah | 1,815 |
| 217) | DSSA 1 | Land | Sumitro | SHM | 1763 | Dagen | Jaten | Karanganyar | Jawa Tengah | 3,875 |
| 218) | DSSA 1 | Land | Sumitro | SHM | 1764 | Dagen | Jaten | Karanganyar | Jawa Tengah | 3,500 |
| 219) | DSSA 1 | Land | Sumitro | SHM | 1765 | Dagen | Jaten | Karanganyar | Jawa Tengah | 3,100 |

20 June 2020 Version
Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|----|-----------|-------------|--------------|-------------|----------------|------|-----------|-----------|----------|-----------|
| 220) | DSSA 1 | Land | Sumitro | SHM | 1766 | Dagen | Jaten | Karanganyar | Jawa Tengah | 3,950 |
| 221) | DSSA 2 | Land | Indriati, Ny. | SHM | 119 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,340 |
| 222) | DSSA 2 | Land | Indriati, Ny. | SHM | 1125 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,495 |
| 223) | DSSA 2 | Land | Indriati, Ny. | SHM | 889 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,570 |
| 224) | DSSA 2 | Land | Indriati, Ny. | SHM | 715 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,495 |
| 225) | DSSA 2 | Land | Indriati, Ny. | SHM | 690 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,485 |
| 226) | DSSA 2 | Land (warehouse) | Sumitro | SHM | 1543 | Jetis | Jaten | Karanganyar | Jawa Tengah | 3,610 |
| 227) | DSSA 3 | Land | DSSA | SHGB | 2 | Jaten | Jaten | Karanganyar | Jawa Tengah | 12,470 |
| 228) | DSSA 4 | Land | DSSA | SHGB | 8 | Gedanganak | Ungaran Timur | Semarang | Jawa Tengah | 3,225 |
| 229) | DSSA 4 | Land | DSSA | SHGB | 9 | Gedanganak | Ungaran Timur | Semarang | Jawa Tengah | 685 |
| 230) | DSSA 4 | Land | DSSA | SHGB | 19 | Langensari | Klepu | Semarang | Jawa Tengah | 16,480 |
| 231) | DSSA 4 | Land | DSSA | SHGB | 20 | Langensari | Klepu | Semarang | Jawa Tengah | 40,600 |
| 232) | DSSA 4 | Land | DSSA | SHGB | 55 | Langensari | Ungaran Barat | Semarang | Jawa Tengah | 60,830 |
| 233) | DSSA 4 | Land | DSSA | SHGB | 61 | Langensari | Ungaran Barat | Semarang | Jawa Tengah | 10,930 |
| 234) | DSSA 4 | Land | DSSA | SHGB | 62 | Langensari | Ungaran Barat | Semarang | Jawa Tengah | 130 |
| 235) | DSSA 4 | Land | DSSA | SHGB | 127 | Langensari | Ungaran Barat | Semarang | Jawa Tengah | 799 |
| 236) | DSSA 4 | Land | DSSA | SHGB | 208 | Gedanganak | Ungaran Timur | Semarang | Jawa Tengah | 199,744 |

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Reference | Description | Title-holder | Certificate | Certificate no | Desa | Kecamatan | Kabupaten | Propinsi | Area (m²) |
|---|---|---|---|---|---|---|---|---|---|---|
| 237) | DSSA 4 | Land | DSSA | SHGB | 1136 | Beji | Ungaran Timur | Semarang | Jawa Tengah | 15,983 |
| 238) | DSSA 4 | Land | DSSA | SHGB | 1166 | Gedanganak | Ungaran Timur | Semarang | Jawa Tengah | 5,380 |
| 239) | DSSA 5 | Land | Samuel Hartono | SHM | 1514 | Dagen | Jaten | Karanganyar | Jawa Tengah | 2,815 |
| 240) | DSSA 5 | Land | Samuel Hartono | SHM | 138 | Dagen | Jaten | Karanganyar | Jawa Tengah | 3,110 |
| 241) | DSSA 5 | Land | Samuel Hartono | SHM | 127 | Dagen | Jaten | Karanganyar | Jawa Tengah | 5,999 |
| 242) | DSSA 5 | Land | Samuel Hartono | SHM | 324 | Dagen | Jaten | Karanganyar | Jawa Tengah | 3,754 |
| 243) | DSSA 5 | Land | Samuel Hartono | SHM | 520 | Dagen | Jaten | Karanganyar | Jawa Tengah | 1,000 |
| 244) | DSSA 5 | Land | Samuel Hartono | SHM | 521 | Dagen | Jaten | Karanganyar | Jawa Tengah | 721 |
| 245) | DSSA 5 | Land | Samuel Hartono | SHM | 610 | Dagen | Jaten | Karanganyar | Jawa Tengah | 890 |
| 246) | DSSA 5 | Land | Samuel Hartono | SHM | 609 | Dagen | Jaten | Karanganyar | Jawa Tengah | 600 |
| 247) | DSSA 5 | Land | Samuel Hartono | SHM | 588 | Dagen | Jaten | Karanganyar | Jawa Tengah | 244 |
| 248) | DSSA 5 | Land | Samuel Hartono | SHM | 626 | Dagen | Jaten | Karanganyar | Jawa Tengah | 855 |
| 249) | DSSA 5 | Land | Samuel Hartono | SHM | 589 | Dagen | Jaten | Karanganyar | Jawa Tengah | 300 |
| 250) | DSSA 5 | Land | Samuel Hartono | SHM | 1508 | Dagen | Jaten | Karanganyar | Jawa Tengah | 111 |
| 251) | DSSA 5 | Land | Samuel Hartono | SHM | 810 | Dagen | Jaten | Karanganyar | Jawa Tengah | 476 |
| 252) | DSSA 5 | Land | Samuel Hartono | SHM | 1324 | Dagen | Jaten | Karanganyar | Jawa Tengah | 230 |

20 June 2020 Version

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

9.2    Appendix 2 (Sponsor Personal Assets)

| No | Certificate | Certificate No. | Area (m$^2$) | Location |
|---|---|---|---|---|
| 1) | SHM | 592 | 5.570 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 2) | SHM | 2735 | 2.910 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 3) | SHM | 1223 | 5.795 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 4) | SHM | 1076 | 615 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 5) | SHM | 1074 | 1.935 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 6) | SHM | 588 | 675 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 7) | SHM | 587 | 4.305 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 8) | SHM | 58 | 5.410 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 9) | SHM | 3451 | 4.018 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 10) | SHM | 3763 | 5.799 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 11) | SHM | 3437 | 1.955 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 12) | SHM | 2229 | 2.700 | Jalan Tegalsari, Langenharjo,  Grogol, Sukoharjo, Jawa Tengah |
| 13) | SHM | 66 | 1.174 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 14) | SHM | 138 | 951 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 15) | SHM | 139 | 780 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 16) | SHM | 140 | 306 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 17) | SHM | 141 | 642 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 18) | SHM | 142 | 556 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 19) | SHM | 205 | 2.611 | Jalan Adi Sucipto No. 98, Jajar, Laweyan, Surakarta, Jawa Tengah |
| 20) | SHM | 2021 | 103 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 21) | SHM | 2018 | 223 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 22) | SHM | 3667 | 166 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 23) | SHM | 2923 | 180 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 24) | SHM | 1826 | 480 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 25) | SHM | 2023 | 400 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |

Private and Confidential
20 June 2020 Version

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Certificate | Certificate No. | Area (m²) | Location |
|----|-------------|-----------------|-----------|----------|
| 26) | SHM | 3668 | 165 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 27) | SHM | 2705 | 250 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 28) | SHM | 2002 | 280 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 29) | SHM | 2076 | 145 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 30) | SHM | 2077 | 260 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 31) | SHM | 2110 | 421 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 32) | SHM | 3686 | 856 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 33) | SHM | 1869 | 715 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 34) | SHM | 2020 | 130 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 35) | SHM | 2922 | 177 | Jalan Raya Solo - Sragen KM. 14, Nangsri, Kebakkramat, Karanganyar |
| 36) | SHM | 3381 | 750 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 37) | SHM | 3380 | 586 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 38) | SHM | 3379 | 617 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 39) | SHM | 3409 | 177 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 40) | SHM | 3408 | 178 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 41) | SHM | 3410 | 168 | Jalan Lingkungan Desa Triyagan, Triyagan, Mojolaban, Karanganyar |
| 42) | SHM | 3403 | 140 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |

20 June 2020 Version                           Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Certificate | Certificate No. | Area (m²) | Location |
|----|-------------|-----------------|-----------|----------|
| 43) | SHM | 3407 | 148 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 44) | SHM | 3406 | 142 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 45) | SHM | 3404 | 140 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 46) | SHM | 3405 | 141 | Jalan Raya Solo - Karanganyar,  Triyagan, Mojolaban, Karanganyar |
| 47) | SHM | 1039 | 9.505 | Jalan Lingkungan Desa dagen, Dagen, Jaten, Karanganyar |
| 48) | SHM | 189 | 3.327 | Jalan Raya Solo - Sragen KM. 7,1, Dagen, Jaten, Karanganyar |
| 49) | SHM | 1933 | 283 | Jalan Raya Palur, Dagen, Jaten, Karanganyar |
| 50) | SHM | 3166 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 51) | SHM | 3167 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 52) | SHM | 3168 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 53) | SHM | 3169 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 54) | SHM | 3170 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 55) | SHM | 3171 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 56) | SHM | 3172 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 57) | SHM | 3173 | 108 | Jalan Lingkungan Perumahan Taman Serasi, Ngijo, Tasikmadu |
| 58) | SHM | 2639 | 5.990 | Jalan Raya Solo - Semarang, Mojosongo, Mojosongo, Boyolali |
| 59) | SHM | 2113 | 4.232 | Jalan Raya Solo - Semarang, Mojosongo, Mojosongo, Boyolali |
| 60) | SHM | 680 | 2.600 | Jalan Adi Sucipto, Solo |
| 61) | SHM | 737 | 2.450 | Jalan Adi Sucipto, Solo |
| 62) | SHM | 1504 | 275 | Jalan RM. Said No. 161, Mangkubumen, Banjarsari, Surakarta |
| 63) | SHM | 1590 | 104 | Jalan RM. Said No. 161, Mangkubumen, Banjarsari, Surakarta |
| 64) | SHM | 2454 | 1.492 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 65) | SHM | 2819 | 1.795 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 66) | SHM | 2820 | 1.924 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 67) | SHM | 2821 | 1.996 | Jalan Ahmad Yani, Pabelan, Kartasura, Sukoharjo |
| 68) | SHM | 772 | 606 | Jebres, Kec. Jebres, Kota Surakarta |
| 69) | SHM | 1271 | 294 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 70) | SHM | 2829 | 233 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 71) | SHM | 1266 | 121 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 72) | SHM | 1267 | 122 | Ruko Gayamsari, Jl Majapahit, Gayamsari, Semarang |
| 73) | SHM | 550 | 112 | Jl Slamet Riyadi, Pasar Kliwon, Surakarta |
| 74) | SHGB | 1021 | 110 | Jl Ir Soekarno Ruko JC 20, Solo Baru, Madegondo |

20 June 2020 Version

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian version of the Composition Plan shall prevail

| No | Certificate | Certificate No. | Area (m²) | Location |
|----|-------------|-----------------|-----------|----------|
| 75) | SHGB | 1025 | 110 | Jl Ir Soekarno Ruko JC 24, Solo Baru, Madegondo |
| 76) | SHGB | 1027 | 110 | Jl Ir Soekarno Ruko JC 26, Solo Baru, Madegondo |
| 77) | SHGB | 1014 | 110 | Jl Ir Soekarno Ruko JC 12, Solo Baru, Madegondo |
| 78) | SHM | 262 | 316 | Jl. Tentara Pelajar Banjarsari Solo |
| 79) | SHM | 1943 | 879 | Jalan Karanglo Sorogenen, Sleman, Yogyakarta |
| 80) | SHM | 1944 | 880 | Jalan Karanglo Sorogenen, Sleman, Yogyakarta |
| 81) | SHM | 2514 | 338 | Jalan Ahmad Yani, Gilingan, Banjarsari, Surakarta |
| 82) | SHM | 3010 | 134 | Jalan Ahmad Yani, Gilingan, Banjarsari, Surakarta |

20 June 2020 Version                                                      Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

9.3     Appendix 3 (Verified Creditors)

| No | Secured Creditors | Verified Claims |
|---|---|---|
| 1) | PT. BANK NEGARA INDONESIA (PERSERO), Tbk. | 485.079.274.747,00 |
| 2) | PT. BANK RAKYAT INDONESIA (PERSERO), Tbk. | 1.909.047.285.752,10 |
| 3) | PT. BANK PERMATA, Tbk. | 580.228.699.319,50 |
| 4) | PT. BANK NATIONALNOBU, Tbk. | 88.557.181.661,68 |
| 5) | PT. BANK HARDA INTERNASIONAL, Tbk. | 57.998.159.683,73 |
| 6) | PT. BANK DANAMON, Tbk | 237.390.000.000,00 |
| 7) | PT. BANK MULTIARTA SENTOSA | 184.259.220.629,62 |
| 8) | STANDARD CHARTERED BANK, CABANG JAKARTA | 620.820.172.243,26 |
| 9) | PT. BANK QNB INDONESIA, Tbk. | 146.288.931.697,82 |
| 10) | PT. BANK SBI INDONESIA | 34.084.949.462,00 |
| 11) | PT. BANK CIMB NIAGA, Tbk. | 367.012.756.271,55 |
| 12) | PT. BANK MASPION INDONESIA, Tbk. | 46.500.558.400,84 |
| 13) | PT. BANK CENTRAL ASIA, Tbk. | 3.183.480.400,00 |
| 14) | LEMBAGA PEMBIAYAAN EKSPOR INDONESIA (LPEI) / INDONESIA EXIMBANK | 3.133.615.225.062,82 |
| 15) | PT. BANK MANDIRI (PERSERO), Tbk. | 2.237.963.345.198,76 |
| 16) | PT. BANK MAYBANK INDONESIA, Tbk. | 536.500.829.759,93 |
| 17) | PT. BANK ICBC INDONESIA | 52.898.121.915,06 |
| 18) | PT. BANK BNI SYARIAH | 381.272.087.980,00 |
| 19) | PT. BANK BRI SYARIAH, Tbk. | 453.877.905.375,00 |
| 20) | PT. BANK MUAMALAT INDONESIA, Tbk. | 132.902.491.670,00 |
| 21) | PT. BANK SYARIAH MANDIRI | 527.773.626.668,27 |

20 June 2020 Version                                                    Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No | Secured Creditors | Verified Claims |
|----|-------------------|-----------------|
| 22) | THE BANK OF NEW YORK MELLON | 3.306.895.483.151,80 |
| 23) | BANCO FINANTIA, S.A. | 118.798.199.880,58 |
| 24) | IP ALL SEASONS ASIAN CREDIT FUND | 91.321.443.202,12 |
| 25) | SEA TOWN MASTER FUND | 148.490.151.629,98 |
| 26) | FMAP ACL LIMITED | 106.244.703.378,78 |
| 27) | ATHOS ASIA EVENT DRIVEN MASTER FUND | 211.449.975.885,94 |
| 28) | INCOME PARTNERS MANAGED VOLATILITY HIGH YIELD BOND FUND | 95.033.697.003,50 |
| 29) | ST ASSET MANAGEMENT LIMITED | 89.094.090.807,90 |
| 30) | GOPHER GLOBAL FIXED INCOME FUND | 152.944.856.134,94 |
| 31) | ING Bank N.V. - Singapore Branch | 382.416.861.848,28 |
| 32) | UNION BANK OF INDIA, HONG KONG | 406.129.330.958,80 |
| 33) | MITSUBISHI UFJ LEASE (Singapore) Pte Ltd | 79.538.834.558,00 |
| 34) | THE SHANGHAI COMMERCIAL & SAVINGS BANK Ltd SINGAPORE BRANCH | 26.512.944.947,28 |
| 35) | BANK OF PANHSIN | 86.504.032.699,28 |
| 36) | PT. BANK BNP PARIBAS INDONESIA | 492.315.382.866,80 |
| 37) | ENTIE COMMERCIAL BANK | 13.256.472.331,90 |
| 38) | STANDARD CHARTERED BANK | 216.482.454.018,98 |
| 39) | TAIWAN COOPERATIVE BANK, MANILA OFFSHORE BANKING BRANCH | 217.024.278.697,51 |
| 40) | BNP PARIBAS (SINGAPORE BRANCH) | 15.712.406.981,50 |
| 41) | MALAYAN BANKING BERHAD, SINGAPORE BRANCH | 245.731.459.764,24 |
| 42) | AOZORA ASIA PACIFIC FINANCE LIMITED | 53.025.889.611,08 |
| 43) | CHAILEASE INTERNATIONAL FINANCIAL SERVICES CO., LTD | 13.256.472.331,90 |

20 June 2020 Version                                                                 Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No | Secured Creditors | Verified Claims |
|----|-------------------|-----------------|
| 44) | NEC CAPITAL SOLUTIONS SINGAPORE PTE. LIMITED | 26.512.944.947,28 |
| 45) | PT. BANK JTRUST INDONESIA TBK. | 26.531.233.234,26 |
| 46) | PT BANK SHINHAN INDONESIA | 496.478.235.138,26 |
| 47) | INDIAN BANK, SINGAPORE BRANCH | 319.292.631.645,08 |
| 48) | QATAR NATIONAL BANK (Q.P.S.C.), SINGAPORE BRANCH (QNB) | 540.299.433.409,54 |
| 49) | WOORI GLOBAL MARKETS ASIA LIMITED | 128.749.638.423,00 |
| 50) | YUANTA COMMERCIAL BANK CO., LTD HONG KONG BRANCH | 218.085.315.989,54 |
| 51) | STANDARD CHARTERED BANK SINGAPORE LIMITED | 162.898.732.322,00 |
| 52) | FIRST COMMERCIAL BANK, LTD., SINGAPORE BRANCH | 128.749.638.423,00 |
| 53) | FIRST ABU DHABI BANK PJSC, SINGAPORE BRANCH | 146.284.566.531,00 |
| 54) | THE HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, JAKARTA BRANCH (PT. BANK HSBC INDONESIA)) | 297.370.886.207,06 |
| 55) | SUMITOMO MITSUI BANKING CORPORATION, SINGAPORE BRANCH | 141.543.946.365,00 |
| 56) | CHINA CITIC BANK INTERNATIONAL LIMITED, SINGAPORE BRANCH | 110.227.245.438,36 |
| 57) | FEDERATED PROJECT AND TRADE FINANCE CORE FUND | 37.703.982.566,14 |
| 58) | PINPOINT MULTI STRATEGY MASTER FUND | 133.641.136.424,46 |

20 June 2020 Version                                                      Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No | Unsecured Creditors | Verified Claims |
|---|---|---|
| 1) | PT. BANK NEGARA INDONESIA (PERSERO), Tbk. | 63.128.069.699,00 |
| 2) | PT. BANK DANAMON, Tbk. | 23.895.798.936,64 |
| 3) | STANDARD CHARTERED BANK, CABANG JAKARTA | 46.310.000.000,00 |
| 4) | ING Bank N.V. - Singapore Branch | 20.685.121.010,50 |
| 5) | THE BANK OF NEW YORK MELLON | 2.267.840.000,00 |
| 6) | CV. CAHAYA ASIA | 3.604.618.800,00 |
| 7) | PT. SHINE GOLDEN BRIDGE | 1.697.880.000,00 |
| 8) | PT. PANCA ABADI NUSANTARA | 323.491.431.557,00 |
| 9) | PT. NUSANTARA ANUGERAH TEKSTIL | 66.670.179.091,00 |
| 10) | PT. KINERJA MUTIARA PERSADA | 3.270.865.925,00 |
| 11) | PT. KARIS SUN INDONESIA | 12.751.200,00 |
| 12) | CV. SURYA PUTERA ANUGERAH | 694.724.580,00 |
| 13) | PT. ASTER POLYCEM | 12.440.606.300,00 |
| 14) | PT. SUMBER ABADI ENERGINDO | 11.508.256.250,00 |
| 15) | PT. ADIL JAYA | 177.117.240,00 |
| 16) | PT. SOUTH PACIFIC VISCOSE | 59.510.381.573,40 |
| 17) | PT. PURINUSA EKAPERSADA | 88.524.023,00 |
| 18) | PT. LAUTAN LUAS, Tbk. | 56.584.000,00 |
| 19) | PT. SAMUDRA DWI TRANSPORINDO | 464.669.875,50 |
| 20) | UD. SAMUDRA TRANSPORT | 61.389.686,50 |
| 21) | CV. PRATAMA JAYA TRANSPORT | 131.520.541,00 |
| 22) | PT. MULTIKIMIA INTIPELANGI | 1.024.401.345,00 |
| 23) | DRIYANI YUNINGTYAS | 1.000.000,00 |
| 24) | GRACE CHRISNAWATI CHRISTIANTO | 1.000.000,00 |
| 25) | WAGIMAN | 1.000.000,00 |
| 26) | IRMA ADE NUGROHO | 1.000.000,00 |
| 27) | SHERLY PRICILIA SURYA | 1.000.000,00 |

20 June 2020 Version                                                    Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No | Unsecured Creditors | Verified Claims |
|----|---------------------|-----------------|
| 28) | NONIK | 1.000.000,00 |
| 29) | PRISKILLA LAURENSIA | 1.000.000,00 |
| 30) | MONICA YUBI ASTARI | 1.000.000,00 |
| 31) | MICHEL CHRISA EFFENDI | 1.500.000,00 |
| 32) | SUNARDI | 1.000.000,00 |
| 33) | RELLA EDWIN H | 1.000.000,00 |
| 34) | EMA AMBAR M | 1.000.000,00 |
| 35) | RONNY KURNIAWAN | 1.000.000,00 |
| 36) | RISKA FEBRIAN UTOMO | 1.500.000,00 |
| 37) | YOHANES FATOMI | 1.000.000,00 |
| 38) | SHERLY PUTRI P | 1.000.000,00 |
| 39) | STEFFI INDAH | 1.000.000,00 |
| 40) | MERRY YANIKA PUTRI | 1.000.000,00 |
| 41) | EMEILYA KUMALA S | 1.000.000,00 |
| 42) | RIZKY K | 1.000.000,00 |
| 43) | KRISTIANI | 1.000.000,00 |
| 44) | MONICA | 1.000.000,00 |
| 45) | POPPY TJANDRA DEWI | 1.500.000,00 |
| 46) | YOHANES HENDRAKUSUMA | 1.000.000,00 |
| 47) | HERI LISTYONO | 1.000.000,00 |
| 48) | AGUSTINA PINDAWATI | 1.000.000,00 |
| 49) | NOVI UTAMI PRASETIO | 1.000.000,00 |
| 50) | ASIH ARIYANI | 1.000.000,00 |
| 51) | GERSON TULE | 1.000.000,00 |
| 52) | DEASI KUSTIANI | 1.000.000,00 |
| 53) | IRWAN BUDIYONO | 1.000.000,00 |
| 54) | MUHARI | 1.000.000,00 |
| 55) | DJOKO SUPARNO | 1.000.000,00 |

20 June 2020 Version                                                  Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No | Unsecured Creditors | Verified Claims |
|----|---------------------|-----------------|
| 56) | RIYANA DEWI | 1.000.000,00 |
| 57) | ERNEST SETYAWAN | 1.500.000,00 |
| 58) | NATALIA INTAN S | 1.000.000,00 |
| 59) | SUJATMO | 1.000.000,00 |
| 60) | BUDHI SAPUTRA | 1.000.000,00 |
| 61) | LAURENTIUS EGA S | 1.500.000,00 |
| 62) | STEFFI SINATA | 1.000.000,00 |
| 63) | ANDRE PRASETYA | 1.000.000,00 |
| 64) | CATUR PRABOWO | 1.000.000,00 |
| 65) | HADIYONO | 1.000.000,00 |
| 66) | IVANDY PUTRA PRABUANA | 1.000.000,00 |
| 67) | NATASHA FELITA | 1.000.000,00 |
| 68) | WIDIANTO ADHI D | 1.000.000,00 |
| 69) | S. CHRISTIAN ANDREAS P | 1.000.000,00 |
| 70) | HASAN | 1.500.000,00 |
| 71) | LILIK PURIWIYANTO | 1.000.000,00 |
| 72) | BREMI ADI P | 1.000.000,00 |
| 73) | ARIS BUDIANTO | 1.000.000,00 |
| 74) | DAVID SETIAWAN RUDYANTO | 1.000.000,00 |
| 75) | ALVIN NATANAEL TANUJAYA | 1.000.000,00 |
| 76) | ELIZABETH PUTRI PERMATASARI | 1.000.000,00 |
| 77) | RACHELITA HARITAMA | 1.000.000,00 |
| 78) | SUKARJO | 1.000.000,00 |
| 79) | AMY AMELIA | 1.000.000,00 |
| 80) | SAMUEL FEBRIATNO | 1.500.000,00 |
| 81) | FRANSISKA MAYA SARI | 1.000.000,00 |
| 82) | YOHANES ENDRA KRISTIANTOMO | 1.000.000,00 |
| 83) | DARMI DARMO SUGONDO | 1.000.000,00 |

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No | Unsecured Creditors | Verified Claims |
|---|---|---|
| 84) | SUGENG HARYANTO | 1.000.000,00 |
| 85) | SHYNINTA CANDRA PUTRI | 1.000.000,00 |
| 86) | DANY GUNAWAN | 1.000.000,00 |

20 June 2020 Version

Private and Confidential

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

9.4    Appendix 4 (CSPA Term Sheet)

Term Sheet for Conditional Sale and Purchase Agreement ("**CSPA**")

| No. | Key Issues | Key Terms |
|---|---|---|
| 1) | Purchaser | Designated party(ies) by the LWG Syndicated Creditors, which will be receiving conditional assignment of LWG Syndicated Creditors' debt under the Existing Facilities (equivalent to the aggregate liquidation value of LWG Assets (as defined below)).<br><br>(hereinafter referred to as "**Purchaser**") |
| 2) ` | Sellers | 1)  DMDT;<br><br>2)  DDT; and<br><br>3)  DDST.<br><br>(hereinafter collectively referred to as "**Sellers**" and each referred to as "**Seller"**). Each Seller will enter into a separate CSPA with the Purchaser. |
| 3) | Execution Date | No later than 3 (three) months after the Effective Date of the Composition Plan unless the Purchaser, at its sole discretion, decides to extend the Execution Date. |
| 4) | Effective Date | The CSPA becomes effective upon the occurrence of a Default against the LWG Syndicated Creditors under the Composition Plan by the Debtors and/or Sponsor ("**Effective Date**"). |
| 5) | Period | 1)  Seven years or any time before seven years as decided, at its sole discretion, by the Purchaser as of the Effective Date of the CSPA.<br><br>2)  Subject to the completion of the CSPA period, the Purchaser has the right to purchase the LWG Assets or appoint another designated party to purchase the LWG Assets.<br><br>3)  Without prejudice to above, the Purchaser may also extend the CSPA period at its sole discretion by notifying the Sellers. |
| 6) | Purchased Assets | Secured assets to the LWG Syndicated Creditors under the Existing Facilities ("**LWG Assets**"). |
| 7) | Purchase Price and Settlement Method | 1)  Pre-determined price based on the liquidation value of the LWG Assets as determined by a public appraisal service office (*kantor jasa penilai publik* or "KJPP") valuations ("**Purchase Price**").<br><br>2)  At the latest 7 Days following the Effective Date of the CSPA, the Sellers can request to the Purchaser for a new appraisal on the liquidation value |

20 June 2020 Version                                          Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No. | Key Issues | Key Terms |
|---|---|---|
| | | ("**Request**"). A KJPP should be appointed at the sole discretion of the Purchaser at the latest 30 Days since the receipt the Request by the Purchaser. At the latest 30 Days following the receipt of the new liquidation value by the Purchaser, the Purchaser will have the right to continue with the CSPA or to enforce the security rights at the Purchaser's sole discretion. |
| | | 3) The Purchaser will pay the Purchase Price by way of set-off against the Sellers' debt to the Purchaser (following the assignment of the Sellers' debt from the LWG Syndicated Creditors to the Purchaser), or any other methods determined at the sole discretion of the Purchaser. |
| | | 4) It is agreed that the payment of Purchase Price can be done in multiple tranches or a one-time payment, as determined at the sole discretion of the Purchaser. |
| | | 5) In the event that the ownership title of LWG Assets is transferred from DDT, DMDT, and DDST (as relevant), all debts of DDT, DMDT, and DDST (as relevant) to the relevant LWG Syndicated Creditors under the Existing Facilities and the Composition Plan are deemed fully paid. |
| 8) | Right to Use | 1) During the CSPA period, the Purchaser has the right to possess, operate and utilize the LWG Assets. It is the parties' intention that the Sellers will grant (i) physical possession of the LWG Assets to the Purchaser and (ii) the right to operate the LWG Assets, from the Effective Date of the CSPA pending the transfer of ownership title of the LWG Assets to the Purchaser. |
| | | 2) The Sellers agree to assign or novate any existing operating contracts related to LWG Assets to the Purchaser, including but not limited to water, electricity and any other relevant contracts in relation to the LWG Assets operation. The Purchaser is also entitled to enter into any other contracts with any third party(ies) for the operational activity of LWG Assets without the need to seek approval from the Sellers. |
| | | 3) The Sellers must maintain the validity of applicable licenses for LWG Assets operation and, if necessary, will use their best endeavours to assist the Purchaser in obtaining any necessary licenses from any governmental body in order to operate the LWG Assets. |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No. | Key Issues | Key Terms |
|-----|-----------|-----------|
|  |  | 4) During the Purchaser's utilization of LWG Assets, the Purchaser is entitled to fully receive any proceeds from the operation of LWG Assets. For the avoidance of doubt, any proceeds generated owned from the operation of the LWG Asset are fully owned by the Purchaser.<br><br>5) In the event that the Purchaser enforce the Right to Use, all debts of DDT, DMDT, and DDST (as relevant) to the relevant LWG Syndicated Creditors under the Existing Facilities and the Composition Plan are deemed fully paid. |
| 9) | Grant of Security Rights | The Sellers must ensure that the existing Security Documents over the LWG Assets are still valid, binding and enforceable in favor of the Purchaser. Each Seller shall execute all documents and do all such things necessary as the Purchaser may reasonably request for perfecting the existing security rights over LWG Asset (including, if necessary, re-executing the relevant Security Documents). |
| 10) | Conditions to Closing | 1) The completion of the CSPA would be subject to the satisfaction of the following conditions precedent within the CSPA period or at a later date as agreed between the parties:<br><br>a) settlement of the Purchase Price by way of set-off against the Sellers' debt to the Purchaser (following the assignment of the Sellers' debt from the LWG Syndicated Creditors to the Purchaser), either through tranches of payment or one-time payment based on the sole discretion of the Purchaser;<br><br>b) the existing Security Documents will be amended to reflect that until transfer of title occurs, the existing security documents will also secure the Purchaser's rights and claims against the Sellers;<br><br>c) the Sellers have obtained all resolutions and approvals, whether internal or from any third party to enter into such documents required in order to give such power, approval or consent to the closing of this sale and purchase of the LWG Assets to the Purchaser or its designated party;<br><br>d) the Sellers have paid all of the lands and building taxes (*pajak bumi dan bangunan* or "PBB") and any ownership costs in relation to the LWG Assets, including but not limited to severance |

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No. | Key Issues | Key Terms |
|---|---|---|
| | | pay of the Sellers' employees, as indebted until the closing date; <br><br> e) the Sellers are not in default of the Composition Plan which may result to the Sellers' bankruptcy; <br><br> f) no cancellation of the Composition Plan, bankruptcy, PKPU and/other similar proceedings initiated/threatened against the Sellers; and <br><br> g) other conditions precedent as the Purchaser (or its designated party) sees fit <br><br> 2) The conditions precedent may only be waived or amended in writing at the sole discretion of the Purchaser. <br><br> 3) On the closing date, the Sellers and the Purchaser (or its designated party) shall sign the deed of sale and purchase of land for the LWG Assets ("**SPA**"). |
| 11) | Tax / Cost | 1) Each party will be responsible to pay any land transfer taxes in relation to the transfer of LWG Assets from the Sellers to the Purchasers (or its designated party) at the completion date. <br><br> 2) The Sellers will remain responsible for any land tax or other ownership cost, including but not limited to any customs obligation, in connection with the LWG Assets until the transfer of title is completed. |
| 12) | Representations and Warranties by the Sellers | The Sellers shall provide representations and warranties that are common for this type of transaction, including but not limited to: <br><br> 1) The Sellers have conducted all of the required actions and have obtained all approvals, powers and formalities to validly enter and perform their liabilities in this CSPA and warrants that such liabilities are legal, valid, binding and can be performed, fulfilled or executed on the closing date. <br><br> 2) Only the Sellers are entitled and fully authorized to transfer rights and interests in the LWG Assets and except for the existing encumbrance acknowledged in the Composition Plan, the LWG Assets are free and clear of any mortgage, assignment of receivables, fiduciary security interest, debenture, lien, charge, pledge, security interest, title retention, right to acquire, option, restriction on transfer, contractual restriction, easement, right-of-way, option, right of first refusal, right of pre-emption, or any other type of preferential arrangement or any other encumbrance or condition whatsoever and any other arrangement having substantially the same or |

Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No. | Key Issues | Key Terms |
|-----|-----------|-----------|
|  |  | similar economic effect, or the security or right of the use thereof, or any agreement or arrangement to create the same.<br><br>3) The LWG Assets have been used and the construction, renovation and operation of the LWG Assets in accordance with the law, including environmental laws, and all authorizations from any agency, authority, official or instrumentality of any such government, whether national, local, or regional which are required have been obtained by the Sellers.<br><br>4) All dues pertaining to the utilities installed at the LWG Assets have been cleared and paid in full, and all terms and conditions of the agreements and/or licenses for their use have been complied with, so the Purchaser will be able to continue using the utilities on the Effective Date of the CSPA.<br><br>5) There is no environment related issues on the LWG Assets, and the Sellers have not received any written notice or report regarding any actual or alleged violation of environmental, health, and safety requirements, or any liabilities or potential liabilities, including any investigatory, remedial or corrective obligations, relating to the LWG Assets or any of its facilities.<br><br>6) The insurance policy over the LWG Assets are in full force and effect, and the Sellers are (i) not in breach or default (including with respect to the payment of premiums or the giving of notices), (ii) no event has occurred which may render any such insurance policy void, and (iii) no party to the policy has repudiated any provision thereof.<br><br>7) The employees located or placed in the LWG Assets shall remain to be employed by the Sellers. If it is desired by the Purchaser (or its designated party) to hire the Sellers' employees at any time during the period of the CSPA, the Sellers must terminate and be responsible for the full severance payment either in the forms of statutory or ex-gratia, without any due and outstanding payment, to the employees (clean break). |
| 13) | Indemnity | 1) The Sellers represent and warrant to the Purchaser that each of the statements set out in the Sellers' representations and warranties above is at the date of the CSPA, the Effective Date of the CSPA and will at completion and at all times before completion (by reference to the facts and circumstances existing at |

20 June 2020 Version                                                    Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No. | Key Issues | Key Terms |
|---|---|---|
| | | the relevant time) be, true and accurate and not misleading. <br><br> 2) The Sellers undertake (without limiting any other rights of the Purchaser in any way including its rights to damages in respect of a claim for breach of any Sellers' warranty on any other basis) that, if there is a breach of any Sellers' warranties and the completion takes place, they shall pay in cash to the Purchaser (or its designated party) on demand a sum equal to: <br><br> a) the loss resulting from such breach; or <br><br> b) all loss which the Purchaser (or its designated party) incurs, whether before or after completion arising (directly or indirectly) out of the settlement of a claim in respect of a breach or an alleged breach of any representations and warranties under the CSPA, or the enforcement of a settlement. |
| 14) | Covenant | 1) Following the Effective Date of the CPSA, in the event that the CSPA, the SPA, and/or any other terms under this CSPA and the SPA cease to be valid, binding or enforceable (whether in whole or in part), the CSPA and the SPA will be unwound and the Sellers will become liable to pay the whole of the debt to LWG Syndicated Creditors and/or Purchaser (as the case may be) in the number verified under the Composition Plan (including, without limitation, the portion of the debt assigned from the LWG Syndicated Creditors to the Purchaser). <br><br> 2) In the event that the Sponsor and/or the Debtor(s) go to bankruptcy or there is a claim to cancel the Composition Plan and/or the Sponsor's composition plan under Case No. 25/Pdt.Sus-PKPU/2019/PN.SMG., the Purchaser will have the right to exit the CSPA and the CSPA will be unwound and the Sellers will become liable to pay the whole of the debt to the LWG Syndicated Creditors and/or the Purchaser (as the case may be) in the number verified under Composition Plan (including, without limitation, the portion of the debt assigned from the LWG Syndicated Creditors to the Purchaser). Debtors and Sponsor agree that CSPA will not waive the right for LWG Syndicated Creditors and its designated party to submit claim during bankruptcy of Debtors and/Sponsor. |
| 15) | Governing Law | Laws of the Republic of Indonesia |

Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

| No. | Key Issues | Key Terms |
|---|---|---|
| 16) | Dispute Resolution | Singapore International Arbitration Centre (SIAC) with three arbitrators. The seat of the arbitration shall be Singapore. |
| 17) | Language | This CSPA is prepared in the English language and the Indonesian language. For the avoidance of any doubt, the Indonesian language text will prevail in the event of any inconsistencies or differences of interpretation with the English language text. |

20 June 2020 Version                                                Private and Confidential
Unofficial Translation of Composition Plan
In the event of any inconsistency between the English and Indonesian versions, the Indonesian
version of the Composition Plan shall prevail

9.5      Appendix 5 (Settlement Details)

# DDT

*Private & Confidential*

# DDT
Outstanding Debt

| Creditors | Principal | | Interest / Margin | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BRI | 804,176 | 27,440 | 22,369 | 167 | 99 | 0 | - | - | 826,644 | 27,607 |
| LPEI | 1,051,564 | - | 19,405 | - | - | - | 6,722 | - | 1,077,690 | - |
| Mandiri | 500,000 | 15,345 | 14,409 | 176 | 9,193 | - | 4,531 | 24 | 528,133 | 15,545 |
| Mega | 200,048 | - | 1,465 | - | - | - | 1,168 | - | 202,682 | - |
| SCB Indonesia | - | 13,220 | - | 21 | - | - | - | - | - | 13,241 |
| Shinhan Indonesia | 249,607 | - | 4,162 | - | - | - | - | - | 253,769 | - |
| **Sub-total Bilateral Loan** | **2,805,395** | **56,005** | **61,810** | **364** | **9,292** | **-** | **12,421** | **24** | **2,888,918** | **56,393** |
| | | | | | | | | | | |
| **Syndicated Loan** | | | | | | | | | | |
| Bank of Panhsin | - | 4,118 | - | 114 | - | - | - | - | - | 4,232 |
| BNPP Indonesia | - | 4,314 | - | 133 | - | - | - | - | - | 4,447 |
| BNPP Singapore[1] | - | 574 | - | - | - | - | - | - | - | 574 |
| First Abu Dhabi Bank, Singapore | - | 10,000 | - | 321 | - | - | - | - | - | 10,321 |
| First Commercial Bank Ltd, Singapore | - | 8,824 | - | 260 | - | - | - | - | - | 9,084 |
| Indian Bank, Singapore | - | 18,236 | - | 550 | - | - | - | - | - | 18,786 |
| LPEI | - | 13,236 | - | 416 | - | - | - | - | - | 13,652 |
| Maybank Indonesia | - | 6,111 | - | 208 | - | 1 | - | - | - | 6,320 |
| Maybank Singapore | - | 5,948 | - | 165 | - | - | - | - | - | 6,114 |
| QNB Singapore | - | 17,648 | - | 519 | - | - | - | - | - | 18,167 |
| SCB London[1] | - | 574 | - | - | - | - | - | - | - | 574 |
| SCB Singapore | - | 11,177 | - | 315 | - | - | - | - | - | 11,493 |
| Union Bank of India, HK | - | 15,099 | - | 420 | - | - | - | - | - | 15,519 |
| Woori Global Markets Asia | - | 8,824 | - | 260 | - | - | - | - | - | 9,084 |
| Yuanta Commercial Bank | - | 8,824 | - | 260 | - | - | - | - | - | 9,084 |
| **Sub-total Syndicated Loan** | **-** | **133,507** | **-** | **3,941** | **-** | **1** | **-** | **-** | **-** | **137,451** |
| | | | | | | | | | | |
| **Total Outstanding Debt** | 2,805,394 | 189,512 | 61,810 | 4,303 | 9,292 | 1 | 12,421 | 24 | 2,888,918 | 193,840 |
| **Total Outstanding Debt (IDR Mn Eqv.)[2]** | | 5,491,542 | | 122,799 | | 9,307 | | 12,764 | | 5,636,411 |

[1] Fee related to DDT Syndicated Loan
[2] Bank Indonesia middle rate USD/IDR: 14,174 as of PKPU Date 30 September 2019

1

*Private & Confidential*

# DDT

Sustainable and Unsustainable Debt Allocation



**Note:**
1) Non-Operating Assets pledged to SCB Indonesia are cross collateral with SCB Indonesia facilities in DDST and DMST.

2

*Private & Confidential*

# DDT

Proposed Debt Settlement (1/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche Syndication A | Tranche Syndication C | Tranche C |
|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | |
| BRI | IDR Mn | 804,176 | 190,000 | 140,000 | - | - | - | 474,176 |
| | USD 000 | 27,440 | 6,350 | 4,939 | - | - | - | 16,152 |
| LPEI | IDR Mn | 1,051,564 | 200,000 | 150,000 | - | - | - | 701,564 |
| | USD 000 | - | | | - | - | - | |
| Mandiri | IDR Mn | 500,000 | 200,000 | 150,000 | - | - | - | 150,000 |
| | USD 000 | 15,345 | 5,644 | 4,233 | - | - | - | 5,468 |
| **Sub-total Bilateral Loan** | **IDR Mn** | **2,355,740** | **590,000** | **440,000** | **-** | **-** | **-** | **1,325,740** |
| | **USD 000** | **42,785** | **11,994** | **9,172** | **-** | **-** | **-** | **21,620** |

*Private & Confidential*

# DDT
## Proposed Debt Settlement (2/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche Syndication A | Tranche Syndication C | Tranche C |
|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | |
| Bank of Panhsin | USD 000 | 4,118 | - | - | - | 2,381 | 1,737 | - |
| BNPP Indonesia | USD 000 | 4,314 | - | - | - | 2,494 | 1,820 | - |
| BNPP Singapore¹ | USD 000 | 574 | - | - | - | 332 | 242 | - |
| First Abu Dhabi Bank PJSC, Singapore | USD 000 | 10,000 | - | - | - | 5,781 | 4,219 | - |
| First Commercial Bank Ltd, Singapore | USD 000 | 8,824 | - | - | - | 5,101 | 3,723 | - |
| Indian Bank, Singapore Branch | USD 000 | 18,236 | - | - | - | 10,542 | 7,694 | - |
| LPEI | USD 000 | 13,236 | 2,822 | 2,117 | - | - | - | 8,297 |
| Maybank Singapore | USD 000 | 5,948 | - | - | - | 3,438 | 2,510 | - |
| Maybank Indonesia | USD 000 | 6,111 | - | - | - | 3,533 | 2,578 | - |
| QNB Singapore | USD 000 | 17,648 | - | - | - | 10,202 | 7,446 | - |
| SCB London¹ | USD 000 | 574 | - | - | - | 332 | 242 | - |
| SCB Singapore | USD 000 | 11,177 | - | - | - | 6,461 | 4,716 | - |
| Union Bank of India, HK | USD 000 | 15,099 | - | - | - | 8,729 | 6,370 | - |
| Woori Global Markets Asia | USD 000 | 8,824 | - | - | - | 5,101 | 3,723 | - |
| Yuanta Commercial Bank | USD 000 | 8,824 | - | - | - | 5,101 | 3,723 | - |
| **Sub-total Syndicated Loan** | **USD 000** | **133,507** | **2,822** | **2,117** | **-** | **69,527** | **50,744** | **8,297** |
| **Total Bilateral and Syndicated Loans** | **IDR Mn** | **2,355,740** | **590,000** | **440,000** | **-** | **-** | **-** | **1,325,740** |
| | **USD 000** | **176,293** | **14,816** | **11,288** | **-** | **31,147** | **50,744** | **29,917** |

¹ *Fee related to DDT Syndicated Loan*

*Private & Confidential*

# DDT
## Debt Restructuring Terms – Settlement for BRI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 804,176,000,000 | 27,440,257 | 1,193,114,196,198 |
| Interest / Margin | 22,369,180,386 | 166,579 | 24,730,272,691 |
| Penalty | 99,089,198 | 122 | 100,818,426 |
| **Total BRI Bilateral Loan** | **826,644,269,584** | **27,606,958** | **1,217,945,287,315** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 190,000,000,000 and USD 6,349,654 / 10 years from Effective Date. |
| Tranche A2 Principal / Tenor | IDR 140,000,000,000 and USD 4,938,620 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 474,176,000,000 and USD 16,151,982 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and Tranche A2, and last principal payment paid on the last day of the 12th year for Tranche C ("**Scheduled Principal Payment**"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 and Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for BRI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR mn) – Tranche A1 | 190,000 | 190 | 190 | 4,750 | 9,500 | 14,250 | 19,000 | 19,000 | 22,800 | 25,650 | 74,670 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 6,350 | 6 | 6 | 159 | 317 | 476 | 635 | 635 | 762 | 857 | 2,497 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche A2 | 140,000 | 140 | 140 | 140 | 140 | 140 | 140 | 140 | 49,000 | 49,000 | 41,020 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 4,939 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 1,729 | 1,729 | 1,446 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche C | 474,176 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 474 | 71,126 | 398,310 |
| Principal Repayment (USD 000) – Tranche C | 16,152 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 2,423 | 13,569 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for Mandiri (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 500,000,000,000 | 15,344,973 | 717,499,642,483 |
| Interest / Margin | 14,408,867,516 | 176,351 | 16,908,464,605 |
| Penalty | 9,192,622,752 | | 9,192,622,752 |
| Other Fees | 4,531,481,400 | 24,156 | 4,873,871,662 |
| **Total Mandiri Bilateral Loan** | **528,132,971,667** | **15,545,480** | **748,474,601,502** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 200,000,000,000 and USD 5,644,137 / 10 years from Effective Date. |
| Tranche A2 Principal / Tenor | IDR 150,000,000,000 and USD 4,233,103 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 150,000,000,000 and USD 5,467,733 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and Tranche A2, and last principal payment paid on the last day of the 12th year for Tranche C ("**Scheduled Principal Payment**"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 and Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for Mandiri (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR mn) – Tranche A1 | 200,000 | 200 | 200 | 5,000 | 10,000 | 15,000 | 20,000 | 20,000 | 24,000 | 27,000 | 78,600 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 5,644 | 6 | 6 | 141 | 282 | 423 | 564 | 564 | 677 | 762 | 2,219 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | | |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | | |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | | |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.00% | - | - | - | - | - | - | - | - | | |
| Principal Repayment (IDR mn) – Tranche A2 | 150,000 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 52,500 | 52,500 | 43,950 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 4,233 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 1,482 | 1,482 | 1,241 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% | 5.00% | | |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | - | - | - | | |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | 2.50% | | |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | - | - | - | | |
| Principal Repayment (IDR mn) – Tranche C | 150,000 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 22,500 | 126,000 |
| Principal Repayment (USD 000) – Tranche C | 5,468 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 820 | 4,598 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for LPEI (1/3)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 1,051,563,562,663 | - | 1,051,563,562,663 |
| Interest / Margin | 19,405,065,921 | - | 19,405,065,921 |
| Penalty | 6,721,543,157 | - | 6,721,543,157 |
| **Total LPEI Bilateral Loan** | **1,077,690,171,742** | **-** | **1,077,690,171,742** |
| | | | |
| **Syndicated Loan** | | | |
| Principal | - | 13,236,000 | 187,607,064,000 |
| Interest / Margin | - | 415,546 | 5,889,955,382 |
| Penalty | - | - | - |
| **Total LPEI Syndicated Loan** | **-** | **13,651,546** | **193,497,019,382** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 280.000.000.000 and USD 2,822,069 / 10 years from Effective Date. |
| Tranche A2 Principal / Tenor | IDR 210.000.000.000 and USD 2,116,551 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 561.563.562.663 and USD 8,297,380 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and Tranche A2, and last principal payment paid on the last day of the 12th year for Tranche C ("**Scheduled Principal Payment**"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 and Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for LPEI (2/3)

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to LPEI and/or debt reduction through *AYDA* shall be used as accelerated repayment of outstanding principal of LPEI's portion in Tranche C at DDT or DMST with inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of LPEI.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

10

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for LPEI (3/3)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral and Syndicated Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR mn) – Tranche A1 | 280,000 | 280 | 280 | 7,000 | 14,000 | 21,000 | 28,000 | 28,000 | 33,600 | 37,800 | 110,040 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 2,822 | 3 | 3 | 71 | 141 | 212 | 282 | 282 | 339 | 381 | 1,108 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche A2 | 210,000 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 73,500 | 73,500 | 61,530 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 2,117 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 741 | 741 | 621 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | 2.40% | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | 1.15% | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche C | 561,564 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 562 | 84,235 | 471,709 |
| Principal Repayment (USD 000) – Tranche C | 8,297 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 1,245 | 6,972 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for DDT Syndicated Lenders[1] (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Syndicated Loan**[1] | | | |
| Principal | - | 120,271,450 | 1,704,727,532,300 |
| Interest / Margin | - | 3,523,452 | 49,941,408,675 |
| Penalty | - | 945 | 13,398,775 |
| **Total Syndicated Loan** | - | **123,795,847** | **1,754,682,339,749** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche DDT Syndication A Principal / Tenor | USD 69,527,672 / 7 years from Effective Date |
| Tranche DDT Syndication C Principal / Tenor | USD 50,743,778 / 15 years from Effective Date |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 7th year for Tranche DDT Syndication A. Tranche DDT Syndication C shall be paid through a single balloon payment on the last day of the 15th year. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DDT Syndication A principal, quarterly payments. No interest / margin payment for Tranche DDT Syndication C. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 15th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

[1] excluding LPEI portion in DDT syndication

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for DDT Syndicated Lenders[1] (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan**[1] | | | | | | | | | |
| Principal Repayment – Tranche DDT Syndication A (USD 000) | 69,257 | 3,426 | 7,787 | 9,344 | 10,590 | 11,514 | 11,514 | 15,352 | - |
| Cash Interest / Margin Rate – Tranche DDT Syndication A (USD denominated Loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | |
| Principal Repayment – Tranche DDT Syndication C (USD 000) | 50,744 | - | - | - | - | - | - | - | 50,744 |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|
| **DDT Syndicated Lenders Principal Repayment by Banks (USD 000)** | | | | | | | | | |
| Bank of Panhsin | **4,118** | 117 | 267 | 320 | 363 | 394 | 394 | 526 | 1,737 |
| BNPP Indonesia | **4,314** | 123 | 279 | 335 | 380 | 413 | 413 | 551 | 1,820 |
| First Abu Dhabi Bank PJSC, Singapore | **10,000** | 285 | 647 | 777 | 881 | 957 | 957 | 1,276 | 4,219 |
| First Commercial Bank Ltd, Singapore | **8,824** | 251 | 571 | 686 | 777 | 845 | 845 | 1,126 | 3,723 |
| Indian Bank, Singapore Branch | **18,236** | 519 | 1,181 | 1,417 | 1,606 | 1,746 | 1,746 | 2,328 | 7,694 |
| Maybank Singapore | **5,948** | 169 | 385 | 462 | 524 | 569 | 569 | 759 | 2,510 |
| Maybank Indonesia | **6,111** | 174 | 396 | 475 | 538 | 585 | 585 | 780 | 2,578 |
| QNB Singapore | **17,648** | 503 | 1,143 | 1,371 | 1,554 | 1,690 | 1,690 | 2,253 | 7,446 |
| SCB Singapore | **11,177** | 318 | 724 | 868 | 984 | 1,070 | 1,070 | 1,427 | 4,716 |
| Union Bank of India, HK | **15,099** | 430 | 978 | 1,173 | 1,329 | 1,445 | 1,445 | 1,927 | 6,370 |
| Woori Global Markets Asia | **8,824** | 251 | 571 | 686 | 777 | 845 | 845 | 1,126 | 3,723 |
| Yuanta Commercial Bank | **8,824** | 251 | 571 | 686 | 777 | 845 | 845 | 1,126 | 3,723 |
| BNPP Singapore | **574** | 16 | 37 | 45 | 51 | 55 | 55 | 73 | 242 |
| SCB London | **574** | 16 | 37 | 45 | 51 | 55 | 55 | 73 | 242 |
| **Total** | **120,271** | **3,426** | **7,787** | **9,344** | **10,590** | **11,514** | **11,514** | **15,352** | **50,744** |

[1] excluding LPEI portion in DDT syndication

Private & Confidential

# DDT

Debt Restructuring Terms – Settlement for Mega

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 200,048,000,000 | - | 200,048,000,000 |
| Interest / Margin | 1,465,264,363 | - | 1,465,264,363 |
| Penalty | 1,168,240,000 | - | 1,168,240,000 |
| **Total Mega Bilateral Loan** | **202,681,504,363** | **-** | **202,681,504,363** |
| **Proposed Debt Settlement** | | | |
| **Key terms** | | | |
| Effective Date | Homologation Date. | | |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Mega through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DDT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Mega. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. | | |

Private & Confidential

# DDT

Debt Restructuring Terms – Settlement for Shinhan

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 249,606,557,612 | - | 249,606,557,612 |
| Interest / Margin | 4,162,044,621 | - | 4,162,044,621 |
| Penalty | - | - | - |
| **Total Shinhan Bilateral Loan** | **253,768,602,233** | **-** | **253,768,602,233** |
| **Proposed Debt Settlement** | | | |
| **Key terms** | | | |
| Effective Date | Homologation Date. | | |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Shinhan through Orderly Sale of Non-Operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DDT–For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Shinhan. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision | | |

*Private & Confidential*

# DDT

Debt Restructuring Terms – Settlement for SCB Indonesia

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | - | 13,219,651 | 187,375,328,880 |
| Interest / Margin | - | 20,900 | 296,239,435 |
| Penalty | - | - | - |
| **Total SCB Bilateral Loan** | **-** | **13,240,551** | **187,671,568,315** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to SCB Indonesia through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DMST, DDT and DDST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of SCB Indonesia.<br><br>Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

16

*Private & Confidential*

# DDT

Cash Waterfall Mechanism

| | |
|---|---|
| **Cash Sweep** | Available Cash Sweep from the Excess Cash combined from DDT, DDST, and DMST shall be used for accelerated repayment, with the following priority order:<br><br>1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DDT, DDST, and DMST, on a pro rata basis based on total outstanding principal; then<br>2. Accelerated repayment for Tranche A1 & A2 DDT, Tranche A1 DDST, and Tranche A1 & A2 DMST, on a pro rata basis based on total outstanding principal; then<br>3. Accelerated repayment for Tranche C DDT, Tranche C DDST, Tranche C DMST, Tranche DDT Syndication C, Tranche DDST Syndication C, Tranche DMST Syndication, remaining principal of Mandiri Syariah in DDST and remaining principal of BRI Syariah in DMST, on a pro rata basis based on total outstanding principal; then<br>4. Accelerated repayment for Tranche DDT Syndication A, DDST Syndication A, on a pro rata basis based on total outstanding principal.<br><br>Cash sweep allocation for Tranche DDT Syndication C and DDST Syndication C shall be used for accelerated repayment with Reverse Dutch Auction mechanism.<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

17

Private & confidential

# DDT

Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 617,352,000 | - | 617,352,000 |
| PT Adil Jaya | 127,734,100 | - | 127,734,100 |
| PT Purinusa Ekapersada | 76,933,134 | - | 76,933,134 |
| PT South Pacific Viscose | 4,279,693,364 | - | 4,279,693,364 |
| **Total Unsecured Creditors** | **5,101,712,598** | **-** | **5,101,712,598** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |

18

# DDST

*Private & Confidential*

# DDST
## Outstanding Debt

| Creditors | Principal | | Interest / Margin | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BNI | 167,500 | - | 4,691 | - | 174 | - | - | - | 172,365 | - |
| Mandiri Syariah | 10,623 | 8,647 | 2,580 | - | 98 | - | - | - | 13,301 | 8,647 |
| Nobu | 88,182 | - | 375 | - | - | - | - | - | 88,557 | - |
| QNB Indonesia | - | 10,000 | - | 161 | - | 160 | - | - | - | 10,321 |
| SCB Indonesia | - | 17,959 | - | 77 | - | - | - | - | - | 18,036 |
| **Sub-total Bilateral Loan** | **266,305** | **36,606** | **7,646** | **238** | **272** | **160** | **-** | **-** | **274,223** | **37,004** |
| | | | | | | | | | | |
| **Syndicated Loan** | | | | | | | | | | |
| BNI | - | 21,338 | - | 680 | - | 45 | - | - | - | 22,063 |
| BNPP Indonesia[1] | 106,824 | 18,312 | 845 | 635 | - | - | - | - | 107,669 | 18,947 |
| China Citic Bank, Singapore | - | 7,565 | - | 212 | - | - | - | - | - | 7,777 |
| Federated Project and Trade Finance Core Fund | - | 2,565 | - | 95 | - | - | - | - | - | 2,660 |
| HSBC[1] | 18,850 | 19,045 | - | 604 | - | - | - | - | 18,850 | 19,650 |
| ING Bank Singapore | - | 15,260 | - | 497 | - | - | - | - | - | 15,757 |
| LPEI | - | 20,364 | - | 721 | - | - | - | - | - | 21,085 |
| Maybank Indonesia[1] | 57,958 | 26,914 | - | 496 | - | 32 | - | - | 57,958 | 27,443 |
| QNB Singapore | - | 19,325 | - | 627 | - | - | - | - | - | 19,952 |
| SBI | - | 2,309 | - | 89 | - | 7 | - | - | - | 2,405 |
| SMBC Singapore | - | 9,669 | - | 317 | - | - | - | - | - | 9,986 |
| Taiwan Cooperative Bank, Manila | - | 9,400 | - | 300 | - | - | - | - | - | 9,700 |
| Union Bank of India, HK | - | 5,405 | - | 247 | - | - | - | - | - | 5,652 |
| Yuanta Commercial Bank | - | 6,104 | - | 199 | - | - | - | - | - | 6,303 |
| **Sub-total Syndicated Loan** | **183,632** | **183,575** | **845** | **5,719** | **-** | **84** | **-** | **-** | **184,477** | **189,380** |
| **Total Outstanding Debt** | **449,937** | **220,181** | **8,491** | **5,957** | **273** | **244** | **-** | **-** | **458,700** | **226,382** |
| **Total Outstanding Debt** (IDR Mn Eqv.)[2] | | **3,570,776** | | **92,931** | | **3,735** | | **-** | | **3,667,442** |

[1] Including bilateral portion which are cross collateral with syndication
[2] Bank Indonesia middle rate USD/IDR: 14,174 as of PKPU Date 30 September 2019

---

*Private & Confidential*

# DDST
## Sustainable and Unsustainable Debt Allocation



**Notes:**
[1] Non-Operating Assets pledged to SCB Indonesia are cross collateral with SCB Indonesia facilities in DDST and DMST.
[2] Non-Operating Assets pledged to QNB Indonesia are cross collateral with QNB Indonesia facility in Property Company.

*Private & Confidential*

# DDST

Company Propose Debt Settlement

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche Syndication A | Tranche Syndication C | Tranche C |
|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | |
| BNI | USD 000 | **21,338** | 12,635 | - | - | 8,703 |
| BNPP Indonesia[1] | IDR Mn | **106,824** | - | 61,638 | 45,186 | - |
| | USD 000 | **18,312** | - | 10,566 | 7,746 | - |
| China Citic Bank, Singapore | USD 000 | **7,565** | - | 4,365 | 3,200 | - |
| Federated Project and Trade Finance Core Fund | USD 000 | **2,565** | - | 1,480 | 1,085 | - |
| HSBC[2] | IDR Mn | **18,850** | - | 10,877 | 7,973 | - |
| | USD 000 | **19,046** | - | 10,989 | 8,056 | - |
| ING Bank Singapore | USD 000 | **15,260** | - | 8,805 | 6,455 | - |
| LPEI | USD 000 | **20,364** | 12,058 | - | - | 8,306 |
| Maybank Indonesia[3] | IDR Mn | **57,958** | - | 33,442 | 24,516 | - |
| | USD 000 | **26,914** | - | 15,530 | 11,384 | - |
| QNB Singapore | USD 000 | **19,325** | - | 11,151 | 8,174 | - |
| SBI | USD 000 | **2,309** | - | 1,332 | 976 | - |
| SMBC Singapore | USD 000 | **9,669** | - | 5,579 | 4,090 | - |
| Taiwan Cooperative Bank, Manila | USD 000 | **9,400** | - | 5,424 | 3,976 | - |
| Union Bank of India, HK | USD 000 | **5,405** | - | 3,119 | 2,286 | - |
| Yuanta Commercial Bank | USD 000 | **6,104** | - | 3,522 | 2,582 | - |
| **Total Loan** | **IDR Mn** | **183,632** | **-** | **105,957** | **77,674** | **-** |
| | **USD 000** | **183,574** | **24,693** | **81,862** | **60,011** | **17,009** |

Notes:
[1] Including bilateral loan of IDR 106,824 Mn
[2] Including bilateral loan of IDR 18,850 Mn and USD 1,625,184
[3] Including bilateral loan of IDR 57,958 Mn and USD 19,349,197

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for DDST Syndicated Lenders[1] (1/3)

| Outstanding Loan[1] | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Syndicated Loan** | | | |
| Principal | 183,631,657,814 | 141,872,381 | 2,194,530,786,108 |
| Interest / Margin | 845,292,287 | 4,318,298 | 62,052,848,139 |
| Penalty | - | 39,809 | 564,252,766 |
| **Total Syndicated Loan** | **184,476,950,101** | **146,230,488** | **2,257,147,887,013** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche DDST Syndication A Principal / Tenor | IDR 105,957,252,824 and USD 81,861,744 / 8 years from Effective Date |
| Tranche DDST Syndication C Principal / Tenor | IDR 77,674,404,990 and USD 60,010,637 / 15 years from Effective Date |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 8th year for Tranche DDST Syndication A. Tranche DDST Syndication C shall be paid through a single balloon payment on the last day of the 15th year. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DDST Syndication A principal, quarterly payments. No interest / margin payment for Tranche DDST Syndication C. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 15th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

Note:
[1] Including BNPP Indonesia, HSBC, and Maybank Indonesia bilateral loan. Excluding BNI and LPEI portion in DDST syndication

Private & Confidential

# DDST

Debt Restructuring Terms – Settlement for DDST Syndicated Lenders[1] (2/3)

| Syndicated Loan | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment –Tranche DDST Syndication A (IDR Mn) | 105,957 | 2,216 | 4,433 | 8,865 | 13,298 | 15,514 | 20,544 | 20,544 | 20,544 | - |
| Principal Repayment –Tranche DDST Syndication A (USD 000) | 81,862 | 1,712 | 3,425 | 6,849 | 10,274 | 11,986 | 15,872 | 15,872 | 15,872 | - |
| Cash Interest / Margin Rate – Tranche DDST Syndication A (IDR denominated Loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | - |
| Cash Interest / Margin Rate – Tranche DDST Syndication A (USD denominated Loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | - |
| Principal Repayment –Tranche DDST Syndication C (IDR Mn) | 77,674 | - | - | - | - | - | - | - | - | 77,674 |
| Principal Repayment –Tranche DDST Syndication C (USD 000) | 60,011 | - | - | - | - | - | - | - | - | 60,011 |

Note:
[1] Including BNPP Indonesia, HSBC, and Maybank Indonesia bilateral loan. Excluding BNI and LPEI portion in DDST syndication

24

Private & Confidential

# DDST

Debt Restructuring Terms – Settlement for DDST Syndicated Lenders[1] (3/3)

| DDST Syndicated Lenders Principal Repayment by Banks | Unit | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BNPP Indonesia | IDR Mn | 106,824 | 1,289 | 2,579 | 5,157 | 7,736 | 9,025 | 11,951 | 11,951 | 11,951 | 45,186 |
| BNPP Indonesia | USD 000 | 18,312 | 221 | 442 | 884 | 1,326 | 1,547 | 2,049 | 2,049 | 2,049 | 7,746 |
| Maybank Indonesia | IDR Mn | 57,958 | 700 | 1,399 | 2,798 | 4,197 | 4,897 | 6,484 | 6,484 | 6,484 | 24,516 |
| Maybank Indonesia | USD 000 | 26,914 | 325 | 650 | 1,299 | 1,949 | 2,274 | 3,011 | 3,011 | 3,011 | 11,384 |
| HSBC | IDR Mn | 18,850 | 228 | 455 | 910 | 1,365 | 1,593 | 2,109 | 2,109 | 2,109 | 7,973 |
| HSBC | USD 000 | 19,046 | 230 | 460 | 919 | 1,379 | 1,609 | 2,131 | 2,131 | 2,131 | 8,056 |
| ING Bank Singapore | USD 000 | 15,260 | 184 | 368 | 737 | 1,105 | 1,289 | 1,707 | 1,707 | 1,707 | 6,455 |
| SBI | USD 000 | 2,309 | 28 | 56 | 111 | 167 | 195 | 258 | 258 | 258 | 976 |
| QNB Singapore | USD 000 | 19,325 | 233 | 466 | 933 | 1,399 | 1,633 | 2,162 | 2,162 | 2,162 | 8,174 |
| SMBC Singapore | USD 000 | 9,669 | 117 | 233 | 467 | 700 | 817 | 1,082 | 1,082 | 1,082 | 4,090 |
| Taiwan Cooperative Bank Manila | USD 000 | 9,400 | 113 | 227 | 454 | 681 | 794 | 1,052 | 1,052 | 1,052 | 3,976 |
| Yuanta HK | USD 000 | 6,104 | 74 | 147 | 295 | 442 | 516 | 683 | 683 | 683 | 2,582 |
| China Citic Bank Singapore | USD 000 | 7,565 | 91 | 183 | 365 | 548 | 639 | 846 | 846 | 846 | 3,200 |
| Federated Project and Trade Finance Core Fund | USD 000 | 2,565 | 31 | 62 | 124 | 186 | 217 | 287 | 287 | 287 | 1,085 |
| Union Bank of India HK | USD 000 | 5,405 | 65 | 130 | 261 | 391 | 457 | 605 | 605 | 605 | 2,286 |
| Total | IDR Mn | 183,632 | 2,216 | 4,433 | 8,865 | 13,298 | 15,514 | 20,544 | 20,544 | 20,544 | 77,674 |
| Total | USD 000 | 141,872 | 1,712 | 3,425 | 6,849 | 10,274 | 11,986 | 15,872 | 15,872 | 15,872 | 60,011 |

Note:
[1] Including BNPP Indonesia, HSBC, and Maybank Indonesia bilateral loan. Excluding BNI and LPEI portion in DDST syndication

25

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for LPEI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Syndicated Loan** | | | |
| Principal | - | 20,364,000 | 288,639,336,000 |
| Interest / Margin | - | 720,996 | 10,219,400,125 |
| Penalty | - | - | - |
| **Total Syndicated Loan** | **-** | **21,084,996** | **298,858,736,125** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | USD 12,058,182 / 10 years from Effective Date |
| Tranche C Principal / Tenor | USD 8,305,818 / 11 years from Effective Date |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 11th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 2.5% for USD denominated loan, respectively, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 11th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

26

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for LPEI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | | | | | |
| Principal Repayment (USD '000) – Tranche A1 | 12,058 | 60 | 60 | 121 | 121 | 121 | 121 | 121 | 121 | 7,235 | 3,977 | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 2.50% | 2.50% | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | - | - | - |
| Principal Repayment (USD '000) – Tranche C | 8,306 | 8 | 855 | 855 | 1,137 | 1,137 | 1,137 | 1,137 | 1,137 | 831 | 71 | - |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | - |

27

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for BNI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 167,500,000,000 | - | 167,500,000,000 |
| Interest / Margin | 4,690,798,336 | - | 4,690,798,336 |
| Penalty | 174,417,149 | - | 174,417,149 |
| **Total BNI Bilateral Loan** | **172,365,215,485** | - | **172,365,215,485** |
| | | | |
| **Syndicated Loan** | | | |
| Principal | - | 21,338,000 | 302,444,812,000 |
| Interest / Margin | - | 680,002 | 9,638,348,348 |
| Penalty | - | 44,511 | 630,898,914 |
| **Total BNI Syndicated Loan** | - | **22,062,513** | **312,714,059,262** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Debt novation to DMST | Propose to novate the BNI Bilateral Loan of IDR 172,365,215,485 to DMST and will be serviced via DMST operational cash flow. |
| Syndicated Loan | BNI Portion in DDST Syndicated Loan shall be settled using DDST cash flow through Tranche A1 and C, as described below. |
| Tranche A1 Principal / Tenor | USD 12,634,918 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | USD 8,703,082 / 11 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 11th year for Tranche C ("**Scheduled Principal Payment**"). |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 2.5% for USD denominated loan, respectively, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 11th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

28

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for BNI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral and Syndicated Loan** | | | | | | | | | | | | |
| Principal Repayment (USD 000) – Tranche A1 | 12,635 | 63 | 63 | 126 | 126 | 126 | 126 | 126 | 126 | 7,581 | 4,172 | - |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 1.50% | 2.50% | 2.50% | - |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | - | - | - |
| Principal Repayment (USD 000) – Tranche C | 8,703 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 870 | 4,352 | 3,409 |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% | 2.50% |

29

# DDST

Debt Restructuring Terms – Settlement for Nobu

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 88,182,102,655 | - | 88,182,102,655 |
| Interest / Margin | 375,079,007 | - | 375,079,007 |
| Penalty | - | - | - |
| **Total Bilateral Loan** | **88,557,181,662** | **-** | **88,557,181,662** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Nobu through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DDST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Nobu. |
| | Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

# DDST

Debt Restructuring Terms – Settlement for SCB Indonesia

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | - | 17,958,787 | 254,547,848,497 |
| Interest / Margin | - | 77,117 | 1,093,053,948 |
| Penalty | - | - | - |
| **Total Bilateral Loan** | **-** | **18,035,904** | **255,640,902,446** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to SCB Indonesia through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DMST, DDT and DDST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of SCB Indonesia. |
| | Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for Mandiri Syariah (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 10,623,400,000 | 8,647,387 | 133,191,464,047 |
| Interest / Margin | 2,579,547,886 | - | 2,579,547,886 |
| Penalty | 98,480,396 | - | 98,480,396 |
| **Total Bilateral Loan** | **13,301,428,282** | **8,647,387** | **135,869,492,328** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to Mandiri Syariah and/or debt reduction through *AYDA* as repayment of outstanding principal and unpaid interest / margin. Any excess shall be used to repay Mandiri Syariah outstanding debt at DSSA. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Mandiri Syariah. Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Currency Conversion | Mandiri Syariah outstanding principal, interest / margin, and penalty in USD denominated loan shall be converted into IDR denominated loan using conversion date exchange rate based on Mandiri Syariah internal system. The calculation of interest/margin payment of Mandiri Syariah USD denominated loan will use BI middle rate on 14 May 2020 of USD/IDR 14,946. |
| Principal Payment | Outstanding principal to Mandiri Syariah will be settled with scheduled principal payment as noted in the table below ("**Scheduled Payment**"), monthly payments, and shall be adjusted on a pro-rata basis based on Settlement via Orderly Sale of Non-operating Asset and/or AYDA, and with accelerated repayment via Cash Sweep. For the avoidance of doubt, total principal payment from Settlement via Cash Collateral, Settlement via Orderly Sale of Non-operating Asset and/or AYDA and Scheduled Principal Payment may not exceed Mandiri Syariah outstanding principal |
| Settlement via Cash Collateral | DDST's existing time deposit of IDR 7,500,000,000 in Mandiri Syariah shall be used to reduce the outstanding principal on the Effective Date. |
| Cash Interest / Margin | Applied Cash Interest/Margin as noted in the table below as annual payment, will be paid monthly, and shall be adjusted on a pro-rata basis based on Settlement via Orderly Sale of Non-operating Asset and/or AYDA. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be settled through the proceeds from the Orderly Sale of Non-operating Asset. Any remaining Outstanding Interest / Margin & Penalty will be paid at the end of the last day of the 12th year. |

32

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for Mandiri Syariah (2/2)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment[1,2] (IDR Mn) | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 126 | 124,183 |
| Cash Interest / Margin[2] (IDR denominated loan) | 662 | 661 | 660 | 660 | 659 | 658 | 658 | 657 | 656 | 656 | 655 | 654 | |

**Note:**
1) Assumed Bank Indonesia middle rate USD/IDR: 14,174 on PKPU date of 30 September 2019, conversion rate that may be used on the Currency Conversion may differ.
2) Scheduled payment has been adjusted with settlement via cash collateral amounting IDR 7,500,000,000

33

*Private & Confidential*

# DDST

Debt Restructuring Terms – Settlement for QNB Indonesia

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 10,000,000 | 141,740,000,000 |
| Interest / Margin | - | 161,000 | 2,282,007,622 |
| Penalty | - | 159,935 | 2,266,924,076 |
| **Total Bilateral Loan** | **-** | **10,320,935** | **146,288,931,698** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Novate to Property Company | With regards to the non-operating assets pledged to QNB Indonesia are crossed collateral with QNB Indonesia facility in Property Company, we propose to novate the debt to Property Company and will be serviced via Property Company operational cash flow. |

*Private & Confidential*

# DDST

Cash Waterfall Mechanism

| | |
|---|---|
| | |
| **Cash Sweep** | Available Cash Sweep from the Excess Cash combined from DDT, DDST, and DMST shall be used for accelerated repayment, with the following priority order: <br><br> 1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DDT, DDST, and DMST, on a pro rata basis based on total outstanding principal; then <br> 2. Accelerated repayment for Tranche A1 & A2 DDT, Tranche A1 DDST, and Tranche A1 & A2 DMST, on a pro rata basis based on total outstanding principal; then <br> 3. Accelerated repayment for Tranche C DDT, Tranche C DDST, Tranche C DMST, Tranche DDT Syndication C, Tranche DDST Syndication C, Tranche DMST Syndication, remaining principal of Mandiri Syariah in DDST and remaining principal of BRI Syariah in DMST, on a pro rata basis based on total outstanding principal; then <br> 4. Accelerated repayment for Tranche DDT Syndication A, DDST Syndication A, on a pro rata basis based on total outstanding principal. <br><br> Cash sweep allocation for Tranche DDT Syndication C and DDST Syndication C shall be used for accelerated repayment with Reverse Dutch Auction mechanism. <br><br> Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

*Private & Confidential*

## DDST

Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 592,992,000 | - | 592,992,000 |
| PT Adil Jaya | 44,443,940 | - | 44,443,940 |
| PT South Pacific Viscose | 14,320,210,905 | - | 14,320,210,905 |
| **Unsecured Creditors - Banks** | | | |
| BNI | 63,128,069,699 | - | 63,128,069,699 |
| **Total Unsecured Creditors** | **78,085,716,544** | **-** | **78,085,716,544** |

| Proposed Debt Settlement | |
|---|---|
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| BNI Settlement | 1. Outstanding loan of IDR 825,000,000 shall be paid maximum one year from the Effective Date.<br>2. Outstanding loan of IDR 62,303,069,699 is a corporate guarantee claim relating to personal loan of Sumitro registered as secured creditor at PKPU Case 25. This amount shall be settled at Sumitro's PKPU Case 25. |

# DMST

*Private & Confidential*

# DMST
## Outstanding Debt

| Creditors | Principal | | Interest / Margin / Profit Sharing | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BNI | 167,500 | - | 4,691 | - | 174 | - | - | - | 172,365 | - |
| BRI Syariah | 122,331 | - | 902 | - | - | - | - | - | 123,234 | - |
| CIMB Niaga | 70,000 | 15,723 | 700 | - | - | - | - | - | 70,700 | 15,723 |
| Danamon | 11,750 | - | - | - | - | - | - | - | 11,750 | - |
| LPEI | 1,472,975 | - | 27,802 | - | - | - | 9,729 | - | 1,510,507 | - |
| Mandiri | 1,064,500 | 19,239 | 30,420 | 323 | 9,644 | - | 6,889 | 27 | 1,111,453 | 19,588 |
| Permata | 100,990 | 25,017 | 187 | 77 | 4 | 3 | - | - | 101,180 | 25,097 |
| SCB Indonesia | - | 12,487 | - | 37 | - | - | - | - | - | 12,523 |
| **Sub-total Bilateral Loan** | **3,010,047** | **72,465** | **64,702** | **436** | **9,822** | **3** | **16,619** | **27** | **3,101,189** | **72,931** |
| **Syndicated Loan** | | | | | | | | | | |
| ICBC Indonesia | - | 3,600 | - | 97 | - | 34 | - | 1 | - | 3,732 |
| Permata | - | 8,400 | - | 171 | - | 130 | - | 1 | - | 8,701 |
| **Sub-total Syndicated Loan** | **-** | **12,000** | **-** | **268** | **-** | **164** | **-** | **1** | **-** | **12,433** |
| **Total Outstanding Debt** | **3,010,047** | **84,465** | **64,702** | **705** | **9,822** | **167** | **16,619** | **27** | **3,101,189** | **85,364** |
| **Total Outstanding Debt (IDR Mn Eqv.)[1]** | | **4,207,258** | | **74,689** | | **12,189** | | **17,005** | | **4,311,141** |

**Note:**
1) Bank Indonesia middle rate USD/IDR: 14,174 as of PKPU Date 30 September 2019

*Private & Confidential*

# DMST
## Sustainable and Unsustainable Debt Allocation



**Notes:**
[1] Operational Assets DSSA 3 and Non-operating Assets pledged to Danamon are cross collateral with Danamon Facility in DSSA
[2] Non-operating Assets pledged to CIMB Niaga are cross collateral with CIMB Niaga Facility in DSSA.
[3] Non-operating Assets pledged to SCB Indonesia are cross collateral with SCB Indonesia Facility in DDT and DDST
[4] Non-operating Assets pledged to BRI Syariah are cross collateral with BRI Syariah Facility in DSSA.

*Private & Confidential*

# DMST

Propose Debt Settlement

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche Syndication | Tranche C |
|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | |
| BNI | IDR Mn | 167,500 | 92,300 | - | - | 75,200 |
| | USD 000 | - | - | - | - | - |
| LPEI | IDR Mn | 1,472,975 | 811,900 | - | - | 661,075 |
| | USD 000 | - | - | - | - | - |
| Mandiri | IDR Mn | 1,064,500 | 586,700 | - | - | 477,800 |
| | USD 000 | 19,239 | 10,604 | - | - | 8,635 |
| Permata | IDR Mn | 100,990 | - | 55,700 | - | 45,290 |
| | USD 000 | 25,017 | - | 13,786 | - | 11,231 |
| **Sub-total Bilateral Loan** | **IDR Mn** | **2,805,965** | **1,490,900** | **55,700** | **-** | **1,259,365** |
| | **USD 000** | **44,256** | **10,604** | **13,786** | **-** | **19,866** |
| | | | | | | |
| **Syndicated Loan** | | | | | | |
| ICBC Indonesia | USD 000 | 3,600 | - | - | 3,600 | - |
| Permata | USD 000 | 8,400 | - | - | 8,400 | - |
| **Sub-total Syndicated Loan** | **IDR Mn** | **-** | **-** | **-** | **-** | **-** |
| | **USD 000** | **12,000** | **-** | **-** | **12,000** | **-** |
| **Total Bilateral and Syndicated Loans** | **IDR Mn** | **2,805,965** | **1,490,900** | **55,700** | **-** | **1,259,365** |
| | **USD 000** | **56,256** | **10,604** | **13,786** | **12,000** | **19,866** |

40

*Private & Confidential*

# DMST

Debt Restructuring Terms – Settlement for BNI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 167,500,000,000 | - | 167,500,000,000 |
| Interest / Margin | 4,690,798,336 | - | 4,690,798,336 |
| Penalty & Other Fees | 174,417,149 | - | 174,417,149 |
| **Total BNI Bilateral Loan** | 172,365,215,485 | - | 172,365,215,485 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 92,300,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 75,200,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C.  For the avoidance of doubt, Principal and Cash Interest/Margin Payment will apply from the Effective Date until the required novation process from DDST to DMST is completed. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% per annum for IDR denominated loan, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to BNI and/or debt reduction through AYDA shall be used to repay BNI Tranche C and Tranche A1 principal in inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BNI. Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, and Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

41

*Private & Confidential*

# DMST

Debt Restructuring Terms – Settlement for BNI (2/2)

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Novation | Facility of BNI to DDST consist of Rp167.500.000.000 working capital financing facility granted pursuant to the agreement made between DDST and PT Bank Negara Indonesia (Persero) Tbk under credit agreement no 2014.033 dated 15 October 2014 which was last amended by the 7th amendment dated 27 September 2019 ("BNI Facility"), shall be novated to DMST in accordance with the terms stipulated in Novation Provisions in clause 3. Specific Provisions of the Composition Plan. For the avoidance of doubt, all securities attached to BNI Facility, shall be pledged as securities at DMDT (after novation) and as securities of Debtors and the Sponsor debts provided by BNI. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A1 | 92,300 | 923 | 1,385 | 1,846 | 4,615 | 4,615 | 11,076 | 11,538 | 13,384 | 15,691 | 27,227 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR Mn) – Tranche C | 75,200 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 15,040 | 59,410 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |

*Private & Confidential*

# DMST

Debt Restructuring Terms – Settlement for LPEI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 1,472,975,000,000 | - | 1,472,975,000,000 |
| Interest / Margin | 27,802,468,702 | - | 27,802,468,702 |
| Penalty & Other Fees | 9,729,362,500 | - | 9,729,362,500 |
| **Total LPEI Bilateral Loan** | 1,510,506,831,202 | - | 1,510,506,831,202 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 811,900,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 661,075,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% per annum for IDR denominated loan, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to LPEI and/or debt reduction through *AYDA* shall be used as accelerated repayment of outstanding principal of LPEI's portion in Tranche C at DDT or DMST with inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of LPEI. <br><br> Please refer to below "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for LPEI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A1 | 811,900 | 8,119 | 12,179 | 16,238 | 40,595 | 40,595 | 97,428 | 101,488 | 117,726 | 138,023 | 239,509 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR Mn) – Tranche C | 661,075 | 661 | 3,661 | 3,661 | 4,661 | 4,661 | 4,661 | 4,661 | 4,661 | 661 | 661 | 132,215 | 496,250 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for Mandiri (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 1,064,500,000,000 | 19,238,687 | 1,337,189,147,412 |
| Interest / Margin | 30,419,525,249 | 322,901 | 34,996,328,700 |
| Penalty & Other Fees | 16,533,122,063 | 26,625 | 16,910,498,010 |
| **Total Mandiri Bilateral Loan** | **1,111,452,647,313** | **19,588,213** | **1,389,095,974,122** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 586,700,000,000 and USD 10,603,923 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 477,800,000,000 and USD 8,634,764 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for Mandiri (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A1 | 586,700 | 5,867 | 8,801 | 11,734 | 29,335 | 29,335 | 70,404 | 73,338 | 85,072 | 99,739 | 173,075 | - | - |
| Principal Repayment (USD 000) – Tranche A1 | 10,604 | 106 | 159 | 212 | 530 | 530 | 1,272 | 1,325 | 1,538 | 1,803 | 3,129 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | | |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | | |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.25% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | | |
| Deferred Interest / Margin Rate – Tranche A1 (USD denominated loan) | | 1.25% | 1.00% | - | - | - | - | - | - | - | - | | |
| Principal Repayment (IDR Mn) – Tranche C | 477,800 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 478 | 95,560 | 377,460 |
| Principal Repayment (USD 000) – Tranche C | 8,635 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 1,727 | 6,818 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for Permata (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 100,990,221,000 | 25,016,991 | 455,581,058,379 |
| Interest / Margin | 186,575,516 | 76,967 | 1,277,509,176 |
| Penalty & Other Fees | 3,556,859 | 2,794 | 43,153,204 |
| **Total Permata Bilateral Loan** | **101,180,353,375** | **25,096,752** | **456,901,720,759** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A2 Principal / Tenor | IDR 55,700,000,000 and USD 13,785,805 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 45,290,221,000 and USD 11,231,186 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A2 and last principal payment paid on the last day of the 12th year for Tranche C. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% and 2.5% for IDR denominated loan and USD denominated loan, respectively, upon full settlement of Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2, paid on the last day of the 12th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

# DMST

Debt Restructuring Terms – Settlement for Permata (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR Mn) – Tranche A2 | 55,700 | 557 | 836 | 4,178 | 5,570 | 5,570 | 6,963 | 6,963 | 8,355 | 8,355 | 8,355 | - | - |
| Principal Repayment (USD 000) – Tranche A2 | 13,786 | 138 | 207 | 1,034 | 1,379 | 1,379 | 1,723 | 1,723 | 2,068 | 2,068 | 2,068 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | - | - |
| Cash Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.25% | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (USD denominated loan) | | 1.25% | 1.00% | - | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR Mn) – Tranche C | 45,290 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 9,058 | 35,782 |
| Principal Repayment (USD 000) – Tranche C | 11,231 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 2,246 | 8,875 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 5.00% | 5.00% |
| Cash Interest / Margin Rate – Tranche C (USD denominated loan) | | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 2.50% | 2.50% |

48

# DMST

Debt Restructuring Terms – Settlement for DMST Syndicated Lenders

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Syndicated Loan** | | | |
| Principal | - | 12,000,000 | 170,088,000,000 |
| Interest / Margin | - | 268,132 | 3,800,500,842 |
| Penalty | - | 164,851 | 2,327,572,496 |
| **Total DMST Syndicated Loan** | - | 12,432,983 | 176,225,100,617 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche Syndication Principal / Tenor | USD 12,000,000 / 5 years from Effective Date. |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 5th year for Tranche DMST Syndication. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DMST Syndication, quarterly payments. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty will be paid on the last day of the 5th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | |
| Principal Repayment (USD 000) | 12,000 | 1,800 | 1,800 | 1,800 | 2,400 | 4,200 |
| Cash Interest / Margin Rate (USD denominated loan) | | 1.25% | 1.50% | 2.50% | 2.50% | 2.50% |

49

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for BRI Syariah (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 122,331,318,369 | - | 122,331,318,369 |
| Interest / Margin / Profit Sharing | 902,193,473 | - | 902,193,473 |
| Penalty & Other Fees | - | - | - |
| **Total BRI Syariah Bilateral Loan** | **123,233,511,842** | **-** | **123,233,511,842** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset pledged to BRI Syariah and/or debt reduction through *AYDA* as repayment of outstanding principal and unpaid interest / margin / profit sharing in DMST and DSSA. Any excess shall be used to repay BRI Syariah outstanding debt at DMDT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BRI Syariah. Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Principal Payment | **Pre non-operating asset sale:** <br> As noted in the table below, monthly payments, up to the date of Orderly Sale of the Non-operating Asset. <br> **Post non-operating asset sale:** <br> In the event that the proceeds from the Orderly Sale of Non-operating Assets is less than the total outstanding principal, the remaining principal (the "**Remaining Principal**") shall be serviced with the below principal repayment debt schedule, monthly payments, with last principal payment paid on the end of the last day of the 12th year. |
| Cash Interest / Margin / Profit Sharing | As noted in the table below as annual rate, applied to the outstanding principal if the non-operating assets has not been sold or applied to the Remaining Principal post non-operating asset sales, monthly payments. |
| Outstanding Interest / Margin / Profit Sharing and Penalty | Any Outstanding Interest / Margin / Profit Sharing and Penalty shall be settled through the proceeds from the Orderly Sale of Non-operating Asset. Any remaining Outstanding Interest / Margin / Profit Sharing & Penalty will be paid at the last day of the 12th year. |

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for BRI Syariah (2/2)

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 98.80% |
| Cash Interest / Margin / Profit Sharing (IDR denominated loan) | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | |

*Private & Confidential*

# DMST

Debt Restructuring Terms – Settlement for CIMB Niaga

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 70,000,000,000 | 15,722,809 | 292,855,090,372 |
| Interest / Margin | 700,000,000 | - | 700,000,000 |
| Penalty & Other Fees | - | - | - |
| **Total CIMB Niaga Bilateral Loan** | **70,700,000,000** | **15,722,809** | **293,555,090,372** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to CIMB Niaga through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DMST and DSSA to CIMB Niaga. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of CIMB Niaga. <br><br> Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

*Private & Confidential*

# DMST

Debt Restructuring Terms – Settlement for Danamon

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 11,750,000,000 | - | 11,750,000,000 |
| Interest / Margin | - | - | - |
| Penalty & Other Fees | - | - | - |
| **Total Danamon Bilateral Loan** | **11,750,000,000** | **-** | **11,750,000,000** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to Danamon through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement at DMST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Danamon. Any excess net proceeds from sale shall be used to repay Danamon Tranche C and Tranche A2 principal at DSSA. <br><br> Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA) and AYDA *(Agunan yang Diambil Alih)* provision. |

Private & Confidential

# DMST

Debt Restructuring Terms – Settlement for SCB Indonesia

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 12,486,854 | 176,988,665,619 |
| Interest / Margin | - | 36,619 | 519,035,863 |
| Penalty & Other Fees | - | - | - |
| **Total SCB Indonesia Bilateral Loan** | **-** | **12,523,473** | **177,507,701,483** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to SCB Indonesia through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement of DMST, DDT and DDST. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of SCB Indonesia.<br><br>Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

Private & Confidential

# DMST

Cash Waterfall Mechanism

| | |
|---|---|
| **Cash Sweep** | Available Cash Sweep from the Excess Cash combined from DDT, DDST, and DMST shall be used for accelerated repayment, with the following priority order:<br><br>1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DDT, DDST, and DMST, on a pro rata basis based on total outstanding principal; then<br>2. Accelerated repayment for Tranche A1 & A2 DDT, Tranche A1 DDST, and Tranche A1 & A2 DMST, on a pro rata basis based on total outstanding principal; then<br>3. Accelerated repayment for Tranche C DDT, Tranche C DDST, Tranche C DMST, Tranche DDT Syndication C, Tranche DDST Syndication C, Tranche DMST Syndication, remaining principal of Mandiri Syariah in DDST and remaining principal of BRI Syariah in DMST, on a pro rata basis based on total outstanding principal; then<br>4. Accelerated repayment for Tranche DDT Syndication A, DDST Syndication A, on a pro rata basis based on total outstanding principal.<br><br>Cash sweep allocation for Tranche DDT Syndication C and DDST Syndication C shall be used for accelerated repayment with Reverse Dutch Auction mechanism.<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

*Private & confidential*

# DMST

Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 588,734,800 | - | 588,734,800 |
| PT Adil Jaya | 4,939,200 | - | 4,939,200 |
| PT South Pacific Viscose | 40,910,477,304 | - | 40,910,477,304 |
| **Unsecured Creditors – Banks** | | | |
| Standard Chartered Bank Indonesia | - | 3,267,250 | 46,310,000,000 |
| **Total Unsecured Creditors** | **41,504,151,304** | **3,267,250** | **87,814,151,304** |

| Proposed Debt Settlement | |
|---|---|
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| Standard Chartered Bank Indonesia Settlement | SCB Indonesia outstanding loan shall be paid on the last day of the 12th year from Effective Date. |

# DMDT

*Private & Confidential*

# DMDT
Outstanding Debt

| Creditors | Principal | | Interest / Margin / Profit Sharing | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BCA | - | 177 | - | - | - | - | - | - | - | 177 |
| BNI Syariah | 278,302 | - | 102,970 | - | - | - | - | - | 381,272 | - |
| BRI Syariah | 279,977 | - | 5,454 | - | - | - | - | - | 285,431 | - |
| Muamalat | 124,890 | - | 8,012 | - | - | - | - | - | 132,902 | - |
| Sub-total Bilateral Loan | 683,169 | 177 | 116,436 | - | - | - | - | - | 799,605 | 177 |
| Senior Notes | - | 300,000 | - | 14,231 | - | - | - | - | - | 314,231 |
| **Syndicated Loan** | | | | | | | | | | |
| Aozora Asia Pacific | - | 3,669 | - | 72 | - | - | - | - | - | 3,741 |
| Bank of Panhsin | - | 1,834 | - | 36 | - | - | - | - | - | 1,871 |
| BNPP Indonesia | - | 3,669 | - | 75 | - | - | - | - | - | 3,744 |
| BNPP Singapore[1] | - | 535 | - | - | - | - | - | - | - | 535 |
| CIFC International | - | 917 | - | 18 | - | - | - | - | - | 935 |
| Entie Commercial Bank | - | 917 | - | 18 | - | - | - | - | - | 935 |
| Indian Bank, Singapore | - | 3,669 | - | 72 | - | - | - | - | - | 3,741 |
| ING Bank Singapore | - | 11,006 | - | 217 | - | - | - | - | - | 11,223 |
| Jtrust Indonesia | - | 1,834 | - | 38 | - | - | - | - | - | 1,872 |
| LPEI | - | 3,669 | - | 75 | - | - | - | - | - | 3,744 |
| Maybank Singapore | - | 11,006 | - | 217 | - | - | - | - | - | 11,223 |
| MUFJ Lease Singapore | - | 5,503 | - | 109 | - | - | - | - | - | 5,612 |
| NEC Capital Singapore | - | 1,834 | - | 36 | - | - | - | - | - | 1,871 |
| SCB London[2] | - | 14,482 | - | 217 | - | - | - | - | - | 14,699 |
| Shanghai Commercial & Savings Bank | - | 1,834 | - | 36 | - | - | - | - | - | 1,871 |
| Shinhan Indonesia | - | 3,669 | - | 75 | - | - | - | - | - | 3,744 |
| TCB, Manila | - | 5,503 | - | 109 | - | - | - | - | - | 5,612 |
| Union Bank of India, HK | - | 7,337 | - | 145 | - | - | - | - | - | 7,482 |
| Sub-total Syndicated Loan | - | 82,886 | - | 1,567 | - | - | - | - | - | 84,453 |
| Total Outstanding Debt | 683,169 | 383,063 | 116,436 | 15,798 | - | - | - | - | 799,605 | 398,861 |
| Total Outstanding Debt (IDR Mn Eqv.)[3] | | 6,112,706 | | 340,360 | | - | | - | | 6,453,066 |

[1] *fee related to DMDT Syndicated Loan*
[2] *including fee of USD 3,476,000 related to DMDT Syndicated Loan*
[3] *Bank Indonesia mid rate USD/IDR: 14,174*

58

*Private & Confidential*

# DMDT
Sustainable and Unsustainable Debt Allocation



| | Pledged to | Settlement Via | Descriptions |
|---|---|---|---|
| Operational Asset DMDT 1 | BRI Syariah | Tranche ASmbh | Sustainable Portion |
| | | Tranche ASmsy | Sustainable Portion |
| | | Sale of Non-Operating Asset and/or AYDA | Settlement via Sale of Non-Operating Asset and/or AYDA |
| Operational Asset DMDT 5 | Syndicated Lenders DMDT - USD 160,000,000 Facility Agreement (Non SOE portion) | Tranche DMDT Syndication | Sustainable Portion |
| Operational Asset DMDT 6 | Syndicated Lenders DMDT - USD 160,000,000 Facility Agreement (SOE portion) | Tranche A1 | Sustainable Portion |
| Operational Asset DMDT 8 | BNI Syariah | Tranche ASmsy | Sustainable Portion |
| Senior Notes | Senior Notes Holder | Notes A | Sustainable Portion for Senior Notes Holder |
| | | Notes B | Unsustainable Portion for Senior Notes Holder |
| Non-Operating Assets DMDT | Muamalat | Sale of Non-Operating Asset and/or AYDA | Settlement via Sale of Non-Operating Asset and/or AYDA |

**Notes:**
- DMDT 2 & 3 is pledged to Mandiri related to DMDT and DAMAITEX's debt.

59

*Private & Confidential*

# DMDT
Proposed Debt Settlement (1/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche ASmsy | Tranche Syndication | Notes A | Notes B | Tranche C |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | |
| BNI Syariah | IDR Mn | 278,302 | - | - | - | 278,302 | - | - | - | - |
| | USD 000 | - | - | - | - | - | - | - | - | - |
| BRI Syariah | IDR Mn | 279,977 | - | - | 129,977 | 150,000 | - | - | - | - |
| | USD 000 | - | - | - | - | - | - | - | - | - |
| **Total Bilateral Loan** | **IDR Mn** | **558,279** | - | - | 129,977 | 428,302 | - | - | - | - |
| | **USD 000** | **-** | - | - | - | - | - | - | - | - |
| **Senior Notes** | **USD 000** | **300,000** | - | - | - | - | - | 150,000 | 150,000 | - |

*Private & Confidential*

# DMDT
Proposed Debt Settlement (2/2)

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche ASmsy | Tranche Syndication | Notes A | Notes B | Tranche C |
|---|---|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | | | |
| Aozora Asia Pacific | USD 000 | 3,669 | - | - | - | - | 3,668 | - | - | - |
| Bank of Panshin | USD 000 | 1,834 | - | - | - | - | 1,834 | - | - | - |
| BNPP Indonesia | USD 000 | 3,669 | - | - | - | - | 3,669 | - | - | - |
| BNPP Singapore[1] | USD 000 | 535 | - | - | - | - | 535 | - | - | - |
| CIFC International | USD 000 | 917 | - | - | - | - | 917 | - | - | - |
| Entie Commercial Bank | USD 000 | 917 | - | - | - | - | 917 | - | - | - |
| Indian Bank, Singapore | USD 000 | 3,669 | - | - | - | - | 3,669 | - | - | - |
| ING Bank Singapore | USD 000 | 11,006 | - | - | - | - | 11,006 | - | - | - |
| Jtrust Indonesia | USD 000 | 1,834 | - | - | - | - | 1,834 | - | - | - |
| LPEI | USD 000 | 3,669 | 3,669 | - | - | - | - | - | - | - |
| Maybank Singapore | USD 000 | 11,006 | - | - | - | - | 11,006 | - | - | - |
| MUFJ Lease Singapore | USD 000 | 5,503 | - | - | - | - | 5,503 | - | - | - |
| NEC Capital Singapore | USD 000 | 1,834 | - | - | - | - | 1,834 | - | - | - |
| SCB London[2] | USD 000 | 14,482 | - | - | - | - | 14,482 | - | - | - |
| Shanghai Commercial & Savings Bank | USD 000 | 1,834 | - | - | - | - | 1,834 | - | - | - |
| Shinhan Indonesia | USD 000 | 3,669 | - | - | - | - | 3,669 | - | - | - |
| TCB, Manila | USD 000 | 5,503 | - | - | - | - | 5,503 | - | - | - |
| Union Bank of India, HK | USD 000 | 7,337 | - | - | - | - | 7,337 | - | - | - |
| **Total Syndication Loan** | **USD 000** | **82,886** | - | - | - | - | 79,217 | - | - | - |
| **Total Bilateral Loan, Senior Notes and Syndicated Loan** | **IDR Mn** | **558,279** | - | - | 129,977 | 428,302 | - | - | - | - |
| | **USD 000** | **382,887** | 3,669 | - | - | - | 79,217 | 150,000 | 150,000 | - |

1 fee related to DMDT Syndicated Loan
2 including fee of USD 3,476,000 related to DMDT Syndicated Loan

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for BCA

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | - | 177,000 | 2,508,798,000 |
| Interest / Margin | - | - | - |
| Penalty | - | - | - |
| **Total BCA Bilateral Loan** | - | **177,000** | **2,508,798,000** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Cash Collateral | BCA outstanding loan shall be settled fully within 1 (one) month from Effective Date. For avoidance of doubt, proceeds for debt settlement will be from DMDT's existing deposit amount in BCA. |

62

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for BNI Syariah

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 278,302,398,785 | - | 278,302,398,785 |
| Interest / Margin | 36,614,859,968 | - | 36,614,859,968 |
| Penalty | - | - | - |
| **Total BNI Syariah Bilateral Loan** | **314,917,258,753** | - | **314,917,258,753** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche ASmsy Principal / Tenor | IDR 278,302,398,785 / 7 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 7th year for Tranche ASmsy. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to BNI Syariah Tranche ASmsy outstanding principal, monthly payments. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to BNI Syariah Tranche ASmsy outstanding principal, paid on the last day of the 7th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 7th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment – Tranche ASmsy (IDR mn) | 278,302 | 2,783 | 5,566 | 13,915 | 13,915 | 13,915 | 48,703 | 179,505 | |
| Cash Interest / Margin – Tranche ASmsy (IDR denominated loan) | | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | |
| Deferred Interest / Margin – Tranche ASmsy (IDR denominated loan) | | 2.50% | 2.50% | - | - | - | - | - | |
| Oustanding Interest / Margin & Penalty (IDR mn) | 36,615 | | | - | - | - | - | | 36,615 |

63

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for BRI Syariah (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 279,977,000,000 | - | 279,977,000,000 |
| Interest / Margin / Profit Sharing | 5,453,898,616 | - | 5,453,898,616 |
| Penalty | | - | |
| **Total BRI Syariah Bilateral Loan** | **285,430,898,616** | **-** | **285,430,898,616** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche ASmsy Principal / Tenor | IDR 150,000,000,000 / 7 years from Effective Date. |
| Tranche ASMbh Principal / Tenor | IDR 129,977,000,000 / 7 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 7th year for Tranche ASmsy and Asmbh |
| Cash Interest / Margin / Profit Sharing Payment | As noted in the table below as annual rate, applied to BRI Syariah Tranche ASmsy and Tranche ASmbh outstanding principal, monthly payments. |
| Deferred Interest / Margin / Profit Sharing Payment | As noted in the table below as annual rate, applied to the outstanding Tranche ASmsy, paid on the last day of the 7th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin / Profit Sharing Payment | One month after Effective Date. |
| Outstanding Interest / Margin / Profit Sharing and Penalty | Any Outstanding Interest / Margin / Profit Sharing and Penalty shall be paid on the last day of the 7th year. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from the sale of all non-operating assets pledged to BRI Syariah through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used to repay BRI Syariah Tranche ASmsy portion in inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BRI Syariah. Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 ''Specific Provisions of the Composition Agreement'' for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

64

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for BRI Syariah (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | |
| Principal Repayment – Tranche ASmbh (IDR mn) | 129,977 | 1,300 | 2,600 | 6,499 | 6,499 | 6,499 | 22,746 | 83,834 |
| Principal Repayment – Tranche ASmsy (IDR mn) | 150,000 | 1,500 | 3,000 | 7,500 | 7,500 | 7,500 | 26,250 | 96,750 |
| Cash Interest / Margin / Profit Sharing – Tranche ASmbh and Tranche Asmsy (IDR denominated loan) | | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% |
| Deferred Interest / Margin / Profit Sharing – Tranche ASmbh and Tranche ASmsy (IDR denominated loan) | | 2.50% | 2.50% | - | - | - | - | - |

65

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for DMDT Syndicated Lenders[1] (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Syndicated Loan** | | | |
| Principal | - | 79,217,489 | 1,122,828,683,275 |
| Interest / Margin | - | 1,491,938 | 21,146,732,614 |
| Penalty | - | - | - |
| **Total DMDT Syndicated Loan** | - | 80,709,427 | 1,143,975,415,888 |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche DMDT Syndication Principal / Tenor | USD 79,217,489 / 7 years from Effective Date |
| Principal Payment | As noted in the table below, quarterly payments, with last principal payment paid on the last day of the 7th year, subject to the Option for Principal Extension. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche DMDT Syndication, quarterly payments. |
| First Principal & Interest / Margin Payment | Three months after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 7th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Option for Tranche DMDT Syndication Principal Extension | Six month prior to end of year sixth anniversary, DMDT has an option to request Tranche DMDT Syndication principal payment due in year 7 to be extended to 8 (eight) years. Should this option be triggered by DMDT, principal amount due in year 7 (seven) shall be equally installed in year 7 and 8 with an interest / margin of 5% per annum in year 7 and 8. |

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for DMDT Syndicated Lenders[1] (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | |
| Principal Repayment – Tranche DMDT Syndication (USD 000) | 79,217 | 2,805 | 7,012 | 8,415 | 9,817 | 15,350 | 17,909 | 17,909 |
| Cash Interest / Margin Rate – Tranche DMDT Syndication (USD denominated Loan) | | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| **DMDT Syndicated Lenders Principal Repayment by Banks (in USD 000)** | | | | | | | | |
| Aozora Asia Pacific | 3,668 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| Bank of Panhsin | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| BNPP Indonesia | 3,669 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| BNPP Singapore | 535 | 19 | 47 | 57 | 66 | 104 | 121 | 121 |
| CIFC International | 917 | 32 | 81 | 97 | 114 | 178 | 207 | 207 |
| Entie Commercial Bank | 917 | 32 | 81 | 97 | 114 | 178 | 207 | 207 |
| Indian Bank, Singapore | 3,669 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| ING Bank Singapore | 11,006 | 390 | 974 | 1,169 | 1,364 | 2,133 | 2,488 | 2,488 |
| Jtrust Indonesia | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| Maybank Singapore | 11,006 | 390 | 974 | 1,169 | 1,364 | 2,133 | 2,488 | 2,488 |
| MUFJ Lease Singapore | 5,503 | 195 | 487 | 585 | 682 | 1,066 | 1,244 | 1,244 |
| NEC Capital Singapore | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| SCB London | 14,482 | 513 | 1,282 | 1,538 | 1,795 | 2,806 | 3,274 | 3,274 |
| Shanghai Commercial & Savings Bank | 1,834 | 65 | 162 | 195 | 227 | 355 | 415 | 415 |
| Shinhan Indonesia | 3,669 | 130 | 325 | 390 | 455 | 711 | 829 | 829 |
| TCB, Manila | 5,503 | 195 | 487 | 585 | 682 | 1,066 | 1,244 | 1,244 |
| Union Bank of India, HK | 7,337 | 260 | 649 | 779 | 909 | 1,422 | 1,659 | 1,659 |
| **Total** | **79,217** | **2,805** | **7,012** | **8,415** | **9,817** | **15,350** | **17,909** | **17,909** |

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for LPEI

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Syndicated Loan** | | | |
| Principal | - | 3,668,605 | 51,998,802,309 |
| Interest / Margin | - | 75,043 | 1,063,664,301 |
| Penalty | - | - | - |
| **Total DMDT Syndicated Loan** | - | **3,743,648** | **53,062,466,610** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | USD 3,668,605 / 7 years from Effective Date |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 7th year. |
| Cash Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1 principal, monthly payments. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 7th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|---|
| **Syndicated Loan** | | | | | | | | |
| Principal Repayment – Tranche A1 (USD 000) | 3,669 | 183 | 459 | 550 | 642 | 550 | 642 | 642 |
| Cash Interest / Margin Rate – Tranche A1 (USD denominated Loan) | | 1.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |

*Private & Confidential*

# DMDT

Debt Restructuring Terms – Settlement for Muamalat

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 124,890,000,000 | - | 124,890,000,000 |
| Interest / Margin | 8,012,491,670 | - | 8,012,491,670 |
| Penalty | - | - | - |
| **Total Muamalat Bilateral Loan** | **132,902,491,670** | **-** | **132,902,491,670** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-Operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Muamalat through Orderly Sale of Non-Operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / margin. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Muamalat.<br><br>Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

Private & Confidential

# DMDT

Debt Restructuring Terms – Settlement for Senior Notes

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Senior Notes** | | | |
| Principal | - | 300,000,000 | 4,252,200,000,000 |
| Coupon | - | 14,231,250 | 201,713,737,500 |
| Penalty | - | - | - |
| **Total Senior Notes** | - | **314,231,250** | **4,453,913,737,500** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Notes A Principal / Tenor | USD 150 million with a term of 8 years from the Effective Date. |
| Notes B Principal / Tenor | USD 150 million with a term of 12 years from the Effective Date. |
| Security rights | Notes A to be granted secondary pledge over the land, buildings and machinery regarding factories DMDT 4, DMDT 5 and DMDT 6. |
| Notes Redemption | Notes A: a single balloon payment paid on the last day of the 8th year. DMDT, on a best effort basis, shall refinance Notes A at the end of year 7 subject to market conditions at the time.<br><br>Notes B: shall be redeemed via excess cash (as defined in Cash Waterfall Mechanism) using Reverse Dutch Auction. A maturity premium of 10% of amount outstanding at maturity shall apply. |
| Coupon Payment | Notes A: interest for the first year of 1.5% annually and thereafter 2.5% annually, with payment semi-annual.<br>Notes B: Zero Coupon |
| Outstanding Coupon Payment | Outstanding coupon as of 30 September 2019 shall be paid down by the amount in the Interest Reserve Account, amounting to USD 12,937,500 within 30 days of the Homologation of the Composition Date. The remaining coupon of USD 1,293,750 shall be waived. |
| Undertaking | DMDT to incur no further financial indebtedness secured against assets secured to the Noteholders unless subordinated to the Noteholders. |

Private & Confidential

# DMDT

Cash Waterfall Mechanism

| | |
|---|---|
| **Cash Sweep** | Available Cash Sweep from the Excess Cash combined from DMDT and DSSA shall be used for accelerated repayment, with the following priority order:<br><br>1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DMDT and DSSA, on a pro rata basis based on total outstanding principal; then<br>2. Accelerated repayment for Tranche ASmbh DMDT, Tranche ASmsy DMDT, Notes B, Tranche A1 & A2 DSSA, and Tranche ASmbh DSSA, on a pro rata basis based on total outstanding principal; then<br>3. Accelerated repayment for Tranche A1 DMDT, Tranche DMDT Syndication, Tranche C DSSA, and remaining principal of BRI Syariah in DSSA, on a pro rata basis based on total outstanding principal.<br><br>Cash sweep allocation for Notes B shall be used for accelerated repayment with Reverse Dutch Auction mechanism.<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

Private & Confidential

# DMDT

Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 603,432,000 | - | 603,432,000 |
| CV Surya Putera Anugerah | 372,980,080 | - | 372,980,080 |
| PT Aster Polycem | 12,240,527,300 | - | 12,240,527,300 |
| PT Kinerja Mutiara Persada | 3,270,865,925 | - | 3,270,865,925 |
| PT Shine Golden Bridge | 1,697,880,000 | - | 1,697,880,000 |
| PT Sumber Abadi Energindo | 5,681,108,550 | - | 5,681,108,550 |
| **Unsecured Creditors – Banks** | | | |
| ING Bank N.V – Singapore Branch | - | 1,459,371 | 20,695,121,011 |
| The Bank of New York Mellon | - | 160,000 | 2,267,840,000 |
| **Unsecured Creditors – Individuals (64 persons)** | **67,500,000** | **-** | **67,500,000** |
| **Total Unsecured Creditors** | **23,934,293,855** | **1,619,371** | **46,897,254,866** |

| Proposed Debt Settlement | |
|---|---|
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Unsecured Creditors – Individuals Settlement | All Unsecured Creditors Individuals shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 12th month from the Effective Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| ING Bank N.V – Singapore Branch Settlement | ING Bank N.V – Singapore Branch outstanding loan shall be paid on the last day of the 12th year from Effective Date. |
| The Bank of New York Mellon ("BONY") - Trustee Cost Settlement | Trustee costs related to BONY and its legal advisors, up to Homologation Date, shall be paid within 90 (ninety) days from the Effective Date.  For avoidance of doubt, the amount of USD 160,000 was the portion claimed by BONY up to PKPU Date, 30 September 2019. |

72



*Private & Confidential*

# DSSA
## Outstanding Debt

| Creditors | Principal | | Interest / Margin / Profit Sharing | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| BCA | - | 48 | - | - | - | - | - | - | - | 48 |
| BRI | 670,833 | - | 19,955 | - | 314 | - | - | - | 691,102 | - |
| BRI Syariah | 38,490 | - | 6,723 | - | - | - | - | - | 45,213 | - |
| CIMB Niaga | 73,218 | - | 240 | - | - | - | - | - | 73,458 | - |
| Danamon[1] | 240,200 | - | 4,814 | - | 4,522 | - | - | - | 249,536 | - |
| Harda | 55,743 | - | 1,867 | - | 388 | - | - | - | 57,998 | - |
| Mandiri Syariah | 339,710 | - | 52,875 | - | 1,839 | - | - | - | 394,425 | - |
| Maspion | 46,059 | - | 215 | - | 2 | - | 225 | - | 46,501 | - |
| Mega Syariah | 124,282 | - | 274 | - | - | - | 125 | - | 124,681 | - |
| Multiarta Sentosa | 183,733 | - | 527 | - | - | - | - | - | 184,259 | - |
| Shinhan Indonesia | 184,603 | - | 5,044 | - | - | - | - | - | 189,647 | - |
| **Total Outstanding Debt** | **1,956,870** | **48** | **92,534** | **-** | **7,065** | **-** | **350** | **-** | **2,056,819** | **48** |
| **Total Outstanding Debt** (IDR Mn Eqv.)[2] | | **1,957,545** | | **92,534** | | **7,065** | | **350** | | **2,057,494** |

[1] Including Danamon's verified unsecured portion
[2] Bank Indonesia middle rate USD/IDR: 14,174 as of PKPU Date 30 September 2019

*Private & Confidential*

# DSSA
## Sustainable and Unsustainable Debt Allocation



Note:
1) Operational Assets DSSA 3 and Non-operating Assets pledged to Danamon are cross collateral with Danamon Facility in DMST.
2) Non-operating Assets pledged for CIMB Niaga are cross collateral with CIMB Niaga facilities in DMST.
3) Non-operating Assets pledged to BRI Syariah are cross collateral with BRI Syariah facility in DMST.
4) Non-operating Assets pledged to Shinhan Indonesia are cross collateral with Shinhan Indonesia facility in Property Company.

*Private & Confidential*

# DSSA

Proposed Debt Settlement

| Creditors | Original Currency | TOTAL | Tranche A1 | Tranche A2 | Tranche ASmbh | Tranche C |
|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | |
| BRI | IDR Mn | 670,833 | 650,000 | - | - | 20,833 |
| Danamon | IDR Mn | 240,200 | - | 200,000 | - | 40,200 |
| Mandiri Syariah | IDR Mn | 339,710 | - | - | 339,710 | - |
| Multiarta Sentosa | IDR Mn | 183,733 | - | 150,000 | - | 33,733 |
| **Total Bilateral Loan** | **IDR Mn** | **1,419,916** | **650,000** | **350,000** | **339,710** | **94,766** |

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for BCA

| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
|---|---|---|---|
| **Outstanding Loan** | | | |
| **Bilateral Loan** | | | |
| Principal | - | 47,600 | 674,682,400 |
| Interest / Margin | - | - | - |
| Penalty | - | - | - |
| **Total BCA Bilateral Loan** | **-** | **47,600** | **674,682,400** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Cash Collateral | BCA outstanding loan shall be settled fully within 1 (one) month from Effective Date. For avoidance of doubt, proceeds for debt settlement will be from DSSA's existing deposit amount in BCA. |

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for BRI (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 670,833,000,000 | - | 670,833,000,000 |
| Interest / Margin | 19,954,984,377 | - | 19,954,984,377 |
| Penalty | 314,014,060 | - | 314,014,060 |
| **Total BRI Bilateral Loan** | **691,101,998,437** | **-** | **691,101,998,437** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A1 Principal / Tenor | IDR 650,000,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 20,833,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A1 and last principal payment paid on the last day of the 12th year for Tranche C ("**Scheduled Principal Payment**"). |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche A1 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% for IDR denominated loan, upon full settlement of Tranche A1 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A1, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

78

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for BRI (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment – Tranche A1 (IDR mn) | 650,000 | 560 | 8,060 | 10,560 | 38,000 | 68,500 | 68,500 | 96,500 | 96,500 | 124,500 | 138,320 | - | - |
| Cash Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A1 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | - | - | - | - | - | - | - | - | - |
| Principal Repayment – Tranche C (IDR mn) | 20,833 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 208 | 20,415 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.25% | 0.25% | 0.25% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 5.00% | 5.00% |

79

Private & Confidential

# DSSA

Debt Restructuring Terms – Settlement for Danamon (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 240,200,000,000 | - | 240,200,000,000 |
| Interest / Margin | 4,814,138,103 | - | 4,814,138,103 |
| Penalty | 4,521,660,833 | - | 4,521,660,833 |
| **Total Danamon Bilateral Loan** | **249,535,798,936** | **-** | **249,535,798,936** |

| Proposed Debt Settlement |
|---|

| Key terms | |
|---|---|
| Effective Date | Homologation Date. |
| Tranche A2 Principal / Tenor | IDR 200,000,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 40,200,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A2 and last principal payment on the last day of the 12th year for Tranche C (**"Scheduled Principal Payment"**). |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% for IDR denominated loan, upon full settlement of Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to Danamon through Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* shall be used as full debt settlement at DMST. Any excess net proceeds (after deducted with transaction costs) from sale shall be used to pay Danamon Tranche C and Tranche A2 principal at DSSA with inverse order of maturity. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Danamon.<br><br>Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA (*Agunan yang Diambil Alih*) provision. |

80

Private & Confidential

# DSSA

Debt Restructuring Terms – Settlement for Danamon (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment – Tranche A2 (IDR mn) | 200,000 | 200 | 200 | 200 | 10,000 | 20,000 | 20,000 | 30,000 | 30,000 | 40,000 | 49,400 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | - | - | - | - | - | - | - | - | - |
| Principal Repayment – Tranche C (IDR mn) | 40,200 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 40 | 402 | 39,398 |
| Cash Interest / Margin Rate – Tranche C (IDR denominated loan) | | 0.25% | 0.25% | 0.25% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 5.00% | 5.00% |

81

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Multiarta Sentosa (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 183,732,674,177 | - | 183,732,674,177 |
| Interest / Margin | 526,546,453 | - | 526,546,453 |
| Penalty | - | - | - |
| **Total Multiarta Sentosa Bilateral Loan** | **184,259,220,630** | **-** | **184,259,220,630** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche A2 Principal / Tenor | IDR 150,000,000,000 / 10 years from Effective Date. |
| Tranche C Principal / Tenor | IDR 33,732,674,177 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year for Tranche A2 and last principal payment paid on the last day of the 12th year for Tranche C ("**Scheduled Principal Payment**"). |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche A2 and Tranche C, monthly payments. Tranche C interest / margin rate shall increase to 5% for IDR denominated loan, upon full settlement of Tranche A2 Principal either through Scheduled Principal Payment and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding Tranche A2, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

82

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Multiarta Sentosa (2/2)

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Multiarta Sentosa through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as fully repayment on Facility Agreement No. 4 on 9th July 2018 made before Notary Soes Asmara Argawati, SH which has been amended on Amendment of Facility Agreement (Restructure) No.004/PDA1/SLO/072019 on 25th July 2019 ("PDA 1 Facility") amounting IDR 65,561,225,480 pledged with non-operating assets. Fully repayment on PDA 1 Facility equal to fully repayment on Tranche C amounting IDR 33,732,674,177 and accelerated repayment on Tranche A2 amounting IDR 31,828,551,303 with inverse order of maturity. Any excess proceeds, if any, shall be used as accelerated repayment on Tranche A2 with inverse order of maturity.

Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA (*Agunan yang Diambil Alih*) provision. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment (IDR mn) – Tranche A2 | 150,000 | 150 | 150 | 150 | 7,500 | 15,000 | 15,000 | 22,500 | 22,500 | 30,000 | 37,050 | - | - |
| Cash Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | - | - |
| Deferred Interest / Margin Rate – Tranche A2 (IDR denominated loan) | | 2.50% | 2.50% | 2.50% | - | - | - | - | - | - | - | - | - |
| Principal Repayment (IDR mn) – Tranche C | 33,733 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 337 | 33,056 |
| Cash Interest / Margin Rate (IDR denominated loan) | | 0.25% | 0.25% | 0.25% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 5.00% | 5.00% |

83

Private & Confidential

# DSSA

Debt Restructuring Terms – Settlement for Mandiri Syariah (1/2)

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 339,710,000,000 | - | 339,710,000,000 |
| Interest / Margin | 52,875,464,583 | - | 52,875,464,583 |
| Penalty | 1,839,059,848 | - | 1,839,059,848 |
| **Total Mandiri Syariah Bilateral Loan** | **394,424,524,431** | **-** | **394,424,524,431** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Tranche ASmbh Principal / Tenor | IDR 339,710,000,000 / 12 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 12th year for Tranche ASmbh |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche ASmbh, monthly payments. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding DSSA Tranche ASmbh, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep.. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 12th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from the sale of all non-operating asset pledged to Mandiri Syariah through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as installment reduction of Mandiri Syariah Tranche ASmbh portion in inverse order of maturity. <br><br> Please refer to clause ''Deleveraging Via Non-operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |

Private & Confidential

# DSSA

Debt Restructuring Terms – Settlement for Mandiri Syariah (2/2)

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bilateral Loan** | | | | | | | | | | | | | |
| Principal Repayment – Tranche ASmbh (IDR mn) | 339,710 | 340 | 340 | 340 | 14,268 | 28,536 | 28,536 | 42,464 | 42,464 | 56,052 | 71,339 | 679 | 54,352 |
| Cash Interest / Margin – Tranche ASmbh (IDR denominated loan) | | 2.10% | 2.10% | 2.10% | 4.20% | 4.20% | 4.20% | 4.20% | 4.00% | 3.50% | 3.00% | 5.00% | 5.00% |
| Deferred Interest / Margin – Tranche ASmbh (IDR denominated loan) | | 2.10% | 2.10% | 2.10% | - | - | - | - | - | - | - | - | - |

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for BRI Syariah

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 38,490,000,000 | - | 38,490,000,000 |
| Interest / Margin / Profit Sharing | 6,723,494,917 | - | 6,723,494,917 |
| Penalty | - | - | - |
| **Total BRI Syariah Bilateral Loan** | **45,213,494,917** | **-** | **45,213,494,917** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Net Proceeds (after deducted with transaction costs) from Orderly Sale of Non-operating Asset and/or debt reduction through *AYDA* as repayment of outstanding principal and unpaid interest / Margin / Profit Sharing in DMST and DSSA. Any excess shall be used to repay BRI Syariah outstanding debt at DMDT. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of BRI Syariah. Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. Any KJPP fee related to the appraisal of the pledged Non-operating Asset shall be borne by Debtor. |
| Principal Payment | **Pre non-operating asset sales:**<br>As noted in the table below, monthly payments, up to the sale of the non-operating asset.<br>**Post non-operating asset sales:**<br>In the event that the proceeds from the orderly sale of all the non-operating assets is less than the total outstanding principal, the remaining principal (the "**Remaining Principal**") shall be serviced with the below principal repayment debt schedule, monthly payments, with last principal payment paid on the end of the last day of the 12th year. |
| Interest / Margin / Profit Sharing | As noted in the table below as annual rate, applied to the outstanding principal if the non-operating assets has not been sold or applied to the Remaining Principal post non-operating asset sales, monthly payments. |
| Outstanding Interest / Margin / Profit Sharing and Penalty | Any Outstanding Interest / Margin / Profit Sharing and Penalty shall be settled through the proceeds from the orderly sale of non-operating asset. Any remaining Outstanding Interest / Margin / Profit Sharing & Penalty will be paid at the last day of the 12th year. |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | Year 11 | Year 12 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 0.10% | 98.80% |
| Cash Interest / Margin / Profit Sharing (IDR denominated loan) | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | 0.50% | |

86

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for CIMB Niaga

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 73,217,665,899 | - | 73,217,665,899 |
| Interest / Margin | 240,000,000 | - | 240,000,000 |
| Penalty | - | - | - |
| **Total CIMB Niaga Bilateral Loan** | **73,457,665,899** | **-** | **73,457,665,899** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to CIMB Niaga through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DMST and DSSA to CIMB Niaga. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of CIMB Niaga.<br><br>Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Harda

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 55,742,600,413 | - | 55,742,600,413 |
| Interest / Margin | 1,867,250,997 | - | 1,867,250,997 |
| Penalty | 388,308,274 | - | 388,308,274 |
| **Total Harda Bilateral Loan** | **57,998,159,684** | **-** | **57,998,159,684** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Harda through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / Margin & penalty. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Harda. |
| | Please refer to clause "Deleveraging Via Non-operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Maspion

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Bilateral Loan** | | | |
| Principal | 46,058,788,516 | - | 46,058,788,516 |
| Interest / Margin | 214,941,013 | - | 214,941,013 |
| Penalty | 226,828,872 | - | 226,828,872 |
| **Total Maspion Bilateral Loan** | **46,500,558,401** | **-** | **46,500,558,401** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Maspion through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / Margin & penalty. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Maspion. |
| | Please refer to clause "Deleveraging Via Non-Operating Asset" under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Mega Syariah

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 124,282,228,015 | - | 124,282,228,015 |
| Interest / Margin | 274,000,000 | - | 274,000,000 |
| Penalty | 125,000,000 | - | 125,000,000 |
| **Total Mega Syariah Bilateral Loan** | **124,681,228,015** | **-** | **124,681,228,015** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Mega Syariah through Orderly Sale of Non-operating Asset and/or debt reduction through AYDA shall be used as full debt settlement. Any excess proceeds from sale shall be used as payment for unpaid interest / Margin & penalty. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subjects to the consideration of Mega Syariah.

Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision. |

*Private & Confidential*

# DSSA

Debt Restructuring Terms – Settlement for Shinhan

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 184,603,000,000 | - | 184,603,000,000 |
| Interest / Margin | 5,044,000,000 | - | 5,044,000,000 |
| Penalty | - | - | |
| **Total Shinhan Bilateral Loan** | **189,647,000,000** | **-** | **189,647,000,000** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Settlement via Orderly Sale of Non-operating Asset and/or AYDA | Proceeds from the sale of all non-operating asset pledged to Shinhan through Orderly Sale of Non-Operating Asset and/or debt reduction through AYDA shall be used as full debt settlement of DSSA. For the avoidance of doubt, sale of non-operating assets can be done either entirely or partially subject to the consideration of Shinhan.

Please refer to clause ''Deleveraging Via Non-Operating Asset'' under Article 3 "Specific Provisions of the Composition Agreement" for the detailed sale process, price determination, transaction costs, Power of Attorney (PoA), and AYDA *(Agunan yang Diambil Alih)* provision |

Private & Confidential

# DSSA

Cash Waterfall Mechanism

| | |
|---|---|
| **Cash Sweep** | Available Cash Sweep from the Excess Cash combined from DMDT and DSSA shall be used for accelerated repayment, with the following priority order:<br><br>1. Any outstanding deferred interest and/or margin and deferred principal during the restructuring period at DMDT and DSSA, on a pro rata basis based on total outstanding principal; then<br>2. Accelerated repayment for Tranche ASmbh DMDT, Tranche ASmsy DMDT, Notes B, Tranche A1 & A2 DSSA, and Tranche ASmbh DSSA, on a pro rata basis based on total outstanding principal; then<br>3. Accelerated repayment for Tranche A1 DMDT, Tranche DMDT Syndication, Tranche C DSSA, and remaining principal of BRI Syariah in DSSA, on a pro rata basis based on total outstanding principal.<br><br>Cash sweep allocation for Notes B shall be used for accelerated repayment with Reverse Dutch Auction mechanism.<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

Private & Confidential

# DSSA

Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
|---|---|---|---|
| | **IDR Denominated Loan** | **USD Denominated Loan** | **Total Loan in IDR eqv.** |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 584,872,000 | - | 584,872,000 |
| CV Pratama Jaya Transport | 131,520,541 | - | 131,520,541 |
| CV Surya Putera Anugerah | 321,744,500 | - | 321,744,500 |
| PT Aster Polycem | 200,079,000 | - | 200,079,000 |
| PT Karis Sun Indonesia | 12,751,200 | - | 12,751,200 |
| PT Lautan Luas Tbk | 56,584,000 | - | 56,584,000 |
| PT Multikimia Intipelangi | 1,024,401,345 | - | 1,024,401,345 |
| PT Purinusa Ekapersada | 11,590,889 | - | 11,590,889 |
| PT Samudra Dwi Transporindo | 464,669,876 | - | 464,669,876 |
| PT Sumber Abadi Energindo | 5,061,173,550 | - | 5,061,173,550 |
| UD Samudra Transport | 61,389,687 | - | 61,389,687 |
| **Unsecured Creditors - Banks** | | | |
| Danamon | 23,895,798,937 | - | 23,895,798,937 |
| **Total Unsecured Creditors** | **31,826,575,524** | **-** | **31,826,575,524** |

| Proposed Debt Settlement | |
|---|---|
| **Key Terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |
| Danamon Settlement | The unsecured portion of Danamon outstanding loan will be settled through Tranche C. Please refer to "Debt Restructuring Terms – Settlement for Danamon" for the detailed settlement terms. |

# DAMAITEX

*Private & Confidential*

## DAMAITEX
Outstanding Debt

| Creditors | Principal | | Interest / Margin | | Penalty | | Other Fees | | Total Debt | |
|---|---|---|---|---|---|---|---|---|---|---|
| | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 | IDR Mn | USD 000 |
| **Bilateral Loan** | | | | | | | | | | |
| Mandiri | 100,000 | - | 331 | - | 62 | - | - | - | 100,393 | - |
| **Total Outstanding Debt** | **100,000** | **-** | **331** | **-** | **62** | **-** | **-** | **-** | **100,393** | **-** |
| **Total Outstanding Debt** (IDR Mn Eqv.)[1] | | **100,000** | | **331** | | **62** | | **-** | | **100,393** |

**Note:**
1) Bank Indonesia mid rate USD/IDR: 14,174

*Private & Confidential*

# DAMAITEX

Debt Restructuring Terms – Settlement for Mandiri

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Bilateral Loan** | | | |
| Principal | 100,000,000,000 | - | 100,000,000,000 |
| Interest / Margin | 330,669,745 | - | 330,669,745 |
| Penalty | 62,099,829 | - | 62,099,829 |
| **Total Mandiri Bilateral Loan** | **100,392,769,574** | **-** | **100,392,769,574** |

| Proposed Debt Settlement |
|---|

| Key terms | |
|---|---|
| Effective Date | Homologation Date. |
| Outstanding Principal / Tenor | IDR 100,000,000,000  / 10 years from Effective Date. |
| Principal Payment | As noted in the table below, monthly payments, with last principal payment paid on the last day of the 10th year. |
| Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding principal, monthly payments. |
| Deferred Interest / Margin Payment | As noted in the table below as annual rate, applied to the outstanding principal, paid on the last day of the 10th year and/or Accelerated Repayment via cash sweep. |
| First Principal & Interest / Margin Payment | One month after Effective Date. |
| Outstanding Interest / Margin and Penalty | Any Outstanding Interest / Margin and Penalty shall be paid on the last day of the 10th year. |
| Accelerated Repayment | Accelerated repayment through cash sweep, if any (see Cash Waterfall Mechanism) and allocated in inverse order of maturity. |

| | Total | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 | Year 8 | Year 9 | Year 10 | At Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Principal Repayment (IDR mn) | 100,000 | 500 | 2,500 | 3,500 | 5,000 | 5,000 | 6,000 | 8,000 | 9,500 | 10,000 | 10,000 | 40,000 |
| Cash Interest / Margin Rate (IDR denominated loan) | | 2.50% | 3.50% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | 5.00% | |
| Deferred Interest / Margin Rate (IDR denominated loan) | | 2.50% | 1.50% | - | - | - | - | - | - | - | - | |

96

*Private & Confidential*

# DAMAITEX

Cash Waterfall

| | |
|---|---|
| **Cash Waterfall** | Available Cash Sweep from the Excess Cash shall be used for accelerated repayment, with the following priority order:<br><br>1.  Any outstanding deferred interest and/or Margin and deferred principal during the restructuring period;<br>2.  Accelerated repayment for Outstanding Principal<br><br>Accelerated repayment will be allocated based on an inverse order of maturity. No penalty shall be charged for any accelerated repayment made. |

*Private & confidential*

# DAMAITEX

Debt Restructuring Terms – Settlement for Unsecured Creditors

| Outstanding Loan | | | |
|---|---|---|---|
| | IDR Denominated Loan | USD Denominated Loan | Total Loan in IDR eqv. |
| **Trade Creditors** | | | |
| CV Cahaya Asia | 617,236,000 | | 617,236,000 |
| PT Sumber Abadi Energindo | 765,974,150 | - | 765,974,150 |
| **Total Unsecured Creditors** | **1,383,210,150** | **-** | **1,383,210,150** |

| Proposed Debt Settlement | |
|---|---|
| **Key terms** | |
| Effective Date | Homologation Date. |
| Trade Creditors Settlement | All Trade Creditors shall be paid at minimum on a monthly pro-rata basis, with the first payment paid one month after the Effective Date and the last payment paid on the last day of the 24th month from the Effective Date. However, the Debtor may accelerate payment to Trade Creditors that are critical to its operations if agreed by the CFO and the Independent Director. |



## **Exhibit E**

Unofficial English Translation of Case 25 Composition Plan

*Unofficial translation*

Composition Plan

Sumitro ("**Debtor**")

In the Suspension of Payment ("**PKPU**") Proceeding of

Case No. No. 25/Pdt.Sus-PKPU/2019/PN.Smg

Semarang, 23 June 2020

*Unofficial translation*

On this day, Tuesday, dated 23 June 2020, at the Commercial Court at the Semarang District Court, a Composition Plan is made and executed by and between the Debtor (as described below) and Creditors (as described below) as evidence and proof of the agreement between the Debtor and Creditors on the Composition Plan ("**Composition Plan**"), as follows:

1.  **Sumitro,** an Indonesian citizen, holder of Identity Card No. 3372042512690002, having his address at Tegalharjo, Kejamatan Jebres, Kota Surakarta, Jawa Tengah Indonesia ("**Debtor**")

    and

2.  **Creditors**, as set out in Attachment 1 (Verified Creditors), which are the creditors listed in the List of Fixed Claims dated 25 November 2019, which was verified by the Administrator Team in Attachment 1 (Verified Creditors);

Hereinafter they shall be referred to individually as a "**Creditor**" and collectively as "**Creditors**".

The Debtor and Creditors are collectively referred to as "**Parties**".

The Debtor and Creditors will first explain the following:

A.    On 10 September 2019, a Petition for Suspension of Payment (PKPU) was submitted against the Debtor by one of its creditors under case register No. 25/Pdt.Sus-PKPU/2019/PN.SMG ("**PKPU Petition"**).

B.    Based on the PKPU Petition, the Panel of Judges of the Commercial Court at the Semarang District Court have granted the PKPU Petition and granted a Temporary PKPU to the Company, as determined in Court Decision No. 25/Pdt.Sus-PKPU/2019/PN.SMG ("**PKPU Decision**"), which was announced during the trial dated 30 September 2019 ("**PKPU Decision Date**").

C.    The Panel of Judges of Case No. 25/Pdt.Sus-PKPU/2019/PN.SMG read the PKPU Decision by virtue of which it: (i) granted the PKPU Petition; (ii) granted the Debtor to be in the Temporary PKPU for 45 (forty-five) days since the date the decision was read; (iii) declared that the Debtor is under PKPU; (iv) stated the appointment of Verry Sitorus, S.H., Uli Ingot Hamonangan Simanungkalit, S.H. as the administrator team of the Debtor (in PKPU); and (v) appointed Mr. Edy Suwanto, S.H., M.H. as the Supervisory Judge.

D.    Whereas, the Debtor has followed the Temporary PKPU and Permanent PKPU with schedules and agenda as determined by the Administrator Team and Supervisory Judge.

E.    Whereas, the content of this Composition Plan has been presented in the creditors meetings, both within and outside of the Commercial Court at the Semarang District Court to the Creditors together with the Supervisory Judge concerning the Composition Plan submitted by the Debtor.

F.    Whereas, in the Creditors meeting convened today on, [day], [xx] 2020 at the Commercial Court at the Semarang District Court, which was attended by the Supervisory Judge, Administrator Team and the Parties at the Commercial Court at the Semarang District

*Unofficial translation*

Court either via physical meeting or through electronic communication facilities that was held by the Administrator Team, a meeting was held with the agenda of Discussion on the Composition Plan and Voting to agree or reject the Composition Plan.

G.   Whereas, in relation to the voting as mentioned above, the Debtor and Creditors that agree to the Composition Plan intend to make and execute a Composition Plan as evidence and proof to show that a settlement has been reached by the Debtor and Creditors.

Subsequently, based on the abovementioned, in this Composition Plan, the Debtor and Creditors hereby mutually agree to the matters as provided in the Composition Plan, as follows:

*Unofficial translation*

**Definitions**

Unless defined otherwise in this Composition Plan, defined terms used in the Composition Plan (Duniatex) shall have the same meaning here.

Each definition below, unless expressly provided otherwise in the context of each sentence stated in this Composition Plan and that has been individually defined in this Composition Plan, has the following meaning:

"**Security Documents (Duniatex)** means deeds and/or certificates of Hak Tanggungan, fiducia security rights and/or pledges and any other relevant documents pursuant to the Existing Facilities (Duniatex) including but not limited to the security sharing agreements and any ancillary documents in the relevant deeds and/or certificates which are required for perfection, implementation and enforcement of any Security Documents (Duniatex)."

"**Supervisory Judge**" is the judge as referred to in the Bankruptcy Law that was appointed by the Panel of Judges.

"**Day**" or "**Days**" or "**Calendar Day**" or "**Calendar Days**" means each day or days in 1 (one) year without exception including Saturdays, Sundays, and national holidays as determined by the Government and Business Day.

"**Business Day**" means a day (other than a Saturday, Sunday, or national holidays) on which banks are open for general banking business (including dealings in foreign currencies) in New York City, London, Jakarta, Hong Kong, and Singapore.

" **Existing Personal Guarantees** " means personal guarantee given by debtor as defined in Attachment 1 (Personal Guarantees);

"**Panel of Judges**" is the panel of judges examining and adjudicating the PKPU Petition case.

"**Commercial Court**" is the Commercial Court at the Semarang District Court, having its address at Jl. Siliwangi No. 512, Kembangarum, Kec. Semarang Bar., Kota Semarang, Jawa Tengah 50146.

"**Administrators (Administrator Team)**" are the administrators as referred to in the Bankruptcy Law that were appointed by the Panel of Judges.

"**Homologated Composition Plan**" is the entire provisions of the Composition Plan homologated by the Panel of Judges.

"**Composition Plan**" is this Composition Plan as the Composition Plan that was approved through voting by the entitled Creditors of the Debtor in accordance with Article 281 paragraph (1) of the Bankruptcy Law on [xx] 2020.

"**Composition Plan (Duniatex)**" is the composition plan in relation to the Group in case No. 22/Pdt.Sus-PKPU/2019/PN.SMG at the Commercial Court.

"**PG Claims**" means claim to the Debtor based on Existing Personal Guarantee.

"**Year**" is calendar year.

"**Effective Date**" means the Homologation Date.

"**Homologation Date**" is the date of the homologation or the ratification of the Composition Plan by the Panel of Judges of Case No. 25/Pdt.Sus-PKPU/2019/PN.SMG at the Commercial Court. The Composition Plan will take effect on and from the Homologation Date regardless of any

pending cassation proceedings, or any other legal remedy taken against this Composition Plan, the Composition Plan (Duniatex) or Case No. 22/Pdt.Sus-PKPU/2019/PN.SMG and/or No. 25/Pdt.Sus-PKPU/2019/PN.SMG.

"**Bankruptcy Law**" is Law No. 37 of 2004 on Bankruptcy and Suspension of Payments.

1.    **SUMMARY**

1.1    This Composition Plan was prepared to help reach a consensual restructuring with the entire creditors of the Debtor. This Composition Plan was made and prepared by the Debtor for the purpose of the creditors' voting at the creditors meeting held at the Commercial Court pursuant to the provisions of Article 281 paragraph (1) of Law No. 37 of 2004 on Bankruptcy and Suspension of Payments.

1.2    In making their decision, the Creditors must rely on their own considerations and analysis of this Composition Plan, the terms and conditions, and all information provided in this Composition Plan, including all benefits and risks contained therein.

1.3    This Composition Plan is made with attachments as may be referred to in certain parts of this Composition Plan. The Attachments are an integral part of this Composition Plan.

2.    **GENERAL PROVISIONS OF THE COMPOSITION PLAN**

2.1    <u>**Transfer of Rights.**</u> Each Creditor may at any time assign any of its rights and obligations overs its claims under the Homologated Composition Plan, to another party, which assignment or transfer will come into force without any requirement to obtain the consent of the Debtor or the courts of Indonesia and will be effective as of the date provided under the relevant assignment or transfer document, subject to the following provision:

   I.    Any third party transferee or assignee of such novation or transfer of claim rights and obligations based on the Homologated Composition Plan will be bound and subject to all provisions of the Homologated Composition Plan.

   II.    Any Creditor who assigns or transfers its rights and obligations to any third party shall give a notice in writing to the Debtor regarding such transfer or assignment of claims, using the notice details set out in this Composition Plan, in accordance with applicable laws and regulations in Indonesia. The Debtor must execute and do all such acts and things as the Creditors may request for perfecting and completing any assignment or transfer.

   III.    Pending receipt of the notification of transfer or assignment and such transfer or assignment being fully complete, the Debtor must continue to make payment to the relevant original Creditor as if no transfer or assignment has occurred.

2.2    The terms in this Composition Plan apply to the following Creditors:

   a.    **Verified Creditor.**

A Verified Creditor is any Creditor of a Debtor that has a claim against the Debtor, and has been verified by the Administrator Team in relation to the formality requirements of a PKPU process, and registered in the List of Fixed Claims dated 25 November 2019 made by the Administrator Team.

b. **Non-Verified Creditor.**

A Non-Verified Creditor is: 1) a creditor of the Debtor that has a claim against the Debtor but did not participate or submit its claim in the PKPU process of case No. 25/Pdt.Sus-PKPU/2019/PN.Smg; or 2) a creditor that was not identified or acknowledged by the Debtor prior to the Composition Plan being homologated by the Panel of Judges. For a creditor or creditors classified in this paragraph b, the following terms apply:

(i).    The claim or claims can only be accepted and acknowledged by the Debtor later on if it is in line with the principles of Indonesian accounting (Financial Accounting Standards Statement - "**PSAK**") and applicable Laws and Regulations; and

(ii).   The claim or claims if later on accepted and acknowledged by the Debtor will only be paid after the relevant Debtor fully settles its entire obligations to the Creditors under both this Composition Plan and Composition Plan (Duniatex), and is subject to the contents of both this Composition Plan and Composition Plan (Duniatex).

2.3    After the Composition Plan has been homologated by the Semarang Commercial Court Panel Judge in Case No. 25/Pdt.Sus-PKPU/2019/PN SMG, the Composition Plan that has been ratified binds all Creditors, except the secured creditors who do not approve the Composition Plan (the "**Dissenting Secured Creditors**") as referred to in Article 281 paragraph (2) of the Bankruptcy Law.

3.    **SPECIFIC PROVISIONS OF THE COMPOSITION PLAN**

| Existing Facilities | The following is a list of agreements (and the maximum amount (limit) based on the agreements), which underlies the obligations of the Debtor to the relevant Creditors. The amount of claims based on the verification are set out in Attachment 2 (Verified Creditors). |
|---|---|
| | PT Bank Central Asia Tbk |
| | 1. Refinancing housing loan (KPR) in the maximum amount (limit) of IDR 29,750,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Central Asia Tbk under notification letter on the consumer credit application approval No. 7850/181/16623/17/A ("BCA Facility") |
| | PT. Bank Negara Indonesia (Persero) Tbk |

*Unofficial translation*

| | |
|---|---|
| | 2. Aflopend loan in the maximum amount (limit) of IDR 70,000,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Negara Indonesia (Persero) Tbk under Credit Agreement No. SLO/011.2016/656/GRIYAMULTIGUNA dated 28 September 2016 ("BNI Facility")<br><br>PT Bank Rakyat Indonesia (Persero) Tbk<br><br>3. KPR Take Over Facility in the maximum amount (limit) of IDR 3,300,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Rakyat Indonesia (Persero) Tbk under Credit Decision Offering Letter No. B.39 KC-VII/ADK/KONS/OL/07/2018 dated 5 July 2018; and<br><br>4. KPR Facility in the maximum amount (limit) of IDR 11,000,000,000 that was granted based on a loan agreement between Sumitro and PT Bank Rakyat Indonesia (Persero) Tbk under Credit Decision Offering Letter No. KC-VII/ADK/KONS/OL/08/2018.<br><br>(Point number 3 and 4 above hereinafter referred to as "BRI Facility")<br><br>(collectively referred to as "**Existing Facilities**" and each referred to as "**Existing Facility**") |
| **Amount in Arrears** | As of the PKPU Decision Date, the amount of debt in arrears with regards to the Existing Facilities are as follows:<br><br><table><tr><td>No.</td><td>Facility</td><td>Currency</td><td>Amount in Arrears</td></tr><tr><td>1.</td><td>BCA Facility</td><td>IDR</td><td>17,720,255,133.95</td></tr><tr><td>2.</td><td>BNI Facility</td><td>IDR</td><td>62,303,069,699.00</td></tr><tr><td>3.</td><td>BRI Facility</td><td>IDR</td><td>12,355,637,576.00</td></tr></table> |
| **Debt Settlement** | 1. The Existing Facilities will be settled in accordance with the original/existing provisions that are regulated by each prevailing facility document.<br><br>2. The Debtor should fulfill the required terms at any time for the performance of the Non-Operational Asset Sales and/or AYDA as regulated under the Composition Plan (Duniatex), including but not limited to the obligation to be present at the Notary/PPAT office.<br><br>3. If one or more of the debtor in case No. 22/Pdt.Sus-PKPU/2019/PN.Smg in default in make payment to creditors based on the Composition Plan (Duniatex), then as request of the relevant creditors, the Debtor should make payment to the relevant creditor. |
| **Settlement in relation to PG Claims** | 1. Settlement of all PG Claims shall be performed based on legal principles of personal guarantees as which the debtor |

has committed himself as a personal guarantor to creditors for debt in case No. 22/Pdt.Sus-PKPU/2019/PN.Smg

2. Specifically for the LWG Syndicated Creditors, all the provisions under the Existing Personal Guarantees shall mutatis mutandis applicable to this Composition Plan unless expressly stated otherwise in this Composition Plan. For the avoidance of doubt, the application of the Existing Personal Guarantee includes but not limited to:

   a. the Debtor's unconditional and irrevocable guarantees to the Creditors as a continuing obligation;

   b. the Debtor's waiver in favour of the Creditors and any and all of his rights, protection, privileges and defenses provided by law to a guarantor and in particular the provisions in Article 1430, 1831, 1833, 1837, 1843, 1847 of the Indonesian Civil Code; and

   c. the Debtor's unconditional and irrevocable agreement to fully indemnify the Creditors upon demand for and against any loss from time to time.

3. The Existing Personal Guarantees shall continue to prevail to secure all sustainable or unsustainable debts of the PG Claims. The Verified Creditors may request the amendment of the Existing Personal Guarantees granted in their favour (and the Debtor must comply with) to ensure such Creditor's right under the relevant Personal Guarantees are maintained in accordance with and with due observance of the terms of this Composition Plan and the Composition Plan (Duniatex).

4. The process of amending and perfecting any new Personal Guarantees required under the terms of this Composition Plan:

   a. Starts on the Homologation Date and must be completed within 3 (three) months from the Homologation Date or on such date as agreed by the Debtor and the relevant Creditors who are granted the personal guarantee.

   b. It is to be done by assigning notaries/PPAT approved by the relevant Creditors who are granted the personal guarantee.

   c. The Debtor shall ensure that all documents and letters required for the preparation and/or perfection of new Personal Guarantee must be available no later than 14 calendar days from the date requested by the relevant Creditors and/or by the Notary/PPAT.

5. If for any whatsoever reason the Debtor is declared bankrupt, the Verified Creditors will have the right to claim against the Debtor's bankruptcy regardless of any bankruptcy or default under case No. 22/Pdt.Sus.-PKPU/2019/PN.Smg or Composition Plan (Duniatex).

*Unofficial translation*

| Debtor Warranty | The Debtor shall comply with all its undertakings and obligations under the Composition Plan (Duniatex), including but not limited to his obligation to provide Working Capital (as defined in Composition Plan (Duniatex)), and ancillaries document to Composition Plan (Duniatex). Non-fulfillment of any terms by the Debtor under this Composition Plan or The Composition Plan (Duniatex) will constitute a default under this Composition Plan. |
|---|---|

## 4   EVENT OF DEFAULT

4.1   Non-fulfillment of one or more provisions in this Composition Plan, the Existing Personal Guarantees (or any of its amendment), and the Composition Plan (Duniatex) by the Debtor and/or any of the Group, which is not rectified within 30 calendar days after the receipt of a notification letter of default from any Creditor by Debtor or any of the Group, or any creditors in Composition Plan (Duniatex) will be considered as an event of default ("**Default**").

4.2   Without reducing provisions in Article 4.3, if a Default occurs, the Debtor and Creditor may agree to settlement provisions other than those set out by this Composition Plan.

4.3   Filing for cancellation of the homologated Composition Plan as a result of a Default can be made by any Creditor which is being defaulted by the Debtor or the Group. In the event of the cancellation, the Parties are subject to the provisions of Article 291 of the Bankruptcy along with other application regulations.

## 5.   MISCELLANEOUS PROVISIONS

5.1   Non-Verified Creditors will be bound and subject to the Homologated Composition Plan by taking into consideration the General Provisions, Specific Provisions and Miscellaneous Provisions of this Composition Plan based on the types and amounts of each of their claims. For the avoidance of the debt, Non-Verified Creditors will have no voting rights.

5.2   All costs and fees in relation to the PKPU Process of the Debtor, i.e., service fees of the Administrator Team, service cost and fees of the Debtor's legal consultants and financial consultants must be paid before the Homologation Date or other dates in accordance with the applicable provisions or agreed previous date.

5.3   All provisions in the agreements agreed upon before the PKPU Decision Date by and between the Debtor and Creditors are deemed to remain in effect as long as they do not conflict and are otherwise regulated by the provisions in this Composition Plan ("**Prior Agreement**") if the Composition Plan has been homologated by the Commercial Court. In the event that there is a conflict between the provisions in this Composition Plan and the provisions in the Prior Agreement, the provisions of this Composition Plan will prevail.

5.4   Every provision governing the rights and obligations of Creditors and the Debtor in the Composition Plan is subject to the provisions in the Bankruptcy Law. All provisions governing the rights and obligations of Creditors and the Debtor, if not regulated and determined in the Composition Plan, are governed by the Prior Agreement.

*Unofficial translation*

## 6.    **CLOSING**

6.1    After this Composition Plan is homologated by the Panel of Judges of the Commercial Court of Semarang District Court in Case No. 25/Pdt.Sus-PKPU/2019/PN.SMG., the homologated Composition Plan will bind to all Creditors, excluding any Creditor that does not approve the Composition Plan as referred to in Article 281 paragraph (2) of the Bankruptcy law.

6.2    The implementation of this Homologated Composition Plan is subject and performed based on the provisions under the Bankruptcy Law and the statutes and the applicable laws in the territory of Indonesia.

6.3    Correspondence related to the Composition Plan to Debtor can be addressed as follows:

| | | |
|---|---|---|
| Address | : | Jl. Raya Palur Km 7.1, Karanganyar, Jawa Tengah, Indonesia |
| Fax | : | +62 271 825 954 |
| Email | : | dtx@duniatex.com |
| Attn | : | Sumitro |

Any change in the above correspondence address must be delivered in writing by the Debtor to the Creditors. If not notified in writing by the Debtor, the above correspondence address will remain valid and binding. Proof of delivery by registered mail to the address is sufficient and valid proof.

*Unofficial translation*

Hereby, this Composition Plan is prepared and to be executed by the authorized representatives of the parties before the Supervisory Judge, Mr. Edy Suwanto, S.H., M.H., and the Administrator Team, Verry Sitorus, S.H., Uli Ingot Hamonangan Simanungkalit, S.H., as the administrators in Semarang, on the day and data as firstly referred in the above.

**Debtor**

IDR 6,000

Stamp duty

<u>Sumitro</u>

Acknowledging and witnessing,

**Administrator Team**

Verry Sitorus, S.H.,          Uli Ingot Hamonangan
                             Simanungkalit, S.H.

**Supervisory Judge**

Andreas Priwantyo Setiyadi, S.H., M.H.

Composition Plan                                   Private and Confidential

7.    **ATTACHMENTS**

7.1    Attachment 1 (**Existing Personal Guarantees**)


The following is a list of personal guarantee agreements that underlie the obligations of the Debtor to the relevant Creditors that his capacity as the personal guarantor. The amount of verified claims is set out in Attachment 1 (Verified Creditors).


1.    Deed of Personal Guarantee and Indemnity No. 15 dated 29 September 2016, made before Putut Mahendra S.H., Notary in Jakarta;

2.    Deed of Personal Guarantee and Indemnity No. 26 dated 21 November 2017, made before Pujiastuti Pangestu S.H., Notary in Karanganyar;

3.    Personal Guarantee and Indemnity Agreement by the Debtor as Gurarantor in favour of PT Bank Central Asia Tbk. as Security Agent dated 22 June 2018;

4.    Personal Guarantee Agreement between the Debtor and Standard Chartered Bank for DMST dated 28 April 2008;

Composition Plan                                    Private and Confidential

7.2      Attachment 2 (Verified Creditors)

| No | Secured Creditors | Verified Claims | Signature |
|---|---|---|---|
| 1. | PT. BANK CENTRAL ASIA, TBK. | 17,720,255,133.95 | |
| 2. | PT. BANK RAKYAT INDONESIA (PERSERO), TBK. | 12,355,637,576.00 | |
| 3. | PT. BANK NEGARA INDONESIA (PERSERO), TBK. | 62,303,069,699.00 | |

| No | Unsecured Creditors | Verified Claims | Signature |
|---|---|---|---|
| 1. | AOZORA ASIA PACIFIC FINANCE LIMITED | 53,025,889,611.08 | |
| 2. | BANK OF PANHSIN | 86,504,032,699.28 | |
| 3. | BNP PARIBAS, BRANCH SINGAPORE | 15,712,406,981.50 | |
| 4. | CHAILEASE INTERNATIONAL FINANCIAL SERVICE CO., LTD. | 13,256,472,33.90 | |
| 5. | CHINA CITIC BANK INTERNASIONAL LIMITED, SINGAPORE BRANCH | 110,227,245,438.36 | |
| 6. | ENTIE COMMERCIAL BANK | 13,256,472,331.90 | |

Composition Plan                                    Private and Confidential

| | | | |
|---|---|---|---|
| 7. | FEDERATED PROJECT AND TRADE FINANCE CORE FUND | 37,703,982,566.14 | |
| 8. | FIRST ABU DHABI BANK PJSC, SINGAPORE BRANCH | 146,284,566,531.00 | |

11

Composition Plan                                    Private and Confidential

| No | Unsecured Creditors | Verified Claims | Signature |
|----|---------------------|-----------------|-----------|
| 9. | FIRST COMMERCIAL BANK, LTD., SINGAPORE BRANCH | 128,749,638,423.00 | |
| 10. | INDIAN BANK, SINGAPORE BRANCH | 319,292,631,645.08 | |
| 11. | ING BANK N.V., SINGAPORE BRANCH | 382,416,861,848.28 | |
| 12. | LEMBAGA PEMBIAYAAN EKSPOR INDONESIA/INDONESIA EXIMBANK | 1,623,108,393,858.71 | |
| 13. | MALAYAN BANKING BERHAD, SINGAPORE | 245,731,459,764.24 | |
| 14. | MITSUBISHI UFJ LEASE (SINGAPORE) PTE LTD | 79,538,834,558.36 | |
| 15. | NEC CAPITAL SOLUTIONS SINGAPORE PTE.LTD | 26,512,944,947.28 | |
| 16. | PT. BANK BNP PARIBAS INDONESIA | 384,646,105,317.80 | |
| 17. | PT. BANK CIMB NIAGA, TBK. | 367,012,756,271.55 | |
| 18. | PT. BANK DANAMON INDONESIA, TBK. | 261,285,798,936.64 | |
| 19. | PT. BANK ICBC INDONESIA | 52,898,121,915.06 | |
| 20. | PT. BANK JTRUST INDONESIA, TBK. | 26,531,233,234.26 | |
| 21. | PT. BANK MANDIRI (PERSERO), TBK. | 2,237,963,345,198.76 | |
| 22. | PT. BANK MASPION INDONESIA, TBK. | 46,500,558,400.84 | |
| 23. | PT. BANK MULTIARTA SENTOSA | 184,259,220,629.62 | |

Composition Plan                                    Private and Confidential

| No | Unsecured Creditors | Verified Claims | Signature |
|---|---|---|---|
| 24. | PT. BANK NASIONALNOBU, TBK. | 88,557,181,661.68 | |
| 25. | PT. BANK NEGARA INDONESIA (PERSERO), TBK. | 485,079,274,747.00 | |
| 26. | PT. BANK BNI SYARIAH | 381,272,087,980.00 | |
| 27. | PT. BANK PERMATA, TBK. | 123,326,978,560.00 | |
| 28. | PT. BANK RAKYAT INDONESIA (PERSERO), TBK. | 1,217,945,287,316.10 | |
| 29. | PT. BANK BRI SYARIAH, TBK. | 285,430,898,616.00 | |
| 30. | PT. BANK SBI INDONESIA | 34,084,949,461.88 | |
| 31. | PT. BANK SHINHAN INDONESIA | 496,478,235,138.26 | |
| 32. | PT. BANK SYARIAH MANDIRI | 527,773,626,668.27 | |
| 33. | PT. MAYBANK INDONESIA, TBK | 536,500,829,759.93 | |
| 34. | QATAR NATIONAL BANK (Q.P.S.C), SINGAPORE BRANCH | 540,299,433,409.54 | |
| 35. | STANDARD CHARTERED BANK SINGAPORE LIMITED | 162,898,732,322.00 | |
| 36. | STANDARD CHARTERED BANK | 216,482,454,018.98 | |
| 37. | STANDARD CHARTERED BANK, JAKARTA BRANCH | 603,475,164,171.96 | |
| 38. | SUMITOMO MITSUI BANKING CORPORATION, SINGAPORE BRANCH | 141,543,946,365.92 | |

| No | Unsecured Creditors | Verified Claims | Signature |
|----|---------------------|-----------------|-----------|
| 39. | TAIWAN COOPERATIVE BANK, MANILA OFFSHORE BANKING BRANCH | 217,024,278,697.51 | |
| 40. | PT. BANK HSBC INDONESIA | 297,370,886,207.06 | |
| 41. | THE SHANGHAI COMMERCIAL & SAVING BANK LTD. SINGAPORE BRANCH | 26,512,944,947.28 | |
| 42. | UNION BANK OF INDIA, HONG KONG | 406,129,330,958.80 | |
| 43. | WOORI GLOBAL MARKETS ASIA LIMITED | 128,749,638,423.00 | |
| 44. | YUANTA COMMERCIAL BANK CO., LTD HONGKONG BRANCH | 218,085,315,989.54 | |